**T. A. BLACKBURN LAW, PLLC**
**Tyrone A. Blackburn, Esq.**
1242 East 80th Street, 3rd Floor
Brooklyn, NY 11236
347-342-7432
*Attorneys for Plaintiff Liza Gardner*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| |
|---|
| LIZA GARDNER,<br>                    Plaintiff,<br><br>-against-<br><br>SEAN COMBS,<br>AARON HALL,<br>DONALD EARLE DEGRATE JR., AKA,<br>DEVANTE SWING,<br>UMG RECORDINGS, INC., UNIVERSAL<br>MUSIC GROUP, N.V.<br>JOHN DOES 1-10 (names being fictitious and<br>used to connote an unidentified person<br>responsible for this occurrence), JANE DOES<br>1-10 (names being fictitious and used to<br>connote an unidentified person responsible for<br>this occurrence), ABC CORPORATIONS 1-10<br>(names being fictitious and used to connote<br>unidentified entities responsible for this<br>occurrence),<br>                    Defendants. |

| |
|---|
| DOCKET NO.: 2:24-cv-07729-LMG-JRA<br><br>CIVIL ACTION<br>**FIRST AMENDED COMPLAINT**<br>**JURY DEMAND** |

Plaintiff Liza Gardner ("Plaintiff Gardner," "The Children," "The Child," "Ms. Gardner"), by and through her attorneys at T. A. Blackburn Law, PLLC., alleges as follows:

## INTRODUCTION

1. Plaintiff Gardner files this Complaint for damages and other relief pursuant to New Jersey P.L. 2019, c.120; Plaintiff's claims are timely in the State of New Jersey. A copy of the New Jersey P.L. 2019, c.120 statute is attached hereto. (***See*** **Exhibit 1**).

2. Plaintiff Gardner brings this action seeking declaratory and monetary relief against Defendants for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1).

3. As previously stated, this cause of action is timely pursuant to New Jersey P.L. 2019, c.120 because it arises out of conduct perpetrated against Plaintiff, who was a minor child at the

tender age of sixteen years old at the time of the conduct, which constitutes multiple sexual offenses as defined NJ Rev Stat § 2C:14-2 (2023).

NJ Rev Stat § 2C:14-2 (2023) States in Relevant Part:

> 2C:14-2. Sexual assault. a. An actor is guilty of aggravated sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:
>
> 1) The victim is less than 13 years old;
> 2) The victim is at least 13 but less than 16 years old; and
>     a. The actor is related to the victim by blood or affinity to the third degree, or
>     b. The actor has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional, or occupational status, or
>     c. The actor is a resource family parent, a guardian, or stands in loco parentis within the household;
> 3) The act is committed during the commission, or attempted commission, whether alone or with one or more other persons, of robbery, carjacking, kidnapping, homicide, aggravated assault on the victim or a person other than the victim, burglary, arson, or criminal escape;
> 4) The actor is armed with a weapon or any object fashioned in such a manner as to lead the victim to reasonably believe it to be a weapon and threatens by word or gesture to use the weapon or object;
> 5) The actor is aided or abetted by one or more other persons, and the actor commits the act using coercion or without the victim's affirmative and freely given permission;
> 6) The actor commits the act using coercion or without the victim's affirmative and freely given permission and severe personal injury is sustained by the victim;
> 7) The victim, at the time of sexual penetration, is one whom the actor knew or should have known was:
>     a. physically helpless or incapacitated;
>     b. intellectually or mentally incapacitated; or
>     c. had a mental disease or defect which rendered the victim temporarily or permanently incapable of understanding the distinctively sexual nature of the conduct, including, but not limited to, being incapable of providing consent, or incapable of understanding or exercising the right to refuse to engage in the conduct.

> Aggravated sexual assault is a crime of the first degree.

> Except as otherwise provided in subsection d. of this section, a person convicted under paragraph (1) of this subsection shall be sentenced to a specific term of years which shall be fixed by the court and shall be between 25 years and life imprisonment of which the person shall serve 25 years before being eligible for parole, unless a longer term of parole ineligibility is otherwise provided pursuant to this Title.

2

An actor is guilty of sexual assault if the actor commits an act of sexual contact with a victim who is less than 13 years old and the actor is at least four years older than the victim.

An actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:

1) The actor commits the act using coercion or without the victim's affirmative and freely-given permission, but the victim does not sustain severe personal injury;
2) The victim is on probation or parole, or is detained in a hospital, prison or other institution and the actor has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional or occupational status;
3) The victim is at least 16 but less than 18 years old and:
    a. The actor is related to the victim by blood or affinity to the third degree; or
    b. The actor has supervisory or disciplinary power of any nature or in any capacity over the victim; or
    c. The actor is a resource family parent, a guardian, or stands in loco parentis within the household;
4) The victim is at least 13 but less than 16 years old and the actor is at least four years older than the victim;
5) The victim is a pupil at least 18 but less than 22 years old and has not received a high school diploma and the actor is a teaching staff member or substitute teacher, school bus driver, other school employee, contracted service provider, or volunteer and the actor has supervisory or disciplinary power of any nature or in any capacity over the victim. As used in this paragraph, "teaching staff member" has the meaning set forth in N.J.S.18A:1-1.

Sexual assault is a crime of the second degree.

1) Notwithstanding the provisions of subsection a. of this section, where a defendant is charged with a violation under paragraph (1) of subsection a. of this section, the prosecutor, in consideration of the interests of the victim, may offer a negotiated plea agreement in which the defendant would be sentenced to a specific term of imprisonment of not less than 15 years, during which the defendant shall not be eligible for parole. In such event, the court may accept the negotiated plea agreement and, upon such conviction, shall impose the term of imprisonment and period of parole ineligibility as provided for in the plea agreement and may not impose a lesser term of imprisonment or parole or a lesser period of parole ineligibility than that expressly provided in the plea agreement. The Attorney General shall develop guidelines to ensure the uniform exercise of discretion in making determinations regarding a negotiated reduction in the term of imprisonment and period of parole ineligibility set forth in subsection a. of this section.

4. This suit arises from the actions of Defendants Sean Combs ("Combs"), Aaron Hall ("Hall"), Donald Earle DeGrate Jr., aka, Devonte Swing ("Swing"), and UMGR

3

Recordings, Inc. ("UMGR"), a subsidiary of a subsidiary of Universal Music Group, N.V. ("UMGNV"), JOHN and JANE DOES 1-10 and ABC CORPS. 1-10 (hereinafter collectively the "Corporate Defendants") and their participation in the harm visited upon Plaintiff Gardner.

5. Upon information and belief, Uptown Records ("UR") and MCA, Inc. ("MCA") merged into UMGR, which is a subsidiary of Universal Music Group, N.V.

6. UMGR and UMGNV are successors in interest to UR and MCA.

7. Ms. Gardner is a Caucasian female and a United States citizen who was, at all relevant times, a resident of and domiciled in the State of North Carolina.

8. Combs, also known as, **Inmate 37452-054**, is a United States citizen and was at all relevant times a resident of and domiciled in the State of New York. Upon information and belief, Mr. Combs currently resides at the **The Metropolitan Detention Center**, located at 80 29th St, Brooklyn, NY 11232.

9. Hall is a United States citizen and was at all relevant times a resident of and domiciled in the State of New Jersey. Upon information and belief, Hall currently resides in one of the following states: Georgia, Ohio, California, or Florida[1].

10. Upon information and belief, at the time of the assault, Hall resided in Englewood, New Jersey, in an apartment paid for and subsidized by the corporate defendant.

11. Upon information and belief, Swing is a United States Citizen and was at all times relevant a resident of and domiciled in the State of California.

12. UMGRR is a global Music Company headquartered at 2220 Colorado Avenue in Santa Monica, California. It is registered as a foreign business in the State of New Jersey.

13. UMGRRNV is a is a Dutch–American multinational music corporation under Dutch law. UMGRRNV's corporate headquarters are located in Hilversum, Netherlands and its operational headquarters are located in Santa Monica, California.

14. During the relevant period, Defendants John and Jane Does 1-10 are currently unknown individuals and/or employees who aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment, Defendants ratified, embraced and added to this conduct. As parties engage in discovery,

---

[1] Hall has intentionally dogged service of process in this case.

Plaintiff retains the right to amend the Complaint to add these individual employees by name.

15. During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities who employed Plaintiff or aided and/ or abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

## JURISDICTION AND VENUE

16. This Court has personal jurisdiction over the Defendant under and consistent with the Constitutional requirements of Due Process in that the Defendants, acting directly or through his agents or apparent agents, committed one or more of the following:

    a. The transaction of any business within the state;
        i. Corporate Defendants are Foreign Registered Businesses in the State of New Jersey.
    b. The making of any contract within the state;
        i. Upon information and belief, at the time of the assault, corporate defendants purchased, leased, or subleased real estate in the State of New Jersey for the individual defendants.
    c. The commission of a tortious act within this district, and
        i. Individual defendants raped the child in the State of New Jersey by violently and forcefully inserting their penis in the vagina of the child in the state of New Jersey. The corporate defendants facilitated and or supported this act by intoxicating the child with alcohol, and then transporting the child across state lines from New York to New Jersey to the property they procured for the individual defendants.
    d. The ownership, use, or possession of any real estate in this state.
        i. The individual defendants possessed real estate in New Jersey. The real estates were procured by the corporate defendants.

## REQUEST FOR JUDICIAL NOTICE OF FEDERAL INDICTMENT

17. According to Rule 201(b)(2) of the Federal Rules of Evidence, Plaintiff respectfully requests this Court take notice of certain public records and documents, as detailed below:

    a. *THE COURT MAY TAKE JUDICIAL NOTICE OF FACTS THAT ARE NOT SUBJECT TO REASONABLE DISPUTE WHERE THEIR ACCURACY CAN BE DETERMINED BY RELIABLE SOURCES*

18. According to Rule 201(b)(2) of the Federal Rules of Evidence, courts may take judicial notice of facts that are not subject to reasonable dispute and are capable of accurate and ready determination by resorting to sources whose accuracy cannot reasonably be

questioned.  Where a Court is supplied with the necessary information, taking judicial notice is mandatory.  *See* Fed.  R. Evid. 201(d).  Pleadings and public filings are just the kinds of documents that are not subject to reasonable dispute and are capable of an accurate and ready determination under Rule 201(b)(2) of the Federal Rules of Evidence. Accordingly, it is proper for courts to take judicial notice of the existence of such documents.  *See Roe v. Johnson*, 334 F. Supp.  2d 415, 419-20 (S.D.N.Y. 2004) (recognizing that a court, according to Rule 201(b), may take notice of the public record); *see also A.I. Trade Finance, Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 387 (S.D.N.Y. 1996) (in taking judicial notice of a judgment in Vienna, Austria, the Court pointed out that "[t]he Second Circuit has noted that Rule 201 permits a court to take judicial notice of a foreign judgment").

19. Here, Plaintiff requests the Court to take judicial notice of a September 19, 2024, true and correct copy of the federal indictment of Defendant Sean Combs, which is attached hereto as **Exhibit 2**.

20. Additionally, Plaintiff requests the Court to take judicial notice of the following Complaints filed against Sean Combs:

- in the matter of *Graves v. Combs et al.,* United States District Court, Southern District of New York, Case No 1:24-cv-07201-AT;
- in the matter of *English v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cv-05090-AT;
- in the matter of *Jane Doe v. Combs et al.,* United States District Court, Southern District of New York, Case 1:23-cv-10628-JGLC;
- in the matter of *USA v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cr-00542-ALC;
- in the matter of *McKinney v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cv-03931-NRB;
- in the matter of *Richard v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cv-06848-KPF; and
- in the matter of *Jones v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cv-1457

a true and correct copy of which is attached hereto as **Exhibit 3**.

21. There is no dispute regarding the existence of these documents.  *Se*e 21B Wright & Graham, Federal Practice and Procedure: Evidence 2d § 5106.4 (noting that, in contrast to facts discussed within court documents, it is proper to take judicial notice of the fact that the court documents exist).  Additionally, "[c]onsideration of documents subject to judicial notice does not necessarily convert a motion to dismiss into a motion for summary

judgment." *Weston Funding, LLC v. Consorcio G Grupo Dina, S.A. de C.V*., 451 F. Supp. 2d 585, 588 (S.D.N.Y. 2006).

22. Court documents are public records of which the Court can take judicial notice. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("Courts routinely take judicial notice of documents filed in other courts[.]"); *Global Network Commc'ns v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (citation and internal quotation marks omitted); *see, e.g., Blount v. Moccia*, No. 1:16-cv-4505-GHW, 2017 U.S. Dist. LEXIS 192983, 2017 WL 5634680, at *2 n.5 (S.D.N.Y. November 21, 2017) (taking judicial notice of indictment but expressing no opinion as to the innocence or guilty of those indicted);   Bond v. City of New York, No. 14-cv-2431, 2015 U.S. Dist. LEXIS 130922, 2015 WL 5719706, at *2 (E.D.N.Y. September 28, 2015) (taking judicial notice of "fact of the grand jury indictment"); *Obilo v. City Univ. of N.Y.*, No. 10-cv-5118, 2003 U.S. Dist. LEXIS 2886, 2003 WL 1809471, at *4-5 (E.D.N.Y. February 28, 2003) (noting that it is "well established" that a court may take judicial notice of a grand jury indictment).  In taking judicial notice of the indictment, the Court expresses no opinion as to the innocence or guilt of the indicted party.  *Young v. Commissioner*, No. 6:18-cv-00135 (DNH/TWD), 2018 U.S. Dist. LEXIS 172986, at *11-12 n.5, 123 A.F.T.R.2d (RIA) 2019-660 (N.D.N.Y. October 4, 2018).

23. Under Federal Rule of Evidence 201, a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed.  R. Evid. 201(c)(2). It is well established that a court may "take judicial notice of its own orders," and "its own records." *Rosado-Acha v. Red Bull GmbH*, No. 15 Civ. 7620, 2016 U.S. Dist. LEXIS 84543, 2016 WL 3636672, at *7 (S.D.N.Y. June 29, 2016) (citations omitted).  The Court thus grants the Motion and takes judicial notice of these documents.  *Levin v. Bank of N.Y. Mellon*, No. 09-CV-5900 (JPO), 2019 U.S. Dist. LEXIS 22788, at *83 n.2 (S.D.N.Y. February 12, 2019).

24. Plaintiff respectfully requests the Court to take judicial notice according to FCRP 201(c)(2) of the documents attached here as **Exhibit 2 and 3**.

## SUMMARY OF FACTUAL ACCUSATIONS

25. Upon information and belief, in 1990, the child was in New Jersey/New York City with a few friends. They were Monica Case (a fifteen-year-old child), Dalvin DeGrate, and DeVante Swing, who were all members of the R&B group Jodeci.

26. The child was invited to New Jersey by close friends Dalvin DeGrate and DeVante Swing and other members of the group Jodeci[2]. Upon information and belief, at the time, Jodeci were employees of Corporate Defendants or their predecessors in interest, UR/MCA.

27. The Child and the members of Jodeci are all from North Carolina.

28. Upon information and belief, UR, MCA, and UMGR subsidized Jodeci's housing and living arrangements in New Jersey. Upon information and belief, UR, MCA, and UMGR senior executives wanted their "urban artists" to live in suburban neighborhoods out of state.

29. Upon information and belief, UR, MCA, and UMGR wanted to keep their "Urban Artists" out of the streets of Harlem and New York City, which were dangerous at the time.

30. According to NYPD crime statistics data, in 1990, there was a total of 527,257 crime complaints. In addition to the number of murders confirmed to *Newsweek*, the data also shows that there were over 3,000 rape incidents, 100,280 robberies, 44,122 felony assaults, and over 100,000 burglary and grand larceny incidents in 1990[3].

31. In 1990, prior to inviting the children to New Jersey, Jodeci was signed by Hip-Hop artist Heavy D to UR, a label that was a subsidiary of MCA, which was a subsidiary of UMGR.

32. Upon information and belief, Jodeci was assigned to UR employee Sean Combs, who took on the task of developing the new act. The group was introduced after providing background vocals on the 1990 song "Treat Them Like They Want to Be Treated."

33. Upon information and belief, "Forever My Lady" is the debut studio album of Jodeci, released in 1991 by UR and MCA.

---

[2] Jodeci is an American R&B quartet consisting of members DeVanté Swing, Mr. Dalvin, K-Ci, and JoJo. Formed in 1988 in Charlotte, North Carolina.
[3] https://www.newsweek.com/new-york-city-most-dangerous-year-crime-1990-compared-2022-1750454#:~:text=According%20to%20NYPD%20crime%20stat,grand%20larceny%20incidents%20in%201990.

34. Upon information and belief, the end of summer into the fall of 1990 MCA held an event at their New York City offices.

35. The Child and her friend Monica Case met Combs and Hall at the offices of MCA Records for this event. In addition to Combs and Hall, Ms. Gardner met R&B Singer Mary J. Blige and Hip-Hop artist Queen Latifah.

36. At the MCA event, the children were provided a lot of alcohol.  Upon information and belief, MCA provided transportation for the children and other artists as they were visibly intoxicated.

37. Upon information and belief, after the MCA event, the children attended dinner with members of Jodeci, Combs, and Hall.  Combs and Hall were very flirtatious and handsy with the intoxicated children.

38. Upon information and belief, individual defendants offered the children more drinks even though the children had been provided excessive amounts of alcohol at the MCA event.  Upon information and belief, Hall and Combs provided the children with marijuana as well.  These substances were provided to the children throughout the evening.

39. At the ages of sixteen and fifteen, the children were minors in 1990 and incapable of consenting to drink alcohol.  Marijuana was also illegal in New York and New Jersey in 1990.

40. Upon information and belief, in 1990, the legal drinking age in New Jersey was 21 years old.  This was due to the National Minimum Drinking Age Act (NMDAA) of 1984, which was signed into law by President Ronald Reagan and gradually raised the legal drinking age to 21 by 1990.  The NMDAA threatened to withhold 10% of a state's annual federal highway funds if it allowed people under 21 to purchase alcohol. As a result, by mid-1988, all 50 states and the District of Columbia had raised their drinking age to 21.

41. Towards the end of the night, Combs and Hall invited the children back to Hall's home in New Jersey for an afterparty.  Upon information and belief, the corporate defendants transported the children to the home of Hall through cabs or private cars from New York to New Jersey.

42. It is important to note that Hall was one of the biggest R&B artists at the time.  He had enjoyed great success as a member of the R&B group Guy.

9

43. Based on information and belief, Hall was one of the corporate defendants' most important employees. Equally important was Combs, who was responsible for managing the success of Jodeci as the group's artist and repertoire ("A&R"). Combs was required to establish the group's sound and style. The corporate defendants relied upon Combs' expertise to ensure they recouped the most out of their investment in Jodeci.

44. Based on information and belief, Combs and Hall were prominent employees of MCA, UR, and UMGR, and it was important for the corporate defendants to keep them happy, hence why they had no problem trafficking intoxicated children across state lines to a house that they subsidized for Hall.

45. According to Ms. Gardner, she was wearing a black skirt with a button-up blouse.

46. Below is a photo from that day in 1990, hours before Hall and Combs brutally raped the child:



Depicted in this image are **SIXTEEN**-year-old Plaintiff Gardner, **TWENTY-SIX**-year-old Hall, and **FIFTEEN**-year-old Monica Case. The children are being physically accosted by Hall.

47. While at Hall's apartment depicted in the image above, Ms. Gardner was offered more alcohol and was physically forced into having sex with Combs against her will.

48. At the time Combs assaulted Ms. Gardner, she recalls feeling the side effects of the alcohol. She recalls Combs mounting her and forcing up her skirt, pulling her underwear to the side, and forcefully penetrating her vagina with his erect penis.

49. Unbeknownst to Ms. Gardner at the time, Defendant Swing was in the room when this assault took place and did not take any steps to prevent this abuse from occurring. Defendant Swing is six months older than Combs and was the assumed co-guardian (along with corporate defendants) of the child since he was an adult and was the individual who invited the child to NY/NJ and housed her in his home that was subsidized by the corporate defendants.  He not only provided her shelter, he provided food and drink as well (all subsidized by corporate defendant).

50. The children were not at the legal age to consent to sexual intercourse with Combs or Hall.

51. After Combs finished doing his business, the child was in bed, shocked and traumatized. As she was in the process of getting dressed, Hall barged into the room, pinned her down, and forced open the child's legs.  He then forced his erect penis into the child's vagina.

52. As depicted in the photo above, the child who was no more than 90 pounds at the time, was no physical match for Hall who is at least 6 feet tall and weighed over 200 pounds.

53. According to the child, Hall's penis was extremely large, while Combs' penis was prepubescent.  Hall's penis caused her immense pain as it could not fit, yet he held her down and forced it in.

54. After Hall finished raping the child, she quickly got dressed and ran out of Hall's apartment.  Ms. Case was irate and caused a scene for them to leave.  At that time, members of Jodeci drove them back to their residence.

55. According to Ms. Gardner, her other friend (not Ms. Case) shared with her that she, too, had sex with Combs and Hall in another room.  Upon information and belief, when Combs finished with Ms. Gardner, he and Hall switched, and they commenced intercourse with Ms. Gardner's friend.

56. The following day, Combs came to the home where Ms. Gardner and her friends were staying.  Combs was irate and began assaulting and choking Ms. Gardner to the point that she passed out.

11

57. Combs was searching for Ms. Gardner's friend because he was worried that she would tell the girl he was with at the time what he and Hall had done to them.

58. This violent act by Combs was no surprise to Corporate Defendants as three years prior to this, from 1987 to 1989. According to an investigative article published by Rolling Stone[4] on May 28, 2024, Combs was allegedly involved in a violent incident where he beat a woman with a belt in front of shocked schoolmates at Howard University. Combs reportedly appeared outside the school's Harriet Tubman Quadrangle dorm and began yelling in a "belligerent" manner for his then-girlfriend to come outside.

59. According to one witness, Combs used what looked like a belt to strike the young woman "all over the place." "She was trying to defend herself a little bit," the witness tells *Rolling Stone*. "She was crying. And we were telling him, 'Get off of her.' We were screaming for her."

60. Based on information and belief, this was not the only incident of violence with Combs at Howard University. Corporate Defendants' employee Andre Harrell traveled to Howard to bail Combs out of trouble and bring him back to New York.

61. As evidenced by the hotel video published by CNN, Combs has continued his pattern and practice of beating women.

62. After first denying the claims of his former spouse, Cassie Ventura, SC was seen viciously and violently grabbing, shoving, dragging, and kicking Ms. Ventura in a hotel in California[5]. Ms. Ventura attempted to escape Mr. Combs, but as the video shows, he refused to let her go. He beat her and attempted to kidnap her (by attempting to drag her back into the hotel room against her will) to make her stay:

---

[4] https://www.rollingstone.com/music/music-features/diddy-friends-bad-boy-artists-abuse-violence-1235028178/
[5] https://www.cnn.com/2024/05/17/entertainment/video/sean-diddy-combs-cassie-venture-surveillance-digvid



**Surveillance video shows Sean 'Diddy' Combs physically assaulting former girlfriend in 2016**

A 2016 surveillance video obtained by CNN shows Sean "Diddy" Combs violently grab, shove, drag and kick his then-girlfriend Cassie Ventura during an altercation in a hotel in California.

03:04 - Source: CNN

## AARON HALL AND SEAN COMBS ROUTINELY ENGAGED IN SEX ACTS IN EACH OTHER'S PRESENCE

63. Hall confirmed Combs' presence in the room when he engaged in sex acts.

64. In a YouTube video posted by VladTV, titled "Aaron Hall Claims that Diddy Watched Him Make Love to a Woman (Flashback)[6]."

---

[6] https://youtu.be/2LVditdoACM?si=8esfOwbGEYCGUylr



Hall says the following:

[00:00:05] Aaron Hall: Can no bitch out there say that she handled my shit. My father's a pastor, so my whole thing is that my grandfather being a pimp, it's just like I'm 3rd generation Aaron Hall III. My father's is Aaron Hall junior. He's a pastor, so I just skipped over it like checkers.

[laughter]

My whole thing is this that if you never heard a girl say that no fucked up trick shit about Aaron Hall, then you understand that less chill shit is some real shit.

[00:00:31] Interviewer: That was basically from some life experience?

[00:00:35] Aaron: Now my whole thing is that I just think that girls think that a whole lot of guys run after they shit. You know what I mean?

[00:00:42] Interviewer: Talk to me. You can say what you want on there.

[00:00:46] Aaron: A whole lot of girls out there with the umbilical cords, them young 1970s, 1980s bitches, they try to go up there with the fresh out the pussy shit and think they can get like a nigga like Aaron Hall. I'm a historical dick, they fuck with me it's a—

[laughter]

[00:01:02] Interviewer: That's right.

[00:01:03] Aaron: **IF THEY FUCK WITH ME, IT'S A BIG DICK**[7]. Everybody know my son's mother. Everybody know that shit.

[00:01:08] Interviewer: Yes. That's Gloria, ain't it? Tell them about it.

[00:01:10] Aaron: When you put Aaron's on it, when you fuck a bitch for three days and take the bitch's hand and take them out of the man's hand, then you are a retired pimp. At the time, as soon as I came to South Beach, I just grabbed her. She'll tell you the same story. I just grabbed her and fucked her for three days, then Aaron's got on a pussy with an apostrophe s like it's Aaron with three colors on it. You feel me?

[00:01:31] Interviewer: Yes. Crazy glue.

[00:01:32] Aaron: **MY WHOLE THING IS THIS IS THAT IF NIGGAS CAN'T HANDLE ME, I'M NOT GOING TO NEVER LET THEM GET MY LAST NAME. IF YOU CAN'T HANDLE MY DICK, YOU AIN'T GETTING MY LAST NAME, SO I'VE BEEN SINGLE FOR 50 YEARS**.

[laughter]

[00:01:41] Interviewer: Oh, all right, man.

[00:01:42] Aaron: A whole lot of niggas out there from Jamie Foxx to Denzel Washington to whoever, everybody know me. Everybody know if I say it, I'm a fuck to death. **I LIKE TO FUCK IN PUBLIC. YOU FEEL ME?** Niggas can't say nothing about it. Them square ass niggas, them precious cake, little dick niggas. I like for them niggas to see how I fuck. **YOU SPEAK TO JODECI OR PUFFY OR ANY OF THEM NIGGAS, THEY'VE BEEN AT MY HOUSE. THEY ALL SEE ME FUCK. THEY ALL KNOW I'M A BIG NIGGA**.

If a bitch touch my dick and she say my dick is small, then she's a lying bitch. Tell her to name the tattoo that's on my rib that says warning.

[laughter]

You get this, nigga, I'm fucking you up. The thing is that a whole lot of niggas write about taking girls out to shop, taking girls to fly to Dubai, and all that shit. Bitch, close your eyes, we anywhere. My whole thing is this is that-

[00:02:31] Interviewer: Talk about it.

---

[7] Presumably, this confirms Ms. Gardner's claim that Halls penis was extremely large and painful to take.

[00:02:32] Aaron: -if you can handle my dick and you can make me still be Aaron Hall without fucking rubbing off your mouth, then I'll take you anywhere. Other than that shit, you back home, bitch.

65. Hall's disgusting claims are eerily similar, if not identical, to the trauma he and Combs visited upon Ms. Gardner.

**AARON HALL TAKES PRIDE IN STATUTORILY RAPING MINORS**

66. Hall has bragged about his sexual promiscuity and the fact that he has engaged in sexual intercourse with minors.

67. In a YouTube video posted by VladTV, titled "Aaron Hall on Gloria Velez: I Took Her & F***ed Her[8]."



Hall says the following:

[00:00:00] Interviewer: Luke said that he introduced you to Gloria Velez.

[00:00:08] Aaron Hall: Luke didn't introduce me to no Gloria Velez. We can call Luke right now, you know what I mean?

[00:00:12] Interviewer: He said it in an interview a while back.

---

[8] https://youtu.be/X3PrjTVgteM?si=nTWaU1d1O40XcvZd

16

[00:00:12] Speaker 3: Well, how did it happen?

[00:00:14] Aaron Hall: Look what I'm saying to you. She was standing up with a Jamaican rapper named Mad Lion.

[00:00:22] Interviewer: Okay, I know who that is.

[00:00:26] Aaron Hall: Big Pun, Fat Joe, Method Man, whoever you speak to, just ask them how I did it. I got out the limo, grabbed her hand and went upstairs and fucked her. Luke didn't never fucking introduce me to anybody in his life. I love Luke to death.

[00:00:41] Speaker 3: He just had on porno.

[00:00:42] Aaron Hall: Look, the reason why he's saying he introduced me to her because it's a good thing to say, "Okay, I introduced Aaron Hall to this girl." I took her. Me and Gloria's cool. We got cool in two weeks. You feel me? I'm a boss. I ain't going to argue with you about no shit. You an umbilical cord bitch. You fucking 35, 36 years old. I'm not going to disrespect you, but I'm a boss motherfucker. I love my son, so I ain't going to break probation by fucking with you and not being able to speak to him again. You feel what I'm saying?

When I speak to a nigger that got dick and balls, he can never say he introduced me to no bitch. Nobody ain't never introduced me to a bitch in their life. I wish they did. The thing is that you can ask Gloria though. It have nothing to do with me. I don't like talking about no man. We both Adam first.

[00:01:29] Interviewer: You know something I just remembered? That Gloria had tattooed Aaron's right above her—

[00:01:34] Aaron Hall: In black, red, and green.

[00:01:37] Interviewer: Right above her vagina.

[00:01:38] Aaron Hall: Right above it with a parenthesis with an S. Aaron's.

[00:01:45] Interviewer: It belongs to—

[00:01:46] Aaron Hall: Look. When I saw her, she was dancing with Luke. I didn't know she was a puppy. She was tall. She was big, blonde hair, with the black pant leather. I was like, "I'm getting that." Everybody knows I couldn't even really speak then. I had a speech impediment. I don't stutter anymore. I just went there and just grabbed her hand and went inside the hotel and gave it to her. You feel me? She going to say Luke is lying. You feel me? Because I don't lie on my dick. You feel what I'm saying?

17

My mother was Puerto Rican. From Ponce. When I see anybody that's Spanish, I'm going to grab them. I ain't going to ask if you holding the hand all loose and you holding a conversation with a nigga-

[00:02:31] Speaker 3: Preach.

[00:02:32] Aaron Hall: I'm going to take your bitch. She chose up already. Now she want to go renegade? Go renegade, bitch.

[00:02:38] Interviewer: At what point did she get the tattoo?

[00:02:40] Aaron Hall: Three days after I fucked her.

[00:02:41] Interviewer: Three days.

[00:02:42] Aaron Hall: Three whole days. If anybody can do that shit, I don't care if you was married, I don't care if you was engaged, if it's your anniversary, if your bitch did that shit, then I'll stop singing *I Miss You*. My whole thing is this, is that I love Gloria to death because she gave me a beautiful son. You feel what I'm saying? My whole thing is I want to make sure that it's right. I love my son Aaron Robin Hall IV to death. I ain't seen him in 15 years, but I love him to death. We talk all the time. Gloria didn't do no bad thing to me.

I thought she was older. You feel what I'm saying? Sometime I see a puppy on the field when I'm doing dog training, I think it's a year old or two years old, and it be like eight months. I don't know. When I saw her, everybody was trying to get at her. Why y'all scared of her? I took her. I couldn't even talk, I had a speech impediment after.

[00:03:27] Speaker 3: Yes, because they didn't know what to do.

[00:03:28] Aaron Hall: They ain't know what to say.

68. Based on information and belief, when Hall met Gloria Velez, she was a sixteen-year-old high school student in Broward County, Florida. She attended Stoneman Douglas High School.

69. Upon information and belief, in the State of Florida, a child under 16 years of age cannot consent to sexual activity, regardless of the age of the defendant. A child who is at least 16 years of age and less than 18 years of age cannot consent to sexual activity if the defendant is 24 years of age or older[9].

---

[9] https://aspe.hhs.gov/reports/state-laws

70. Upon information and belief, when Hall statutorily raped Ms. Velez in 1994, he was 30 years old, which is 14 years older than Ms. Velez.

71. Upon information and belief, at the time that Hall statutorily raped Ms. Velez, he was an employee of Corporate Defendants or a subsidiary of Corporate Defendants, Silas Records. He met Ms. Velez at a Silas/Corporate Defendants'-sponsored event. This represents another example of Corporate Defendants facilitating and sponsoring events where children are present and susceptible to being raped by predatory employees like Hall and Combs.

72. In discussing her past and the fact that she was groomed as a child by the likes of Hall, Ms. Velez posted to her social media page the following photo of her high school ID card from 1994:



**Gloria Velez's Social Media Post Evidencing Her Adolescence When Groomed and Statutorily Raped by Hall**

73. As indicated in the transcript above, Hall referred to sixteen-year-old Ms. Velez as a puppy. He goes on to say that when he is on the field *doing dog training*, he sometimes misidentifies an 8-month-old puppy (Ms. Velez) for a 2-year-old dog (an adult).

74. Hall goes on to brag about grabbing sixteen-year-old Ms. Velez by the hand and **forcing** her to have sex with him.

75. Upon information and belief, in 1994, at the time Hall raped Ms. Velez; Hall was an employee of Silas Records, a subsidiary label of Corporate Defendants, which is a subsidiary of UMGR.

### SEAN COMBS HAS A WELL-DOCUMENTED HISTORY OF LEGAL TROUBLE

76. According to an article by NPR[10], the following is a brief timeline of Mr. Combs legal troubles:

**1991:** According to a November 2023 lawsuit, Combs allegedly drugs, sexually assaults and videotapes 19-year-old Joi Dickerson Neal, after going on a date with him.

**1996:** Combs is found guilty of criminal mischief for threatening a photographer from the *New York Post* with a gun.

**April 16, 1999:** Combs is arrested and charged with two felonies — second-degree assault and criminal mischief — in the beating of record executive Steve Stoute, who says Combs and two bodyguards beat him with their fists, a telephone, a champagne bottle and a chair. When Combs publicly apologizes, Stoute asks for the charges to be dismissed. (Combs reportedly pays Stoute $500,000.) The assault charge is dropped, Combs pleads guilty to the lesser charge of harassment, and he is sentenced to one day of anger management classes.

**Dec. 27, 1999:** Combs, along with then-girlfriend Jennifer Lopez and rapper Shyne, are arrested in relation to a shooting at Club New York. Combs shot Natalia Reuben in the face, and she consistently blamed Combs for shooting her.

**March 26, 2001:** In a lawsuit, local TV host Roger Mills sues Combs, accusing him of assault, false imprisonment, destruction of property, intentional infliction of emotional distress, and a civil conspiracy, in an exchange where Combs' entourage roughed him up and destroyed his camera.

**2003:** According to a December 2023 lawsuit, Combs, his former Bad Boy Records president, Harve Pierre, and a third unidentified man allegedly gangrape an unnamed 17-year-old victim at a Manhattan recording studio.

---

[10] https://www.npr.org/2024/02/29/1234684758/sean-combs-diddy-allegations-timeline

**February 2006:** Ventura signed a 10-album deal with Bad Boy Entertainment. Her debut single "Me & U" is released, and her self-titled album drops the same year. According to a November 2023 lawsuit, Combs' "vicious cycle of abuse" begins here. Ventura alleges years of physical, psychological and emotional abuse. She claims Combs forced her to purchase and take illegal drugs like cocaine, ketamine and ecstasy; that he filmed her as he forced her to participate in sex with male sex workers in multiple cities for his own voyeuristic pleasure in a practice he called "freak offs"; and that he beat her on many occasions in retaliation for talking to other men, often with witnesses present.

**March 6, 2007:** In a lawsuit, Gerard Rechnitzer alleges that Combs punched him, pushed his girlfriend and tried to spit on another woman outside Teddy's nightclub at the Hollywood Roosevelt Hotel. In a statement, Combs' attorney, Benjamin Brafman, says, "It's just another example of an opportunist seeking to fabricate a lawsuit based on a flat-out lie to try to take advantage of Mr. Combs' celebrity status." The case is settled out of court in March 2008, the terms undisclosed.

**May 11, 2007:** In a complaint to the police, Combs' Making the Band co-star Laurieann Gibson alleges that he threatened her with a chair while New Edition's Michael Bivins held her in place.

**2010:** In the November 2023 suit, Ventura claims all aspects of her life were "controlled by either Mr. Combs or his management companies." She claims he paid for her apartment and all living expenses and that he had access to her medical records: "For instance, when Ms. Ventura began experiencing memory loss — potentially due to excessive drug use and/or head injuries caused by Mr. Combs' beatings, as described below — her MRI results were provided directly to Mr. Combs. Mr. Combs also repeatedly arranged for his staff to drive Ms. Ventura to certain medical appointments. In this way, Mr. Combs exerted ownership over Ms. Ventura."

**February 2012:** In the November 2023 suit, Ventura alleges that Combs said he was going to blow up the car of rapper Kid Cudi, whom Ventura was dating at the time, "and that he wanted to ensure that Kid Cudi was home with his friends when it happened. Around that time, Kid Cudi's car exploded in his driveway." Kid Cudi, in a statement to The New York Times, corroborated the account.

21

**September 2018:** After multiple attempts to sever ties with Combs, Ventura says she met with him to have dinner and believed it was to talk of concluding her Bad Boy contract and "have a discussion about concluding their relationship for good." But after the dinner, Ventura alleged he forced himself into her apartment and forcibly raped her. From her November 2023 suit: "Soon thereafter, Ms. Ventura took steps to completely separate herself from her long-time abuser, including by leaving the home that he paid for and returning the car he purchased for her."

**2022 – 2023:** In a February 2024 lawsuit, producer Rodney "Lil Rod" Jones, a former producer of Combs who worked with him on his latest release, The Love Album: Off the Grid, alleges that the music mogul groped him repeatedly and during the duration of making the album, Combs forced Jones to solicit sex workers, take illegal drugs and more. The suit names others close to Combs, including Combs' son, Justin Dior Combs, and high-ranking members of Motown Records and Universal Music Group, as co-defendants.

**Nov. 16, 2023:** Ventura accuses Diddy of years of sexual misconduct, harassment, sex trafficking and rape. Ventura's allegations lasted for the entirety of their working and personal relationship. Ventura files the civil suit in New York Superior Court under the state's Adult Survivors Act, a New York law permitting victims of sexual abuse a one-year window to file civil action regardless of the statute of limitations of the crimes themselves. (Tiffany Red, a songwriter and one of Cassie's collaborators, later publicly corroborates her claims.)

**Nov. 23, 2023:** One day before the window for filing suits under the Adult Survivors Act is set to close, two separate lawsuits alleging misconduct in the early 1990s are filed against Combs in New York Superior Court: one by Joi Dickerson and the other by an unnamed plaintiff.

**Dec. 6, 2023:** The unnamed fourth person comes forward, accusing Combs and others of gang rape in 2003.

**Dec. 10, 2023:** In response to the accusations, 18 brands sever ties with Combs' Black-owned e-commerce venture, Empower Global.

**Dec. 11, 2023:** A public petition started by feminist and survivor advocacy group UltraViolet circulates, calling for The Recording Academy to rescind Combs' 2024 Grammy nomination for progressive R&B album amid the sexual abuse allegations.

**Dec. 13, 2023:** In response to the accusations, streaming network Hulu scraps a reality show project featuring Combs that was previously in development and centered around the mogul and his family.

**Feb. 26, 2024:** The fifth assault lawsuit is filed against Combs by Rodney "Lil Rod" Jones. Combs' lawyer denies the allegations, claiming, "We have overwhelming, indisputable proof that his claims are complete lies."

77. Hall and Combs have a pattern and practice of engaging in illegal sex acts.

### Corporate Defendants Have A Pattern and Practice of Employing Convicted Rapists and Alleged Sexual Predators

78. Upon information and belief, UMGR has contracted with Łukasz Sebastian Gottwald (aka, Dr. Luke"). In October 2014, Kesha sued Dr. Luke, accusing him of drugging and raping her. According to information and belief, in 2021, Gottwald launched Amigo Records as an imprint of Republic Records, a subsidiary of UMGR. Apparently, UMGR saw no issue with employing Dr. Luke to produce music for their artist Nicki Minaj.

79. Upon information and belief, former UMGR employee Russell Simmons brutally raped Music Producer Drew Dixon in 1995.

80. Upon information and belief, UMGR's former employee, Antonio Marquis "L.A." Reid, the former CEO of UMGR subsidiary, the Island Def Jam Music Group, brutally raped music producer Drew Dixon.

81. Upon information and belief, former UMGR employee Russell Simmons brutally raped writer Jenny Lumet.

82. Upon information and belief, former UMGR employee Russell Simmons brutally raped filmmaker Jennifer Jarosik.

83. Upon information and belief, former UMGR employee Russell Simmons brutally raped singer turned lawyer Tina Baker.

84. Upon information and belief, former UMGR employee Russell Simmons brutally raped musician Sherri Hines.

85. Upon information and belief, former UMGR employee Russell Simmons brutally raped writer and activist Sil Lai Abrams.

23

86. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted model Keri Claussen Khalighi.

87. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted publicist and author Kelly Cutrone.

88. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted reality television personality Luann de Lesseps.

89. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted actress Natashia Williams-Blach.

90. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted musical journalist Toni Sallie.

91. In 2023, a judge ordered UMGR to pay $500,000 to the child victims of UMGR employee R. Kelly.  Mr. Kelly was convicted of sex trafficking in the United States District Court for the Eastern District of New York.  He is currently serving 30 years in prison.

92. At his sentencing, US District Judge Ann Donnelly said UMGR employee R. Kelly had an "indifference to human suffering" and had used sex as a weapon, forcing his victims to do unspeakable things while saddling some with sexually transmitted diseases. "You taught them that love is enslavement and violence."

93. As evidenced by their pattern and practice of employing depraved deviants, Corporate Defendants employed admitted rapist Hall and Combs.

94. Throughout the years, UMGR has partnered with and employed Combs despite his many public run-ins with the law:

   a. In April of 1999, after a dispute over the use of footage in a music video, the record producer and UMGR employee Steve Stoute claimed Mr. Combs and his bodyguards beat him with a champagne bottle, a telephone, a chair, and their fists. Upon information and belief, despite one of their employees being physically assaulted by Combs, UMGR did not hesitate to employ Combs from 2003 to 2005.

   b. According to a December 2023 lawsuit, in 2003, Combs, his former Bad Boy Records president, Harve Pierre, and a third unidentified man allegedly gang-raped an unnamed 17-year-old victim at a Manhattan recording studio while Combs was an employee of UMGR.  Upon information and belief, UMGR did not end Combs' employment at that time.

24

## UR, UMGR, MCA and/or UMGRRNV WERE
### *RESPONDEAT* SUPERIOR FOR HALL, SWING, AND COMBS

95. Hall was an employee of UR, UMGR, MCA and/or UMGRRNV at the time he raped Plaintiff. Swing was an employee of these corporate entities at the time when he aided and abetted in the rape of the child whom he was the co-guardian of. Combs was an employee of these corporate entities at the time he raped Plaintiff.

96. Corporate Defendants enabled Hall and Combs to statutorily rape the child and to commit many other crimes of a sexual nature. This includes prohibited sexual acts as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1) violence motivated by gender. Corporate Defendants are liable to Plaintiff.

97. Corporate Defendants enabled or participated in the sexual abuse of Plaintiff because Defendants failed to, among other things, protect Plaintiff from a known danger; have sufficient policies and procedures in place to prevent sexual assault and the distribution of alcohol to a child; properly implement policies and procedures to prevent sexual assault and the distribution of alcohol to a child; take reasonable measures to ensure that policies to prevent sexual assault and the distribution of alcohol to a child were working; train their employees on identifying sexual assault and inappropriate workplace behaviors; protect their employees from sexual assault; and adhere to the applicable standard of care.

98. Corporate Defendants enabled or participated in the sexual abuse of Plaintiff because Defendants failed to timely and properly educate, train, supervise, and/or monitor their agents or employees regarding policies and procedures that should be followed when sexual abuse is suspected or observed.

99. Prior to Combs and Hall sexually assaulting Plaintiff, Corporate Defendants knew or should have known that Combs and Hall were not fit to be in a position of authority. Defendants, by and through their agents, servants, and/or employees, became aware, or should have become aware, of Combs and Hall's propensity to commit sexual assault and of the risk to Plaintiff's safety. At the very least, Defendants knew or should have known that they did not have sufficient information about whether their leaders, managers, and people were safe to be in positions of power to harm a minor child like Plaintiff.

100.     Defendant Corporate Defendants knew or should have known that Combs and Hall posed a risk of sexual assault.  Corporate Defendants failed to properly supervise Combs and Hall and protect Plaintiff from a known danger, thereby enabling Combs and Hall to repeat sexual assault on Plaintiff.

101.     Defendant Corporate Defendants negligently deemed Hall and Combs as fit to be in a position of authority and/or that any previous suitability problems Hall and Combs had were fixed and cured and/or that Hall and Combs would not commit acts of sexual assault and/or that Hall and Combs would not injure others.

102.     Moreover, Corporate Defendants enabled the sexual abuse of Plaintiff by actively maintaining and employing Hall and Combs in a position of power and authority through which Hall and Combs had control and influence over people, including Plaintiff.

## **DAMAGES**

103.     The actions of Hall and Combs have stayed with Ms. Gardner throughout the duration of her life.  After being violently and statutorily raped by Combs and Aaron Hall, Ms. Gardner's life has been overwhelmed by depression, post-traumatic stress disorder, and strained relationships with men.

104.     The harm that Ms. Gardner has suffered is well documented through multiple excited utterance witness statements, as well as through documentation from her medical providers.

105.     In an affidavit, Ms. Gardner's friend whom she met in 2017, details a conversation the pair had during a trip to Las Vegas in 2019 where they discussed their childhood and some interactions with musicians and artists.

106.     In the affidavit, Ms. Gardner's friend went on to say, at that time, Ms. Gardner shared her experience of sexual assault at the hands of Aaron Hall and Sean "Puffy" Combs.

She writes,
"Liza said she was 16 years old and had been invited to New York by a couple of her friends who were members of the RnB group Jodeci. At the time, Jodeci was signed to MCA or Uptown Records. Liza is from North Carolina and had known members of Jodeci from their neighborhood and church in North Carolina.

When she came to New York, MCA hosted an event for one of their artists. Liza was given alcohol at this event and was invited to dinner. Other MCA artists, Queen Latifah and Mary

26

J. Blige, were at this dinner. After dinner, Liza was invited back to Aaron Halls apartment for an afterparty. Present at this afterparty were members of Jodeci, Puffy, and Aaron Hall.

Aaron Hall gave Liza more alcohol, and she recalls feeling lightheaded and dizzy. She said Puffy was acting very aggressive and forced himself onto her. After he finished, she tried to collect herself and get dressed. Before she knew it, Aaron Hall burst into the room, held her down, and raped her. She said she felt helpless. She could not fight him off as he was significantly bigger and stronger than her. She said she laid there in disbelief. After Aaron Hall was finished raping her, she ran out of the house.

The following day, she was awoken by Puffy yelling and screaming as he searched for Liza's friend, who he believed was going to report the assault from the night before. Liza's friend was not in the house, and Puffy turned to her, demanding that she give up her friend's location. She told him she did not know, and Puffy began to strangle her."

107.    Ms. Gardner's licensed therapist provided a letter that said the following:

The therapist writes,

"I am writing to verify my recorded notes of what my client Liza Gardner disclosed during her treatment, as well as my professional opinion of her subsequent symptomology as a result of her early Trauma.

I began seeing Liza as of 1/9/2014 through 7/30/2014. Unfortunately, therapy became cost-prohibitive for the client to continue for any length of time. While in treatment, Liza was consistent and engaged in the therapy.

As my records indicate on 2/18/2014, my client disclosed that she was raped by two males in New York when she was 16 years of age."

It is my professional opinion that the trauma of being raped by two men accounted for much of her ongoing symptoms of hypervigilance, anxiety, panic attacks, and episodes of depression, all, symptoms indicative of PTSD.

**<u>FIRST CAUSE OF ACTION</u>**
**Battery**
**(Against Hall and Combs)**

108.    Liza Gardner incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

109.    Defendants committed battery against Ms. Gardner when they both penetrated Ms. Gardner's sixteen-year-old vagina with their penises against her will and, in the case of Combs, physically assaulted her when he choked her the following morning.

110.    Defendants intentionally, and without her consent, attacked Ms. Gardner to satisfy their sexual desires.  Under all circumstances, the defendants' physical contact with Ms.

Gardner was offensive and wrongful. Defendants continued to attack Ms. Gardner despite her attempts to thwart their actions.

111.    The Plaintiff's claim for battery is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

112.    Plaintiff repeats and reiterates each paragraph and allegation of this complaint as if set forth at length herein.

113.    As this Court may be aware, new legislation that affects all sexual abuse-based lawsuits was passed on May 13, 2019, and took effect on December 1, 2019. This legislation significantly alters Sexual Abuse Litigation. The legislation listed as P.L. 2019, c.120 extends the Statute of Limitations in civil actions for sexual abuse claims, expands categories of potential defendants in Civil Actions, and creates a two-year window for parties to bring previously time-barred actions based on sexual abuse.

114.    Specifically, P.L. 2019, c.120 expands the Statute of Limitations from two (2) years to seven (7) years. P.L. 2019, c .120 makes charitable organizations liable for the negligent or willful, wanton, or grossly negligent conduct of trustees, officers, agents, employees, volunteers, and servants. Defendants may attempt to rely on claims that Plaintiff's counts are time-barred. However, this law renders these defenses moot. Absent said defenses, Defendants' possible motion to dismiss will rely upon fact sensitive contentions which are improperly brought under a motion to dismiss.

115.    This Complaint alleges, among other things, that the Defendants had actual or constructive knowledge of sexual abuse by allowing their teachers, instructors, trustees, officers, agents, employees, volunteers, and servants to target young children for involuntary sexual activity. Despite this knowledge, Defendants failed to supervise, control, and monitor their teachers, instructors, trustees, officers, agents, employees, volunteers, and servants, failed to maintain effective policies and procedures for reporting and recognizing nonconsensual sexual activities, failed to properly protect children, failed to provide proper security, and failed to exercise due care under the circumstances.

116.    Defendants' conduct was the direct and proximate cause of Ms. Gardner's past and future substantial damages, including significant pain and suffering, lasting psychological and financial harm, loss of dignity, and invasion of privacy.

117.    The Defendants' actions constitute sexual offenses as defined in the New Jersey Penal Law, including but not limited to sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1).

118.    The Plaintiff's claim for battery is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## SECOND CAUSE OF ACTION
### Assault/Sexual Assault
### (Against Hall and Combs)

119.    Liza Gardner incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

120.    As described above, Defendants Hall and Combs frightened and placed Plaintiff in apprehension of harm when they raped her within the State of New Jersey.

121.    Defendants Hall and Combs forcibly touched and attempted and/or threatened to touch Plaintiff's intimate areas and/or touched her with their intimate body parts.

122.    As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

123.    The Defendants' actions constitute sexual offenses as defined in the New Jersey Penal Law, including but not limited to sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1).

124.    The Plaintiff's claim for assault/sexual assault is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child

sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

125.    The conduct of Defendants Hall and Combs described above was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

### THIRD CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

126.     Liza Gardner repeats and realleges by reference all paragraphs above as though fully set forth herein.

127.    Defendants' conduct created an unreasonable risk of causing emotional distress to Ms. Gardner, and the Defendants knew or should have known that such conduct (intoxicating a child with alcohol and marijuana transporting her across state lines, failing to provide a chaperone for a visibly intoxicated child, allowing their employees to rape her) was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

128.    Swing had a duty to plaintiff as her host and co-guardian not to place plaintiff in a position where she would be provided alcohol and then raped.  He invited her to NY/NJ under false pretenses, knowing that he intended to have Combs and Hall rape plaintiff. Swing failed his duty, and Plaintiff was harmed.

129.    Ms. Gardner's emotional distress was foreseeable to the Defendants.

130.    As a direct and proximate result of said extreme and outrageous conduct by the defendants, Ms. Gardner suffered humiliation, mental anguish, disassociation, and emotional and physical distress and has been hurt and injured in her health, both mentally

and physically, strength, activity, and her ability to lead an everyday life without mental anguish. All of these have caused, continue to cause, and will continue to cause Plaintiff great mental and physical pain and suffering for the rest of her life.

131.     As a result of such severe emotional and mental distress, Ms. Gardner has been generally, especially, and consequentially damaged in an amount to be established, according to evidence.

132.     The Defendants' behavior toward Ms. Gardner was so outrageous as to exceed all reasonable bounds of decency. The defendants knew with substantial certainty or should have known that their behavior would cause Ms. Gardner to be a victim of intoxication, sexual assault, sexual abuse, and sexual contact.

133.     The Defendants knew with substantial certainty or should have known that intoxicating, transporting plaintiff across state lines, drugging, and raping Plaintiff would cause her to endure severe emotional distress.

134.     The Defendants committed the infliction of emotional, physical, and mental distress willfully and intentionally and through coercion, oppression, fraud, and malice and consciously disregarded Ms. Gardner's rights. Therefore, Ms. Gardner is entitled to an award of exemplary or punitive damages in an amount to be established at Trial to meaningfully punish Defendants', thereby deterring similar conduct in the future.

135.     The Plaintiff's claim for NIED is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

136.     Upon information and belief, the aforementioned corporate Defendants, through its officers, directors, agents, and employees, was responsible for the acts and omissions that give rise to this action. Specifically, Defendants, acting by and through its duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

137.     At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously

and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

138.      Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Ms. Gardner's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful act.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

### FOURTH CAUSE OF ACTION
**Negligence (Premises Liability For The Sexual Assault)**
**(Against Hall and Corporate Defendants)**

139.      Ms. Gardner's references and realleges all preceding paragraphs as if set forth fully herein.

140.      Premises liability is not a cause of action under New Jersey law but a theory in which a plaintiff may bring a negligence claim.  To establish such a claim, Plaintiff must plead four elements: "(1) a duty of care; (2) a breach of that duty; (3) actual and proximate causation; and (4) damages." *Shelley v. Christopher Acad.*, Civil Action No. 19-20751, 2021 U.S. Dist. LEXIS 139611, at *6-7 (D.N.J. July 27, 2021).

141.      **Duty**: As detailed above, Hall was the owner, lessee, or beneficiary of the property where the Plaintiff was drugged and raped.  Corporate Defendants were the landlords, homeowners, or lessors of the property where the Plaintiff was raped.  Hall invited, and Corporate Defendants transported the Plaintiff via a cab or private vehicle to the property where the Plaintiff was raped.  On the night of the rape, Plaintiff was a child who was intoxicated because of the alcohol provided by Corporate Defendants.  Defendant Hall had a duty not to sleep with Plaintiff or to provide her with additional alcohol and marijuana when she arrived at his property in New Jersey.  Hall was 26 years old at the time, while Plaintiff was a child.  Hall also had a duty to prevent Combs from sleeping with Plaintiff, who was a visibly intoxicated child.  Corporate Defendants had a duty to ensure that Plaintiff, who was visibly intoxicated, was safe when she arrived at their property.  They

had a duty to ensure that Plaintiff, who was a child, was not subject to drug use and sexual contact from Combs and Halls.  Who were corporate defendants adult employees.

142.    **Breach of Duty**:  Defendants did not protect Plaintiff from sexual assault from Hall and Combs.  Defendants breached their duty to prevent Plaintiff from being raped by Hall and Combs.

143.    **Actual and Practical Cause**: Defendants were the actual and proximate cause of the harm that was visited upon Plaintiff due to their decision to invite and transport Plaintiff to the property where Plaintiff was raped.  Defendants were responsible for Plaintiff's intoxication.  Defendants were the cause of Hall and Combs sleeping with Plaintiff, who was a visibly intoxicated child.

144.    **Damages**: as a direct result of Defendants' negligence, Plaintiff suffers from PTSD, depression, severe anxiety, sleep deprivation, public humiliation, and shame.

145.    The conduct of Defendants described above was willful, wanton, and malicious. At all relevant times, Corporate Defendants knew or should have known that providing alcohol to a sixteen-year-old child and transporting that child across state lines was certain to cause injury to the child.  Hall knew or should have known that providing alcohol and marijuana to a child and then allowing Combs to rape her was certain to cause injury to Plaintiff.  Corporate Defendants knew or should have known that by sending an intoxicated child, unsupervised, to a home they either leased or owned to be with Hall and Combs, who were at least ten years older than her, would or could result in Plaintiff being raped. Corporate Defendants knew or should have known that Hall had the propensity to sleep with children, as evidenced by his admissions mentioned above.  Collectively, the defendants acted with the knowledge of or with reckless disregard for the fact that their respective conduct was certain to cause injury and/or humiliation to Ms. Gardner and intended to cause fear, physical injury, and/or pain and suffering to Ms. Gardner.  By virtue of the preceding, Ms. Gardner is entitled to recover punitive damage.

146.    The Plaintiff's claim for Negligence is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

147.     Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Ms. Gardner's injuries and damages.

148.     At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

149.     Ms. Gardner has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## <u>FIFTH CAUSE OF ACTION</u>
### Vicarious Liability
### (Against Corporate Defendants)

150.     Plaintiff repeats, reiterates, and re-alleges all of the above paragraphs as if set fully forth herein.

151.     Combs and Hall both sexually assaulted and inflicted extreme emotional distress on Plaintiff.

152.     Defendants are vicariously liable for the actions of their agents, servants, licensees, and/or employees, especially Defendants Hall and Combs due to the fact that defendants created the environment, and the opportunity for their agents/employees to intoxicate and rape a minor child.

153.     Corporate Defendants' vicarious liability is triggered in part by the overt acts they committed when they provided Plaintiff, who was a child at the time, with unlimited amounts of alcohol.  At 16 years old, Plaintiff was statutorily prohibited from consuming alcohol, and the Corporate Defendants were statutorily prohibited from providing alcohol to Plaintiff.  Upon information and belief, in 1984, Congress passed the Minimum Drinking Age Act.  All states gradually began to raise their legal drinking age to 21. By 1990, all states had enacted this law, including New York and New Jersey.

154.     In addition to intoxicating the minor plaintiff, the Corporate Defendants then transported the plaintiff across state lines from New York to New Jersey in violation of the MANN Act.  Upon information and belief, the plaintiff, who had not drank alcohol prior to the Corporate Defendants providing it, was visibly intoxicated.  She was unchaperoned and was sent to the house that the Corporate Defendants purportedly subsidized for their employee, Hall.  The Corporate Defendants knew or should have known that Hall and Combs had a propensity to sleep with children.

155.     Upon information and belief, the corporate defendants have a pattern and practice of covering up the sexual assaults of their artist by paying off the victims through unmarked international wire transfers[11].  This practice explains why the Corporate Defendants did not hesitate to provide sixteen-year-old Plaintiff with alcohol and transport her across state lines to the home they subsidize for Hall.

156.     The Plaintiff has experienced pain and suffering as an adolescent and an adult; physical injury and pain; bodily injury (including sickness, disease, mental anguish or injury, shock, fear, and fright); social isolation; educational adjustment problems; mood swings; low self-esteem; relationship and intimacy problems; lack of trust in people; feelings of insecurity; discomfort from letting his children be in the presence of others; family discord; medical expenses; emotional trauma; diminished childhood; diminished enjoyment of life; costs of counseling; lost wages; severe emotional distress; diminished enjoyment of life; diminished enjoyment of childhood; difficulty and an inability to focus; difficulty and an inability to perform educational tasks; anxiety; depression; humiliation; pain in mind and body; and severe embarrassment.  Additionally, Plaintiff is having and

---

[11] If corporate defendants are foolish enough to challenge this point the plaintiff reserves her right t replead and add the names of all of their artist who's rapes the corporate defendants covered up through hush money payments.

has had difficulty living a normal life; is and has not engaged in normal development and activities; suffers from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in his full normal daily activities.

157.    The Plaintiff's claim for Vicarious Liability is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)).  *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

158.    Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

159.    At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

160.    Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## SIXTH CAUSE OF ACTION
### Violation Of The New Jersey Child Sexual Abuse Act
### N.J. Stat. § 2A:61B-1
### (Against Corporate Defendants)

161.    Plaintiff repeats, reiterates, and re-alleges all of the above paragraphs as if set fully herein.

162.    Corporate Defendants, as social hosts, employers, organizers, supervisors, and sanctioning body for Hall and Combs, owed a duty to invitees and guests, such as Plaintiff.

163.    Corporate Defendants had a duty to take reasonable steps to protect Plaintiff, a minor child, from foreseeable harm when she was invited to their event. Upon her arrival at their event, the Corporate Defendants assumed a duty of care, custody, and control over the minor plaintiff, including when they placed the intoxicated minor in a car and trafficked plaintiff across state lines to a property they subsidized for Hall in a clear violation of the MANN Act.

164.    Corporate Defendants owed a duty to keep participants at their event, such as Plaintiff, who was a minor, safe.

165.    Corporate Defendants had a duty to prevent Hall and Combs from using the premises, instrumentalities in their position with each institutional defendant to target, groom, intoxicate (marijuana and alcohol, which were both illegal for children to consume in 1990), and sexually abuse children, including Plaintiff.

166.    The Corporate Defendants were in loco parentis with the Plaintiff, knew or should have known that the Plaintiff was vulnerable to Defendants Hall and Combs' actions, and should have had measures in place to prevent such conduct.

167.    Corporate Defendants recklessly, negligently, and carelessly breached their duty in the following ways:

    a.  Failing to observe, supervise, and keep the plaintiff safe when it invited the plaintiff to their event. Knew or should have known that Plaintiff was a child. They assumed the responsibility of caring for the minor plaintiff by failing to request the presence of the plaintiff's parents, guardians, or chaperones. In doing so, Corporate Defendants stood in loco parentis to plaintiffs;

    b.  Failing to have or enforce proper protocols and procedures within their organizations to prevent sexual abuse of minors;

    c.  Failing to have proper policies and procedures for the adequate supervision and observation of Plaintiff;

    d.  Failing to adequately monitor the activities of Hall and Combs to ensure that they do not pose a risk to minors attending the institutional defendant's party;

     e.    Failing to recognize Hall and Combs' conduct as presenting a risk of sexual abuse to Plaintiff;

     f.    Failing to identify Combs and Hall as sexual abusers; Failure to investigate, research, and/or perform background checks of Hall and Combs before certifying, promoting, and presenting them as employees;

     g.    Failure to have policies in place to identify potential sexual abusers before certifying, promoting, and presenting them as employees; and Creating a culture of permissiveness that allowed adults to prey on minors such as Plaintiff.

168.     Defendants knowingly permitted and/or acquiesced in the sexual abuse Plaintiff suffered in violation of the New Jersey Child Sex Abuse Act.

169.     Defendants' acts and/or omissions constitute negligence, gross negligence, malice vindictiveness, wanton and reckless disregard, and indifference to Plaintiff's rights and safety.

170.     Specifically, Plaintiff has experienced pain and suffering as an adolescent and an adult; physical injury and pain; bodily injury (including sickness, disease, mental anguish or injury, shock, fear, and fright); social isolation; educational adjustment problems; mood swings; low self-esteem; relationship and intimacy problems; lack of trust in people; feelings of insecurity; discomfort from letting his children be in the presence of others; family discord; medical expenses; emotional trauma; diminished childhood; diminished enjoyment of life; costs of counseling; lost wages; severe emotional distress; diminished enjoyment of life; diminished enjoyment of childhood; difficulty and an inability to focus; difficulty and an inability to perform educational tasks; anxiety; depression; humiliation; pain in mind and body; and severe embarrassment. Additionally, Plaintiff is having and has had difficulty living a normal life; is and has not engaged in normal development and activities; suffers from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in his full normal daily activities.

171.     The Plaintiff's claim for Vicarious Liability is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

172.     Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

173.     At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of respondeat superior, agency, and corporate negligence.

174.     Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## <u>SEVENTH CAUSE OF ACTION</u>
**Negligent Hiring, Training, Accreditation and Supervision**
**(Against Corporate Defendants)**

175.     Plaintiff Gardner repeats, reiterates, and re-alleges all of the above paragraphs as if set fully herein.

176.     This is an action for negligence and/or gross negligence and/or recklessness and/or intentional conduct, conspiracy and damages against defendants.

177.     At all relevant times, Defendants Combs and Hall were employees, agents, and/or servants of the Corporate Defendants, John DOES 1-10 and Jane DOES 1-10.

178.     As such, Defendants Combs and Hall were under the direct supervision, employ, and/or control of the Corporate Defendants, John DOES 1-10 and Jane DOES 1-10.

179.     At all relevant times, Defendants had a duty to ensure that Hall and Combs did not sexually abuse, assault, and/or molest children.

180.     Defendants recklessly, negligently, and carelessly breached their duty in the following ways:

   a. Failing to properly investigate their employees, including Hall and Combs.
   b. Failing to perform a proper background check on Defendants Combs and Hall prior to allowing them to come into contact with minors such as Ms. Gardner;
   c. Failing to review and assess Hall and Combs's application to be an employee;
   d. Failing to check Hall and Combs references prior to allowing them to be an A&R and Artist;
   e. Failing to adequately investigate and/or ignoring the previous misconduct and/or general lack of fitness as an A&R and Artist;
   f. Ignoring the misconduct and/or general lack of fitness for duties of Hall and Combs;
   g. Failing to make sufficient inquiry into the moral character of Hall and Combs by, among other things, failing to investigate his overall fitness and suitability to be an A&R and Artist;
   h. Failing to subject Hall and Combs to adequate, valid, and appropriate psychological testing;
   i. Failing to monitor defendant Hall and Combs' conduct during their teaching/instructing, supervising, or advising regard to his relationship with minors; failed employment, period with to warn the plaintiff of the deviant sexual behaviors of Hall and Combs.
   j. Upon information and belief, and according to public accounts, failing to fire and remove Defendants Hall and Combs, resulting in Hall kidnapping, raping and impregnating 15-year-old Gloria Velez four years later at one of corporate defendants parties and or events;
   k. Failing to adequately monitor the activities of its employees, such as Hall and Combs, to ensure that they do not pose a risk to minors;
   l. Failing to strip Defendants Hall and Combs' of their employment; and
   m. Failing to train agents, servants, licensees, and/or employees on investigation, detection, and reporting of sexual abuse allegations.

181.     The actions/inactions complained of hereinabove were at least negligent and/or grossly negligent and were malicious, willful, intentional, and revealed a reckless and wanton disregard and indifference for the safety and protection of the plaintiff and the rights of the plaintiff.

182.     Specifically, Plaintiff has experienced pain and suffering as an adolescent and an adult; physical injury and pain; bodily injury (including sickness, disease, mental anguish or injury, shock, fear, and fright); social isolation; educational adjustment problems; mood swings; low self-esteem; relationship and intimacy problems; lack of trust in people;

feelings of insecurity; discomfort from letting his children be in the presence of others; family discord; medical expenses; emotional trauma; diminished childhood; diminished enjoyment of life; costs of counseling; lost wages; severe emotional distress; diminished enjoyment of life; diminished enjoyment of childhood; difficulty and an inability to focus; difficulty and an inability to perform educational tasks; anxiety; depression; humiliation; pain in mind and body; and severe embarrassment.

183.      Additionally, Plaintiff is having and has had difficulty living a normal life; is and has not engaged in normal development and activities; suffers from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in his full normal daily activities.

184.      Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

185.      At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

186.      Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

41

**EIGHT CAUSE OF ACTION**
**Failure To Detect, Investigate and Report Sexual Abuse**
**(Against Corporate Defendants)**

187.    Plaintiff repeats, reiterates, and re-alleges all of the above paragraphs as if set fully herein.

188.    Defendants recklessly, gross negligently, negligently, and carelessly breached its duty in the following ways:

    a.  Failing to have adequate processes for detection, investigation, and reporting of sexual abuse allegations;

    b.  Failure to enforce processes for detection, investigation, and reporting of sexual abuse allegations;

    c.  Failing to investigate complaints of child sex abuse, together with other complaints made regarding Defendants Hall and Combs;

    d.  Ignoring complaints of child sex abuse made regarding Defendants Hall and Combs;

    e.  Concealing complaints of child sex abuse made regarding Defendants Hall and Combs;

    f.  Failing to report complaints of child sex abuse made regarding Defendants Hall and Combs to appropriate authorities for investigation;

    g.  Failing to have proper protocols, procedures, and guidelines for the prevention, detection, and investigation of sexual abuse allegations.

189.    Specifically, Plaintiff has experienced pain and suffering as an adolescent and an adult; physical injury and pain; bodily injury (including sickness, disease, mental anguish or injury, shock, fear, and fright); social isolation; educational adjustment problems; mood swings; low self-esteem; relationship and intimacy problems; lack of trust in people; feelings of insecurity; discomfort from letting her children be in the presence of others; family discord; medical expenses; emotional trauma; diminished childhood; diminished enjoyment of life; costs of counseling; lost wages; severe emotional distress; diminished enjoyment of life; diminished enjoyment of childhood; difficulty and an inability to focus; difficulty and an inability to perform educational tasks; anxiety; depression; humiliation; pain in mind and body; and severe embarrassment. Additionally, Plaintiff is having and has had difficulty living a normal life; is and has not engaged in normal development and activities; suffers from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in his full normal daily activities.

190.    Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions

42

that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

191.    At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

192.    Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## <u>NINTH CAUSE OF ACTION</u>

### Intention Infliction of Emotional Distress
### (Against The Corporate Defendants)

193.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

194.    Defendants, including the corporate defendants, and individual defendants Hall, Combs and Swing, engaged in extreme and outrageous conduct by knowingly allowing the sexual assault of a minor, Ms. Gardner, to occur.

195.    Defendants were fully aware of the ongoing assault against Ms. Gardner, as a minor, and other victims under their control or on their premises and deliberately failed to intervene. Despite their responsibility to ensure the safety and well-being of those in their care, Defendants allowed the assaults to continue unchecked.

196.    At all relevant times, Defendants knew, or should have known, that Ms. Gardner was being assaulted and/or otherwise abused as a minor. Despite this knowledge, the

corporate defendants refused to discipline the perpetrators, take protective measures, or stop the abuse. Defendants' inaction in the face of this known and repeated misconduct amounted to a complete disregard for Ms. Gardner's safety and well-being, creating an environment where assaults were permitted to continue, as evidenced by the kidnapping and rape of 15-year-old Gloria Velez four years later.

197.    Defendants either intended to cause severe emotional distress to Ms. Gardner or acted with reckless disregard for the probability that their failure to intervene would result in severe emotional harm. Their refusal to protect Ms. Gardner, to stop the assault, or to discipline those responsible was carried out with a reckless indifference to the emotional trauma that would naturally result from such ongoing abuse.

198.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Ms. Gardner has suffered severe emotional distress, including but not limited to, anxiety, depression, fear, humiliation, and profound psychological trauma. This emotional distress stems from the continuous assaults and Defendants' knowing and deliberate refusal to act, despite their awareness of the ongoing harm.

199.    The emotional distress suffered by Ms. Gardner as a result of the Defendants' conduct is severe and enduring. Ms. Gardner has experienced significant psychological trauma, loss of security, mental anguish, and a fear for her personal safety that has impacted her life in a lasting and debilitating manner. Defendants' failure to protect Ms. Gardner and their disregard for her emotional and physical well-being has caused substantial harm.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

### TENTH CAUSE OF ACTION
**MANN ACT VIOLATIONS**
*18 U.S.C. § 2421*
**Coercion of a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b), and transportation of a minor with intent to engage in illegal sexual activity in violation of 18 U.S.C. § 2423(a).**
**(Against All Defendants)**

200.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

201.     Defendants knowingly violated the Mann Act, *18 U.S.C. § 2421*, *et seq*., that provides, *inter alia*

   a.   IN GENERAL.—
        ***Whoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage*** in prostitution*, or in any sexual activity for which any person can be charged with a criminal offense or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both.*

202.     Defendants knowingly transported the child across state lines, from New York to New Jersey, with the intent to violate New Jersey's statutory rape, drinking and marijuana laws as set forth above.

203.     Defendants actions involved interstate commerce, with the intent to have Plaintiff engage in what Defendants' knew was illegal underage drinking, marijuana use, and sexual intercourse. Defendants knowingly engaged in such fraudulent and unlawful acts with the express knowledge that Plaintiff was visibly intoxicated, weight less than a hundred pounds, was a child, and could not consent to drinking alcohol, smoking marijuana, and having sex with two adult males. These matters have been pled with particularity in previous numbered paragraphs of the within Complaint and those averments are incorporated herein by reference thereto.

204.     Defendants knew that the child would, as a result of Defendants' unlawful activities, engage in sexual activity whereby Defendants can be charged (and should be charged) with a criminal offense.

205.     Defendants have violated *22 U.S. Code § 7101, et seq*., that provides for criminal penalties for violations of the Statute as well as civil cause of action.

206.     Defendants have violated the Mann Act, 18 U.S.C. § 2421, *et seq*., for which Defendants can and should be criminally prosecuted.

207.     Pursuant to 18 U.S.C. § 1595(a), "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees".

208.     Defendants have violated the criminal laws of New Jersey, as are set forth in previous numbered paragraphs of this Complaint for which Defendants may be criminally prosecuted; these paragraphs are incorporated herein by reference thereto.

209.     Defendants have violated the criminal laws of New York, as are set forth below, for which Defendants may and should be criminally prosecuted:

    a.  Unlawfully Dealing with a Child in the First Degree prohibits providing alcohol to a person under 21. (Penal Law § 260.20(2).

    b.  Sex Trafficking (PL 230.34)

    c.  Sex Trafficking of a Child (PL 230.34-a).

210.     Defendants' actions were meant to intoxicate and prostitute the child to satisfy their personal and their employees sexual needs.

211.     Defendants actions have damaged Plaintiff in an amount in excess of $10,000,000.00, caused her other financial damage as well as physical and mental damages.

212.     Plaintiff is entitled to monetary damages against the Defendants, jointly and severally, in an amount in excess of $10,000,000.00. Further Plaintiff is entitled to attorneys' fees for bringing this action.

213.     The emotional distress suffered by Ms. Gardner as a result of the Defendants' conduct is severe and enduring. Ms. Gardner has experienced significant psychological trauma, loss of security, mental anguish, and a fear for her personal safety that has impacted her life in a lasting and debilitating manner. Defendants' failure to protect Ms. Gardner and their disregard for her emotional and physical well-being has caused substantial harm.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## ELEVENTH CAUSE OF ACTION
### Aiding and Abetting
### (Against Defendant Swing)

214.    Plaintiffs repeat and reiterate the allegations above as if set forth verbatim herein.

215.    The New Jersey Supreme Court has adopted the definition of "aiding and abetting" set forth in *Hurley v. Atlantic City Police Dep't* 174 F.3d 95, 129 (3d Cir. 1999).

216.    Aiding and abetting liability requires "active and purposeful conduct." *Id.* at 83. *Colantino v. Villa Enters. Mgmt.*, 2019 N.J. Super. Unpub. LEXIS 3665, *23-24.

217.    Here, as evidenced by the sworn declaration of Monica Case the Defendant Swing was: "in the room, leaning against the wall or furniture or something, watching whatever Puffy was doing to Liza."

218.    As detailed above, Puffy (Combs) was raping the Child.  Swing was her co-guardian at the time, he invited her to New York/New Jersey. He had a duty to protect the Child as her parents entrusted him with her safety.  He trafficked and or coerced the child travel across state lines from North Carolina to New York and New Jersey with the hidden intention of providing the child with alcohol, and marijuana and prostituting the child to his A&R Combs.  As evidenced by the YouTube states from Hall, Swing was accustomed to "watching him fuck." Ms. Case's sworn declaration under penalty of perjury, confirms Halls statement as it relates to the child.

219.    Defendant Swing, in his position as an employee/agent for Defendant Corporation, and Combs, knowingly, and eagerly aided and abetted the defendants plan to intoxicate, drug, sex traffic, and brutally rape the child.  Defendant Swing got personal gratification while pervertedly treating the child's statutory rape as a live pornographic film.  As the child indicated above, she tried to fight Hall off and was writhing in pain due to the size of his penis, presumably, Defendant Swing stood there, witnessed this, and did nothing to help the child whom he had a co-responsibility to care for.

220.    The harm suffered by Ms. Gardner because of the Defendants' conduct is severe and enduring. Ms. Gardner has experienced significant psychological trauma, loss of security, mental anguish, and a fear for her personal safety that has impacted her life in a lasting and debilitating manner. Defendants' failure to protect Ms. Gardner and their disregard for her emotional and physical well-being has caused substantial harm.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

a. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the State of New Jersey;

b. An award of damages against Defendants, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

c. An award of damages against Defendants, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

d. An award of punitive damages, in an amount to be determined at Trial;

e. Prejudgment interest on all amounts due;

f. An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

g. Such other and further relief as the Court may deem just and proper.

48

## DEMAND FOR INSURANCE COVERAGE

In accordance with R. 4:10-2, defendants are demanded to provide a complete copy of their applicable insurance policies and declaration sheets demonstrating coverage within thirty (30) days of service of this Complaint.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_/s/Tyrone a. Blackburn, esq._
TYRONE A. BLACKBURN

## CERTIFICATION

I hereby certify that this matter is not the subject of any other action pending in any court or arbitration proceeding, that Plaintiff contemplates no such other action or arbitration proceeding, and that there are no other parties, whom to the knowledge of Plaintiff's counsel, should be joined in this action. I hereby certify that the statements I made are factual. I am aware that if any of the preceding statements I made are willfully false, I am subject to punishment.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_/s/Tyrone a. Blackburn, esq._
TYRONE A. BLACKBURN

## DEMAND FOR TRIAL BY JURY

The plaintiffs demand a trial by jury on all issues involved in this matter.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_/s/Tyrone a. Blackburn, esq._
TYRONE A. BLACKBURN

## DESIGNATION OF TRIAL COUNSEL

Please note that Tyrone Blackburn, Esq. is hereby designated as Trial Counsel in the above-captioned matter, according to R.4:25 et. seq.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_/s/Tyrone a. Blackburn, esq._
TYRONE A. BLACKBURN

49

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors.

From this point forward, you are directed to prevent "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any information set forth hereafter.

**If you cause any such alteration, destruction, or change, direct it, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation**.

Electronically Stored Information:
In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, C.D.s, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:
In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter.

Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

50

Although we may bring a motion with a court to order the preservation of documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion.

Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we are likely to seek all documents in their original, electronic form, along with metadata or information about those documents in the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, you must take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after the date of filing this pleading, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____
TYRONE A. BLACKBURN

51

## DEMAND FOR ANSWERS TO SUPPLEMENTAL INTERROGATORIES

Under R. 4:17-1 *et seq*., Plaintiff hereby demands that Defendants Sean Combs and Aaron Hall provide certified answers to the following supplemental interrogatories:

1. Please state whether, upon or about 1990, you had physical contact with the Plaintiff by inserting your penis in the Plaintiff's vagina.

2. Please state whether, upon or about 1990, you had physical contact with the Plaintiff by inserting your penis in the Plaintiff's mouth.

3. Please state whether, upon or about 1990, you had physical contact with the Plaintiff by inserting your penis in the Plaintiff's anus.

4. If your answer to interrogatory numbers 1-3 was yes, please identify each person who knows any fact relating to this conduct.

5. If your answer to interrogatory numbers 1-3 was yes, please identify each writing relating to this conduct (including but not limited to email, text messages, WhatsApp, Signal, Sessions, and/or social media app messages).

6. Please identify the present custodian of each writing identified in your answer to interrogatory number 5.

7. If your answer to interrogatory numbers 1-3 was no, please set forth each fact upon which you base such denial.

8. If your answer to interrogatory numbers 1-3 was no, please identify each person who knows any fact relating to such denial.

9. If your answer to interrogatory numbers 1-3 was no, please identify each writing relating to such denial (including but not limited to email, text messages, WhatsApp, Signal, Sessions, and/or social media app messages).

10. Please identify the present custodian of each writing identified in your answer to interrogatory number 9.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____
TYRONE A. BLACKBURN

## DEMAND FOR PRODUCTION OF DOCUMENTS

Under R. 4:18-1, *et seq*., Plaintiff hereby demands that the individual Defendants provide the following documents:

1. Any statements or reports from any person or governmental entity concerning this civil action or its subject matter.

2. Copies of any and all photographs or videos in your possession of the Plaintiff and the defendants in or about 1990 at the location where Plaintiff claims the sexual assault took place.

3. Copies of any claims information bureau or other insurance claim searches or other documents referencing any prior or subsequent injuries and claims by Plaintiff.

4. Copies of any oral or written statements made by any person with regard to all happenings having to do with the subject matter of this action.

5. Copies of any and all expert reports, reports of diagnostic tests, hospital and medical records, X-rays, CAT scan films, MRI films, and any other films and bills relating to any condition or injury sustained by Plaintiff.

6. Copies of all written reports or summaries of oral reports of all expert or treating or examining physicians along with their curriculum vitae.

7. Copies of any and all books, treatises, commentaries, reports, statutes, codes, ordinances, rules, regulations, or other published documents referred to, utilized by, or relied upon by any expert witness whom the plaintiff/defendant intends to call during the Trial.

8. Copies of any and all photographs, diagrams, charts, drawings, maps, plans, models, or other visual reproductions of any object, place, or thing related to this litigation.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____
TYRONE A. BLACKBURN

## DEMAND FOR ANSWERS TO SUPPLEMENTAL INTERROGATORIES

Under R. 4:17-1 *et seq.*, Plaintiff hereby demands that Defendants UR, MCA, and UMGR provide certified answers to the following supplemental interrogatories:

1. State whether, in or about 1990, Aaron Hall was an artist or employee of your company.

2. State whether, in or about 1990, Sean Combs was an artist or employee of your company.

3. State whether, in or about 1994, Aaron Hall was an artist or employee of your company.

4. State whether, in or about 1994, your company subsidized housing for Aaron Hall in the state of New Jersey.

5. State whether, in or about 1994, your company subsidized housing for Jodeci.

6. State whether, in or about 1994, your company subsidized housing for Sean Combs.

7. State whether, in or about 1994, your company hosted a party in the summer and or fall of 1990.

8. Please identify the present custodian of each writing identified in your answer to interrogatory numbers 1-7.

9. If your answer to interrogatory numbers 1-7 was no, please set forth each fact upon which you base such denial.

10. If your answer to interrogatory numbers 1-7 was no, please identify each person who knows any fact relating to such denial.

11. If your answer to interrogatory numbers 1-7 was no, please identify each writing relating to such denial (including but not limited to email, text messages, WhatsApp, Signal, Sessions, and/or social media app messages).

12. Please identify the present custodian of each writing identified in your answer to interrogatory number 9.

13. From on or about 2015 to 2023, did you ever wire $100,000 from an unnamed overseas account to an individual that accused one of your artists or employees of rape/sexual assault which occurred in the state of California?

14. From on or about 2015 to 2023, did you ever wire $200,000 from an unnamed overseas account to an individual that accused one of your artists or employees of rape/sexual assault which occurred in the state of California?

15. From on or about 2015 to 2023, did you ever wire $300,000 from an unnamed overseas account to an individual that accused one of your artists or employees of rape/sexual assault which occurred in the state of California?

16. From on or about 2015 to 2023, did you ever respond to the home of one of your artists or employees who was involved in a domestic dispute?

   a. Did you provide the domestic partner of that artist with a sedative, taking her to a nearby hotel where you forced her to sign an NDA in exchange for a wire between $100,000 to $500,000?

17. From on or about 2015 to 2023, did you ever wire money from an unnamed overseas account to an individual who was under the age of 18 that accused one of your artists or employees of rape/sexual assault?

18. From on or about 2015 to 2023, how many times has your organization wired money from an unnamed, unmarked account to an individual who has accused one of your employees and or artists of sexual assault, rape, and or battery?

19. Have you ever forced an artist or employee to sign a long-term recording contract with your company through acts of coercion?

20. Have you ever forced an artist or employee to sign and or renew a recording contract with your company through sexual bribery?

21. Have you ever forced an artist or employee to watch a video of themselves being sexually assaulted to force them to sign and or renew a recording contract with your company?

22. Have you ever forced an artist or employee to watch a video of themselves using narcotics or illegal substances to force them to sign and or renew a recording contract with your company?

DATED: October 8, 2024

                                      **T. A. Blackburn Law, PLLC**

                                      _____/s/*Tyrone a. Blackburn, esq.*_____
                                              TYRONE A. BLACKBURN