Exhibit A: First Amended Complaint

**T. A. BLACKBURN LAW, PLLC**
**Tyrone A. Blackburn, Esq.**
1242 East 80th Street, 3rd Floor
Brooklyn, NY 11236
347-342-7432
*Attorneys for Plaintiff Liza Gardner*

| | |
|---|---|
| LIZA GARDNER,<br>                    Plaintiff,<br><br>-against-<br><br>SEAN COMBS,<br>AARON HALL,<br>DONALD EARLE DEGRATE JR., AKA,<br>DEVANTE SWING,<br>UMG RECORDINGS, INC., UNIVERSAL<br>MUSIC GROUP, N.V.<br>JOHN DOES 1-10 (names being fictitious and<br>used to connote an unidentified person<br>responsible for this occurrence), JANE DOES<br>1-10 (names being fictitious and used to<br>connote an unidentified person responsible for<br>this occurrence), ABC CORPORATIONS 1-10<br>(names being fictitious and used to connote<br>unidentified entities responsible for this<br>occurrence),<br>                    Defendants. | **UNITED STATES DISTRICT COURT**<br>**DISTRICT OF NEW JERSEY**<br><br>DOCKET NO.: 2:24-cv-07729-LMG-JRA<br><br>CIVIL ACTION<br>**FIRST AMENDED COMPLAINT**<br>**JURY DEMAND** |

Plaintiff Liza Gardner ("Plaintiff Gardner," "The Children," "The Child," "Ms. Gardner"), by and through her attorneys at T. A. Blackburn Law, PLLC., alleges as follows:

<u>**INTRODUCTION**</u>

1. Plaintiff Gardner files this Complaint for damages and other relief pursuant to New Jersey P.L. 2019, c.120; Plaintiff's claims are timely in the State of New Jersey. A copy of the New Jersey P.L. 2019, c.120 statute is attached hereto. (***See* Exhibit 1**).

2. Plaintiff Gardner brings this action seeking declaratory and monetary relief against Defendants for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1).

3. As previously stated, this cause of action is timely pursuant to New Jersey P.L. 2019, c.120 because it arises out of conduct perpetrated against Plaintiff, who was a minor child at the

1

tender age of sixteen years old at the time of the conduct, which constitutes multiple sexual offenses as defined NJ Rev Stat § 2C:14-2 (2023).

NJ Rev Stat § 2C:14-2 (2023) States in Relevant Part:

> 2C:14-2. Sexual assault. a. An actor is guilty of aggravated sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:
>
> 1) The victim is less than 13 years old;
> 2) The victim is at least 13 but less than 16 years old; and
>    a. The actor is related to the victim by blood or affinity to the third degree, or
>    b. The actor has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional, or occupational status, or
>    c. The actor is a resource family parent, a guardian, or stands in loco parentis within the household;
> 3) The act is committed during the commission, or attempted commission, whether alone or with one or more other persons, of robbery, carjacking, kidnapping, homicide, aggravated assault on the victim or a person other than the victim, burglary, arson, or criminal escape;
> 4) The actor is armed with a weapon or any object fashioned in such a manner as to lead the victim to reasonably believe it to be a weapon and threatens by word or gesture to use the weapon or object;
> 5) The actor is aided or abetted by one or more other persons, and the actor commits the act using coercion or without the victim's affirmative and freely given permission;
> 6) The actor commits the act using coercion or without the victim's affirmative and freely given permission and severe personal injury is sustained by the victim;
> 7) The victim, at the time of sexual penetration, is one whom the actor knew or should have known was:
>    a. physically helpless or incapacitated;
>    b. intellectually or mentally incapacitated; or
>    c. had a mental disease or defect which rendered the victim temporarily or permanently incapable of understanding the distinctively sexual nature of the conduct, including, but not limited to, being incapable of providing consent, or incapable of understanding or exercising the right to refuse to engage in the conduct.
>
> Aggravated sexual assault is a crime of the first degree.
>
> Except as otherwise provided in subsection d. of this section, a person convicted under paragraph (1) of this subsection shall be sentenced to a specific term of years which shall be fixed by the court and shall be between 25 years and life imprisonment of which the person shall serve 25 years before being eligible for parole, unless a longer term of parole ineligibility is otherwise provided pursuant to this Title.

An actor is guilty of sexual assault if the actor commits an act of sexual contact with a victim who is less than 13 years old and the actor is at least four years older than the victim.

An actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:

1) The actor commits the act using coercion or without the victim's affirmative and freely-given permission, but the victim does not sustain severe personal injury;
2) The victim is on probation or parole, or is detained in a hospital, prison or other institution and the actor has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional or occupational status;
3) The victim is at least 16 but less than 18 years old and:
   a. The actor is related to the victim by blood or affinity to the third degree; or
   b. The actor has supervisory or disciplinary power of any nature or in any capacity over the victim; or
   c. The actor is a resource family parent, a guardian, or stands in loco parentis within the household;
4) The victim is at least 13 but less than 16 years old and the actor is at least four years older than the victim;
5) The victim is a pupil at least 18 but less than 22 years old and has not received a high school diploma and the actor is a teaching staff member or substitute teacher, school bus driver, other school employee, contracted service provider, or volunteer and the actor has supervisory or disciplinary power of any nature or in any capacity over the victim. As used in this paragraph, "teaching staff member" has the meaning set forth in N.J.S.18A:1-1.

Sexual assault is a crime of the second degree.

1) Notwithstanding the provisions of subsection a. of this section, where a defendant is charged with a violation under paragraph (1) of subsection a. of this section, the prosecutor, in consideration of the interests of the victim, may offer a negotiated plea agreement in which the defendant would be sentenced to a specific term of imprisonment of not less than 15 years, during which the defendant shall not be eligible for parole. In such event, the court may accept the negotiated plea agreement and, upon such conviction, shall impose the term of imprisonment and period of parole ineligibility as provided for in the plea agreement and may not impose a lesser term of imprisonment or parole or a lesser period of parole ineligibility than that expressly provided in the plea agreement. The Attorney General shall develop guidelines to ensure the uniform exercise of discretion in making determinations regarding a negotiated reduction in the term of imprisonment and period of parole ineligibility set forth in subsection a. of this section.

4. This suit arises from the actions of Defendants Sean Combs ("Combs"), Aaron Hall ("Hall"), Donald Earle DeGrate Jr., aka, Devonte Swing ("Swing"), and UMGR

3

Recordings, Inc. ("UMGR"), a subsidiary of a subsidiary of Universal Music Group, N.V. ("UMGNV"), JOHN and JANE DOES 1-10 and ABC CORPS. 1-10 (hereinafter collectively the "Corporate Defendants") and their participation in the harm visited upon Plaintiff Gardner.

5. Upon information and belief, Uptown Records ("UR") and MCA, Inc. ("MCA") merged into UMGR, which is a subsidiary of Universal Music Group, N.V.

6. UMGR and UMGNV are successors in interest to UR and MCA.

7. Ms. Gardner is a Caucasian female and a United States citizen who was, at all relevant times, a resident of and domiciled in the State of North Carolina.

8. Combs, also known as, **Inmate 37452-054**, is a United States citizen and was at all relevant times a resident of and domiciled in the State of New York. Upon information and belief, Mr. Combs currently resides at the **The Metropolitan Detention Center**, located at 80 29th St, Brooklyn, NY 11232.

9. Hall is a United States citizen and was at all relevant times a resident of and domiciled in the State of New Jersey. Upon information and belief, Hall currently resides in one of the following states: Georgia, Ohio, California, or Florida[1].

10. Upon information and belief, at the time of the assault, Hall resided in Englewood, New Jersey, in an apartment paid for and subsidized by the corporate defendant.

11. Upon information and belief, Swing is a United States Citizen and was at all times relevant a resident of and domiciled in the State of California.

12. UMGRR is a global Music Company headquartered at 2220 Colorado Avenue in Santa Monica, California. It is registered as a foreign business in the State of New Jersey.

13. UMGRRNV is a is a Dutch–American multinational music corporation under Dutch law. UMGRRNV's corporate headquarters are located in Hilversum, Netherlands and its operational headquarters are located in Santa Monica, California.

14. During the relevant period, Defendants John and Jane Does 1-10 are currently unknown individuals and/or employees who aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment, Defendants ratified, embraced and added to this conduct. As parties engage in discovery,

---

[1] Hall has intentionally dogged service of process in this case.

4

Plaintiff retains the right to amend the Complaint to add these individual employees by name.

15. During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities who employed Plaintiff or aided and/ or abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

## JURISDICTION AND VENUE

16. This Court has personal jurisdiction over the Defendant under and consistent with the Constitutional requirements of Due Process in that the Defendants, acting directly or through his agents or apparent agents, committed one or more of the following:

   a. The transaction of any business within the state;
      i. Corporate Defendants are Foreign Registered Businesses in the State of New Jersey.
   b. The making of any contract within the state;
      i. Upon information and belief, at the time of the assault, corporate defendants purchased, leased, or subleased real estate in the State of New Jersey for the individual defendants.
   c. The commission of a tortious act within this district, and
      i. Individual defendants raped the child in the State of New Jersey by violently and forcefully inserting their penis in the vagina of the child in the state of New Jersey. The corporate defendants facilitated and or supported this act by intoxicating the child with alcohol, and then transporting the child across state lines from New York to New Jersey to the property they procured for the individual defendants.
   d. The ownership, use, or possession of any real estate in this state.
      i. The individual defendants possessed real estate in New Jersey. The real estates were procured by the corporate defendants.

## REQUEST FOR JUDICIAL NOTICE OF FEDERAL INDICTMENT

17. According to Rule 201(b)(2) of the Federal Rules of Evidence, Plaintiff respectfully requests this Court take notice of certain public records and documents, as detailed below:

   a. *THE COURT MAY TAKE JUDICIAL NOTICE OF FACTS THAT ARE NOT SUBJECT TO REASONABLE DISPUTE WHERE THEIR ACCURACY CAN BE DETERMINED BY RELIABLE SOURCES*

18. According to Rule 201(b)(2) of the Federal Rules of Evidence, courts may take judicial notice of facts that are not subject to reasonable dispute and are capable of accurate and ready determination by resorting to sources whose accuracy cannot reasonably be

5

questioned.  Where a Court is supplied with the necessary information, taking judicial notice is mandatory.  *See* Fed.  R. Evid. 201(d).  Pleadings and public filings are just the kinds of documents that are not subject to reasonable dispute and are capable of an accurate and ready determination under Rule 201(b)(2) of the Federal Rules of Evidence. Accordingly, it is proper for courts to take judicial notice of the existence of such documents.  *See Roe v. Johnson*, 334 F. Supp.  2d 415, 419-20 (S.D.N.Y. 2004) (recognizing that a court, according to Rule 201(b), may take notice of the public record); *see also A.I. Trade Finance, Inc. v. Centro Internationale Handelsbank AG*, 926 F. Supp. 378, 387 (S.D.N.Y. 1996) (in taking judicial notice of a judgment in Vienna, Austria, the Court pointed out that "[t]he Second Circuit has noted that Rule 201 permits a court to take judicial notice of a foreign judgment").

19. Here, Plaintiff requests the Court to take judicial notice of a September 19, 2024, true and correct copy of the federal indictment of Defendant Sean Combs, which is attached hereto as **Exhibit 2**.

20. Additionally, Plaintiff requests the Court to take judicial notice of the following Complaints filed against Sean Combs:

- in the matter of *Graves v. Combs et al.,* United States District Court, Southern District of New York, Case No 1:24-cv-07201-AT;
- in the matter of *English v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cv-05090-AT;
- in the matter of *Jane Doe v. Combs et al.,* United States District Court, Southern District of New York, Case 1:23-cv-10628-JGLC;
- in the matter of *USA v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cr-00542-ALC;
- in the matter of *McKinney v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cv-03931-NRB;
- in the matter of *Richard v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cv-06848-KPF; and
- in the matter of *Jones v. Combs et al.,* United States District Court, Southern District of New York, Case 1:24-cv-1457

a true and correct copy of which is attached hereto as **Exhibit 3**.

21. There is no dispute regarding the existence of these documents.  *See* 21B Wright & Graham, Federal Practice and Procedure: Evidence 2d § 5106.4 (noting that, in contrast to facts discussed within court documents, it is proper to take judicial notice of the fact that the court documents exist).  Additionally, "[c]onsideration of documents subject to judicial notice does not necessarily convert a motion to dismiss into a motion for summary

judgment." *Weston Funding, LLC v. Consorcio G Grupo Dina, S.A. de C.V.*, 451 F. Supp. 2d 585, 588 (S.D.N.Y. 2006).

22. Court documents are public records of which the Court can take judicial notice. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("Courts routinely take judicial notice of documents filed in other courts[.]"); *Global Network Commc'ns v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (citation and internal quotation marks omitted); *see, e.g., Blount v. Moccia*, No. 1:16-cv-4505-GHW, 2017 U.S. Dist. LEXIS 192983, 2017 WL 5634680, at *2 n.5 (S.D.N.Y. November 21, 2017) (taking judicial notice of indictment but expressing no opinion as to the innocence or guilty of those indicted); Bond v. City of New York, No. 14-cv-2431, 2015 U.S. Dist. LEXIS 130922, 2015 WL 5719706, at *2 (E.D.N.Y. September 28, 2015) (taking judicial notice of "fact of the grand jury indictment"); *Obilo v. City Univ. of N.Y.*, No. 10-cv-5118, 2003 U.S. Dist. LEXIS 2886, 2003 WL 1809471, at *4-5 (E.D.N.Y. February 28, 2003) (noting that it is "well established" that a court may take judicial notice of a grand jury indictment). In taking judicial notice of the indictment, the Court expresses no opinion as to the innocence or guilt of the indicted party. *Young v. Commissioner*, No. 6:18-cv-00135 (DNH/TWD), 2018 U.S. Dist. LEXIS 172986, at *11-12 n.5, 123 A.F.T.R.2d (RIA) 2019-660 (N.D.N.Y. October 4, 2018).

23. Under Federal Rule of Evidence 201, a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). It is well established that a court may "take judicial notice of its own orders," and "its own records." *Rosado-Acha v. Red Bull GmbH*, No. 15 Civ. 7620, 2016 U.S. Dist. LEXIS 84543, 2016 WL 3636672, at *7 (S.D.N.Y. June 29, 2016) (citations omitted). The Court thus grants the Motion and takes judicial notice of these documents. *Levin v. Bank of N.Y. Mellon*, No. 09-CV-5900 (JPO), 2019 U.S. Dist. LEXIS 22788, at *83 n.2 (S.D.N.Y. February 12, 2019).

24. Plaintiff respectfully requests the Court to take judicial notice according to FCRP 201(c)(2) of the documents attached here as **Exhibit 2 and 3**.

## SUMMARY OF FACTUAL ACCUSATIONS

25. Upon information and belief, in 1990, the child was in New Jersey/New York City with a few friends. They were Monica Case (a fifteen-year-old child), Dalvin DeGrate, and DeVante Swing, who were all members of the R&B group Jodeci.

26. The child was invited to New Jersey by close friends Dalvin DeGrate and DeVante Swing and other members of the group Jodeci[2]. Upon information and belief, at the time, Jodeci were employees of Corporate Defendants or their predecessors in interest, UR/MCA.

27. The Child and the members of Jodeci are all from North Carolina.

28. Upon information and belief, UR, MCA, and UMGR subsidized Jodeci's housing and living arrangements in New Jersey. Upon information and belief, UR, MCA, and UMGR senior executives wanted their "urban artists" to live in suburban neighborhoods out of state.

29. Upon information and belief, UR, MCA, and UMGR wanted to keep their "Urban Artists" out of the streets of Harlem and New York City, which were dangerous at the time.

30. According to NYPD crime statistics data, in 1990, there was a total of 527,257 crime complaints. In addition to the number of murders confirmed to *Newsweek*, the data also shows that there were over 3,000 rape incidents, 100,280 robberies, 44,122 felony assaults, and over 100,000 burglary and grand larceny incidents in 1990[3].

31. In 1990, prior to inviting the children to New Jersey, Jodeci was signed by Hip-Hop artist Heavy D to UR, a label that was a subsidiary of MCA, which was a subsidiary of UMGR.

32. Upon information and belief, Jodeci was assigned to UR employee Sean Combs, who took on the task of developing the new act. The group was introduced after providing background vocals on the 1990 song "Treat Them Like They Want to Be Treated."

33. Upon information and belief, "Forever My Lady" is the debut studio album of Jodeci, released in 1991 by UR and MCA.

---

[2] Jodeci is an American R&B quartet consisting of members DeVanté Swing, Mr. Dalvin, K-Ci, and JoJo. Formed in 1988 in Charlotte, North Carolina.
[3] https://www.newsweek.com/new-york-city-most-dangerous-year-crime-1990-compared-2022-1750454#:~:text=According%20to%20NYPD%20crime%20stat,grand%20larceny%20incidents%20in%201990.

34. Upon information and belief, the end of summer into the fall of 1990 MCA held an event at their New York City offices.

35. The Child and her friend Monica Case met Combs and Hall at the offices of MCA Records for this event. In addition to Combs and Hall, Ms. Gardner met R&B Singer Mary J. Blige and Hip-Hop artist Queen Latifah.

36. At the MCA event, the children were provided a lot of alcohol.  Upon information and belief, MCA provided transportation for the children and other artists as they were visibly intoxicated.

37. Upon information and belief, after the MCA event, the children attended dinner with members of Jodeci, Combs, and Hall.  Combs and Hall were very flirtatious and handsy with the intoxicated children.

38. Upon information and belief, individual defendants offered the children more drinks even though the children had been provided excessive amounts of alcohol at the MCA event. Upon information and belief, Hall and Combs provided the children with marijuana as well.  These substances were provided to the children throughout the evening.

39. At the ages of sixteen and fifteen, the children were minors in 1990 and incapable of consenting to drink alcohol.  Marijuana was also illegal in New York and New Jersey in 1990.

40. Upon information and belief, in 1990, the legal drinking age in New Jersey was 21 years old.  This was due to the National Minimum Drinking Age Act (NMDAA) of 1984, which was signed into law by President Ronald Reagan and gradually raised the legal drinking age to 21 by 1990.  The NMDAA threatened to withhold 10% of a state's annual federal highway funds if it allowed people under 21 to purchase alcohol. As a result, by mid-1988, all 50 states and the District of Columbia had raised their drinking age to 21.

41. Towards the end of the night, Combs and Hall invited the children back to Hall's home in New Jersey for an afterparty.  Upon information and belief, the corporate defendants transported the children to the home of Hall through cabs or private cars from New York to New Jersey.

42. It is important to note that Hall was one of the biggest R&B artists at the time.  He had enjoyed great success as a member of the R&B group Guy.

9

43. Based on information and belief, Hall was one of the corporate defendants' most important employees. Equally important was Combs, who was responsible for managing the success of Jodeci as the group's artist and repertoire ("A&R"). Combs was required to establish the group's sound and style. The corporate defendants relied upon Combs' expertise to ensure they recouped the most out of their investment in Jodeci.

44. Based on information and belief, Combs and Hall were prominent employees of MCA, UR, and UMGR, and it was important for the corporate defendants to keep them happy, hence why they had no problem trafficking intoxicated children across state lines to a house that they subsidized for Hall.

45. According to Ms. Gardner, she was wearing a black skirt with a button-up blouse.

46. Below is a photo from that day in 1990, hours before Hall and Combs brutally raped the child:



Depicted in this image are **SIXTEEN**-year-old Plaintiff Gardner, **TWENTY-SIX**-year-old Hall, and **FIFTEEN**-year-old Monica Case. The children are being physically accosted by Hall.

47. While at Hall's apartment depicted in the image above, Ms. Gardner was offered more alcohol and was physically forced into having sex with Combs against her will.

48. At the time Combs assaulted Ms. Gardner, she recalls feeling the side effects of the alcohol. She recalls Combs mounting her and forcing up her skirt, pulling her underwear to the side, and forcefully penetrating her vagina with his erect penis.

49. Unbeknownst to Ms. Gardner at the time, Defendant Swing was in the room when this assault took place and did not take any steps to prevent this abuse from occurring. Defendant Swing is six months older than Combs and was the assumed co-guardian (along with corporate defendants) of the child since he was an adult and was the individual who invited the child to NY/NJ and housed her in his home that was subsidized by the corporate defendants. He not only provided her shelter, he provided food and drink as well (all subsidized by corporate defendant).

50. The children were not at the legal age to consent to sexual intercourse with Combs or Hall.

51. After Combs finished doing his business, the child was in bed, shocked and traumatized. As she was in the process of getting dressed, Hall barged into the room, pinned her down, and forced open the child's legs. He then forced his erect penis into the child's vagina.

52. As depicted in the photo above, the child who was no more than 90 pounds at the time, was no physical match for Hall who is at least 6 feet tall and weighed over 200 pounds.

53. According to the child, Hall's penis was extremely large, while Combs' penis was prepubescent. Hall's penis caused her immense pain as it could not fit, yet he held her down and forced it in.

54. After Hall finished raping the child, she quickly got dressed and ran out of Hall's apartment. Ms. Case was irate and caused a scene for them to leave. At that time, members of Jodeci drove them back to their residence.

55. According to Ms. Gardner, her other friend (not Ms. Case) shared with her that she, too, had sex with Combs and Hall in another room. Upon information and belief, when Combs finished with Ms. Gardner, he and Hall switched, and they commenced intercourse with Ms. Gardner's friend.

56. The following day, Combs came to the home where Ms. Gardner and her friends were staying. Combs was irate and began assaulting and choking Ms. Gardner to the point that she passed out.

11

57. Combs was searching for Ms. Gardner's friend because he was worried that she would tell the girl he was with at the time what he and Hall had done to them.

58. This violent act by Combs was no surprise to Corporate Defendants as three years prior to this, from 1987 to 1989. According to an investigative article published by Rolling Stone[4] on May 28, 2024, Combs was allegedly involved in a violent incident where he beat a woman with a belt in front of shocked schoolmates at Howard University. Combs reportedly appeared outside the school's Harriet Tubman Quadrangle dorm and began yelling in a "belligerent" manner for his then-girlfriend to come outside.

59. According to one witness, Combs used what looked like a belt to strike the young woman "all over the place." "She was trying to defend herself a little bit," the witness tells *Rolling Stone*. "She was crying. And we were telling him, 'Get off of her.' We were screaming for her."

60. Based on information and belief, this was not the only incident of violence with Combs at Howard University. Corporate Defendants' employee Andre Harrell traveled to Howard to bail Combs out of trouble and bring him back to New York.

61. As evidenced by the hotel video published by CNN, Combs has continued his pattern and practice of beating women.

62. After first denying the claims of his former spouse, Cassie Ventura, SC was seen viciously and violently grabbing, shoving, dragging, and kicking Ms. Ventura in a hotel in California[5]. Ms. Ventura attempted to escape Mr. Combs, but as the video shows, he refused to let her go. He beat her and attempted to kidnap her (by attempting to drag her back into the hotel room against her will) to make her stay:

---

[4] https://www.rollingstone.com/music/music-features/diddy-friends-bad-boy-artists-abuse-violence-1235028178/
[5] https://www.cnn.com/2024/05/17/entertainment/video/sean-diddy-combs-cassie-venture-surveillance-digvid

12



## Surveillance video shows Sean 'Diddy' Combs physically assaulting former girlfriend in 2016

A 2016 surveillance video obtained by CNN shows Sean "Diddy" Combs violently grab, shove, drag and kick his then-girlfriend Cassie Ventura during an altercation in a hotel in California.

03:04 · Source: CNN

## AARON HALL AND SEAN COMBS ROUTINELY ENGAGED IN SEX ACTS IN EACH OTHER'S PRESENCE

63. Hall confirmed Combs' presence in the room when he engaged in sex acts.

64. In a YouTube video posted by VladTV, titled "Aaron Hall Claims that Diddy Watched Him Make Love to a Woman (Flashback)[6]."

---

[6] https://youtu.be/2LVditdoACM?si=8esfOwbGEYCGUylr

13



Hall says the following:

[00:00:05] Aaron Hall: Can no bitch out there say that she handled my shit. My father's a pastor, so my whole thing is that my grandfather being a pimp, it's just like I'm 3rd generation Aaron Hall III. My father's is Aaron Hall junior. He's a pastor, so I just skipped over it like checkers.

[laughter]

My whole thing is this that if you never heard a girl say that no fucked up trick shit about Aaron Hall, then you understand that less chill shit is some real shit.

[00:00:31] Interviewer: That was basically from some life experience?

[00:00:35] Aaron: Now my whole thing is that I just think that girls think that a whole lot of guys run after they shit. You know what I mean?

[00:00:42] Interviewer: Talk to me. You can say what you want on there.

[00:00:46] Aaron: A whole lot of girls out there with the umbilical cords, them young 1970s, 1980s bitches, they try to go up there with the fresh out the pussy shit and think they can get like a nigga like Aaron Hall. I'm a historical dick, they fuck with me it's a—

[laughter]

14

[00:01:02] Interviewer: That's right.

[00:01:03] Aaron: **IF THEY FUCK WITH ME, IT'S A BIG DICK**[7]. Everybody know my son's mother. Everybody know that shit.

[00:01:08] Interviewer: Yes. That's Gloria, ain't it? Tell them about it.

[00:01:10] Aaron: When you put Aaron's on it, when you fuck a bitch for three days and take the bitch's hand and take them out of the man's hand, then you are a retired pimp. At the time, as soon as I came to South Beach, I just grabbed her. She'll tell you the same story. I just grabbed her and fucked her for three days, then Aaron's got on a pussy with an apostrophe s like it's Aaron with three colors on it. You feel me?

[00:01:31] Interviewer: Yes. Crazy glue.

[00:01:32] Aaron: **MY WHOLE THING IS THIS IS THAT IF NIGGAS CAN'T HANDLE ME, I'M NOT GOING TO NEVER LET THEM GET MY LAST NAME. IF YOU CAN'T HANDLE MY DICK, YOU AIN'T GETTING MY LAST NAME, SO I'VE BEEN SINGLE FOR 50 YEARS.**

[laughter]

[00:01:41] Interviewer: Oh, all right, man.

[00:01:42] Aaron: A whole lot of niggas out there from Jamie Foxx to Denzel Washington to whoever, everybody know me. Everybody know if I say it, I'm a fuck to death. **I LIKE TO FUCK IN PUBLIC. YOU FEEL ME?** Niggas can't say nothing about it. Them square ass niggas, them precious cake, little dick niggas. I like for them niggas to see how I fuck. **YOU SPEAK TO JODECI OR PUFFY OR ANY OF THEM NIGGAS, THEY'VE BEEN AT MY HOUSE. THEY ALL SEE ME FUCK. THEY ALL KNOW I'M A BIG NIGGA**.

If a bitch touch my dick and she say my dick is small, then she's a lying bitch. Tell her to name the tattoo that's on my rib that says warning.

[laughter]

You get this, nigga, I'm fucking you up. The thing is that a whole lot of niggas write about taking girls out to shop, taking girls to fly to Dubai, and all that shit. Bitch, close your eyes, we anywhere. My whole thing is this that-

[00:02:31] Interviewer: Talk about it.

---

[7] Presumably, this confirms Ms. Gardner's claim that Halls penis was extremely large and painful to take.

[00:02:32] Aaron: -if you can handle my dick and you can make me still be Aaron Hall without fucking rubbing off your mouth, then I'll take you anywhere. Other than that shit, you back home, bitch.

65. Hall's disgusting claims are eerily similar, if not identical, to the trauma he and Combs visited upon Ms. Gardner.

**AARON HALL TAKES PRIDE IN STATUTORILY RAPING MINORS**

66. Hall has bragged about his sexual promiscuity and the fact that he has engaged in sexual intercourse with minors.

67. In a YouTube video posted by VladTV, titled "Aaron Hall on Gloria Velez: I Took Her & F***ed Her[8]."



Hall says the following:

[00:00:00] Interviewer: Luke said that he introduced you to Gloria Velez.

[00:00:08] Aaron Hall: Luke didn't introduce me to no Gloria Velez. We can call Luke right now, you know what I mean?

[00:00:12] Interviewer: He said it in an interview a while back.

---

[8] https://youtu.be/X3PrjTVgteM?si=nTWaU1d1O40XcvZd

16

[00:00:12] Speaker 3: Well, how did it happen?

[00:00:14] Aaron Hall: Look what I'm saying to you. She was standing up with a Jamaican rapper named Mad Lion.

[00:00:22] Interviewer: Okay, I know who that is.

[00:00:26] Aaron Hall: Big Pun, Fat Joe, Method Man, whoever you speak to, just ask them how I did it. I got out the limo, grabbed her hand and went upstairs and fucked her. Luke didn't never fucking introduce me to anybody in his life. I love Luke to death.

[00:00:41] Speaker 3: He just had on porno.

[00:00:42] Aaron Hall: Look, the reason why he's saying he introduced me to her because it's a good thing to say, "Okay, I introduced Aaron Hall to this girl." I took her. Me and Gloria's cool. We got cool in two weeks. You feel me? I'm a boss. I ain't going to argue with you about no shit. You an umbilical cord bitch. You fucking 35, 36 years old. I'm not going to disrespect you, but I'm a boss motherfucker. I love my son, so I ain't going to break probation by fucking with you and not being able to speak to him again. You feel what I'm saying?

When I speak to a nigger that got dick and balls, he can never say he introduced me to no bitch. Nobody ain't never introduced me to a bitch in their life. I wish they did. The thing is that you can ask Gloria though. It have nothing to do with me. I don't like talking about no man. We both Adam first.

[00:01:29] Interviewer: You know something I just remembered? That Gloria had tattooed Aaron's right above her—

[00:01:34] Aaron Hall: In black, red, and green.

[00:01:37] Interviewer: Right above her vagina.

[00:01:38] Aaron Hall: Right above it with a parenthesis with an S. Aaron's.

[00:01:45] Interviewer: It belongs to—

[00:01:46] Aaron Hall: Look. When I saw her, she was dancing with Luke. I didn't know she was a puppy. She was tall. She was big, blonde hair, with the black pant leather. I was like, "I'm getting that." Everybody knows I couldn't even really speak then. I had a speech impediment. I don't stutter anymore. I just went there and just grabbed her hand and went inside the hotel and gave it to her. You feel me? She going to say Luke is lying. You feel me? Because I don't lie on my dick. You feel what I'm saying?

17

My mother was Puerto Rican. From Ponce. When I see anybody that's Spanish, I'm going to grab them. I ain't going to ask if you holding the hand all loose and you holding a conversation with a nigga-

[00:02:31] Speaker 3: Preach.

[00:02:32] Aaron Hall: I'm going to take your bitch. She chose up already. Now she want to go renegade? Go renegade, bitch.

[00:02:38] Interviewer: At what point did she get the tattoo?

[00:02:40] Aaron Hall: Three days after I fucked her.

[00:02:41] Interviewer: Three days.

[00:02:42] Aaron Hall: Three whole days. If anybody can do that shit, I don't care if you was married, I don't care if you was engaged, if it's your anniversary, if your bitch did that shit, then I'll stop singing *I Miss You*. My whole thing is this, is that I love Gloria to death because she gave me a beautiful son. You feel what I'm saying? My whole thing is I want to make sure that it's right. I love my son Aaron Robin Hall IV to death. I ain't seen him in 15 years, but I love him to death. We talk all the time. Gloria didn't do no bad thing to me.

I thought she was older. You feel what I'm saying? Sometime I see a puppy on the field when I'm doing dog training, I think it's a year old or two years old, and it be like eight months. I don't know. When I saw her, everybody was trying to get at her. Why y'all scared of her? I took her. I couldn't even talk, I had a speech impediment after.

[00:03:27] Speaker 3: Yes, because they didn't know what to do.

[00:03:28] Aaron Hall: They ain't know what to say.

68. Based on information and belief, when Hall met Gloria Velez, she was a sixteen-year-old high school student in Broward County, Florida. She attended Stoneman Douglas High School.

69. Upon information and belief, in the State of Florida, a child under 16 years of age cannot consent to sexual activity, regardless of the age of the defendant. A child who is at least 16 years of age and less than 18 years of age cannot consent to sexual activity if the defendant is 24 years of age or older[9].

---

[9] https://aspe.hhs.gov/reports/state-laws

70. Upon information and belief, when Hall statutorily raped Ms. Velez in 1994, he was 30 years old, which is 14 years older than Ms. Velez.

71. Upon information and belief, at the time that Hall statutorily raped Ms. Velez, he was an employee of Corporate Defendants or a subsidiary of Corporate Defendants, Silas Records. He met Ms. Velez at a Silas/Corporate Defendants'-sponsored event. This represents another example of Corporate Defendants facilitating and sponsoring events where children are present and susceptible to being raped by predatory employees like Hall and Combs.

72. In discussing her past and the fact that she was groomed as a child by the likes of Hall, Ms. Velez posted to her social media page the following photo of her high school ID card from 1994:



**Gloria Velez's Social Media Post Evidencing Her Adolescence When Groomed and Statutorily Raped by Hall**

73. As indicated in the transcript above, Hall referred to sixteen-year-old Ms. Velez as a puppy. He goes on to say that when he is on the field *doing dog training*, he sometimes misidentifies an 8-month-old puppy (Ms. Velez) for a 2-year-old dog (an adult).

19

74. Hall goes on to brag about grabbing sixteen-year-old Ms. Velez by the hand and **forcing** her to have sex with him.

75. Upon information and belief, in 1994, at the time Hall raped Ms. Velez; Hall was an employee of Silas Records, a subsidiary label of Corporate Defendants, which is a subsidiary of UMGR.

## SEAN COMBS HAS A WELL-DOCUMENTED HISTORY OF LEGAL TROUBLE

76. According to an article by NPR[10], the following is a brief timeline of Mr. Combs legal troubles:

**1991:** According to a November 2023 lawsuit, Combs allegedly drugs, sexually assaults and videotapes 19-year-old Joi Dickerson Neal, after going on a date with him.

**1996:** Combs is found guilty of criminal mischief for threatening a photographer from the *New York Post* with a gun.

**April 16, 1999:** Combs is arrested and charged with two felonies — second-degree assault and criminal mischief — in the beating of record executive Steve Stoute, who says Combs and two bodyguards beat him with their fists, a telephone, a champagne bottle and a chair. When Combs publicly apologizes, Stoute asks for the charges to be dismissed. (Combs reportedly pays Stoute $500,000.) The assault charge is dropped, Combs pleads guilty to the lesser charge of harassment, and he is sentenced to one day of anger management classes.

**Dec. 27, 1999:** Combs, along with then-girlfriend Jennifer Lopez and rapper Shyne, are arrested in relation to a shooting at Club New York. Combs shot Natalia Reuben in the face, and she consistently blamed Combs for shooting her.

**March 26, 2001:** In a lawsuit, local TV host Roger Mills sues Combs, accusing him of assault, false imprisonment, destruction of property, intentional infliction of emotional distress, and a civil conspiracy, in an exchange where Combs' entourage roughed him up and destroyed his camera.

**2003:** According to a December 2023 lawsuit, Combs, his former Bad Boy Records president, Harve Pierre, and a third unidentified man allegedly gangrape an unnamed 17-year-old victim at a Manhattan recording studio.

---

[10] https://www.npr.org/2024/02/29/1234684758/sean-combs-diddy-allegations-timeline

20

**February 2006:** Ventura signed a 10-album deal with Bad Boy Entertainment. Her debut single "Me & U" is released, and her self-titled album drops the same year. According to a November 2023 lawsuit, Combs' "vicious cycle of abuse" begins here. Ventura alleges years of physical, psychological and emotional abuse. She claims Combs forced her to purchase and take illegal drugs like cocaine, ketamine and ecstasy; that he filmed her as he forced her to participate in sex with male sex workers in multiple cities for his own voyeuristic pleasure in a practice he called "freak offs"; and that he beat her on many occasions in retaliation for talking to other men, often with witnesses present.

**March 6, 2007:** In a lawsuit, Gerard Rechnitzer alleges that Combs punched him, pushed his girlfriend and tried to spit on another woman outside Teddy's nightclub at the Hollywood Roosevelt Hotel. In a statement, Combs' attorney, Benjamin Brafman, says, "It's just another example of an opportunist seeking to fabricate a lawsuit based on a flat-out lie to try to take advantage of Mr. Combs' celebrity status." The case is settled out of court in March 2008, the terms undisclosed.

**May 11, 2007:** In a complaint to the police, Combs' Making the Band co-star Laurieann Gibson alleges that he threatened her with a chair while New Edition's Michael Bivins held her in place.

**2010:** In the November 2023 suit, Ventura claims all aspects of her life were "controlled by either Mr. Combs or his management companies." She claims he paid for her apartment and all living expenses and that he had access to her medical records: "For instance, when Ms. Ventura began experiencing memory loss — potentially due to excessive drug use and/or head injuries caused by Mr. Combs' beatings, as described below — her MRI results were provided directly to Mr. Combs. Mr. Combs also repeatedly arranged for his staff to drive Ms. Ventura to certain medical appointments. In this way, Mr. Combs exerted ownership over Ms. Ventura."

**February 2012:** In the November 2023 suit, Ventura alleges that Combs said he was going to blow up the car of rapper Kid Cudi, whom Ventura was dating at the time, "and that he wanted to ensure that Kid Cudi was home with his friends when it happened. Around that time, Kid Cudi's car exploded in his driveway." Kid Cudi, in a statement to The New York Times, corroborated the account.

21

**September 2018:** After multiple attempts to sever ties with Combs, Ventura says she met with him to have dinner and believed it was to talk of concluding her Bad Boy contract and "have a discussion about concluding their relationship for good." But after the dinner, Ventura alleged he forced himself into her apartment and forcibly raped her. From her November 2023 suit: "Soon thereafter, Ms. Ventura took steps to completely separate herself from her long-time abuser, including by leaving the home that he paid for and returning the car he purchased for her."

**2022 – 2023:** In a February 2024 lawsuit, producer Rodney "Lil Rod" Jones, a former producer of Combs who worked with him on his latest release, The Love Album: Off the Grid, alleges that the music mogul groped him repeatedly and during the duration of making the album, Combs forced Jones to solicit sex workers, take illegal drugs and more. The suit names others close to Combs, including Combs' son, Justin Dior Combs, and high-ranking members of Motown Records and Universal Music Group, as co-defendants.

**Nov. 16, 2023:** Ventura accuses Diddy of years of sexual misconduct, harassment, sex trafficking and rape. Ventura's allegations lasted for the entirety of their working and personal relationship. Ventura files the civil suit in New York Superior Court under the state's Adult Survivors Act, a New York law permitting victims of sexual abuse a one-year window to file civil action regardless of the statute of limitations of the crimes themselves. (Tiffany Red, a songwriter and one of Cassie's collaborators, later publicly corroborates her claims.)

**Nov. 23, 2023:** One day before the window for filing suits under the Adult Survivors Act is set to close, two separate lawsuits alleging misconduct in the early 1990s are filed against Combs in New York Superior Court: one by Joi Dickerson and the other by an unnamed plaintiff.

**Dec. 6, 2023:** The unnamed fourth person comes forward, accusing Combs and others of gang rape in 2003.

**Dec. 10, 2023:** In response to the accusations, 18 brands sever ties with Combs' Black-owned e-commerce venture, Empower Global.

**Dec. 11, 2023:** A public petition started by feminist and survivor advocacy group UltraViolet circulates, calling for The Recording Academy to rescind Combs' 2024 Grammy nomination for progressive R&B album amid the sexual abuse allegations.

22

**Dec. 13, 2023:** In response to the accusations, streaming network Hulu scraps a reality show project featuring Combs that was previously in development and centered around the mogul and his family.

**Feb. 26, 2024:** The fifth assault lawsuit is filed against Combs by Rodney "Lil Rod" Jones. Combs' lawyer denies the allegations, claiming, "We have overwhelming, indisputable proof that his claims are complete lies."

77. Hall and Combs have a pattern and practice of engaging in illegal sex acts.

### Corporate Defendants Have A Pattern and Practice of Employing Convicted Rapists and Alleged Sexual Predators

78. Upon information and belief, UMGR has contracted with Łukasz Sebastian Gottwald (aka, Dr. Luke"). In October 2014, Kesha sued Dr. Luke, accusing him of drugging and raping her. According to information and belief, in 2021, Gottwald launched Amigo Records as an imprint of Republic Records, a subsidiary of UMGR. Apparently, UMGR saw no issue with employing Dr. Luke to produce music for their artist Nicki Minaj.

79. Upon information and belief, former UMGR employee Russell Simmons brutally raped Music Producer Drew Dixon in 1995.

80. Upon information and belief, UMGR's former employee, Antonio Marquis "L.A." Reid, the former CEO of UMGR subsidiary, the Island Def Jam Music Group, brutally raped music producer Drew Dixon.

81. Upon information and belief, former UMGR employee Russell Simmons brutally raped writer Jenny Lumet.

82. Upon information and belief, former UMGR employee Russell Simmons brutally raped filmmaker Jennifer Jarosik.

83. Upon information and belief, former UMGR employee Russell Simmons brutally raped singer turned lawyer Tina Baker.

84. Upon information and belief, former UMGR employee Russell Simmons brutally raped musician Sherri Hines.

85. Upon information and belief, former UMGR employee Russell Simmons brutally raped writer and activist Sil Lai Abrams.

23

86. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted model Keri Claussen Khalighi.

87. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted publicist and author Kelly Cutrone.

88. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted reality television personality Luann de Lesseps.

89. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted actress Natashia Williams-Blach.

90. Upon information and belief, former UMGR employee Russell Simmons sexually harassed or assaulted musical journalist Toni Sallie.

91. In 2023, a judge ordered UMGR to pay $500,000 to the child victims of UMGR employee R. Kelly. Mr. Kelly was convicted of sex trafficking in the United States District Court for the Eastern District of New York. He is currently serving 30 years in prison.

92. At his sentencing, US District Judge Ann Donnelly said UMGR employee R. Kelly had an "indifference to human suffering" and had used sex as a weapon, forcing his victims to do unspeakable things while saddling some with sexually transmitted diseases. "You taught them that love is enslavement and violence."

93. As evidenced by their pattern and practice of employing depraved deviants, Corporate Defendants employed admitted rapist Hall and Combs.

94. Throughout the years, UMGR has partnered with and employed Combs despite his many public run-ins with the law:

   a. In April of 1999, after a dispute over the use of footage in a music video, the record producer and UMGR employee Steve Stoute claimed Mr. Combs and his bodyguards beat him with a champagne bottle, a telephone, a chair, and their fists. Upon information and belief, despite one of their employees being physically assaulted by Combs, UMGR did not hesitate to employ Combs from 2003 to 2005.

   b. According to a December 2023 lawsuit, in 2003, Combs, his former Bad Boy Records president, Harve Pierre, and a third unidentified man allegedly gang-raped an unnamed 17-year-old victim at a Manhattan recording studio while Combs was an employee of UMGR. Upon information and belief, UMGR did not end Combs' employment at that time.

24

## UR, UMGR, MCA and/or UMGRRNV WERE
### *RESPONDEAT* SUPERIOR FOR HALL, SWING, AND COMBS

95. Hall was an employee of UR, UMGR, MCA and/or UMGRRNV at the time he raped Plaintiff. Swing was an employee of these corporate entities at the time when he aided and abetted in the rape of the child whom he was the co-guardian of. Combs was an employee of these corporate entities at the time he raped Plaintiff.

96. Corporate Defendants enabled Hall and Combs to statutorily rape the child and to commit many other crimes of a sexual nature. This includes prohibited sexual acts as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1) violence motivated by gender. Corporate Defendants are liable to Plaintiff.

97. Corporate Defendants enabled or participated in the sexual abuse of Plaintiff because Defendants failed to, among other things, protect Plaintiff from a known danger; have sufficient policies and procedures in place to prevent sexual assault and the distribution of alcohol to a child; properly implement policies and procedures to prevent sexual assault and the distribution of alcohol to a child; take reasonable measures to ensure that policies to prevent sexual assault and the distribution of alcohol to a child were working; train their employees on identifying sexual assault and inappropriate workplace behaviors; protect their employees from sexual assault; and adhere to the applicable standard of care.

98. Corporate Defendants enabled or participated in the sexual abuse of Plaintiff because Defendants failed to timely and properly educate, train, supervise, and/or monitor their agents or employees regarding policies and procedures that should be followed when sexual abuse is suspected or observed.

99. Prior to Combs and Hall sexually assaulting Plaintiff, Corporate Defendants knew or should have known that Combs and Hall were not fit to be in a position of authority. Defendants, by and through their agents, servants, and/or employees, became aware, or should have become aware, of Combs and Hall's propensity to commit sexual assault and of the risk to Plaintiff's safety. At the very least, Defendants knew or should have known that they did not have sufficient information about whether their leaders, managers, and people were safe to be in positions of power to harm a minor child like Plaintiff.

25

100.    Defendant Corporate Defendants knew or should have known that Combs and Hall posed a risk of sexual assault. Corporate Defendants failed to properly supervise Combs and Hall and protect Plaintiff from a known danger, thereby enabling Combs and Hall to repeat sexual assault on Plaintiff.

101.    Defendant Corporate Defendants negligently deemed Hall and Combs as fit to be in a position of authority and/or that any previous suitability problems Hall and Combs had were fixed and cured and/or that Hall and Combs would not commit acts of sexual assault and/or that Hall and Combs would not injure others.

102.    Moreover, Corporate Defendants enabled the sexual abuse of Plaintiff by actively maintaining and employing Hall and Combs in a position of power and authority through which Hall and Combs had control and influence over people, including Plaintiff.

## DAMAGES

103.    The actions of Hall and Combs have stayed with Ms. Gardner throughout the duration of her life. After being violently and statutorily raped by Combs and Aaron Hall, Ms. Gardner's life has been overwhelmed by depression, post-traumatic stress disorder, and strained relationships with men.

104.    The harm that Ms. Gardner has suffered is well documented through multiple excited utterance witness statements, as well as through documentation from her medical providers.

105.    In an affidavit, Ms. Gardner's friend whom she met in 2017, details a conversation the pair had during a trip to Las Vegas in 2019 where they discussed their childhood and some interactions with musicians and artists.

106.    In the affidavit, Ms. Gardner's friend went on to say, at that time, Ms. Gardner shared her experience of sexual assault at the hands of Aaron Hall and Sean "Puffy" Combs.

She writes,
"Liza said she was 16 years old and had been invited to New York by a couple of her friends who were members of the RnB group Jodeci. At the time, Jodeci was signed to MCA or Uptown Records. Liza is from North Carolina and had known members of Jodeci from their neighborhood and church in North Carolina.

When she came to New York, MCA hosted an event for one of their artists. Liza was given alcohol at this event and was invited to dinner. Other MCA artists, Queen Latifah and Mary

26

J. Blige, were at this dinner. After dinner, Liza was invited back to Aaron Halls apartment for an afterparty. Present at this afterparty were members of Jodeci, Puffy, and Aaron Hall.

Aaron Hall gave Liza more alcohol, and she recalls feeling lightheaded and dizzy. She said Puffy was acting very aggressive and forced himself onto her. After he finished, she tried to collect herself and get dressed. Before she knew it, Aaron Hall burst into the room, held her down, and raped her. She said she felt helpless. She could not fight him off as he was significantly bigger and stronger than her. She said she laid there in disbelief. After Aaron Hall was finished raping her, she ran out of the house.

The following day, she was awoken by Puffy yelling and screaming as he searched for Liza's friend, who he believed was going to report the assault from the night before. Liza's friend was not in the house, and Puffy turned to her, demanding that she give up her friend's location. She told him she did not know, and Puffy began to strangle her."

107.     Ms. Gardner's licensed therapist provided a letter that said the following:

The therapist writes,

"I am writing to verify my recorded notes of what my client Liza Gardner disclosed during her treatment, as well as my professional opinion of her subsequent symptomology as a result of her early Trauma.

I began seeing Liza as of 1/9/2014 through 7/30/2014. Unfortunately, therapy became cost-prohibitive for the client to continue for any length of time. While in treatment, Liza was consistent and engaged in the therapy.

As my records indicate on 2/18/2014, my client disclosed that she was raped by two males in New York when she was 16 years of age."

It is my professional opinion that the trauma of being raped by two men accounted for much of her ongoing symptoms of hypervigilance, anxiety, panic attacks, and episodes of depression, all, symptoms indicative of PTSD.

## FIRST CAUSE OF ACTION
### Battery
### (Against Hall and Combs)

108.     Liza Gardner incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

109.     Defendants committed battery against Ms. Gardner when they both penetrated Ms. Gardner's sixteen-year-old vagina with their penises against her will and, in the case of Combs, physically assaulted her when he choked her the following morning.

110.     Defendants intentionally, and without her consent, attacked Ms. Gardner to satisfy their sexual desires.  Under all circumstances, the defendants' physical contact with Ms.

Gardner was offensive and wrongful. Defendants continued to attack Ms. Gardner despite her attempts to thwart their actions.

111.    The Plaintiff's claim for battery is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

112.    Plaintiff repeats and reiterates each paragraph and allegation of this complaint as if set forth at length herein.

113.    As this Court may be aware, new legislation that affects all sexual abuse-based lawsuits was passed on May 13, 2019, and took effect on December 1, 2019. This legislation significantly alters Sexual Abuse Litigation. The legislation listed as P.L. 2019, c.120 extends the Statute of Limitations in civil actions for sexual abuse claims, expands categories of potential defendants in Civil Actions, and creates a two-year window for parties to bring previously time-barred actions based on sexual abuse.

114.    Specifically, P.L. 2019, c.120 expands the Statute of Limitations from two (2) years to seven (7) years. P.L. 2019, c .120 makes charitable organizations liable for the negligent or willful, wanton, or grossly negligent conduct of trustees, officers, agents, employees, volunteers, and servants. Defendants may attempt to rely on claims that Plaintiff's counts are time-barred. However, this law renders these defenses moot. Absent said defenses, Defendants' possible motion to dismiss will rely upon fact sensitive contentions which are improperly brought under a motion to dismiss.

115.    This Complaint alleges, among other things, that the Defendants had actual or constructive knowledge of sexual abuse by allowing their teachers, instructors, trustees, officers, agents, employees, volunteers, and servants to target young children for involuntary sexual activity. Despite this knowledge, Defendants failed to supervise, control, and monitor their teachers, instructors, trustees, officers, agents, employees, volunteers, and servants, failed to maintain effective policies and procedures for reporting and recognizing nonconsensual sexual activities, failed to properly protect children, failed to provide proper security, and failed to exercise due care under the circumstances.

28

116.     Defendants' conduct was the direct and proximate cause of Ms. Gardner's past and
future substantial damages, including significant pain and suffering, lasting psychological
and financial harm, loss of dignity, and invasion of privacy.

117.     The Defendants' actions constitute sexual offenses as defined in the New Jersey
Penal Law, including but not limited to sexual abuse as defined in section 1 of P.L.1992,
c.109 (C.2A:61B-1).

118.     The Plaintiff's claim for battery is thus timely under the amendment to the CSAA
(N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse
that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-
2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly
and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees
and costs as are allowed by law.

## SECOND CAUSE OF ACTION
### Assault/Sexual Assault
### (Against Hall and Combs)

119.     Liza Gardner incorporates by reference all preceding paragraphs and re-alleges
them as if set forth fully herein.

120.     As described above, Defendants Hall and Combs frightened and placed Plaintiff in
apprehension of harm when they raped her within the State of New Jersey.

121.     Defendants Hall and Combs forcibly touched and attempted and/or threatened to
touch Plaintiff's intimate areas and/or touched her with their intimate body parts.

122.     As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer
harm, including physical injury, severe emotional distress, humiliation, anxiety, and other
consequential damages for which she is entitled to an award of monetary damages and
other relief.

123.     The Defendants' actions constitute sexual offenses as defined in the New Jersey
Penal Law, including but not limited to sexual abuse as defined in section 1 of P.L.1992,
c.109 (C.2A:61B-1).

124.     The Plaintiff's claim for assault/sexual assault is thus timely under the amendment
to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child

29

sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

125.     The conduct of Defendants Hall and Combs described above was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

### THIRD CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

126.      Liza Gardner repeats and realleges by reference all paragraphs above as though fully set forth herein.

127.     Defendants' conduct created an unreasonable risk of causing emotional distress to Ms. Gardner, and the Defendants knew or should have known that such conduct (intoxicating a child with alcohol and marijuana transporting her across state lines, failing to provide a chaperone for a visibly intoxicated child, allowing their employees to rape her) was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

128.     Swing had a duty to plaintiff as her host and co-guardian not to place plaintiff in a position where she would be provided alcohol and then raped.  He invited her to NY/NJ under false pretenses, knowing that he intended to have Combs and Hall rape plaintiff. Swing failed his duty, and Plaintiff was harmed.

129.     Ms. Gardner's emotional distress was foreseeable to the Defendants.

130.     As a direct and proximate result of said extreme and outrageous conduct by the defendants, Ms. Gardner suffered humiliation, mental anguish, disassociation, and emotional and physical distress and has been hurt and injured in her health, both mentally

30

and physically, strength, activity, and her ability to lead an everyday life without mental anguish. All of these have caused, continue to cause, and will continue to cause Plaintiff great mental and physical pain and suffering for the rest of her life.

131. As a result of such severe emotional and mental distress, Ms. Gardner has been generally, especially, and consequentially damaged in an amount to be established, according to evidence.

132. The Defendants' behavior toward Ms. Gardner was so outrageous as to exceed all reasonable bounds of decency. The defendants knew with substantial certainty or should have known that their behavior would cause Ms. Gardner to be a victim of intoxication, sexual assault, sexual abuse, and sexual contact.

133. The Defendants knew with substantial certainty or should have known that intoxicating, transporting plaintiff across state lines, drugging, and raping Plaintiff would cause her to endure severe emotional distress.

134. The Defendants committed the infliction of emotional, physical, and mental distress willfully and intentionally and through coercion, oppression, fraud, and malice and consciously disregarded Ms. Gardner's rights. Therefore, Ms. Gardner is entitled to an award of exemplary or punitive damages in an amount to be established at Trial to meaningfully punish Defendants', thereby deterring similar conduct in the future.

135. The Plaintiff's claim for NIED is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

136. Upon information and belief, the aforementioned corporate Defendants, through its officers, directors, agents, and employees, was responsible for the acts and omissions that give rise to this action. Specifically, Defendants, acting by and through its duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

137. At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously

and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

138.     Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Ms. Gardner's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful act.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

<u>FOURTH CAUSE OF ACTION</u>
**Negligence (Premises Liability For The Sexual Assault)**
**(Against Hall and Corporate Defendants)**

139.     Ms. Gardner's references and realleges all preceding paragraphs as if set forth fully herein.

140.     Premises liability is not a cause of action under New Jersey law but a theory in which a plaintiff may bring a negligence claim. To establish such a claim, Plaintiff must plead four elements: "(1) a duty of care; (2) a breach of that duty; (3) actual and proximate causation; and (4) damages." *Shelley v. Christopher Acad.*, Civil Action No. 19-20751, 2021 U.S. Dist. LEXIS 139611, at *6-7 (D.N.J. July 27, 2021).

141.     **Duty**: As detailed above, Hall was the owner, lessee, or beneficiary of the property where the Plaintiff was drugged and raped. Corporate Defendants were the landlords, homeowners, or lessors of the property where the Plaintiff was raped. Hall invited, and Corporate Defendants transported the Plaintiff via a cab or private vehicle to the property where the Plaintiff was raped. On the night of the rape, Plaintiff was a child who was intoxicated because of the alcohol provided by Corporate Defendants. Defendant Hall had a duty not to sleep with Plaintiff or to provide her with additional alcohol and marijuana when she arrived at his property in New Jersey. Hall was 26 years old at the time, while Plaintiff was a child. Hall also had a duty to prevent Combs from sleeping with Plaintiff, who was a visibly intoxicated child. Corporate Defendants had a duty to ensure that Plaintiff, who was visibly intoxicated, was safe when she arrived at their property. They

had a duty to ensure that Plaintiff, who was a child, was not subject to drug use and sexual contact from Combs and Halls. Who were corporate defendants adult employees.

142.     **Breach of Duty**: Defendants did not protect Plaintiff from sexual assault from Hall and Combs. Defendants breached their duty to prevent Plaintiff from being raped by Hall and Combs.

143.     **Actual and Practical Cause**: Defendants were the actual and proximate cause of the harm that was visited upon Plaintiff due to their decision to invite and transport Plaintiff to the property where Plaintiff was raped. Defendants were responsible for Plaintiff's intoxication. Defendants were the cause of Hall and Combs sleeping with Plaintiff, who was a visibly intoxicated child.

144.     **Damages**: as a direct result of Defendants' negligence, Plaintiff suffers from PTSD, depression, severe anxiety, sleep deprivation, public humiliation, and shame.

145.     The conduct of Defendants described above was willful, wanton, and malicious. At all relevant times, Corporate Defendants knew or should have known that providing alcohol to a sixteen-year-old child and transporting that child across state lines was certain to cause injury to the child. Hall knew or should have known that providing alcohol and marijuana to a child and then allowing Combs to rape her was certain to cause injury to Plaintiff. Corporate Defendants knew or should have known that by sending an intoxicated child, unsupervised, to a home they either leased or owned to be with Hall and Combs, who were at least ten years older than her, would or could result in Plaintiff being raped. Corporate Defendants knew or should have known that Hall had the propensity to sleep with children, as evidenced by his admissions mentioned above. Collectively, the defendants acted with the knowledge of or with reckless disregard for the fact that their respective conduct was certain to cause injury and/or humiliation to Ms. Gardner and intended to cause fear, physical injury, and/or pain and suffering to Ms. Gardner. By virtue of the preceding, Ms. Gardner is entitled to recover punitive damage.

146.     The Plaintiff's claim for Negligence is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)). *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

147.     Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Ms. Gardner's injuries and damages.

148.     At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

149.     Ms. Gardner has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

### FIFTH CAUSE OF ACTION
**Vicarious Liability**
**(Against Corporate Defendants)**

150.     Plaintiff repeats, reiterates, and re-alleges all of the above paragraphs as if set fully forth herein.

151.     Combs and Hall both sexually assaulted and inflicted extreme emotional distress on Plaintiff.

152.     Defendants are vicariously liable for the actions of their agents, servants, licensees, and/or employees, especially Defendants Hall and Combs due to the fact that defendants created the environment, and the opportunity for their agents/employees to intoxicate and rape a minor child.

153.     Corporate Defendants' vicarious liability is triggered in part by the overt acts they committed when they provided Plaintiff, who was a child at the time, with unlimited amounts of alcohol.  At 16 years old, Plaintiff was statutorily prohibited from consuming alcohol, and the Corporate Defendants were statutorily prohibited from providing alcohol to Plaintiff.  Upon information and belief, in 1984, Congress passed the Minimum Drinking Age Act.  All states gradually began to raise their legal drinking age to 21. By 1990, all states had enacted this law, including New York and New Jersey.

154.     In addition to intoxicating the minor plaintiff, the Corporate Defendants then transported the plaintiff across state lines from New York to New Jersey in violation of the MANN Act.  Upon information and belief, the plaintiff, who had not drank alcohol prior to the Corporate Defendants providing it, was visibly intoxicated.  She was unchaperoned and was sent to the house that the Corporate Defendants purportedly subsidized for their employee, Hall.  The Corporate Defendants knew or should have known that Hall and Combs had a propensity to sleep with children.

155.     Upon information and belief, the corporate defendants have a pattern and practice of covering up the sexual assaults of their artist by paying off the victims through unmarked international wire transfers[11].  This practice explains why the Corporate Defendants did not hesitate to provide sixteen-year-old Plaintiff with alcohol and transport her across state lines to the home they subsidize for Hall.

156.     The Plaintiff has experienced pain and suffering as an adolescent and an adult; physical injury and pain; bodily injury (including sickness, disease, mental anguish or injury, shock, fear, and fright); social isolation; educational adjustment problems; mood swings; low self-esteem; relationship and intimacy problems; lack of trust in people; feelings of insecurity; discomfort from letting his children be in the presence of others; family discord; medical expenses; emotional trauma; diminished childhood; diminished enjoyment of life; costs of counseling; lost wages; severe emotional distress; diminished enjoyment of life; diminished enjoyment of childhood; difficulty and an inability to focus; difficulty and an inability to perform educational tasks; anxiety; depression; humiliation; pain in mind and body; and severe embarrassment.  Additionally, Plaintiff is having and

---

[11] If corporate defendants are foolish enough to challenge this point the plaintiff reserves her right t replead and add the names of all of their artist who's rapes the corporate defendants covered up through hush money payments.

35

has had difficulty living a normal life; is and has not engaged in normal development and activities; suffers from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in his full normal daily activities.

157.    The Plaintiff's claim for Vicarious Liability is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)).  *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

158.    Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

159.    At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

160.    Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

### SIXTH CAUSE OF ACTION
**Violation Of The New Jersey Child Sexual Abuse Act**
**N.J. Stat. § 2A:61B-1**
**(Against Corporate Defendants)**

161.    Plaintiff repeats, reiterates, and re-alleges all of the above paragraphs as if set fully herein.

162.    Corporate Defendants, as social hosts, employers, organizers, supervisors, and sanctioning body for Hall and Combs, owed a duty to invitees and guests, such as Plaintiff.

163.    Corporate Defendants had a duty to take reasonable steps to protect Plaintiff, a minor child, from foreseeable harm when she was invited to their event.  Upon her arrival at their event, the Corporate Defendants assumed a duty of care, custody, and control over the minor plaintiff, including when they placed the intoxicated minor in a car and trafficked plaintiff across state lines to a property they subsidized for Hall in a clear violation of the MANN Act.

164.    Corporate Defendants owed a duty to keep participants at their event, such as Plaintiff, who was a minor, safe.

165.    Corporate Defendants had a duty to prevent Hall and Combs from using the premises, instrumentalities in their position with each institutional defendant to target, groom, intoxicate (marijuana and alcohol, which were both illegal for children to consume in 1990), and sexually abuse children, including Plaintiff.

166.    The Corporate Defendants were in loco parentis with the Plaintiff, knew or should have known that the Plaintiff was vulnerable to Defendants Hall and Combs' actions, and should have had measures in place to prevent such conduct.

167.    Corporate Defendants recklessly, negligently, and carelessly breached their duty in the following ways:

    a.  Failing to observe, supervise, and keep the plaintiff safe when it invited the plaintiff to their event.  Knew or should have known that Plaintiff was a child.  They assumed the responsibility of caring for the minor plaintiff by failing to request the presence of the plaintiff's parents, guardians, or chaperones.  In doing so, Corporate Defendants stood in loco parentis to plaintiffs;

    b.  Failing to have or enforce proper protocols and procedures within their organizations to prevent sexual abuse of minors;

    c.  Failing to have proper policies and procedures for the adequate supervision and observation of Plaintiff;

    d.  Failing to adequately monitor the activities of Hall and Combs to ensure that they do not pose a risk to minors attending the institutional defendant's party;

      e.  Failing to recognize Hall and Combs' conduct as presenting a risk of sexual abuse to Plaintiff;

      f.  Failing to identify Combs and Hall as sexual abusers; Failure to investigate, research, and/or perform background checks of Hall and Combs before certifying, promoting, and presenting them as employees;

      g.  Failure to have policies in place to identify potential sexual abusers before certifying, promoting, and presenting them as employees; and Creating a culture of permissiveness that allowed adults to prey on minors such as Plaintiff.

168.     Defendants knowingly permitted and/or acquiesced in the sexual abuse Plaintiff suffered in violation of the New Jersey Child Sex Abuse Act.

169.     Defendants' acts and/or omissions constitute negligence, gross negligence, malice vindictiveness, wanton and reckless disregard, and indifference to Plaintiff's rights and safety.

170.     Specifically, Plaintiff has experienced pain and suffering as an adolescent and an adult; physical injury and pain; bodily injury (including sickness, disease, mental anguish or injury, shock, fear, and fright); social isolation; educational adjustment problems; mood swings; low self-esteem; relationship and intimacy problems; lack of trust in people; feelings of insecurity; discomfort from letting his children be in the presence of others; family discord; medical expenses; emotional trauma; diminished childhood; diminished enjoyment of life; costs of counseling; lost wages; severe emotional distress; diminished enjoyment of life; diminished enjoyment of childhood; difficulty and an inability to focus; difficulty and an inability to perform educational tasks; anxiety; depression; humiliation; pain in mind and body; and severe embarrassment. Additionally, Plaintiff is having and has had difficulty living a normal life; is and has not engaged in normal development and activities; suffers from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in his full normal daily activities.

171.     The Plaintiff's claim for Vicarious Liability is thus timely under the amendment to the CSAA (N.J.S.A. 2A:14-2a(a)(1)) was explicitly made retroactive, applying to child sexual abuse that 'occurred prior to, on or after'" the effective date. *Id.* at 512 (quoting N.J.S.A. 2A:14-2a(a)(1)).  *Maia v. IEW Constr. Grp.*, 2024 N.J. LEXIS 439, at *21 (May 15, 2024).

172.     Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

173.     At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of respondeat superior, agency, and corporate negligence.

174.     Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

**SEVENTH CAUSE OF ACTION**
**Negligent Hiring, Training, Accreditation and Supervision**
**(Against Corporate Defendants)**

175.     Plaintiff Gardner repeats, reiterates, and re-alleges all of the above paragraphs as if set fully herein.

176.     This is an action for negligence and/or gross negligence and/or recklessness and/or intentional conduct, conspiracy and damages against defendants.

177.     At all relevant times, Defendants Combs and Hall were employees, agents, and/or servants of the Corporate Defendants, John DOES 1-10 and Jane DOES 1-10.

178.     As such, Defendants Combs and Hall were under the direct supervision, employ, and/or control of the Corporate Defendants, John DOES 1-10 and Jane DOES 1-10.

179.　　At all relevant times, Defendants had a duty to ensure that Hall and Combs did not sexually abuse, assault, and/or molest children.

180.　　Defendants recklessly, negligently, and carelessly breached their duty in the following ways:

    a. Failing to properly investigate their employees, including Hall and Combs.

    b. Failing to perform a proper background check on Defendants Combs and Hall prior to allowing them to come into contact with minors such as Ms. Gardner;

    c. Failing to review and assess Hall and Combs's application to be an employee;

    d. Failing to check Hall and Combs references prior to allowing them to be an A&R and Artist;

    e. Failing to adequately investigate and/or ignoring the previous misconduct and/or general lack of fitness as an A&R and Artist;

    f. Ignoring the misconduct and/or general lack of fitness for duties of Hall and Combs;

    g. Failing to make sufficient inquiry into the moral character of Hall and Combs by, among other things, failing to investigate his overall fitness and suitability to be an A&R and Artist;

    h. Failing to subject Hall and Combs to adequate, valid, and appropriate psychological testing;

    i. Failing to monitor defendant Hall and Combs' conduct during their teaching/instructing, supervising, or advising regard to his relationship with minors; failed employment, period with to warn the plaintiff of the deviant sexual behaviors of Hall and Combs.

    j. Upon information and belief, and according to public accounts, failing to fire and remove Defendants Hall and Combs, resulting in Hall kidnapping, raping and impregnating 15-year-old Gloria Velez four years later at one of corporate defendants parties or events;

    k. Failing to adequately monitor the activities of its employees, such as Hall and Combs, to ensure that they do not pose a risk to minors;

    l. Failing to strip Defendants Hall and Combs' of their employment; and

    m. Failing to train agents, servants, licensees, and/or employees on investigation, detection, and reporting of sexual abuse allegations.

181.　　The actions/inactions complained of hereinabove were at least negligent and/or grossly negligent and were malicious, willful, intentional, and revealed a reckless and wanton disregard and indifference for the safety and protection of the plaintiff and the rights of the plaintiff.

182.　　Specifically, Plaintiff has experienced pain and suffering as an adolescent and an adult; physical injury and pain; bodily injury (including sickness, disease, mental anguish or injury, shock, fear, and fright); social isolation; educational adjustment problems; mood swings; low self-esteem; relationship and intimacy problems; lack of trust in people;

feelings of insecurity; discomfort from letting his children be in the presence of others; family discord; medical expenses; emotional trauma; diminished childhood; diminished enjoyment of life; costs of counseling; lost wages; severe emotional distress; diminished enjoyment of life; diminished enjoyment of childhood; difficulty and an inability to focus; difficulty and an inability to perform educational tasks; anxiety; depression; humiliation; pain in mind and body; and severe embarrassment.

183.    Additionally, Plaintiff is having and has had difficulty living a normal life; is and has not engaged in normal development and activities; suffers from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in his full normal daily activities.

184.    Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

185.    At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

186.    Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

**EIGHT CAUSE OF ACTION**
**Failure To Detect, Investigate and Report Sexual Abuse**
**(Against Corporate Defendants)**

187.  Plaintiff repeats, reiterates, and re-alleges all of the above paragraphs as if set fully herein.

188.  Defendants recklessly, gross negligently, negligently, and carelessly breached its duty in the following ways:

    a.  Failing to have adequate processes for detection, investigation, and reporting of sexual abuse allegations;

    b.  Failure to enforce processes for detection, investigation, and reporting of sexual abuse allegations;

    c.  Failing to investigate complaints of child sex abuse, together with other complaints made regarding Defendants Hall and Combs;

    d.  Ignoring complaints of child sex abuse made regarding Defendants Hall and Combs;

    e.  Concealing complaints of child sex abuse made regarding Defendants Hall and Combs;

    f.  Failing to report complaints of child sex abuse made regarding Defendants Hall and Combs to appropriate authorities for investigation;

    g.  Failing to have proper protocols, procedures, and guidelines for the prevention, detection, and investigation of sexual abuse allegations.

189.  Specifically, Plaintiff has experienced pain and suffering as an adolescent and an adult; physical injury and pain; bodily injury (including sickness, disease, mental anguish or injury, shock, fear, and fright); social isolation; educational adjustment problems; mood swings; low self-esteem; relationship and intimacy problems; lack of trust in people; feelings of insecurity; discomfort from letting her children be in the presence of others; family discord; medical expenses; emotional trauma; diminished childhood; diminished enjoyment of life; costs of counseling; lost wages; severe emotional distress; diminished enjoyment of life; diminished enjoyment of childhood; difficulty and an inability to focus; difficulty and an inability to perform educational tasks; anxiety; depression; humiliation; pain in mind and body; and severe embarrassment. Additionally, Plaintiff is having and has had difficulty living a normal life; is and has not engaged in normal development and activities; suffers from behavior patterns and will continue to do so in the future; will in the future be caused to endure severe pain in mind and body; has endured interference with and will continue to endure interference with engaging in his full normal daily activities.

190.  Upon information and belief, the aforementioned corporate defendants, through their officers, directors, agents, and employees, were responsible for the acts and omissions

that give rise to this action. Specifically, the corporate defendants, acting by and through their duly authorized agents and employees, negligently and/or recklessly performed or failed to perform duties within the scope of their employment and/or authority, which directly and proximately caused Plaintiff's injuries and damages.

191.     At all relevant times, the aforementioned corporate defendants had the duty to properly hire, train, supervise, and retain their employees and agents. The corporate defendants' failure to do so constitutes corporate negligence for which they are vicariously and directly liable under the doctrines of *respondeat superior*, agency, and corporate negligence.

192.     Plaintiff has properly pleaded the corporate liability of the aforementioned corporate defendants by establishing that the wrongful acts and omissions of their employees and agents, while acting within the scope of their employment, were the direct and proximate cause of Plaintiff's injuries. Accordingly, the aforementioned corporate defendants are liable to Plaintiff for all damages sustained as a result of these wrongful acts.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## <u>NINTH CAUSE OF ACTION</u>

### Intention Infliction of Emotional Distress
### (Against The Corporate Defendants)

193.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

194.     Defendants, including the corporate defendants, and individual defendants Hall, Combs and Swing, engaged in extreme and outrageous conduct by knowingly allowing the sexual assault of a minor, Ms. Gardner, to occur.

195.     Defendants were fully aware of the ongoing assault against Ms. Gardner, as a minor, and other victims under their control or on their premises and deliberately failed to intervene. Despite their responsibility to ensure the safety and well-being of those in their care, Defendants allowed the assaults to continue unchecked.

196.     At all relevant times, Defendants knew, or should have known, that Ms. Gardner was being assaulted and/or otherwise abused as a minor. Despite this knowledge, the

corporate defendants refused to discipline the perpetrators, take protective measures, or stop the abuse. Defendants' inaction in the face of this known and repeated misconduct amounted to a complete disregard for Ms. Gardner's safety and well-being, creating an environment where assaults were permitted to continue, as evidenced by the kidnapping and rape of 15-year-old Gloria Velez four years later.

197.    Defendants either intended to cause severe emotional distress to Ms. Gardner or acted with reckless disregard for the probability that their failure to intervene would result in severe emotional harm. Their refusal to protect Ms. Gardner, to stop the assault, or to discipline those responsible was carried out with a reckless indifference to the emotional trauma that would naturally result from such ongoing abuse.

198.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Ms. Gardner has suffered severe emotional distress, including but not limited to, anxiety, depression, fear, humiliation, and profound psychological trauma. This emotional distress stems from the continuous assaults and Defendants' knowing and deliberate refusal to act, despite their awareness of the ongoing harm.

199.    The emotional distress suffered by Ms. Gardner as a result of the Defendants' conduct is severe and enduring. Ms. Gardner has experienced significant psychological trauma, loss of security, mental anguish, and a fear for her personal safety that has impacted her life in a lasting and debilitating manner. Defendants' failure to protect Ms. Gardner and their disregard for her emotional and physical well-being has caused substantial harm.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

44

## TENTH CAUSE OF ACTION
### MANN ACT VIOLATIONS
### *18 U.S.C. § 2421*
**Coercion of a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b),
and transportation of a minor with intent to engage in illegal sexual activity in violation
of 18 U.S.C. § 2423(a).**
### (Against All Defendants)

200.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

herein.

201.     Defendants knowingly violated the Mann Act, *18 U.S.C. § 2421*, *et seq*., that

provides, *inter alia*

   a.   IN GENERAL.—
        ***Whoever knowingly transports any individual in interstate or foreign commerce,
        or in any Territory or Possession of the United States, with intent that such
        individual engage** in prostitution**, or in any sexual activity for which any person
        can be charged with a criminal offense or attempts to do so, shall be fined under
        this title or imprisoned not more than 10 years, or both.***

202.     Defendants knowingly transported the child across state lines, from New York to

New Jersey, with the intent to violate New Jersey's statutory rape, drinking and marijuana

laws as set forth above.

203.     Defendants actions involved interstate commerce, with the intent to have Plaintiff

engage in what Defendants' knew was illegal underage drinking, marijuana use, and sexual

intercourse. Defendants knowingly engaged in such fraudulent and unlawful acts with the

express knowledge that Plaintiff was visibly intoxicated, weight less than a hundred

pounds, was a child, and could not consent to drinking alcohol, smoking marijuana, and

having sex with two adult males. These matters have been pled with particularity in

previous numbered paragraphs of the within Complaint and those averments are

incorporated herein by reference thereto.

204.     Defendants knew that the child would, as a result of Defendants' unlawful activities,

engage in sexual activity whereby Defendants can be charged (and should be charged) with

a criminal offense.

205.     Defendants have violated *22 U.S. Code § 7101*, *et seq*., that provides for criminal

penalties for violations of the Statute as well as civil cause of action.

206.     Defendants have violated the Mann Act, 18 U.S.C. § 2421, *et seq*., for which

Defendants can and should be criminally prosecuted.

45

207.     Pursuant to 18 U.S.C. § 1595(a), "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees".

208.     Defendants have violated the criminal laws of New Jersey, as are set forth in previous numbered paragraphs of this Complaint for which Defendants may be criminally prosecuted; these paragraphs are incorporated herein by reference thereto.

209.     Defendants have violated the criminal laws of New York, as are set forth below, for which Defendants may and should be criminally prosecuted:

    a.   Unlawfully Dealing with a Child in the First Degree prohibits providing alcohol to a person under 21. (Penal Law § 260.20(2).

    b.   Sex Trafficking (PL 230.34)

    c.   Sex Trafficking of a Child (PL 230.34-a)

210.     Defendants' actions were meant to intoxicate and prostitute the child to satisfy their personal and their employees sexual needs.

211.     Defendants actions have damaged Plaintiff in an amount in excess of $10,000,000.00, caused her other financial damage as well as physical and mental damages.

212.     Plaintiff is entitled to monetary damages against the Defendants, jointly and severally, in an amount in excess of $10,000,000.00. Further Plaintiff is entitled to attorneys' fees for bringing this action.

213.     The emotional distress suffered by Ms. Gardner as a result of the Defendants' conduct is severe and enduring. Ms. Gardner has experienced significant psychological trauma, loss of security, mental anguish, and a fear for her personal safety that has impacted her life in a lasting and debilitating manner. Defendants' failure to protect Ms. Gardner and their disregard for her emotional and physical well-being has caused substantial harm.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

46

## ELEVENTH CAUSE OF ACTION
### Aiding and Abetting
### (Against Defendant Swing)

214.     Plaintiffs repeat and reiterate the allegations above as if set forth verbatim herein.

215.     The New Jersey Supreme Court has adopted the definition of "aiding and abetting" set forth in *Hurley v. Atlantic City Police Dep't* 174 F.3d 95, 129 (3d Cir. 1999).

216.     Aiding and abetting liability requires "active and purposeful conduct." *Id.* at 83. *Colantino v. Villa Enters. Mgmt.*, 2019 N.J. Super. Unpub. LEXIS 3665, *23-24.

217.     Here, as evidenced by the sworn declaration of Monica Case the Defendant Swing was: "in the room, leaning against the wall or furniture or something, watching whatever Puffy was doing to Liza."

218.     As detailed above, Puffy (Combs) was raping the Child.  Swing was her co-guardian at the time, he invited her to New York/New Jersey. He had a duty to protect the Child as her parents entrusted him with her safety.  He trafficked and or coerced the child travel across state lines from North Carolina to New York and New Jersey with the hidden intention of providing the child with alcohol, and marijuana and prostituting the child to his A&R Combs.  As evidenced by the YouTube states from Hall, Swing was accustomed to "watching him fuck." Ms. Case's sworn declaration under penalty of perjury, confirms Halls statement as it relates to the child.

219.     Defendant Swing, in his position as an employee/agent for Defendant Corporation, and Combs, knowingly, and eagerly aided and abetted the defendants plan to intoxicate, drug, sex traffic, and brutally rape the child.  Defendant Swing got personal gratification while pervertedly treating the child's statutory rape as a live pornographic film.  As the child indicated above, she tried to fight Hall off and was writhing in pain due to the size of his penis, presumably, Defendant Swing stood there, witnessed this, and did nothing to help the child whom he had a co-responsibility to care for.

220.     The harm suffered by Ms. Gardner because of the Defendants' conduct is severe and enduring. Ms. Gardner has experienced significant psychological trauma, loss of security, mental anguish, and a fear for her personal safety that has impacted her life in a lasting and debilitating manner. Defendants' failure to protect Ms. Gardner and their disregard for her emotional and physical well-being has caused substantial harm.

47

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, jointly and severally, for general, compensatory, exemplary, and punitive damages plus such interest fees and costs as are allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

a. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the State of New Jersey;

b. An award of damages against Defendants, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

c. An award of damages against Defendants, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

d. An award of punitive damages, in an amount to be determined at Trial;

e. Prejudgment interest on all amounts due;

f. An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

g. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR INSURANCE COVERAGE

In accordance with R. 4:10-2, defendants are demanded to provide a complete copy of their applicable insurance policies and declaration sheets demonstrating coverage within thirty (30) days of service of this Complaint.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____
TYRONE A. BLACKBURN

## CERTIFICATION

I hereby certify that this matter is not the subject of any other action pending in any court or arbitration proceeding, that Plaintiff contemplates no such other action or arbitration proceeding, and that there are no other parties, whom to the knowledge of Plaintiff's counsel, should be joined in this action. I hereby certify that the statements I made are factual. I am aware that if any of the preceding statements I made are willfully false, I am subject to punishment.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____
TYRONE A. BLACKBURN

## DEMAND FOR TRIAL BY JURY

The plaintiffs demand a trial by jury on all issues involved in this matter.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____
TYRONE A. BLACKBURN

## DESIGNATION OF TRIAL COUNSEL

Please note that Tyrone Blackburn, Esq. is hereby designated as Trial Counsel in the above-captioned matter, according to R.4:25 et. seq.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____
TYRONE A. BLACKBURN

49

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors.

From this point forward, you are directed to prevent "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any information set forth hereafter.

**If you cause any such alteration, destruction, or change, direct it, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation**.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, C.D.s, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter.

Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court to order the preservation of documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion.

Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we are likely to seek all documents in their original, electronic form, along with metadata or information about those documents in the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, you must take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after the date of filing this pleading, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____

TYRONE A. BLACKBURN

51

## DEMAND FOR ANSWERS TO SUPPLEMENTAL INTERROGATORIES

Under R. 4:17-1 *et seq*., Plaintiff hereby demands that Defendants Sean Combs and Aaron Hall provide certified answers to the following supplemental interrogatories:

1.  Please state whether, upon or about 1990, you had physical contact with the Plaintiff by inserting your penis in the Plaintiff's vagina.

2.  Please state whether, upon or about 1990, you had physical contact with the Plaintiff by inserting your penis in the Plaintiff's mouth.

3.  Please state whether, upon or about 1990, you had physical contact with the Plaintiff by inserting your penis in the Plaintiff's anus.

4.  If your answer to interrogatory numbers 1-3 was yes, please identify each person who knows any fact relating to this conduct.

5.  If your answer to interrogatory numbers 1-3 was yes, please identify each writing relating to this conduct (including but not limited to email, text messages, WhatsApp, Signal, Sessions, and/or social media app messages).

6.  Please identify the present custodian of each writing identified in your answer to interrogatory number 5.

7.  If your answer to interrogatory numbers 1-3 was no, please set forth each fact upon which you base such denial.

8.  If your answer to interrogatory numbers 1-3 was no, please identify each person who knows any fact relating to such denial.

9.  If your answer to interrogatory numbers 1-3 was no, please identify each writing relating to such denial (including but not limited to email, text messages, WhatsApp, Signal, Sessions, and/or social media app messages).

10. Please identify the present custodian of each writing identified in your answer to interrogatory number 9.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____
TYRONE A. BLACKBURN

52

## DEMAND FOR PRODUCTION OF DOCUMENTS

Under R. 4:18-1, *et seq*., Plaintiff hereby demands that the individual Defendants provide the following documents:

1. Any statements or reports from any person or governmental entity concerning this civil action or its subject matter.

2. Copies of any and all photographs or videos in your possession of the Plaintiff and the defendants in or about 1990 at the location where Plaintiff claims the sexual assault took place.

3. Copies of any claims information bureau or other insurance claim searches or other documents referencing any prior or subsequent injuries and claims by Plaintiff.

4. Copies of any oral or written statements made by any person with regard to all happenings having to do with the subject matter of this action.

5. Copies of any and all expert reports, reports of diagnostic tests, hospital and medical records, X-rays, CAT scan films, MRI films, and any other films and bills relating to any condition or injury sustained by Plaintiff.

6. Copies of all written reports or summaries of oral reports of all expert or treating or examining physicians along with their curriculum vitae.

7. Copies of any and all books, treatises, commentaries, reports, statutes, codes, ordinances, rules, regulations, or other published documents referred to, utilized by, or relied upon by any expert witness whom the plaintiff/defendant intends to call during the Trial.

8. Copies of any and all photographs, diagrams, charts, drawings, maps, plans, models, or other visual reproductions of any object, place, or thing related to this litigation.

DATED: October 8, 2024

**T. A. Blackburn Law, PLLC**

_____/s/*Tyrone a. Blackburn, esq.*_____

TYRONE A. BLACKBURN

**DEMAND FOR ANSWERS TO SUPPLEMENTAL INTERROGATORIES**

Under R. 4:17-1 *et seq.*, Plaintiff hereby demands that Defendants UR, MCA, and UMGR provide certified answers to the following supplemental interrogatories:

1.  State whether, in or about 1990, Aaron Hall was an artist or employee of your company.

2.  State whether, in or about 1990, Sean Combs was an artist or employee of your company.

3.  State whether, in or about 1994, Aaron Hall was an artist or employee of your company.

4.  State whether, in or about 1994, your company subsidized housing for Aaron Hall in the state of New Jersey.

5.  State whether, in or about 1994, your company subsidized housing for Jodeci.

6.  State whether, in or about 1994, your company subsidized housing for Sean Combs.

7.  State whether, in or about 1994, your company hosted a party in the summer and or fall of 1990.

8.  Please identify the present custodian of each writing identified in your answer to interrogatory numbers 1-7.

9.  If your answer to interrogatory numbers 1-7 was no, please set forth each fact upon which you base such denial.

10. If your answer to interrogatory numbers 1-7 was no, please identify each person who knows any fact relating to such denial.

11. If your answer to interrogatory numbers 1-7 was no, please identify each writing relating to such denial (including but not limited to email, text messages, WhatsApp, Signal, Sessions, and/or social media app messages).

12. Please identify the present custodian of each writing identified in your answer to interrogatory number 9.

13. From on or about 2015 to 2023, did you ever wire $100,000 from an unnamed overseas account to an individual that accused one of your artists or employees of rape/sexual assault which occurred in the state of California?

14. From on or about 2015 to 2023, did you ever wire $200,000 from an unnamed overseas account to an individual that accused one of your artists or employees of rape/sexual assault which occurred in the state of California?

54

15. From on or about 2015 to 2023, did you ever wire $300,000 from an unnamed overseas account to an individual that accused one of your artists or employees of rape/sexual assault which occurred in the state of California?

16. From on or about 2015 to 2023, did you ever respond to the home of one of your artists or employees who was involved in a domestic dispute?

    a. Did you provide the domestic partner of that artist with a sedative, taking her to a nearby hotel where you forced her to sign an NDA in exchange for a wire between $100,000 to $500,000?

17. From on or about 2015 to 2023, did you ever wire money from an unnamed overseas account to an individual who was under the age of 18 that accused one of your artists or employees of rape/sexual assault?

18. From on or about 2015 to 2023, how many times has your organization wired money from an unnamed, unmarked account to an individual who has accused one of your employees and or artists of sexual assault, rape, and or battery?

19. Have you ever forced an artist or employee to sign a long-term recording contract with your company through acts of coercion?

20. Have you ever forced an artist or employee to sign and or renew a recording contract with your company through sexual bribery?

21. Have you ever forced an artist or employee to watch a video of themselves being sexually assaulted to force them to sign and or renew a recording contract with your company?

22. Have you ever forced an artist or employee to watch a video of themselves using narcotics or illegal substances to force them to sign and or renew a recording contract with your company?

DATED: October 8, 2024

                                         **T. A. Blackburn Law, PLLC**

                                */s/Tyrone a. Blackburn, esq.*
                                   TYRONE A. BLACKBURN

# EXHIBIT # 1

**CHAPTER 120**

AN ACT concerning certain civil actions, and amending and supplementing various parts of the statutory law.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

1. N.J.S.2A:14-2 is amended to read as follows:

Actions for injury caused by wrongful act, appointment of guardian ad litem.

2A:14-2. a. Except as otherwise provided by law, every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued; except that an action by or on behalf of a minor that has accrued for medical malpractice for injuries sustained at birth shall be commenced prior to the minor's 13th birthday.

b. In the event that an action by or on behalf of a minor that has accrued for medical malpractice for injuries sustained at birth is not commenced by the minor's parent or guardian prior to the minor's 12th birthday, the minor or a person 18 years of age or older designated by the minor to act on the minor's behalf may commence such an action. For this purpose, the minor or designated person may petition the court for the appointment of a guardian ad litem to act on the minor's behalf.

C.2A:14-2a Statute of limitations for action at law resulting from certain sexual crimes against a minor.

2. a. (1) Every action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1) against a minor under the age of 18 that occurred prior to, on or after the effective date of P.L.2019, c.120 (C.2A:14-2a et al.) shall be commenced within 37 years after the minor reaches the age of majority, or within seven years from the date of reasonable discovery of the injury and its causal relationship to the act, whichever date is later.

(2) To the extent applicable, any action for an injury that occurred prior to the effective date of P.L.2019, c.120 (C.2A:14-2a et al.) shall be subject to the provisions of subsection c. of section 1 of P.L.1959, c.90 (C.2A:53A-7) and P.L.2005, c.264 (C.2A:53A-7.4 et seq.), as amended by P.L.2019, c.120 (C.2A:14-2a et al.).

b. (1) Every action at law for an injury resulting from the commission of sexual assault or any other crime of a sexual nature against a person 18 years of age or older that occurred prior to, on or after the effective date of P.L.2019, c.120 (C.2A:14-2a et al.) shall be commenced within seven years from the date of reasonable discovery of the injury and its causal relationship to the act.

(2) To the extent applicable, any action for an injury that occurred prior to the effective date of P.L.2019, c.120 (C.2A:14-2a et al.) shall be subject to the provisions of subsection c. of section 1 of P.L.1959, c.90 (C.2A:53A-7), as amended by P.L.2019, c.120 (C.2A:14-2a et al.).

Nothing in this section is intended to preclude the court from finding that the statute of limitations was tolled in an action because of the plaintiff's mental state, physical or mental disability, duress by the defendant, or any other equitable grounds. Such a finding shall be made after a plenary hearing. The court may order an independent psychiatric evaluation of the plaintiff in order to assist in the determination as to whether the statute of limitations was tolled.

**CHAPTER 120**

AN ACT concerning certain civil actions, and amending and supplementing various parts of the statutory law.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

1.  N.J.S.2A:14-2 is amended to read as follows:

Actions for injury caused by wrongful act, appointment of guardian ad litem.

2A:14-2. a. Except as otherwise provided by law, every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued; except that an action by or on behalf of a minor that has accrued for medical malpractice for injuries sustained at birth shall be commenced prior to the minor's 13th birthday.

b.  In the event that an action by or on behalf of a minor that has accrued for medical malpractice for injuries sustained at birth is not commenced by the minor's parent or guardian prior to the minor's 12th birthday, the minor or a person 18 years of age or older designated by the minor to act on the minor's behalf may commence such an action. For this purpose, the minor or designated person may petition the court for the appointment of a guardian ad litem to act on the minor's behalf.

C.2A:14-2a  Statute of limitations for action at law resulting from certain sexual crimes against a minor.

2.  a. (1) Every action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1) against a minor under the age of 18 that occurred prior to, on or after the effective date of P.L.2019, c.120 (C.2A:14-2a et al.) shall be commenced within 37 years after the minor reaches the age of majority, or within seven years from the date of reasonable discovery of the injury and its causal relationship to the act, whichever date is later.

(2)  To the extent applicable, any action for an injury that occurred prior to the effective date of P.L.2019, c.120 (C.2A:14-2a et al.) shall be subject to the provisions of subsection c. of section 1 of P.L.1959, c.90 (C.2A:53A-7) and P.L.2005, c.264 (C.2A:53A-7.4 et seq.), as amended by P.L.2019, c.120 (C.2A:14-2a et al.).

b. (1) Every action at law for an injury resulting from the commission of sexual assault or any other crime of a sexual nature against a person 18 years of age or older that occurred prior to, on or after the effective date of P.L.2019, c.120 (C.2A:14-2a et al.) shall be commenced within seven years from the date of reasonable discovery of the injury and its causal relationship to the act.

(2)  To the extent applicable, any action for an injury that occurred prior to the effective date of P.L.2019, c.120 (C.2A:14-2a et al.) shall be subject to the provisions of subsection c. of section 1 of P.L.1959, c.90 (C.2A:53A-7), as amended by P.L.2019, c.120 (C.2A:14-2a et al.).

Nothing in this section is intended to preclude the court from finding that the statute of limitations was tolled in an action because of the plaintiff's mental state, physical or mental disability, duress by the defendant, or any other equitable grounds. Such a finding shall be made after a plenary hearing. The court may order an independent psychiatric evaluation of the plaintiff in order to assist in the determination as to whether the statute of limitations was tolled.

c. (1) Every action at law for an injury that is commenced pursuant to this section shall proceed on an individual basis, and not proceed on behalf of a class in a class action, due to the particular circumstances, source of injury and its discovery, and damages relating to each occurrence or occurrences of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1) against either a minor under the age of 18 or a person 18 years of age or older.

(2) Any private, contractual arrangement intending to settle claims for occurrences described in paragraph (1) of this subsection on a class basis is against public policy and shall be void and unenforceable.

3. Section 6 of P.L.1992, c.7 (C.2A:30B-6) is amended to read as follows:

C.2A:30B-6  Commencement of action.
6. In any action for injury based on P.L.1992, c.7 (C.2A:30B-1 et seq.), the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act. The action shall be subject to the statute of limitations set forth in section 2 of P.L.2019, c.120 (C.2A:14-2a).

4. Section 1 of P.L.1992, c.109 (C.2A:61B-1) is amended to read as follows:

C.2A:61B-1  Definitions; accrual of actions; proceedings.
1. a. As used in this act:
(1) "Sexual abuse" means an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult. A parent, resource family parent, guardian or other person standing in loco parentis who knowingly permits or acquiesces in sexual abuse by any other person also commits sexual abuse, except that it is an affirmative defense if the parent, resource family parent, guardian or other person standing in loco parentis was subjected to, or placed in, reasonable fear of physical or sexual abuse by the other person so as to undermine the person's ability to protect the child.
(2) "Sexual contact" means an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of sexually arousing or sexually gratifying the actor. Sexual contact of the adult with himself must be in view of the victim whom the adult knows to be present.
(3) "Sexual penetration" means vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the adult or upon the adult's instruction.
(4) "Intimate parts" means the following body parts: sexual organs, genital area, anal area, inner thigh, groin, buttock or breast of a person.
(5) "Injury or illness" includes psychological injury or illness, whether or not accompanied by physical injury or illness.
b. In any civil action for injury or illness based on sexual abuse, the cause of action shall accrue at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse. Any such action shall be subject to the statute of limitations set forth in section 2 of P.L.2019, c.120 (C.2A:14-2a).
c. (Deleted by amendment, P.L.2019, c.120)

P.L. 2019, CHAPTER 120

3

d. (1) Evidence of the victim's previous sexual conduct shall not be admitted nor reference made to it in the presence of a jury except as provided in this subsection. When the defendant seeks to admit such evidence for any purpose, the defendant must apply for an order of the court before the trial or preliminary hearing, except that the court may allow the motion to be made during trial if the court determines that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence. After the application is made, the court shall conduct a hearing in camera to determine the admissibility of the evidence. If the court finds that evidence offered by the defendant regarding the sexual conduct of the victim is relevant and that the probative value of the evidence offered is not outweighed by its collateral nature or by the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim, the court shall enter an order setting forth with specificity what evidence may be introduced and the nature of the questions which shall be permitted, and the reasons why the court finds that such evidence satisfies the standards contained in this section. The defendant may then offer evidence under the order of the court.

(2) In the absence of clear and convincing proof to the contrary, evidence of the victim's sexual conduct occurring more than one year before the date of the offense charged is presumed to be inadmissible under this section.

(3) Evidence of the victim's previous sexual conduct shall not be considered relevant unless it is material to proving that the source of semen, pregnancy or disease is a person other than the defendant. For the purposes of this subsection, "sexual conduct" shall mean any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, living arrangement and life style.

e. (1) The court may, on motion and after conducting a hearing in camera, order the taking of the testimony of a victim on closed circuit television at the trial, out of the view of the jury, defendant, or spectators upon making findings as provided in paragraph (2) of this subsection.

(2) An order under this section may be made only if the court finds that the victim is 16 years of age or younger and that there is a substantial likelihood that the victim would suffer severe emotional or mental distress if required to testify in open court. The order shall be specific as to whether the victim will testify outside the presence of spectators, the defendant, the jury, or all of them and shall be based on specific findings relating to the impact of the presence of each.

(3) A motion seeking closed circuit testimony under paragraph (1) of this subsection may be filed by:

(a) The victim or the victim's attorney, parent or legal guardian;

(b) The defendant or the defendant's counsel; or

(c) The trial judge on the judge's own motion.

(4) The defendant's counsel shall be present at the taking of testimony in camera. If the defendant is not present, he and his attorney shall be able to confer privately with each other during the testimony by a separate audio system.

(5) If testimony is taken on closed circuit television pursuant to the provisions of this act, a stenographic recording of that testimony shall also be required. A typewritten transcript of that testimony shall be included in the record on appeal. The closed circuit testimony itself shall not constitute part of the record on appeal except on motion for good cause shown.

P.L. 2019, CHAPTER 120
4

f. (1) The name, address, and identity of a victim or a defendant shall not appear on the complaint or any other public record as defined in P.L.1963, c.73 (C.47:1A-1 et seq.). In their place initials or a fictitious name shall appear.

(2) Any report, statement, photograph, court document, complaint or any other public record which states the name, address and identity of a victim shall be confidential and unavailable to the public.

(3) The information described in this subsection shall remain confidential and unavailable to the public unless the victim consents to the disclosure or if the court, after a hearing, determines that good cause exists for the disclosure. The hearing shall be held after notice has been made to the victim and to the defendant and the defendant's counsel.

(4) Nothing contained herein shall prohibit the court from imposing further restrictions with regard to the disclosure of the name, address, and identity of the victim when it deems it necessary to prevent trauma or stigma to the victim.

g. In accordance with R.5:3-2 of the Rules Governing the Courts of the State of New Jersey, the court may, on its own or a party's motion, direct that any proceeding or portion of a proceeding involving a victim sixteen years of age or younger be conducted in camera.

h. A plaintiff who prevails in a civil action pursuant to this act shall be awarded damages in the amount of $10,000, plus reasonable attorney's fees, or actual damages, whichever is greater. Actual damages shall consist of compensatory and punitive damages and costs of suit, including reasonable attorney's fees. Compensatory damages may include, but are not limited to, damages for pain and suffering, medical expenses, emotional trauma, diminished childhood, diminished enjoyment of life, costs of counseling, and lost wages.

5. Section 1 of P.L.1959, c.90 (C.2A:53A-7) is amended to read as follows:

C.2A:53A-7 Immunity from liability for negligence.

1. a. No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes or its trustees, directors, officers, employees, agents, servants or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association.

Nothing in this subsection shall be deemed to grant immunity to any health care provider, in the practice of his profession, who is a compensated employee, agent or servant of any nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes.

b. No nonprofit corporation, society or association organized exclusively for hospital purposes or its trustees, directors, officers or volunteers shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or

P.L. 2019, CHAPTER 120

5

association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association; but nothing herein contained shall be deemed to exempt the agent, employee or servant individually from their liability for any such negligence.

c. Nothing in this section shall be deemed to grant immunity to: (1) any nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes, or its trustee, director, officer, employee, agent, servant or volunteer, causing damage by a willful, wanton or grossly negligent act of commission or omission, including sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1); (2) any trustee, director, officer, employee, agent, servant or volunteer causing damage as the result of the negligent operation of a motor vehicle; or (3) an independent contractor of a nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes.

6.  Section 2 of P.L.2005, c.264 (C.2A:53A-7.5) is amended to read as follows:

C.2A:53A-7.5  Application of act.
2. a. The provisions of this supplementary act, P.L.2005, c.264 (C.2A:53A-7.4 et seq.), shall apply prospectively and also shall be applicable to all civil actions for which the statute of limitations has not expired as of the effective date of this act, and subsequently, not expired as of the effective date of P.L.2019, c.120 (C.2A:14-2a et al.), including the statute of limitations set forth in N.J.S.2A:14-2, section 2 of P.L.2019, c.120 (C.2A:14-2a), section 1 of P.L.1964, c.214 (C.2A:14-2.1), or any other statute. These applicable actions include but are not limited to matters filed with a court that have not yet been dismissed or finally adjudicated as of the effective date of this act or P.L.2019, c.120 (C.2A:14-2a et al.).

b. Notwithstanding the provisions of subsection a. of this section, the provisions of P.L.2005, c.264 (C.2A:53A-7.4 et seq.) shall apply to all civil actions for an injury resulting from an act that occurred prior to the effective date of P.L.2019, c.120 (C.2A:14-2a et al.), and these actions shall be subject to the statute of limitations set forth in section 2 of P.L.2019, c.120 (C.2A:14-2a).

C.59:2-1.3  Liability for public entity.
7.  Notwithstanding any other provision of law to the contrary, including but not limited to the "New Jersey Tort Claims Act," N.J.S.59:1-1 et seq., a public entity is liable in an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1).

8.  N.J.S.59:8-3 is amended to read as follows:

Claims for damages against public entities; inapplicability.
59:8-3.  Claims for damages against public entities. a. Except as otherwise provided in this section, no action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter.

P.L. 2019, CHAPTER 120

6

    b.   The procedural requirements of this chapter shall not apply to an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1).

C.2A:14-2b  Commencement of actions regardless of statute of limitations.

    9.  a.  Notwithstanding the statute of limitations provisions of N.J.S.2A:14-2, section 2 of P.L.2019, c.120 (C.2A:14-2a), section 1 of P.L.1964, c.214 (C.2A:14-2.1), or any other statute, an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1), that occurred prior to the effective date of P.L.2019, c.120 (C.2A:14-2a et al.), and which action would otherwise be barred through application of the statute of limitations, may be commenced within two years immediately following the effective date.

    b.   To the extent applicable, any action brought during the two-year period pursuant to subsection a. of this section shall be subject to the provisions of subsection c. of section 1 of P.L.1959, c.90 (C.2A:53A-7) and P.L.2005, c.264 (C.2A:53A-7.4 et seq.), as amended by P.L.2019, c.120 (C.2A:14-2a et al.).

    c.  (1) Every action at law for an injury that is commenced pursuant to this section shall proceed on an individual basis, and not proceed on behalf of a class in a class action, due to the particular circumstances, source of injury and its discovery, and damages relating to each occurrence or occurrences of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c.7 (C.2A:30B-2), or sexual abuse as defined in section 1 of P.L.1992, c.109 (C.2A:61B-1) against either a minor under the age of 18 or a person 18 years of age or older.

    (2) Any private, contractual arrangement intending to settle claims for occurrences described in paragraph (1) of this subsection on a class basis is against public policy and shall be void and unenforceable.

C.2A:14-2c  Effective date.

    10.  The provisions of this amendatory and supplementary act, P.L.2019, c.120 (C.2A:14-2a et al.), shall take effect on December 1, 2019.  These provisions shall be inapplicable to any civil action governed solely by the statute of limitations of another jurisdiction.

    Approved May 13, 2019.

# EXHIBIT # 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 24 Cr. |
| SEAN COMBS,<br>a/k/a "Puff Daddy,"<br>a/k/a "P. Diddy,"<br>a/k/a "Diddy,"<br>a/k/a "PD,"<br>a/k/a "Love," | 24 CRIM 542 |
| Defendant. | |

## COUNT ONE
### (Racketeering Conspiracy)

The Grand Jury charges:

### Overview

1. For decades, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, abused, threatened, and coerced women and others around him to fulfill his sexual desires, protect his reputation, and conceal his conduct. To do so, COMBS relied on the employees, resources, and influence of the multi-faceted business empire that he led and controlled—creating a criminal enterprise whose members and associates engaged in, and attempted to engage in, among other crimes, sex trafficking, forced labor, kidnapping, arson, bribery, and obstruction of justice.

2. SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, operated his business, headquartered at various times in Manhattan and Los Angeles, under a variety of United States-based corporate entities, including Bad Boy

Entertainment, Combs Enterprises, and Combs Global (collectively, the "Combs Business"). Corporate entities in the Combs Business included, among other things, record labels, a recording studio, an apparel line, an alcoholic spirits business, a marketing agency, and a television network and media company.

3.     At all times relevant to this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, engaged in a persistent and pervasive pattern of abuse toward women and other individuals. This abuse was, at times, verbal, emotional, physical, and sexual. As part of his pattern of abuse, COMBS manipulated women to participate in highly orchestrated performances of sexual activity with male commercial sex workers. At times, COMBS, and others acting at his direction, made arrangements for women and commercial sex workers to fly to COMBS' location. COMBS ensured participation from the women by, among other things, obtaining and distributing narcotics to them, controlling their careers, leveraging his financial support and threatening to cut off the same, and using intimidation and violence.

4.     Physical abuse by SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, was recurrent and widely known. On numerous occasions from at least in or about 2009 and continuing for years, COMBS assaulted women by, among other things, striking, punching, dragging, throwing objects at, and kicking them. These assaults were, at times, witnessed by others and included one instance at a Los Angeles hotel in or about March 2016, which was captured on video and later publicly reported, where COMBS kicked, dragged, and threw a vase at a woman as she was attempting to leave. When a member of the hotel security staff intervened, COMBS attempted to bribe the staff member to ensure silence.

2

COMBS' violence was also not limited to these women. It extended to his employees, witnesses to his abuse, and others.

5.    SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, used the Combs Business, including certain employees, to carry out, facilitate, and cover up his abuse and commercial sex. Those employees—including security staff, household staff, personal assistants, and high-ranking supervisors—and other close associates acted as COMBS' intermediaries, and their conduct was facilitated and assisted by COMBS' control of the Combs Business.

### The Combs Enterprise

6.    From at least in or about 2008, through on or about the date of the filing of this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, and others known and unknown, were members and associates of a criminal organization (the "Combs Enterprise" or the "Enterprise"). Members and associates of the Combs Enterprise engaged in, and attempted to engage in, among other activities, sex trafficking, forced labor, interstate transportation for purposes of prostitution, coercion and enticement to engage in prostitution, narcotics offenses, kidnapping, arson, bribery, and obstruction of justice.

7.    The Combs Enterprise, including its leadership, its members, and its associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity. The Combs Enterprise consisted of: (i) SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant; (ii) entities within the Combs Business, including but not limited to Bad

Boy Entertainment, Combs Enterprises, and Combs Global; (iii) individuals employed by and associated with the Combs Business; and (iv) others known and unknown.

8.     The Combs Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Combs Enterprise.  The Combs Enterprise was engaged in, and its activities affected, interstate and foreign commerce.  The Combs Enterprise operated in the Southern District of New York and elsewhere.

9.     At all times relevant to this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, was the leader of the Combs Enterprise.

10.    SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, and others known and unknown, participated in unlawful and other activities related to the conduct of the Combs Enterprise's affairs.  These individuals included certain Combs Business employees, such as members of COMBS' security staff, household staff, personal assistants, and high-ranking supervisors, as well as other close associates of COMBS.

### Purposes of the Combs Enterprise

11.    The purposes of the Combs Enterprise included the following:

a.     Operating a global business in the media, entertainment, and lifestyle industries, including, among other things, record labels, a recording studio, an apparel line, an alcoholic spirits business, a marketing agency, and a television network and media company;

b.     Preserving, protecting, promoting, and enhancing the power, reputation, and brand of SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, as a musician, entrepreneur, and figure in the entertainment industry;

4

      c.     Enriching members and associates of the Enterprise, including its leader, COMBS, and in particular those who demonstrated loyalty to COMBS and willingness to conceal his crimes;

      d.     Preserving, protecting, promoting, and enhancing the power of the Combs Enterprise, including the power of its leader, COMBS, through violence, use of firearms, threats of violence, coercion, and verbal, emotional, physical, and sexual abuse;

      e.     Fulfilling the personal desires of COMBS, particularly those related to COMBS' sexual gratification, including through the exploitation of women and the use of commercial sex workers;

      f.     Enabling COMBS and other members and associates of the Combs Enterprise to engage in unlawful acts of violence, including sexual violence; sex trafficking; forced labor; interstate transportation for purposes of prostitution; coercion and enticement to engage in prostitution; narcotics distribution; and other crimes, and concealing the commission of such acts;

      g.     Securing absolute loyalty from members of the Combs Enterprise, including through acts of violence and threats; and

      h.     Protecting the Combs Enterprise and its members and associates, including COMBS, from detection and prosecution by law enforcement authorities through acts of intimidation, manipulation, bribery, and threats of retaliation against individuals who witnessed the crimes committed by members and associates of the Enterprise.

<u>Means and Methods of the Enterprise</u>

12.     Among the means and methods by which SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, and other members and

associates of the Combs Enterprise conducted and participated in the conduct of the affairs of the Combs Enterprise included the following:

a. COMBS, and other members and associates of the Combs Enterprise, wielded the power and prestige of COMBS' role at the Combs Business to intimidate, threaten, and lure female victims into COMBS' orbit, often under the pretense of a romantic relationship. COMBS then used force, threats of force, and coercion, to cause victims to engage in extended sex acts with male commercial sex workers that COMBS referred to as, among other things, "Freak Offs." Freak Offs were elaborate and produced sex performances that COMBS arranged, directed, masturbated during, and often electronically recorded. In arranging these Freak Offs, COMBS, with the assistance of members and associates of the Combs Enterprise, transported, and caused to be transported, commercial sex workers across state lines and internationally. Freak Offs occurred regularly, sometimes lasted multiple days, and often involved multiple commercial sex workers. During Freak Offs, COMBS distributed a variety of controlled substances to victims, in part to keep the victims obedient and compliant. Sometimes unbeknownst to the victims, COMBS kept videos he filmed of victims engaging in sex acts with commercial sex workers. After Freak Offs, COMBS and the victims typically received IV fluids to recover from the physical exertion and drug use.

b. Members and associates of the Combs Enterprise, including high-ranking supervisors, security staff, household staff, personal assistants, and other Combs Business employees, facilitated the Freak Offs by, among other things, booking hotel rooms for the Freak Offs; stocking the hotel rooms in advance with the required Freak Off supplies, including controlled substances, baby oil, lubricant, extra linens, and lighting; cleaning the hotel rooms after the Freak Offs to try to mitigate room damage; arranging for travel for victims, commercial sex

6

workers, and COMBS to and from Freak Offs; resupplying COMBS with requested supplies; delivering large sums of cash to COMBS to pay the commercial sex workers; and scheduling the delivery of IV fluids. In or about March 2024, during searches of COMBS' residences in Miami, Florida and Los Angeles, California, law enforcement seized various Freak Off supplies, including narcotics and more than 1,000 bottles of baby oil and lubricant.

      c.     COMBS subjected victims to physical, emotional, and verbal abuse to cause the victims to engage in Freak Offs. COMBS maintained control over his victims through, among other things, physical violence, promises of career opportunities, granting and threatening to withhold financial support, and by other coercive means, including tracking their whereabouts, dictating the victims' appearance, monitoring their medical records, controlling their housing, and supplying them with controlled substances. During and separate from Freak Offs, COMBS, among other things, hit, kicked, threw objects at, and dragged victims, at times, by their hair. These assaults often resulted in injuries that took days or weeks to heal. COMBS also threatened victims' careers and livelihoods, including if they resisted participating in Freak Offs. Victims believed they could not refuse COMBS' demands without risking their financial or job security or without repercussions in the form of physical or emotional abuse. COMBS also used the sensitive, embarrassing, and incriminating recordings that he made during Freak Offs as collateral to ensure the continued obedience and silence of the victims.

      d.     Members and associates of the Combs Enterprise, including COMBS' security personnel, at times carried firearms. On more than one occasion, COMBS himself carried or brandished firearms to intimidate and threaten others, including victims of and witnesses to his abuse. In or about March 2024, during searches of COMBS' residences in Miami, Florida and

7

Los Angeles, California, law enforcement seized firearms and ammunition, including three AR-15s with defaced serial numbers, as well as a drum magazine.

e. Members and associates of the Combs Enterprise enabled COMBS' control over victims by following his directions regarding financial payments to victims, advancing or suppressing the victims' career opportunities, and acquiring the controlled substances COMBS used to keep the victims compliant. Members and associates of the Combs Enterprise at times witnessed COMBS' violence toward the victims, or the victims' injuries caused by Combs, without intervening. Instead, members and associates of the Combs Enterprise helped conceal the violence and abuse by, among other things, assisting COMBS in monitoring and preventing victims from leaving locations, such as hotels or COMBS' residences. These occasions included instances in which a victim was required to remain in hiding—sometimes for several days at a time—to recover from injuries COMBS inflicted, without being publicly observed. Members and associates of the Combs Enterprise also assisted COMBS in locating and contacting victims who attempted to flee his abuse.

f. When employees, witnesses to his abuse, or others threatened COMBS' authority or reputation, COMBS and members and associates of the Enterprise engaged in acts of violence, threats of violence, threats of financial and reputational harm, and verbal abuse. These acts of violence included kidnapping and arson. In addition, on multiple occasions, COMBS threw both objects and people, as well as hit, dragged, choked, and shoved others.

g. When COMBS' authority or reputation was threatened by the possibility of negative publicity or legal or law enforcement action against him, including in or about late 2023 following public allegations of COMBS' crimes, COMBS and members and associates of the Enterprise pressured witnesses and victims, including through attempted bribery, to stay silent and

8

not report what they experienced or knew to law enforcement. On phone calls, COMBS and other members and associates of the Enterprise, among other things, provided these victims and witnesses with a false narrative of events in an effort to conceal COMBS' crimes. COMBS caused these calls to be recorded on at least two occasions.

## The Racketeering Conspiracy

13.     From at least in or about 2008, through on or about the date of the filing of this Indictment, in the Southern District of New York and elsewhere, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, and others known and unknown, being persons employed by and associated with the Combs Enterprise described in paragraphs 6 through 12 of this Indictment, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Combs Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of:

a.     multiple acts involving kidnapping, chargeable under the following provisions of state law: California Penal Code § 207 (kidnapping), California Penal Code §§ 21(a), 664 (attempt), California Penal Code § 31 (aiding and abetting), and California Penal Code § 182 (conspiracy);

b.     multiple acts involving arson, chargeable under the following provisions of state law: California Penal Code § 451 (arson), California Penal Code §§ 21(a), 664 (attempt), California Penal Code § 31 (aiding and abetting), and California Penal Code § 182 (conspiracy);

9

    c.  multiple acts involving bribery, chargeable under the following provisions of state law: California Penal Code § 137(a) (bribery of a witness), California Penal Code §§ 21(a), 664 (attempt), California Penal Code § 31 (aiding and abetting), and California Penal Code § 182 (conspiracy);

    d.  multiple acts indictable under Title 18, United States Code, Section 1512 (relating to tampering with a witness, victim, or an informant);

    e.  multiple acts indictable under Title 18, United States Code, Sections 1589 and 2 (relating to forced labor);

    f.  multiple acts indictable under Title 18, United States Code, Sections 1591 and 2 (relating to sex trafficking);

    g.  multiple acts indictable under Title 18, United States Code, Sections 2421, 2422, and 2 (relating to transportation and inducement to travel for purposes of prostitution and other illegal sexual activities); and

    h.  multiple offenses involving the possession with intent to distribute, or distribution of narcotics and controlled substances, including cocaine, oxycodone, alprazolam, 3,4-Methylenedioxymethamphetamine, 4-Bromo-2,5-dimethoxyphenethylamine, gamma hydroxybutyric acid, and ketamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), (b)(1)(E), (b)(2), and 846 (distribution and possession with intent to distribute and conspiracy to do the same), and Title 18, United States Code, Section 2 (aiding, abetting, and willfully causing).

    14.  It was a part of the conspiracy that SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, agreed that a conspirator would

commit at least two acts of racketeering activity in the conduct of the affairs of the Combs Enterprise.

## Notice of Special Sentencing Factor

15.     From at least in or about 2009, up to and including in or about 2018, in the Southern District of New York and elsewhere, as part of his agreement to conduct and participate in the conduct of the affairs of the Combs Enterprise through a pattern of racketeering activity, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, agreed to, in and affecting interstate and foreign commerce, knowingly recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit by any means a person, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause the person to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1) and (b)(1).

(Title 18, United States Code, Section 1962(d).)

## COUNT TWO
### (Sex Trafficking by Force, Fraud, or Coercion)
### (Victim-1)

The Grand Jury further charges:

16.     From at least in or about 2009, up to and including in or about 2018, in the Southern District of New York and elsewhere, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited by any means a person, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as described in Title 18, United

11

States Code, Section 1591(e)(2), and any combination of such means, would be used to cause the person to engage in a commercial sex act, and attempted, aided and abetted, and willfully caused the same, to wit, COMBS recruited, enticed, harbored, transported, and maintained a person ("Victim-1"), and attempted, aided and abetted, and willfully caused Victim-1, to engage in commercial sex acts, knowing and in reckless disregard of the fact that Victim-1 was engaging in commercial sex acts as a result of force, fraud, and coercion.

(Title 18, United States Code, Sections 1591(a)(1), (b)(1), 1594(a), and 2.)

## COUNT THREE
### (Transportation to Engage in Prostitution)

The Grand Jury further charges:

17. From at least in or about 2009, up to and including in or about 2024, in the Southern District of New York and elsewhere, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, knowingly transported an individual in interstate and foreign commerce with intent that the individual engage in prostitution, and attempted, aided and abetted, and willfully caused the same, to wit, COMBS transported, aided and abetted, and willfully caused the transportation of female victims and commercial sex workers in interstate and foreign commerce on multiple occasions with the intent that they engage in prostitution.

(Title 18, United States Code, Sections 2421(a) and 2.)

## FORFEITURE ALLEGATIONS

18. As a result of committing the offense alleged in Count One of this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963, any and all interests the defendant acquired or maintained in violation of Title 18, United

12

States Code, Section 1962; any and all interests in, securities of, claims against, and property or contractual rights of any kind affording a source of influence over, the enterprise named and described herein which the defendant established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and any and all property constituting and derived from proceeds obtained, directly and indirectly, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

19.     As a result of committing the offense alleged in Count Two of this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1594, any and all property, real and personal, involved in, used, or intended to be used to commit or to facilitate the commission of said offense and any and all property traceable to such property; any and all property, real and personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of said offense, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and proceeds traceable to the commission of said offense.

20.     As a result of committing the offense alleged in Count Three of this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, shall forfeit to the United States, pursuant to (i) Title 18, United States Code, Section 2428, any and all property, real and personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of said offense; and any and all property, real or personal, that was used or intended to be used to commit or facilitate the commission of said offense, and (ii) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any

13

and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

## Substitute Assets Provision

21.    If any of the above described forfeitable property, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

> (Title 18, United States Code, Section 981;
> Title 18, United States Code, Section 1594;
> Title 18, United States Code, Section 1963;
> Title 18, United States Code, Section 2428;
> Title 21, United States Code, Section 853;
> Title 28, United States Code, Section 2461.)



Damian Williams

FOREPERSON                                    DAMIAN WILLIAMS
                                              United States Attorney

14

# EXHIBIT # 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

THALIA GRAVES,

                  Plaintiff,                          No. 24 Civ. 7201

        v.

SEAN COMBS, JOSEPH SHERMAN, DADDY'S      **COMPLAINT AND**
HOUSE RECORDINGS INC., CE OPCO, LLC d/b/a    **DEMAND FOR**
COMBS GLOBAL f/k/a COMBS ENTERPRISES LLC,    **JURY TRIAL**
BAD BOY ENTERTAINMENT HOLDINGS, INC.,
BAD BOY PRODUCTIONS HOLDINGS, INC.,
BAD BOY BOOKS HOLDINGS, INC., BAD BOY
RECORDS LLC, BAD BOY ENTERTAINMENT LLC,
BAD BOY PRODUCTIONS LLC, AND
ORGANIZATIONAL DOES 1-10,

                  Defendants.

-----------------------------------------------------------------X

        Plaintiff Thalia Graves ("Plaintiff"), by and through her attorneys, Allred Maroko

& Goldberg and Cuti Hecker Wang LLP, for her Complaint alleges as follows:

## INTRODUCTION

        1.      In or around the summer of 2001, Plaintiff's life was violently knocked off course

when Defendants Sean Combs and Joseph Sherman viciously raped her at the Bad Boy Records

studio in New York City.

        2.      Plaintiff was twenty-five at the time and dating one of Combs' employees, a

relationship that Combs exploited to lure Plaintiff into meeting him and Sherman alone.  Once

they successfully sequestered Plaintiff, Combs and Sherman gave Plaintiff a drink, likely laced

with a drug that eventually caused her briefly to lose consciousness.  She awoke to find herself

bound and restrained.

3.      Combs and Sherman proceeded to brutally sexually abuse and violate Plaintiff.

Combs mercilessly raped her, anally and vaginally.  Sherman forcefully slammed Plaintiff onto a

table, slapped her, and repeatedly thrust his penis into her mouth.  Both men were undeterred by

Plaintiff's cries for help throughout the attack.

4.      Plaintiff never recovered from Defendants' violent rape.  She had suicidal

thoughts and ideation and has received extensive psychological treatment because of

Defendants' attack.  For decades, she remained silent and did not report the crime out of fear that

Defendants would use their power to ruin her life, as they had repeatedly, explicitly threatened to

do.  To this day, Plaintiff suffers from severe depression, anxiety, and panic attacks, and still

lives in fear of Defendants.

5.      Any progress Plaintiff had made in healing from the attack over the years was

dramatically reversed on or around November 27, 2023, when she learned for the first time that

Combs and Sherman had video-recorded the horrific rape twenty-two years before and had

shown the video to multiple men, seeking to publicly degrade and humiliate both Plaintiff and

her boyfriend.

6.      Plaintiff could not believe that Defendants would record themselves committing

such a gruesome crime and then proceed proudly and widely to disseminate the recording of it.

She was distraught and sunk into a deep depression.  She again considered ending her life.

7.      This action seeks redress for Defendants' brutalizing, misogynistic, and violent

attacks on Plaintiff, starting in 2001 with their rape and continuing in the subsequent years as

they compounded her humiliation by showing the video of the sexual assault to others.

## PARTIES

8.      Plaintiff Thalia Graves is a female who resides in Harris County, Texas.

2

9.      Defendant Sean Combs is a male who, on information and belief, resides in Los Angeles County, California, though at the time of filing was incarcerated in the Metropolitan Detention Center in Brooklyn.  On information and belief, at all relevant times Combs owned and/or controlled Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., Bad Boy Books Holdings, Inc., Bad Boy Records LLC, Bad Boy Entertainment LLC, Bad Boy Productions LLC, (collectively "Bad Boy"), Daddy's House Recording Studio, Inc., and CE OPCO, LLC d/b/a Combs Global, f/k/a Combs Enterprises LLC (all together, the "Combs Corporations").  The facts of Combs' ownership and titles at the Combs Corporations enabled him to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

10.     Defendant Joseph Sherman, a/k/a "Big Joe" is a male who, on information and belief, resides in Westchester County, New York.  On information and belief, Sherman was employed by Combs and/or by the Combs Corporations during the relevant period.  The facts of Combs' ownership and titles and Sherman's titles at the Combs Corporations enabled Sherman to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

11.     Defendant Daddy's House Recordings, Inc. ("Daddy's House") is a domestic business corporation that is incorporated in New York and on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069.  Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.  At the time of the events alleged herein, Daddy's House was a world-class recording studio owned by Combs located at 321 W 44th Street, Suite 201, New York, New York 10036.  On information and belief, at all relevant times, Bad Boy and Combs

together owned and operated Daddy's House. On information and belief, the Bad Boy recording studio was located on the premises of Daddy's House. Combs and Sherman used the Daddy's House premises and their ownership and titles at Daddy's House to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

12. Defendant CE OPCO, LLC d/b/a Combs Global, f/k/a Combs Enterprises LLC ("Combs Global") is a limited liability company incorporated in Delaware that has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069. On information and belief, all members of Combs Global are citizens of Delaware, New York, and/or California. On information and belief, Combs Global is an alter ego for Combs and/or a successor in interest to Combs' other corporations and/or was established or used by Combs for the purpose of moving, disposing of, and/or insulating his assets, including in connection with his criminal activities and to avoid liability. Combs Global currently owns, controls, and/or oversees Bad Boy and Combs' other business ventures in the music, fashion, fragrance, beverage, marketing, film, television, and media industries.

13. As part of his renowned Bad Boy record label and brand, Combs has established several corporate entities under the "Bad Boy" name over the past few decades, including but not limited to Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., Bad Boy Books Holdings, Inc., Bad Boy Records LLC, Bad Boy Entertainment LLC, and Bad Boy Productions LLC (together, "Bad Boy"). On information and belief, all Bad Boy corporate entities are alter egos for Combs, are controlled and/or directed by Combs, and/or were established or used by Combs for the purpose of moving, disposing of, and/or insulating his assets, including in connection with his criminal activities and to avoid liability. On information

and belief, all active Bad Boy entities are now owned and/or controlled by Combs and/or by Combs Global. Combs and Sherman used the Bad Boy premises/recording studio and their ownership and titles at Bad Boy to commit the unlawful sexual violence against Plaintiff described herein and/or to harass and subsequently intimidate her into silence after the rape.

    a. Defendant Bad Boy Entertainment Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069. Bad Boy Entertainment Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global. Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.

    b. Defendant Bad Boy Productions Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 9255 Sunset Boulevard, 2nd Floor, West Hollywood, California 90069. Bad Boy Productions Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global. Combs is listed as the CEO in public filings, with a listed address of 1710 Broadway, New York, New York 10019.

    c. Defendant Bad Boy Books Holdings, Inc. is a domestic business corporation incorporated in New York, that on information and belief now has its principal place of business at 1440 Broadway, 3rd Floor, New York, New York 10018.

Bad Boy Books Holdings, Inc. is part of the Bad Boy enterprise founded and owned by Combs, and on information and belief is now owned and/or controlled by Combs and/or by Combs Global.  The CEO listed on public filings is Eddie Norward Jr., with a listed address of 1710 Broadway, New York, New York 10019, the same address listed for Sean Combs in public filings for Bad Boy Entertainment Holdings, Inc., Bad Boy Productions Holdings, Inc., and Daddy's House Recordings, Inc.

d.  Defendant Bad Boy Records LLC is a Delaware limited liability company that on information and belief is headquartered in New York and/or California.  On information and belief, all members of Bad Boy Records LLC are citizens of Delaware, New York, and/or California.  On information and belief, Bad Boy Records LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs.  On information and belief, Bad Boy Records LLC is now owned and/or controlled by Combs and/or by Combs Global.

e.  Defendant Bad Boy Entertainment LLC is a New York limited liability company that on information and belief is headquartered in New York and/or California.  On information and belief, all members of Bad Boy Entertainment LLC are citizens of New York and/or California.  Bad Boy Entertainment LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs.  On information and belief, Bad Boy Entertainment LLC is now owned and/or

controlled by Bad Boy Entertainment Holdings, Inc. and/or by Combs, and/or by Combs Global.

     f.    Defendant Bad Boy Productions LLC is a New York limited liability company that on information and belief is headquartered in New York and/or California. On information and belief, all members of Bad Boy Productions LLC are citizens of New York and/or California. Bad Boy Productions LLC is part of the Bad Boy enterprise and/or a successor-in-interest to other Bad Boy Defendants that comprise the Bad Boy enterprise founded and owned by Combs. On information and belief, Bad Boy Productions LLC is now owned and/or controlled by Combs and/or by Combs Global.

14.    Defendants Organizational Does 1-10 are currently unknown entities who were owned by and/or employed Defendants Combs and/or Sherman and enabled the commission of the conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities by name.

15.    Each of the Combs Corporations (a) aided and abetted Combs and Sherman in committing the unlawful sexual violence against Plaintiff described herein and/or in harassing and subsequently intimidating her into silence after the rape, (b) provided Combs and Sherman with the studio/office space where they committed the rape, and/or with chattel including recording equipment, storage equipment, etc. to record the rape and disseminate it; (c) are alter egos for Combs, completely dominated by him and used for his personal interests and to engage in wrongdoing which harmed Plaintiff and others, and/or (d) serve or have served as vehicles for Combs to move, dispose of, and/or insulate his assets, including in connection with his criminal activities and to avoid compensating the victims of his many crimes, including Plaintiff.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states, and the amount in controversy exceeds $75,000.

17.     This Court has specific personal jurisdiction over Defendants because the acts giving rise to Plaintiff's claims took place in New York State, and because several of the Defendants are domiciled in New York State and/or regularly transact business in New York State.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## JURY DEMAND

19. Plaintiff hereby demands a trial by jury on her claims in this action.

## FACTUAL ALLEGATIONS

*Background*

20.     Plaintiff's family immigrated to New York City when Plaintiff was a teenager in connection with her mother's work.  Her family ultimately settled in Rego Park, Queens, where she completed her education, and where she was living when she met Combs.

21.     Defendant Combs, also known by his stage names Puff Daddy, Puffy, P. Diddy, Diddy, Brother Love, or Love, is a prominent rapper, record executive, and businessman.  He rose to fame in the 1990s with his record label Bad Boy, and continued to be a notable figure in the music and entertainment industry in the following years.  Combs has continued to amass wealth and power through his business ventures in the music, fashion, fragrance, beverage, marketing, film, television, and media industries.

8

22.     The Bad Boy enterprise is the foundation of Combs' wealth and power.  Bad Boy

has sold over 500 million records through its lucrative distribution deals with the top music

companies in the world, and has signed acclaimed hip hop and R&B artists, including The

Notorious B.I.G., Mary J. Blige, and Usher.  Combs later founded CE OPCO, LLC a/k/a Combs

Enterprises, later rebranded as Combs Global, to serve as a home for his portfolio of businesses,

including his investments in the music, fashion, fragrance, beverage, marketing, film, television,

and media industries.  On information and belief, Combs Global houses Bad Boy and other

notable businesses such as Combs' fashion line Sean Jean, his vodka line Cîroc, and his cable

media company REVOLT MEDIA.

23.     As detailed below, *see infra* ¶¶ 57 through 64, Combs has a long history of

violence and of abusing and raping women, and there have been several civil lawsuits filed

against Combs in the past year alleging sexual violence and abuse.  On September 16, 2024

Combs was arrested and charged with racketeering and sex trafficking.  He was denied bail.

24.     Defendant Sherman, also known as "Big Joe," was employed by Combs as his

bodyguard and head of security during the relevant time period described herein and served in

various roles in the Combs Corporations.  Sherman is also the founder of Rhymes N Dimes

Magazine, Inc., a New York State registered corporation, and through or in connection with that

company produces and distributes pornography.  On information and belief, he has often

distributed videos of his and/or his friends' sexual assaults through his pornography company.

25.     Plaintiff met Defendant Combs in or around late 1999 or early 2000 through her

then-boyfriend, who was an executive at Bad Boy.  In addition to working together, Plaintiff's

boyfriend and Combs had a close personal relationship.  Plaintiff frequently visited her boyfriend

at the Bad Boy studio in New York City and attended events hosted at Combs' residences.  Over

time, Plaintiff became familiar with Combs, and he knew about her relationship with her boyfriend.

**_Defendants Trick, Drug, and Violently Rape Plaintiff_**

26.     In or around the summer of 2001, Plaintiff received a call from Combs concerning her boyfriend's employment at Bad Boy.  He told her he wanted to meet with her in person to discuss her boyfriend's supposed performance issues.  Her boyfriend was determined to climb up the ladder at Combs' records label and as his romantic partner, Plaintiff was committed to helping him.  Plaintiff agreed to meet with Combs.  In retrospect, it was evidently a sick and twisted way of using his ownership of and title at Bad Boy and its affiliate entities to abuse Plaintiff and also show his power and ability to humiliate her boyfriend, his executive.

27.     A few hours later, Combs arrived at Plaintiff's mother's residence in Queens with Sherman, who was employed by Combs as his bodyguard at the time.  Sherman was driving an SUV and Combs was in the backseat.  After Plaintiff entered the vehicle, Combs offered her a glass of wine, which she accepted.

28.     Combs began discussing his alleged concerns about her boyfriend's performance at work.  Meanwhile, as Plaintiff drank what had been handed to her, she started to feel lightheaded, dizzy, and physically weak.  In retrospect, it is clear that Combs had caused a drug to be put into Plaintiff's drink, as a few sips of wine had never impacted her that way.

29.     Combs and Sherman drove Plaintiff to the Bad Boy studio in Manhattan.  When they arrived and Plaintiff tried to get out of the car, she realized that she was feeling odd, and found it difficult to walk.  She assumed this was her fault, and did her best to act normal, and followed Combs as he led her eventually to a couch in a private room in the Bad Boy studio.  She later came to understand this was Combs's personal lounge and office at the Bad Boy studio.

Combs sat on the couch next to Plaintiff and continued speaking to her. Plaintiff began feeling

even more woozy and sedated. She then lost consciousness.

30.     When Plaintiff regained consciousness, she was naked, and her hands were tied

behind her back with what felt like a plastic grocery bag. Plaintiff shouted for help. In response

Sherman lifted her up from the couch and forcefully slammed her face down on what was

apparently a pool table. Shortly thereafter, Combs entered the room naked.

31.     Combs reached for a container of lubricant that smelled like menthol, and

proceeded to apply it to his penis. He then bent Plaintiff over the table causing her feet to dangle

above the floor, forcefully held her down, and anally penetrated her without her consent.

Plaintiff is 4 feet 11 inches tall and weighed only 103 pounds at the time. Plaintiff was unable to

move, totally overpowered physically, in addition to being drugged and bound.

32.     Plaintiff screamed out in pain, but Combs continued to violently anally rape her.

He easily physically overpowered her, smashing her head down on the pool table while she

futilely tried to wriggle out from under him.

33.     During the brutal attack, Plaintiff vomited into her mouth and on the table. At

one point, she involuntarily defecated. Combs was undeterred. He wiped himself off, applied

more lubricant, and without any acknowledgement of Plaintiff's distress, proceeded to vaginally

penetrate Plaintiff.

34.     Plaintiff experienced intense pain and burning sensations in her vagina and anus.

Plaintiff continued to scream for help because of the extreme pain she felt as Combs penetrated

her over and over. She then lost consciousness again.

35.     The next time she regained consciousness, Plaintiff was on the couch and

Sherman was standing in front of her with his bare penis in her face. Sherman slapped Plaintiff

in the face and forcefully inserted his penis into her mouth.  Sherman slapped her yet again, and continued to thrust his penis into Plaintiff's mouth.  Plaintiff once again lost consciousness.

36.     When she next awoke, Plaintiff was on the couch naked and alone in the room.

37.     Plaintiff was in severe pain and distress.  Her anus and vagina burned, her face and wrists were bruised, and her genital area smelled strongly of menthol.  She felt a liquid, presumably semen, dripping out from inside of her.

38.     Her dress was thrown over her, her purse was on the couch next to her, and her bra was on the floor nearby.  She did not see her underpants.

39.     Terrified that Combs and Sherman would return, Plaintiff quickly got dressed and bolted out of the studio room where she had been raped.

40.     Still dizzy and weak, Plaintiff called a livery driver that her family regularly hired and knew well.  The driver picked her up from outside Bad Boy studio.  She was disheveled, crying uncontrollably and suffering from agonizing pain.

41.     The driver drove her to the hospital and tried to convince her to report the rape and get a rape kit, but she was unable to leave the car, "shaking and crying hysterically" and terrified of what Combs would do to her and her family if she reported him.

*The Aftermath and Impact of the Rape on Plaintiff*

42.     Plaintiff sustained serious physical injuries in the aftermath of the rape.  As noted, she had burning in her vagina and anus, and bruising on her wrists and face.  In the days after the assault, she suffered prolonged anal bleeding and hemorrhoids.

43.     Because of Combs' power and notoriety, Plaintiff was afraid to report what had happened.  She was involved in a contentious divorce and custody battle at the time and feared that reporting the rape would cause her to lose custody of her young child.

44.     Plaintiff confided in her boyfriend, Combs' employee, hoping he would comfort and support her.  But instead of supporting her, he discouraged her from disclosing the assault, telling her that it could negatively impact his own career.

45.     Following the assault and multiple times over the years, both Combs and Sherman contacted Plaintiff and warned her to be silent, threatening repercussions including Plaintiff potentially losing custody of her son if she ever disclosed the assault.  Because of their enormous power in the industry, including through their ownership of and positions at the Combs Corporations, Plaintiff knew that they could follow through on their threats.

46.     Plaintiff told close friends that Combs and Sherman had drugged and savagely raped her, but as noted was afraid to report the attack to the police out of fear that Defendants would follow through on their threats.  She was even afraid to stay in New York City while Combs lived there, so with the help of a friend, she fled to Pennsylvania.  Plaintiff has in fact relocated multiple times throughout the years in an effort to stay away from Combs.

47.     Plaintiff has suffered irreparable harm because of the brutal rape by Defendants Combs and Sherman.  She suffers from severe depression and post-traumatic stress disorder. She also has suffered suicidal ideation and intrusive thoughts, and has attempted to end her life.

48.     Plaintiff lives in constant fear.  She struggles with hypervigilance and experiences anxiety and panic attacks in social settings, preferring to be alone.  Her need to hide to feel safe has strained her relationships with friends and family.

49.     Defendants' rape has also impacted Plaintiff's ability to engage in sexual acts with her intimate partners.  To this day, she cannot be in certain sexual positions without experiencing flashbacks of Combs violently penetrating her from behind.

13

*Plaintiff Learns that the Rape was Videotaped and Published*

50.     On or around November 27, 2023, all the trauma of the rape came flooding back to Plaintiff when her former boyfriend revealed to her for the first time that Combs and Sherman had recorded and published the video of the horrific attack.

51.     Earlier that month, Cassie Ventura had come forward and filed a lawsuit against Combs for subjecting her to years of severe sexual and physical abuse.  The case had been settled one day after it had been filed.  Plaintiff's former boyfriend invoked Ms. Ventura's effort to hold Combs' accountable and for the first time confessed that years earlier, but sometime after the actual rape itself, Sherman and Combs had showed him and a group of men – some of whom were also employed by Combs' companies and/or their related entities – the video of Plaintiff being raped.  He disclosed that Combs and Sherman had a pattern and practice of non-consensually recording women engaging in sexual acts and making those videos available to the public, including by selling tapes as pornography.  A Bad Boy artist later corroborated in a text message that Sherman "use[d] to sell porn of him doing this to chix" and that Sherman "did that to a lot of women."

52.     Plaintiff's former boyfriend reported that he and the other men watched the recording of Plaintiff's rape on a handheld camera while at the Bad Boy studio in New York City.  Combs, Sherman, and some of the other men made derogatory comments about the former boyfriend's relationship with Plaintiff, in an attempt to shame him into cutting ties with Plaintiff and to cause her further emotional harm and embarrassment.

53.     On information and belief, Defendants continued to show the video of the rape to others over the years and through to the present and/or sold the video as pornography.

54.     Plaintiff was shocked and horrified that Combs and Sherman had recorded and publicized the video of them raping her.  After over two decades spent trying to heal and distance herself from the experience, Plaintiff was devastated by the news.  She felt as if her life had been turned upside down, again, and like the rape had been happening again and again even as she was trying to forget it.  She experienced acute psychological distress, plunging into a deep depression and having suicidal ideations.  She felt intense fear, anger, and anxiety.

55.     Plaintiff lives with the distress of knowing that the video of her brutal rape is in circulation and that anyone, including her family, friends, and peers, could view it at any time.

56.     In a panic, she reached out to Sherman after learning about the tape, hoping to protect herself from further humiliation by convincing him to destroy the tape or provide it to her, but he did not respond.

### Combs' Pattern and Practice of Violence and Abuse, Including of Drugging, Raping, and Secretly Recording His Violence Against Women

57.     Combs has a long history of violence and abuse.  This long-standing behavior has been enabled by his ownership of and titles at the Combs Corporations and their affiliated entities and the immense wealth and power he has amassed through such business dealings.

58.     Among a long list of allegations:  In 1996 he was found guilty of criminal mischief for threatening a photographer from the *New York Post* with a gun.  In 1999 he was arrested and charged with second-degree assault and criminal mischief in connection with the beating of a record executive, and arrested again the same year in relation to a shooting at a club in New York; that female victim has consistently stated that Combs shot her in the face at point-blank range.

59.     Combs also has a pattern and practice of using his power and influence in the music and entertainment industries to submit people to sexual violence, often drugging his

victims and/or coercing them to consume drugs and recording the assaults, often without the victim's knowledge, just as he did with Plaintiff. In the past year, a number of these people have come forward to accuse Combs of sexual assault, violent rapes and/or sex trafficking:

a. In November 2023, three lawsuits were filed against Combs under the New York Adult Survivors Act. As noted above, Cassie Ventura, an artist signed to Bad Boy, sued Combs in the Southern District of New York for rape and years-long physical abuse, facilitated in part by Combs having supplied Ms. Ventura with copious amounts of drugs and urging her to take them, beginning in 2006. Combs regularly recorded Ms. Ventura engaging in sex acts he forced her to engage in.

b. Joi Dickerson-Neal, who had appeared with Combs in a music video, sued Combs in New York County Supreme Court alleging Combs drugged her, sexually assaulted her, and secretly recorded the assault in 1991.

c. Liza Gardner, whom Combs met at an event hosted by a record label affiliated with Bad Boy, sued him for raping her and a friend in 1990 or 1991 when she was only 16.

d. In December 2023, an anonymous plaintiff sued Combs in the Southern District of New York for drugging and gang-raping her in 2003 when she was only 17 years old. That complaint alleges that Combs and one of his business associates and employees lured the plaintiff to Daddy's House through their affiliations with the Bad Boy enterprise and its related entities, and raped her at the same location where Plaintiff was raped.

e. In February 2024, Rodney "Lil Rod" Jones, one of Combs' former producers, sued Combs for forcing him to engage in unwanted sex acts and sex trafficking,

among other allegations.  In that complaint, Mr. Jones alleges that Combs
regularly drugged others including minors by giving them alcoholic beverages
laced with ecstasy and other date rape drugs, that he believes he himself was
drugged by Combs, and that Combs routinely secretly recorded sexual encounters.

f.  In May 2024, two more women sued Combs.  Former model Crystal McKinney
sued Combs in the Southern District of New York for drugging and sexually
assaulting her at his recording studio in 2003.  Combs had promised to help
advance Ms. McKinney's modeling career, a promise she believed he would
fulfill because of his ownership of and/or titles at the Bad Boy enterprise and its
related entities.  April Lampros, an intern at Arista Records, which was an owner
of Bad Boy, also sued Combs in May 2024 in New York County Supreme Court
for raping her on multiple occasions, secretly filming at least one of the assaults,
and showing the recording to multiple people.  Ms. Lampros alleges that Combs
ordered her to take drugs on one occasion before he raped her.

g.  In July 2024, former adult film star Adria English – who was employed by Combs
as an entertainer at his infamous White Parties that brought together the biggest
names in the music and entertainment industries – sued Combs in the Southern
District of New York for sex trafficking, alleging that he required her to consume
drinks laced with ecstasy and secretly recorded the sexual acts he forced her to
engage in.

h.  In September 2024, singer and songwriter Dawn Angelique Richard also sued
Combs.  Richard was employed by Combs as part of the girl group Danity Kane,
formed by Combs, and later as a key member of Combs' band Diddy – Dirty

Money.  She sued Combs in the Southern District of New York for sexual assault, false imprisonment, and for subjecting her to hostile working conditions due to her gender, including degrading comments and threats.  Ms. Richard has alleged that Combs regularly supplied others including minors with copious amounts of drugs and alcohol, and subjected them to sexual acts while they were sedated and/or unconscious due to the drugs and alcohol.

60.     On September 16, 2024, Combs was arrested at a Manhattan hotel after a grand jury indicted him on charges of sex trafficking and racketeering.  The indictment details how "[f]or decades, [Combs] abused, threatened, and coerced women and others around him to fulfill his sexual desires, protect his reputation, and conceal his conduct."  *See United States of America v. Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love,"* Index No. 24 Crim. 542, Indictment (SDNY), at ¶ 1.[1]  It notes that Combs' abuse of women was enabled by "the employees, resources, and influence of the multi-faceted business empire that he led and controlled—creating a criminal enterprise whose members and associates engaged in, and attempted to engage in, among other crimes, sex trafficking, forced labor, kidnapping, arson, bribery, and obstruction of justice."  *Id.*

61.     The indictment notes that Combs' "business" was operated at various times in both Manhattan and Los Angeles, "under a variety of United States-based corporate entities, including Bad Boy Entertainment, Combs Enterprises, and Combs Global (collectively, the 'Combs Business')."  *Id.* at ¶ 2.

62.     According to the indictment, "[p]hysical abuse by [Combs] was recurrent and widely known."  *Id.* at ¶ 4.  It notes that Combs' assaults on women included "striking,

---

[1] All allegations in the indictment are incorporated by reference herein.

18

punching, dragging, throwing objects at, and kicking them." *Id.* Combs was also charged with "us[ing] the Combs Business, including certain employees, to carry out, facilitate, and cover up his abuse and commercial sex" and the indictment notes that his employees' conduct "was facilitated and assisted by Combs' control of the Combs Business." *Id.* at ¶ 5. The indictment specifically refers to the involvement of "Combs' security staff," likely referring to Sherman. *Id.* It notes that Combs and his affiliates recorded sexual assaults and controlled victims through the use of drugs. *See id.* at ¶ 12. In or about March 2024, law enforcement seized narcotics and more than 1,000 bottles of baby oil and lubricant from Combs' residences. *Id.*

63.     Combs' long history of violence against women makes unmistakably clear that his actions, including his attack of Plaintiff, have been motivated by gender. Specifically, he has a profound contempt for women and an ongoing practice of denigrating and trying to humiliate them.

64.     Combs' treatment of Plaintiff accords with his pattern and practice of drugging, raping, and secretly recording the women he is abusing.

### FIRST CAUSE OF ACTION
**(Violation of New York City Victims of Gender-Motivated Violence Protection Act)**
**(All Defendants)**

65.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

66.     By viciously and violently forcing sexual contact, oral sex, anal sex, and sexual intercourse on Plaintiff, Defendants Combs and Sherman committed a "crime of violence motivated by gender" under the Victims of Gender-Motivated Violence Protection Act ("VGMVPA") as defined in New York City Administrative Code § 10-1103.

67.     The requirement that the crime of violence be committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender is satisfied because Defendants Combs and Sherman violently forced Plaintiff to engage in vaginal intercourse, and oral and anal sex without her consent.  Gender animus inheres when consent is absent.  Moreover, Combs' long history of violence against women evinces a deep contempt for women, as does Sherman's alleged pattern of committing his own sexual assaults, recording them, and selling them as pornography.

68.     Defendants Combs' and Sherman's rapes of Plaintiff presented a serious risk of physical injury to her and in fact caused her significant physical injuries including burning and pain in her vagina and anus, anal bleeding, and bruising to her face and wrists.

69.     The Combs Corporations enabled Combs and/or Sherman to commit the crime of violence motivated by gender because Combs and Sherman raped Plaintiff at the Bad Boy studio, where on information and belief they routinely committed sexual assault and gender-motivated violence, as detailed in other civil lawsuits.  Given Combs' and Sherman's long-standing pattern and practice of committing sexual violence against women, including at the same location where they raped Plaintiff, the Combs Corporations had and/or should have had knowledge of Combs and Sherman using the premises for this unlawful conduct, and did nothing to stop it.

70.     The Combs Corporations enabled Combs and/or Sherman to commit the crime of violence motivated by gender by failing to, among other things, protect Plaintiff from a known danger and/or have sufficient policies and procedures in place to prevent sexual assault and/or train their employees on identifying and preventing sexual assault.  Given Combs' and Sherman's long-standing pattern and practice of committing sexual violence against women,

including on premises owned and/or operated by Defendants, the Combs Corporations had and/or should have had knowledge that Combs and Sherman were a danger to Plaintiff, and did nothing to stop Combs and Sherman.

71. The Combs Corporations enabled Combs and/or Sherman to commit the crime of violence motivated by gender by failing to properly supervise Combs and/or Sherman. Further, Combs, as the owner of Bad Boy and Daddy's House, watched Plaintiff being raped by his employee, on the premises of Bad Boy. The Combs Corporations had knowledge and/or should have had knowledge of Combs' widespread and well-known practice of committing sexual assault and gender-motivated violence, including on premises owned and/or operated by Defendants, and did nothing to stop it.

72. The Combs Corporations further enabled Combs and/or Sherman to commit the crime of violence motivated by gender by actively placing, maintaining, and/or employing Combs and/or Sherman in positions of power and authority, despite the fact that they knew and/or should have known that Combs had a widespread and well-known practice of committing sexual assault and gender-motivated violence, including on premises owned and/or operated by Defendants. Combs and Sherman used their titles and authority conferred by the Combs Corporations, including as CEO, Founder, and Chairman (Combs) and Head of Security (Sherman), to facilitate and perpetuate the violent assault on Plaintiff, and to intimidate and force Plaintiff to keep quiet in subsequent years.

73. The Combs Corporations also enabled Combs and/or Sherman to commit the crime of violence motivated by gender because Combs and Sherman used Plaintiff's boyfriend's employment as an executive for Bad Boy and Daddy's House, and their stated concerns about his performance at work, to lure Plaintiff out of her home to meet with them alone.

21

74.     On information and belief, Plaintiff alleges that Defendant Organizational Does 1 through 10, inclusive, are other parties not yet identified who have enabled Combs and/or Sherman to commit the crime of violence motivated by gender, in the ways articulated above and/or in other ways.

75.     As a result of Defendants' actions, Plaintiff suffered damages in an amount to be determined at trial and pursuant to the fee-shifting provision of the statute.

76.     This legal action has been commenced within the statutory timeframe provided by the two-year look-back window for VGMVPA claims.  *See* New York City Administrative Code § 10-1105.

## SECOND CAUSE OF ACTION
### (Violation of New York Civil Rights Law § 52-B)
### (Combs and Sherman)

77.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

78.     By raping Plaintiff and recording it, Defendants caused Plaintiff to be depicted in a video image unclothed and with intimate body parts exposed, and engaging in sexual conduct with another person in violation of New York Civil Rights Law § 52-B.

79.     Defendants published and/or disseminated the video without Plaintiff's knowledge or consent.  On information and belief, Defendants have continued to disseminate the video, including by selling it as pornography, through the present.

80.     Plaintiff was fully identifiable in the video.

81.     Plaintiff had a reasonable expectation that Defendants would not secretly record a violent rape of her and disseminate the video to others.

82.     By intentionally publicly humiliating Plaintiff and trying to ruin Plaintiff's romantic relationship with her then-boyfriend when they published the video, Defendants had the purpose of harassing, annoying, and/or alarming Plaintiff.

83.     As a direct and proximate result of Defendants' actions in violation of New York Civil Rights Law § 52-B, Plaintiff has suffered and continues to suffer emotional harm, including mental anguish, emotional distress, and humiliation in an amount to be determined at trial.

84.     Defendants' violations of New York Civil Rights Law § 52-B were malicious, willful, wanton, and outrageous, entitling Plaintiff to an award of punitive damages.

85.     Defendants should be ordered to account for and destroy all copies of the video that are in their actual or constructive possession, custody, or control.

86.     Defendants should be temporarily and permanently enjoined from further disseminating or publishing any intimate images of Plaintiff.

### THIRD CAUSE OF ACTION
### (Violation of New York City Administrative Code § 10-180)
### (Combs and Sherman)

87.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

88.     By recording and showing others the video of themselves violently raping Plaintiff, Defendants disclosed an intimate image of Plaintiff without her consent in violation of New York City Administrative Code § 10-180.

89.     Defendants are covered recipients because they recorded and/or caused the video to be recorded themselves.

90.     On information and belief, Defendants have continued to disseminate the video, including by selling it as pornography, through the present.

23

91.     Such intimate images depicted Plaintiff unclothed and with intimate body parts exposed, and engaging in sexual conduct with another person, in violation of § 10-180.

92.     Plaintiff was fully identifiable in the video.

93.     Plaintiff had a reasonable expectation that Defendants would not secretly record a violent rape of her and disseminate the video to others and certainly did not intend for the recording to be disclosed to anyone.

94.     Defendants intentionally disclosed and disseminated the video to Plaintiff's then-boyfriend and others without Plaintiff's consent with the intent to publicly humiliate Plaintiff and ruin her relationship with her then-boyfriend, causing her economic, physical, and/or substantial emotional harm.

95.     Defendants' intention in disseminating and publishing the video was to harass, annoy, alarm, and humiliate Plaintiff, and to cause her economic, physical, and/or substantial emotional harm.

96.     As a direct and proximate result of Defendants' actions in violation of New York City Administrative Code § 10-180, Plaintiff has suffered and continues to suffer emotional harm, including mental anguish, emotional distress, and humiliation in an amount to be determined at trial.

97.     Defendants' violations of New York City Administrative Code § 10-180 were malicious, willful, wanton, and outrageous, entitling Plaintiff to an award of punitive damages.

98.     Defendants should be ordered to account for and destroy all copies of the video that are in their actual or constructive possession, custody, or control.

99.     Defendants should be temporarily and permanently enjoined from further disclosing and disseminating any intimate images of Plaintiff.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

a.  Awarding compensatory damages for all physical injuries, emotional distress, psychological harm, anxiety, humiliation, physical and emotional pain and suffering, family and social disruption, and other harm, in an amount to be determined at trial;

b.  Awarding punitive damages in an amount to be determined at trial;

c.  Awarding attorneys' fees and costs pursuant to any applicable statute or law, including under New York City Administrative Code § 10-1104, New York Civil Rights Law § 52-B(2), New York City Administrative Code § 10-180, and any other applicable statute or law;

d.  Awarding pre- and post-judgment interest on all such damages, fees, and/or costs;

e.  Attaching any and all of Defendants' real property and other assets located in the State of New York pursuant to Federal Rule of Civil Procedure 64;

f.  Ordering Defendants to account for and destroy all copies of any and all images and videos taken of or in connection with Combs' and Sherman's sexual assault of Plaintiff that are in their actual or constructive possession, custody, or control, and enjoining Defendants temporarily and permanently from further disseminating or publishing any intimate images or videos of Plaintiff; and

g.  Awarding such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        September 24, 2024

25

CUTI HECKER WANG LLP

By: *Mariann Wang*
            Mariann Meier Wang
            Heather Gregorio
            Jazly Liriano
            305 Broadway, Suite 607
            New York, New York 10007
            (212) 620-2603
            mwang@chwllp.com
            hgregorio@chwllp.com
            jliriano@chwllp.com

ALLRED, MAROKO & GOLDBERG
            Gloria Allred
            305 Broadway, Suite 607
            New York, New York 10007

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

DAWN ANGELIQUE RICHARD,

      Plaintiff,

    v.

SEAN COMBS, HARVE PIERRE, REMOTE
PRODUCTIONS INC, NEW REMOTE PRODUCTIONS
INC, THE NORDLINGER GROUP LLC, NOVEMBER
15 LLC, DADDY'S HOUSE RECORDING STUDIO,
BAD BOY ENTERTAINMENT LLC, BAD BOY
RECORDS LLC, BAD BOY ENTERTAINMENT
HOLDINGS INC, BAD BOY PRODUCTIONS
HOLDINGS INC, BAD BOY BOOKS HOLDINGS INC,
THE SEAN COMB MUSIC INC, SEAN COMBS
CAPITAL LLC, COMBS ENTERPRISES, LLC,
UNIVERSAL MUSIC GROUP NV,  INTERSCOPE
GEFFEN A&M RECORDS, DIAGEO AMERICAS
SUPPLY INC D/B/A CIROC DISTILLING COMPANY
D/B/A CIROC CANNING CO, COMBS WINES AND
SPIRITS LLC, JANICE COMBS PUBLISHING INC,
JANICE COMBS PUBLISHING HOLDINGS INC,
SONY SONGS, a division of SONY MUSIC
PUBLISHING LLC, LOVE RECORDS INC,  EPIC
RECORDS**,** DOE CORPORATIONS  1-10, AND DOE
DEFENDANTS 11-20,

      Defendants.

CIVIL CASE NO. cv-24-6848

**COMPLAINT**

**JURY TRIAL DEMAND**

---

Plaintiff Dawn Angelique Richard ("Ms. Richard"), by and through her attorneys, The

Bloom Firm and IP Legal Studio LLC, brings this action against Defendants.  Ms. Richard alleges

upon knowledge concerning her own experience and upon information and belief as to all other

matters.

## PRELIMINARY STATEMENT

1.      Dawn Angelique Richard, known professionally as Dawn Richard, is an American

musician, singer, songwriter, and performer. She gained widespread recognition as a member of

the girl group *Danity Kane*, formed by Defendant Sean Combs ("Mr. Combs"), and later transitioned into a key member of Mr. Combs' band *Diddy – Dirty Money.*

2.      Defendant Sean Combs, a once-celebrated hip-hop mogul popularly known by his stage names Puff Daddy, Puffy, P. Diddy, Diddy, or Love, skyrocketed to fame in the late 1990s and became a powerful and enduring figure in the music and entertainment industry. In 1998, Mr. Combs explained the origins of his stage name in a *USA Today* interview: his nickname was "**Puff**" because he had a "**temper**" and was known to "**huff and puff**" when he was angry.

3.      Over the decades following his rise to fame, Mr. Combs' star-studded, larger-than-life persona overshadowed his vicious temper and pervasive acts of violence directed towards those in his inner circle – specifically, women.

4.      Mr. Combs' namesake temper frequently manifested in physical violence. Mr. Combs regularly hurled objects in fits of rage, often throwing items such as mobile phones, laptops, food, and studio equipment across the room or at people. On numerous occasions, Ms. Richard witnessed Mr. Combs brutally beat his girlfriend, Ms. Casandra ("Cassie") Ventura ("Ms. Ventura"). His persistent abuse included choking and strangling Ms. Ventura, striking her with his hands and with objects, slapping her, punching her, and throwing items at her, including a scalding hot pan.

5.      On many occasions, Ms. Richard tried to intervene, offering Ms. Ventura support and encouragement to leave Mr. Combs. Each time, Mr. Combs learned of her efforts to help Ms. Ventura and became enraged, threatening Ms. Richard's life with statements such as "**you want to die today,**" "**I make n***** go missing**" and "**I end people**."

6.      Compounding Mr. Combs' violent acts and death threats, he flagrantly exploited Ms. Richard's musical talent as a singer and writer while withholding her rightful earnings, stealing her copyrighted works, and subjecting her to years of inhumane working conditions which included groping, assault, and false imprisonment, among other violations.

2

7.      For nearly a decade, Mr. Combs manipulated Ms. Richard with mantras that submission to his depraved demands was necessary for career advancement, instilling in her the belief that such abuse and exploitation were required for female artists to succeed in the music industry. It was not until Ms. Ventura's bravery in coming forward that Ms. Richard realized her own personal suffering was tied to the many years of abuse by Mr. Combs that had become normalized for her.

8.      As more women courageously come forward, Plaintiff has been empowered by this collective strength and now adds her voice to the growing chorus of victims bravely sharing their harrowing stories. Together, they seek justice and stand in solidarity, as the latest victims of the #Me Too movement in the music industry.

## PARTIES

9.      Ms. Dawn Angelique Richard is a resident of the State of California and was employed by Defendants Remote Productions Inc., New Remote Productions Inc., Bad Boy Entertainment LLC, Bad Boy Records LLC, Bad Boy Entertainment Holdings LLC, Bad Boy Productions Holdings Inc., Bad Boy Books Holdings Inc., The Sean Comb Music Inc., Sean Combs Capital LLC, and Combs Enterprises LLC (hereinafter collectively "Bad Boy Records") from 2005 until 2012. At all relevant times herein, Ms. Richard met the definition of an "employee" of Defendant Bad Boy Records and related entities. At all relevant times herein, Ms. Richard was a resident of the State of New York.

10.      Defendant Sean Combs, upon information and belief, resides within the State of California. At all relevant times herein, Mr. Combs met the definition of an "employer" of Ms. Richard under all relevant statutes.

11.      Defendant Harve Pierre ("Mr. Pierre"), upon information and belief, resides within the state of New Jersey. At all times relevant herein, Defendant Harve Pierre was the president of

Bad Boy Entertainment and Bad Boy Records in New York and met the definition of an "employer" of Ms. Richard under all relevant statutes.

12.   Defendants Remote Productions Inc. ("RPI") and New Remote Productions Inc. ("NRPI") are Delaware corporations and television production companies, which upon information and belief, were created by Mr. Combs to produce *Making The Band* in New York and in California. At all relevant times herein, RPI and NRPI employed Ms. Richard under all relevant statutes.

13.   Defendant The Nordlinger Group LLC is a finance firm with its principal place of business in New York, and on information and belief, is/was employed by other named defendants herein to pay and account to Ms. Richard pursuant to her employment with other named defendants.  On information and belief, The Nordlinger Group LLC formed November 15 LLC for purposes of disbursing funds relative to *Making The Band.*

14.    Upon information and belief, Defendant Daddy's House Recording Studio Inc. is a New York corporation and a music recording studio owned by Defendant Bad Boy Records, in New York.  At all relevant times herein, Ms. Richard was an employee required to work at said studio.

15.   Defendant Bad Boy Entertainment LLC is a music, media, and entertainment company founded by Defendant Sean Combs, which includes the record label Defendant Bad Boy Records LLC. Defendant Bad Boy Entertainment LLC is a Delaware limited liability company and successor-in-interest to RPI. At all relevant times herein, Bad Boy Entertainment LLC met the definition of an "employer" of Ms. Richard under all relevant statutes.

16.   Defendant Bad Boy Entertainment Inc. is a Florida corporation.  At all relevant times herein, Bad Boy Entertainment Inc. met the definition of an "employer" of Ms. Richard under all relevant statutes.

17.    Defendant Bad Boy Entertainment Holdings Inc. is a New York corporation. Upon information and belief, Defendant Bad Boy Entertainment Holdings Inc. is a successor-in-interest to Defendants Bad Boy Entertainment LLC, Bad Boy Records LLC, and Bad Boy Entertainment Inc. as alleged herein.

18.    Defendant Bad Boy Productions Holdings Inc. is a New York corporation.  Upon information and belief, Defendant Bad Boy Production Holdings Inc. is a successor-in-interest to other "Bad Boy" Defendants as alleged herein.

19.    Defendant Bad Boy Books Holdings Inc. is a New York corporation.  Upon information and belief, Defendant Bad Boy Books Holdings Inc. is a successor-in-interest to other "Bad Boy" Defendants as alleged herein.

20.    Defendant The Sean Comb Music Inc. is a company under which Ms. Richard was employed by Defendant Sean Combs.  Upon information and belief, The Sean Comb Music Inc. is a part or successor to other "Bad Boy" company Defendants as alleged herein.

21.    Defendants Sean Combs Capital LLC and Combs Enterprises LLC are New York limited liability companies, which upon information and belief are successor-in-interest companies to Defendant The Sean Comb Music, Inc.

22.    Defendant Universal Music Group N.V. ("UMG") is a Dutch–American multinational music corporation. UMG's corporate headquarters are located in Hilversum, Netherlands and its operational headquarters are located in Santa Monica, California.  Defendant Interscope Geffen A&M Records are subsidiaries of UMG, with operational headquarters in California.  At all relevant times herein, UMG and subsidiaries Interscope Geffen A&M Records financially benefited from, condoned and enabled Defendant Combs' misconduct as defined under all relevant statutes.

23.     Defendant Diageo Americas Supply Inc. was a New York corporation, and upon information and belief, currently is a Kentucky and/or an Illinois corporation, doing business as

Ciroc Distilling Company in New York.  Ms. Richard conferred a benefit on these Defendants pursuant to the direction of Defendant Combs.

24.     Defendant Combs Wines and Spirits LLC is a New York limited liability company, which upon information and belief, is Defendant Combs' holding company for sponsorships by Defendant Diageo Americas Supply Inc. d/b/a Ciroc Distilling Company.  At all relevant times, Ms. Richard was employed by Defendant Combs Wines and Spirits LLC under all relevant statutes.

25.     Defendant Janice Combs Publishing Inc. is a music publishing administrator and a New York corporation, who at all relevant times, held or holds the publishing copyrights of Ms. Richard pursuant to her employment with other defendants herein under all relevant statutes.

26.     Defendant Janice Combs Publishing Holdings Inc. is a music publishing administrator, a New York corporation, and a successor in interest to Janice Combs Publishing Inc., who at all relevant times, held or holds the publishing copyrights of Ms. Richard pursuant to her employment with other defendants herein under all relevant statutes.

27.     Defendant Sony Songs, a division of Sony Music Publishing LLC, is a New York limited liability company who is the assignee of Ms. Richard's publishing copyrights from Defendants Janice Combs Publishing Inc. and Janice Combs Publishing Holdings Inc.

28.     Defendant Love Records Inc. is a music record label owned and/or, upon information and belief, controlled by Defendant Sean Combs, with its principal place of business in California.  Ms. Richard conferred a benefit on this Defendant pursuant to the direction of Defendant Combs.

29.     Defendant Epic Records, a record label currently managing other defendants' companies, interests and music, is a subsidiary of Sony Music Entertainment, with its principal place of business in New York.  Ms. Richard conferred a benefit on these Defendants pursuant to the direction of Defendant Combs.

6

## JURISDICTION AND VENUE

30.     This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, as this action asserts violations of 18 U.S.C. § 1591 *et seq*., 18 U.S.C. § 1589 *et seq*., and 17 U.S.C. § 106 *et seq*., and therefore raises federal questions regarding the deprivation of Ms. Richard's rights. The Court has supplemental jurisdiction over Ms. Richard's related claims arising under state and city law pursuant to 28 U.S.C. § 1367(a).

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District, and Defendants Sean Combs and Bad Boy Records conduct substantial business and/or are domiciled in this District.

## FACTUAL ALLEGATIONS

### I.     Ms. Richard is selected to be in Mr. Combs' all-female musical group *Danity Kane* after competing on MTV's *Making The Band*

32.     In or around 2004, Ms. Richard was selected to participate in Season 3 of MTV Networks' reality television show, *Making The Band*. The show centered around the formation and development of a new musical group under the mentorship of Mr. Combs. The contestants would compete and be chosen by Mr. Combs to form a band, which would go on to create albums and perform.

33.     For aspiring artists like Ms. Richard, *Making The Band* represented a concrete path to a career in the entertainment industry. Ms. Richard appeared in Seasons 3 and 4 of *Making The Band*, which first aired in 2005,[1] and in Season 5 of *Making His Band*, which aired in 2009.[2]

---

[1] *Making The Band* is a reality television series that premiered on MTV in 2000. The show has had several iterations, each featuring a different musical group. The stars of Season 3 and 4 were Aubrey O'Day, Wanita "D. Woods" Woodget, Shannon Bex, Aundrea Fimbres, and Ms. Richard, known as the all-female group *Danity Kane*.

[2] Season 5 of *Making The Band* featured *Diddy – Dirty Money*, a trio consisting of Mr. Combs, Kalenna Harper, and Ms. Richard.

34.     Out of thousands of contestants, Ms. Richard along with approximately twelve other women were selected to participate in Season 3 of *Making The Band*. Five women, including Ms. Richard, were ultimately chosen to be in the group, *Danity Kane*, which was named by Ms. Richard.

35.     Prior to and including the first *Danity Kane* album, *Making The Band* was filmed entirely at Daddy's House Recording Studio at 3120 W. 44th Street, New York, New York. The *Making The Band* content that focused on *Danity Kane*'s work on its second album, *Welcome to the Dollhouse*, was filmed at Daddy's House and at Mr. Combs' Miami residence.  Other *Making The Band* episodes included Los Angeles as a third filming location.

36.     Upon information and belief, to create *Making The Band*, camera crews filmed 24 hours a day, gathering months' worth of footage to condense into mere hours of entertainment for viewers.

37.     *Danity Kane* released its self-titled debut album in August 2006 and its second album *Welcome to the Dollhouse* in March 2008.

38.     *Danity Kane's* first album sold over 4,000,000 copies; damages to Ms. Richard for unpaid salaries are estimated at $1,000,000.00; *Danity Kane's* second album *Welcome to the Dollhouse* sold over 2,000,000 copies; damages to Ms. Richard for unpaid salaries and royalties are estimated at $500,000.00.  Damages on unpaid wages for touring on over 100 dates for Ms. Richard with *Danity Kane* are estimated at $1,800,000.00.

39.     Mr. Combs fired bandmate Aubrey O'Day and Wanita "D. Woods" Woodgett from *Danity Kane* on live television at the height of its fame in 2008; which resulted in *Danity Kane* being disbanded in 2009.

//

//

## II. Ms. Richard first encounters Mr. Combs' aggressive, intimidating behavior and animus toward women

40.     During the auditions and on the set of *Making The Band*, Mr. Combs projected an aura of superiority, wealth, and power. Mr. Combs regularly wore sunglasses and avoided looking the female contestants in the eyes, contributing to an atmosphere of uncertainty and intimidation.

41.     During auditions, Mr. Combs spoke to the female contestants in a hostile, condescending manner, making disparaging gender-based remarks such as calling them "fat," "ugly," "bitches," and "hoes." Ms. Richard felt threatened and intimidated by Mr. Combs' blatant disdain for the young women, like herself, who were excited for the opportunity to be on his show.

42.     Once the band was made, Mr. Combs' contempt for women was readily apparent as he continued to display aggressive and hostile behavior towards Ms. Richard and her all-female *Danity Kane* bandmates. Mr. Combs regularly referred to the five women as "bitches" and "hoes" and denigrated their physical appearances. By way of example, Mr. Combs stated that Ms. Richard was too skinny and needed to "do something about this [her face]."

43.     On one occasion in or around 2005, during the first season of *Making The Band 3*, Ms. Richard observed Mr. Combs' ex-partner and the mother of three of his children, Kim Porter, leaving Mr. Combs' recording studio in tears with visible facial injuries including a lacerated lip. Realizing that Mr. Combs was capable of committing acts of violence against women caused Ms. Richard to feel deep apprehension and fear that Mr. Combs could one day physically harm her.

44.     Ms. Richard was present when Mr. Combs was introduced to Casandra ("Cassie") Ventura for the first time, in or around 2006. The moment Mr. Combs first saw Ms. Ventura, his demeanor noticeably shifted. Mr. Combs positioned himself directly in front of Ms. Ventura's seat, invading her personal space, and fixated on her with an intense, unyielding stare, isolating her from the other people in the room including Ms. Ventura's then-boyfriend, music producer Ryan Leslie.

45.     Coincidentally, this first meeting between Mr. Combs and Ms. Ventura was the first time that Ms. Richard was in Mr. Combs' presence without a camera crew filming. Observing Mr. Combs behave in such an intimidating, predatory manner the first time that they were off camera made Ms. Richard feel deeply apprehensive and afraid of him.

46.     Subsequently, Ms. Ventura ended her relationship with Mr. Leslie and began dating Mr. Combs, who would become violent and abusive towards her.

### III.     *Danity Kane*: Sexual harassment, inhumane treatment, and denial of basic needs by Mr. Combs

47.     For the majority of Ms. Richard's tenure as a member of *Danity Kane* and *Diddy – Dirty Money*, Mr. Combs required her to remain at his various residences and studios in New York, Los Angeles, Florida, and New Jersey for activities such as recording, rehearsing, dressing, preparing costumes, and exercising.

48.     Throughout the productions of *Making the Band* 3 and 4, Mr. Combs deprived Ms. Richard and her *Danity Kane* bandmates of basic needs such as adequate food and sleep. When Ms. Richard or her *Danity Kane* bandmates requested meals or rest, Mr. Combs refused and chastised them with derogatory comments like "you bitches don't want this" or "y'all are not hungry enough" and "I'm paying you bitches to work." This demeaning behavior gradually undermined Ms. Richard's confidence and contributed significantly to her growing feelings of insecurity and fear of reprisal from Mr. Combs.

49.      Upon information and belief, Mr. Combs would regularly be awake for prolonged periods of time because he was high on drugs. During these periods, Mr. Combs demanded continuous access to Ms. Richard and her *Danity Kane* bandmates, often forcing them to record and rehearse for stretches of 36 to 48 hours without breaks. Forced to choose between eating and sleeping, Ms. Richard lost a significant amount of weight, weighing approximately 100 pounds

at a height of 5'4". Ms. Richard began to normalize these extreme conditions and perceive them as standard requirements of her participation in *Danity Kane*.

50.     Mr. Combs regularly sent his associates to wake Ms. Richard and her *Danity Kane* bandmates in the overnight hours so he could watch them rehearse. The regularity of these disturbances led Ms. Richard to adapt by sleeping in a sitting position, fully dressed and with makeup on, heightening her anxiety. Over time, this abnormal sleeping arrangement came to feel routine, further normalizing Mr. Combs' invasive demands.

51.     In addition to exhausting rehearsals, Mr. Combs required Ms. Richard and her bandmates to participate in intense workouts with a personal trainer. On one occasion, while running on the beach, Ms. Richard became so dehydrated that she vomited. Instead of offering medical assistance, MTV Networks' camera crew filmed the incident – contributing to her acceptance of such treatment as part of her professional life.

52.     The unrelenting and rigorous schedule of rehearsals, performance, and near-constant filming that Mr. Combs imposed caused Ms. Richard to experience extreme weight loss, dehydration, fatigue, and painful rashes from the microphone pack she was required to wear on her back. These conditions intensified Ms. Richard's feelings of powerlessness, as she increasingly viewed them as part of her professional reality and feared the consequences of any resistance.

53.     In a further assertion of power and dominance, Mr. Combs insisted on holding meetings while dressed only his underwear. On one occasion in 2008 at his Miami residence, Mr. Combs emailed Ms. Richard directing her to meet him in the living room. When she arrived, he was wearing only his underwear. Ms. Richard asked Mr. Combs to put clothes on, but he refused, stating "This is my fucking house." Mr. Combs then conducted a meeting lasting approximately an hour while dressed in his underwear, causing Ms. Richard to feel violated and embarrassed, and amplifying her feelings of powerlessness.

54.     Following the official *Danity Kane* breakup in early 2009 effectuated by Mr. Combs, Ms. Richard experienced significant financial hardship. With no prospective opportunities for employment within the entertainment field, Ms. Richard spent several months traveling from Baltimore to Daddy's House Recording Studio in New York, without pay or allocated budget.  Mr. Combs promised that Ms. Richard's compositions would result in payment of license fees and royalties pursuant to her contract with Bad Boy Records; however, no such compensation was ever reported or paid to Ms. Richard. Damages relative to these continuing copyright infringements will be proved at trial.

**IV.     *Diddy – Dirty Money*: Ms. Richard experiences Mr. Combs' gender-based physical violence, criminal acts, sexual assault, threats, and intimidation**

55.     By approximately the fall of 2009, many of Ms. Richard's compositions had been recorded by other Bad Boy Records artists.  Due to the success of her compositions, Ms. Richard was invited to meet with musical artist Kalenna Harper ("Ms. Harper") and shortly thereafter Mr. Combs, Ms. Richard and Ms. Harper formed a new group: *Diddy – Dirty Money*.

56.     Initial recording for *Diddy – Dirty Money*'s album *Last Train to Paris* took place in Mr. Combs' home on Doheny Drive in Los Angeles, California. On the first day of recording, Ms. Richard and Ms. Harper arrived at Mr. Combs' home and waited in the kitchen, where Mr. Combs' girlfriend, Ms. Ventura, was frying eggs for him.

57.     Ms. Richard observed Mr. Combs come down the stairs looking high on drugs, enter the kitchen, approach Ms. Ventura, and scream, "I've been asking you for my shit; I can't stand you bitch, you never do it right!" Mr. Combs pushed Ms. Ventura against the wall and choked her, then picked up the scalding hot pan of eggs and threw it at her, causing her to fall to the ground in a fetal position.  Cursing and screaming, Mr. Combs dragged Ms. Ventura up the stairs.

58.     Frozen in shock and terror, Ms. Richard heard glass shattering, crashing, and banging noises as Mr. Combs dragged Ms. Ventura up the stairs. Ms. Richard wanted to intervene and help Ms. Ventura, but Ms. Harper adamantly refused to interfere in Mr. Combs' relationship, and physically led Ms. Richard out of the residence. Terrified and shaken, Ms. Richard returned to her hotel where she was unable to sleep due to worrying about Ms. Ventura and her own safety.

59.     The following day, Ms. Richard received a call demanding that she return to Mr. Combs' residence to continue recording. Mr. Combs brought Ms. Richard and Ms. Harper into the recording room at his studio, locked the door, dimmed the lights, and gave each of them flowers.  Mr. Combs went on at length, stating: "this is normal, this was just a lover's argument where no one was hurt . . . this is what love is… I'm giving you an opportunity, if you want to make it you'll shut your mouth…*if you say anything, there will be consequences."*  Mr. Combs further warned that "*people end up missing."* Being threatened while locked for over 20 minutes in a small, enclosed space with Mr. Combs after observing Mr. Combs violently assault Ms. Ventura the day before, Ms. Richard was terrified and genuinely believed that Mr. Combs would follow through on his threats.

60.     In or around November 2009, after the Soul Train Awards in Atlanta, Georgia, Mr. Combs flew Ms. Richard and Ms. Harper to his house in New York on his private jet for an afterparty. There were many well-known celebrities at the afterparty, and copious amounts of illegal drugs were being openly consumed. Upon information and belief, Mr. Combs had arranged for dozens of young women and girls – some of whom appeared to be underage – to be transported to the party. The women arrived wearing little to no clothing and were given drugs and alcohol. Many of them appeared lethargic or passed out while Mr. Combs and his guests performed sexual acts on them. Ms. Richard believed that her presence at the party was a test to see whether Mr. Combs could trust her.

61.     Mr. Combs repeatedly said things like "this is a buffet, enjoy yourselves; this is what we do, this is how we party." Ms. Richard felt shocked and horrified at the sight of Mr. Combs and his guests violating incapacitated young women, and implored Mr. Combs' personal assistant Capricorn Clark to allow her to leave. Ms. Clark insisted that Ms. Richard wait 15 minutes for Ms. Clark to "make it make sense" – that is, to make Ms. Richard's exit less conspicuous so that Mr. Combs would not notice that she had left. Knowing that she was not free to leave and had to wait for Ms. Clark to help her orchestrate her departure, Ms. Richard experienced feelings of panic and being trapped against her will.

62.     Mr. Combs regularly placed Ms. Richard in similar situations with no means to escape. At Mr. Combs' drug-fueled parties, his guests, including Ms. Richard, were required to surrender their phones upon entry. Mr. Combs kept the doors locked and guarded by security personnel, making it impossible for Ms. Richard to leave without alerting Mr. Combs that she had done so. Mr. Combs hired police officers to attend his parties, sending a clear message to guests that his influence extended to law enforcement officers, and creating a climate of fear and a tacit warning that reporting him to authorities would be both unacceptable and futile.

63.     On many occasions, Mr. Combs had parties at his Miami, Florida residence that lasted for several days. At one of the parties, Ms. Richard witnessed Mr. Combs openly stating that he had arranged for busloads of young "exotic" girls, such as mixed Black and Asian, Indonesian, and albino. Once again, Ms. Richard observed inebriated young girls being sexually violated by Mr. Combs and his guests. In a state of panic and terror, Ms. Richard fled to the bedroom Mr. Combs had insisted she stay in and barricaded the door shut with furniture.

64.     Mr. Combs openly assaulted Ms. Ventura in front of Ms. Richard and other witnesses on multiple occasions. On one occasion in or around the fall of 2009, *Diddy – Dirty Money* was in New York preparing to perform at a festival. Inside their vehicle, Mr. Combs grabbed Ms. Ventura's neck, pulled her out of the van onto the grass and pinned her head down,

choking her while yelling "you gonna get fucked up today." This incident took place in the backstage area just outside the festival and was entirely visible to passersby.

65.     In another instance, in or around early 2010, Mr. Combs punched Ms. Ventura in the face in the bathroom of a party in Los Angeles. Frequently, when Ms. Ventura attempted to voice an opinion or stand up to Mr. Combs, he would strike her or wrap his hands around her throat and choke her.

66.     On the first several occasions that they observed Mr. Combs assault Ms. Ventura, Ms. Richard and Ms. Harper spoke with Ms. Ventura to support and encourage Ms. Ventura in escaping her abusive relationship with Mr. Combs. Every time that Ms. Richard and Ms. Harper tried to intervene, Mr. Combs learned of the conversation and became irate. Mr. Combs screamed at the women: "Y'all bitches don't get in my relationship," "Don't tell my bitch [Ms. Ventura] what she need to be doing," "Just make money and shut the fuck up," "I end artists," "I shelve careers," "*You could be missing*," and "*You bitches want to die today*," among other threats.

## V.     Interscope Records Enabled Mr. Combs' Gender-Motivated Violence

67.     In or around late 2009 or early 2010, Bad Boy Entertainment ("Bad Boy") entered an agreement with Interscope Geffen A&M Records ("Interscope"). Upon information and belief, Bad Boy was paid $50 million in exchange for Bad Boy's future releases being distributed through Interscope. In so doing, Mr. Combs intended to capitalize on Interscope's significant resources and enhance the promotion and sales of Bad Boy's releases, including *Diddy – Dirty Money*'s upcoming album.

68.     In the weeks and months leading up to the Bad Boy-Interscope deal, Mr. Combs had frequent meetings with producer and then-CEO of Interscope Records Jimmy Iovine. On one such occasion, Combs hosted a dinner at a West Hollywood, California restaurant, which Ms. Richard and Ms. Harper were required to attend. Among the guests at the dinner were celebrities like NeYo and Usher, as well as Mr. Iovine. At the dinner, Mr. Combs and Ms. Ventura had an

argument. In front of the dinner guests, Mr. Combs hissed at Ms. Ventura in a screaming whisper and forcefully punched her in the stomach causing her to double over in visible pain, crying. Ms. Clark escorted Ms. Ventura out of the restaurant, and Mr. Combs remained and continued socializing with the dinner guests. At this point, Interscope Records clearly had actual knowledge that Combs was dangerous around females and that Combs was willing to brazenly batter a female in public.

69.     Even after Mr. Iovine watched Mr. Combs commit a violent assault in front of numerous high-profile witnesses, the Bad Boy-Interscope deal took place and remained in effect, providing Mr. Combs with immense financial rewards and enabling him to commit further acts of violence without fear of repercussions. Watching Mr. Combs openly assault Ms. Ventura in front of Mr. Iovine and various celebrities – and observing that other powerful music industry representatives were complicit in Mr. Combs' behavior – amplified Ms. Richard's fears that Mr. Combs could one day harm her and that his actions would be accepted and normalized by everyone surrounding him.

70.     As part of the agreement between Bad Boy and Interscope, Interscope heavily promoted Diddy – Dirty Money's *Last Train to Paris* album. Mr. Iovine had presented Mr. Combs with a demo of "*Coming Home*" for him to produce – a song that would become a multi-platinum hit.[3] Mr. Iovine was encouraging Mr. Combs to develop a new sound for the album, into which Interscope was investing significant resources. Ms. Richard, Ms. Harper and Ms. Ventura all provided vocal performances for this project. Released in November 2010, the album "*Last Train to Paris*" became *Diddy – Dirty Money*'s most commercially successful project, providing vast financial rewards to both Interscope and Mr. Combs.

---

[3]  The album "*Last Train to Paris*" credits both Interscope Records and Bad Boy Records.
https://www.discogs.com/master/347136-Diddy-Dirty-Money-Last-Train-To-Paris;
https://www.revolt.tv/article/2020-12-14/64067/studio-sessions-never-before-heard-stories-of-diddy-dirty-moneys-last-train-to-paris-creation

## VI.   _Diddy- Dirty Money_: Mr. Combs subjects Ms. Richard to Labor Trafficking and Oppressive Working Conditions

71.   In or around the fall of 2009, _Diddy – Dirty Money_ began recording the song _Love Comes Down_. Upon information and belief, Mr. Combs continued to use drugs that caused him to remain awake for prolonged periods of time. When he was awake, he would demand that Ms. Richard and Ms. Harper record in the studio, where they would spend three to four consecutive days recording without a break to eat or sleep. Mr. Combs required Ms. Richard and Ms. Harper to remain at his home(s) continuously, denying the opportunity to return to their hotel rooms for breaks. The degree of control Mr. Combs exercised over Ms. Richard's daily life and basic needs exacerbated the significant power imbalance and threatening atmosphere that ensured Ms. Richard's compliance with his demands.

72.   Mr. Combs regularly left the studio and required Ms. Richard and Ms. Harper to stay and write verses to songs. Occasionally, Ms. Richard tried to leave to get something to eat or to go to her hotel. Whenever Ms. Richard tried to leave, Mr. Combs would call and demand, "where the fuck are you" and "we have an album to make." Mr. Combs frequently made threats, especially if they asked for food or rest, stating "you're a bitch," "I don't want to see your fucking face," "I make n****s go missing," and "I make things go away." Each time, Ms. Richard returned to the studio immediately, believing that Mr. Combs was capable of following through with his threats.

73.   Mr. Combs criticized Ms. Richard for being "too skinny," yet denied her requests for food and demanded that she drink only peanut butter shakes. Mr. Combs had full meals prepared by a chef and ate them in front of Ms. Richard and Ms. Harper, never offering them food.

74.   Ms. Richard and Ms. Harper begged for food and rest breaks, but Mr. Combs refused, making statements such as "absolutely fucking not" and "this is what it takes to be great."

Mr. Combs' responses underscored the threat he posed and heightened Ms. Richard's concerns for her safety and well-being.

75.     As Ms. Richard continued to work non-stop – transitioning between the studio, rehearsals, workouts, and back to the studio – she became severely dehydrated and experienced chronic stomach cramping from being undernourished and excessively thin. On the numerous occasions that she told Mr. Combs that she was not feeling well, he called her lazy and dismissed her health concerns, instilling in her further apprehension of communicating her needs.

76.     In or around the summer of 2010, Ms. Richard experienced abdominal pain, swollen glands and a fever. She was hospitalized and diagnosed with arthralgia (joint pain due to overuse, sprains, tendonitis and infection), anemia, and a low white blood cell count. Ms. Richard presented Mr. Combs with her medical records specifying that she needed to emphasize eating well, being adequately hydrated, and getting adequate rest, but Mr. Combs ordered her to report to the studio the next day for another multi-day recording session. Mr. Combs' blatant disregard for her health and well-being cemented Ms. Richard's fear of his authority and control over her career and health.

77.     Ms. Richard continued to witness Mr. Combs' abuse towards Ms. Ventura. Ms. Ventura often wore sunglasses and makeup in an attempt to hide visible injuries. These incidents further solidified Ms. Richard's fear of Mr. Combs, as they were constant reminders of the physical dangers she potentially could – and eventually would – face.

78.     Mr. Combs often exhibited uncontrollable anger during recording sessions, throwing objects like albums, laptops, and food against the wall or at individuals. Mr. Combs frequently flew into frenzied, unpredictable rages. Ms. Richard feared making any misstep that could direct his anger toward her. However, her fears went beyond her immediate physical safety. Because she had witnessed Mr. Combs' violent nature, a side of Mr. Combs that the world had not yet seen, she feared that falling out of Mr. Combs' good graces or worse, standing up to him

or speaking out against him, could result in serious harm to her. Ms. Richard frequently thought about Mr. Combs' threat about making people "go missing" and feared taking any action that could label her as a target.

79.    Despite Mr. Combs' violence, threats, and misogyny, *Diddy-Dirty Money* experienced significant sales of records, selling 2,000,000 copies of one single, 500,000 of another in the US, and in Australia 5,000,000 single copies. Ms. Richard's unpaid wages and royalties are estimated at $1,200,000.00. Ms. Richard's unpaid touring wages are estimated at over $350,000.00 for touring dates within the United States alone.

## VII.    CIROC / DiddyBeats / Nonpayment

80.    In or around the summer of 2009, Ms. Richard and Ms. Harper were required by Mr. Combs to perform as part of *Diddy – Dirty Money* and attend numerous promotional events, including late or overnight parties, all of which were under contract between Mr. Combs and CIROC Vodka, or between Mr. Combs and DiddyBeats pursuant to the Bad Boy – Interscope record deal.

81.    Ms. Richard was never compensated for the extra time she spent fulfilling Mr. Combs' promotional contracts, including the CIROC and the DiddyBeats campaign. Mr. Combs was paid approximately $250,000 per CIROC appearance. Mr. Combs did not compensate Ms. Richard or Ms. Harper for these appearances, other than just $5,000 each on a handful of occasions.   Mr. Combs' ongoing explanation for withholding compensation was that their appearances were a requirement for their tour. Additionally, Ms. Richard was required to appear, and to promote DiddyBeats, through parties, album songs and videos.

82.    Over time, Mr. Combs was paid $6.25 million for 25 CIROC shows that Ms. Richard was required to attend.[4]  Following each show, Ms. Richard and Ms. Harper approached

---

[4] Numerous videos depict Ms. Richard performing at CIROC events, such as the video available at https://youtu.be/HtIiNNsIgkw?si=4FFCB1tD6gCeX4R3. This video depicts Ms. Richard singing as part of *Diddy – Dirty Money* and is representative of her performances as part of Mr. Combs' CIROC campaign.

Mr. Combs to inquire about their insufficient and sporadic payments. Mr. Combs routinely responded with statements such as "You bitches aren't grateful" and "you don't want this." Ms. Richard estimates losses from CIROC campaign promotions totaling at least $1,562,500.00. Upon information and belief, Mr. Combs received an advance on DiddyBeats for which Ms. Richard received no compensation.

### VIII.   Mr. Combs Sexually Harasses and Assaults Ms. Richard

83.   Between approximately 2009 and 2011, throughout *Diddy – Dirty Money*'s recording process, rehearsals, and performances, Mr. Combs repeatedly ordered Ms. Richard to strip down to her underwear. He frequently referred to her as a "bitch" or "whore" and made demeaning remarks about her body, alternatingly calling her lazy, fat, ugly, and skinny, particularly in front of his friends, producers, and bodyguards.

84.   Mr. Combs frequently held meetings with Ms. Richard wearing only his underwear, despite Ms. Richard's protests and repeated requests for him to put on clothing. In response, Mr. Combs called her a "bitch" and "whore" and reminded her that she should be grateful for the opportunity to be there.

85.   Often while they were recording in the studio, Mr. Combs would hold "parties" where he would invite young men and women, who were often scantily dressed and appeared underage, to use drugs and engage in sex acts. Ms. Richard observed Mr. Combs and his colleagues kissing, groping, and inappropriately touching the young women. Upon information and belief, the participants often left the immediate area to have sex and returned shortly thereafter.

86.     On numerous occasions between approximately 2009 and 2011, under the guise of preparing for performances, Mr. Combs would intrude into Ms. Richard's changing room at *Daddy's House* unannounced while Ms. Richard was undressed.

87.     Even though a female stylist was present and assisting Ms. Richard with her wardrobe, Mr. Combs would grope Ms. Richard's body, including her bare buttocks and her chest area near her breasts. With no legitimate purpose, and without Ms. Richard's consent, Mr. Combs caressed her buttocks to show the stylist where he wanted her high-waisted panties positioned, and attempted to touch her breasts, claiming to show the stylist where he wanted her bra straps to go.

88.     When Mr. Combs would enter the changing room, Ms. Richard would cover her chest with her hands to prevent Mr. Combs from seeing or touching her breasts. When Mr. Combs would touch her body, Ms. Richard would attempt to swat his hands away and state "don't touch me."

89.     Mr. Combs frequently smacked Ms. Richard's bare buttocks and often commented on her body, noting that although she was "too skinny," she had an "ass."

90.     Ignoring her visible and communicated discomfort, Mr. Combs persisted and continued to intrude when Ms. Richard was in the dressing room, continued to touch her buttocks and breast area under the guise of showing the stylist what to do, and continued to smack her buttocks without her consent.

91.     In or around October 2010, *Diddy – Dirty Money* performed in Glasgow, Scotland, where Mr. Combs engaged in overt sexual advances towards Ms. Richard. On numerous occasions when Ms. Richard exited the dressing room fully styled, Mr. Combs looked at her approvingly and smacked her buttocks while making comments such as "you're looking good," "OK Dawn, OK," and "I see what that is" in a flirtatious tone. Each time, Ms. Richard moved away and asked him not to touch her, but Mr. Combs disregarded her protests.

92.     On their last night in Glasgow, Ms. Richard witnessed Mr. Combs and several other males gang-banging Mr. Combs' female assistant at the hotel pool. Ms. Richard immediately left and went to her hotel room.

93.     On their flight back to the United States the next day, Ms. Richard asked Mr. Combs where his assistant was; Mr. Combs replied, "I don't give a fuck where that bitch is." Ms. Richard later learned that Mr. Combs had taken his assistant's passport with him to the United States, leaving the assistant stranded in the United Kingdom.

94.     In Glasgow, Ms. Harper confided in Ms. Richard that her husband and manager, Tony Vick ("Mr. Vick"), was abusive. After an especially severe assault, she confided in Ms. Richard that she wanted to leave Mr. Vick, and Ms. Richard helped her to plan her exit from the relationship. However, Ms. Harper and Mr. Vick reconciled, and both Mr. Combs and Mr. Vick – who had a close relationship – learned of Ms. Richard's role in helping Ms. Harper.  Both Mr. Combs and Mr. Vick became noticeably distrustful of Ms. Richard, which exacerbated her fears of harm and reprisal.

95.     When Mr. Combs would require his *Diddy – Dirty Money* bandmates to stay at his residence in Miami, Ms. Richard would barricade herself inside her room at night, placing heavy furniture against the door because she feared being harmed in her sleep.

96.     In or around late December 2010, Ms. Richard, Ms. Harper, and Ms. Ventura were in Mr. Combs' Los Angeles home when Mr. Combs stated "I want to gift you [fake] titties for Christmas." Mr. Combs reached out and cupped Ms. Richard's breasts without her permission and stated "You're an A; I'm thinking a D." Ms. Richard recoiled in shock and left the room.

97.     Throughout the abovementioned time period, when Ms. Richard resisted Mr. Combs' advances, Mr. Combs retaliated by denying her singing parts in songs, removing her from songs, refusing to allow her to sing in performances, and turning her microphone off during

performances. The more Ms. Richard rebuffed his advances, the more Mr. Combs' retaliatory
behavior increased.

IX.    **Mr. Combs Assaults and Falsely Imprisons Ms. Richard**

98.    In or around December 2010, *Diddy – Dirty Money* was preparing for an upcoming
performance on *Saturday Night Live* ("SNL"). As usual, rehearsals lasted for days without the
opportunity to eat or rest, and the rehearsal schedule was unpredictable.  After waiting all day for
Mr. Combs to call or send a car, Ms. Richard received a phone call from Mr. Combs demanding
"Where the fuck are you bitches?  You bitches don't want this; y'all don't deserve to have
someone pick you up; get a cab." Ms. Richard and Ms. Harper immediately took a taxi to SIR
Studios at 520 West 25th St, New York NY, anxious because Mr. Combs sounded enraged.

99.    Upon their arrival at SIR Studios, Mr. Combs and Harve Pierre were waiting for
them in the lobby. Mr. Combs screamed obscenities at them: "**Where the fuck were you bitches?
You bitches don't want to win . . . you don't want this . . . I'm so tired of y'all**." Ms. Richard
noticed that people in the lobby were reacting to Mr. Combs' tirade. Embarrassed, Ms. Richard
asked Mr. Combs to stop swearing and calling them "bitches" in front of everyone.

100.    Mr. Combs' facial expression shifted as he stepped towards Ms. Richard, raised
his arm, and swung his fist toward her face. Believing that Mr. Combs was going to hit her, Ms.
Richard braced for the impact. Before Mr. Combs could strike her, Mr. Combs' bodyguard
grabbed her, escorted her out of the studio and forced her into the Bad Boy Records Bentley that
was parked outside. Ms. Harper ran after Ms. Richard, and Mr. Combs' bodyguard closed and
locked the Bentley's doors with both women inside.

101.    Inside the vehicle, Ms. Richard realized there were no interior door handles, and
that they were locked inside with no way to escape. Ms. Richard's belongings were in the studio,
but she was able to call her father from Ms. Harper's cell phone. Ms. Richard relayed to her father
what had happened, and that she needed help and feared that she would go missing. Moments

23

later, Mr. Combs' bodyguard removed only Ms. Harper from the Bentley, leaving Ms. Richard locked in the car alone for over two hours.

102.    Ms. Richard screamed as loudly as she could, but no one responded.  It was late evening in the wintertime, the windows were heavily tinted, and the interior of the car was dark except for faint interior lights. Ms. Richard's belongings and winter coat were in the studio, while the ignition was off and there was no heat. With Mr. Combs' prior threats and violence running through her mind, Ms. Richard felt sheer panic, terror, and feelings of claustrophobia at being locked in a small, dark, enclosed space with no way to communicate or call for help. She began to feel cold and feared for her life, not knowing when or if she would be released.

103.    Ms. Richard's father drove to New York from Baltimore and arrived at the studio approximately two hours later. Only after her father arrived and demanded to see her did Mr. Pierre order Mr. Combs' bodyguard to release Ms. Richard from the vehicle.  Mr. Pierre ushered Ms. Richard's father between several rooms at SIR Studios, where he waited for approximately two hours before being able to confront Mr. Combs.  Once Ms. Richard's father expressed that he intended to contact police, Mr. Combs warned him to "think about your family" and "think about your daughter's career." Her father appeared visibly frightened by Mr. Combs' threats and actions, which in turn made Ms. Richard feel terrified for herself and her family's safety.

104.    The next night, *Diddy – Dirty Money* performed on SNL. Mr. Combs subsequently called Ms. Richard, complimented her performance, and concluded with a threat: "you don't call your dad unless you're in the hospital."

//

//

//

//

//

24

## X.    Unjust Enrichment of Defendants by Breach of Contract and/or Copyright Infringement

105.    As a member of *Danity Kane*, Ms. Richard has performed on over 15 songs[5] and holds composition credits for more than 3 songs.[6]  Defendants have failed to account to or pay Ms. Richard as agreed for her compositions and her performances and have breached contracts and infringed her copyrights, all of which has unjustly enriched Defendants.

106.    As a member of *Diddy-Dirty Money*, Ms. Richard has performances recorded on over 9 songs;[7] additionally Ms. Richard has composition rights and credits on more than 5 songs.[8] Defendants have failed to account to or pay Ms. Richard as agreed for her compositions and her

---

[5]  1. "Show Stopper" 2. "Ride for You" 3. "Damaged" 4. "Bad Girl" 5. "Pretty Boy" 6. "Striptease" 7. "Poetry" 8. "Lights Out" 9. "Sucka for Love" 10. "Ain't Going" 11. "2 of You" 12. "Do Me Good" 13. "Ecstasy" (featuring Rick Ross) 14. "Lemonade" (featuring Tyga) 15. "All in a Day's Work"

[6]

1. "Bad Girl" (featuring Missy Elliott) Written by Dawn Richard, Mary Brown, Mary Brockert, Missy Elliott, Sean Combs, Quincy Jones, David Wolinski, Shanell Woodgett
2. "Secret Place" (Interlude) • Performed by Dawn Richard
3. "Infrared" Written by Dawn Richard, Kwame Holland

[7]  1. "Angels"
2. "Love Come Down"
3. "Yeah Yeah You Would"
4. "Hate That You Love Me"
5. "Your Love" (featuring Trey Songz)
6. "Ass on the Floor" (featuring Swizz Beatz)
7. "Yesterday" (featuring Chris Brown)
8. "I Hate That You Love Me"
9. "Shades" (featuring Lil Wayne and Justin Timberlake)

[8]  1. "I Hate That You Love Me"
Written by Dawn Richard, Richard Butler, Warren Trotter, Arden Altino, Durrell Artaze Babbs
 2.  "Looking for Love" (featuring Usher)
Written by Dawn Richard, Usher Raymond IV, Sean Combs, Kalenna Harper, Kevin "KC" Cossom, Marcella
 Ms. Lago Araica, Eric "E-Class" Akon, Mario "Yellowman" Winans
3. "Strobe Lights" (featuring Lil Wayne)
Written by Dawn Richard, Lil Wayne, Sean Combs, Richard Butler, Warren Trotter, Arden Altino, Marcella Ms. Lago Araica, Kevin "KC" Cossom
4. "Loving You No More" (featuring Drake)
Written by Drake, Dawn Richard, Sean Combs, Richard Butler, Warren Trotter, Arden Altino, Mario Winans, Jerry "Wonda" Duplessis
5. Change" Written by Dawn Richard, Richard Butler, Warren Trotter, Arden Altino

performances and breached contracts and/or infringed her copyrights, unjustly enriching Defendants.

107. In 2020, Mr. Combs selected Ms. Richard for a reboot of *Making The Band*, and Ms. Richard spent hours preparing to be a judge on the new show. However, the COVID-19 pandemic halted those plans, and Ms. Richard was never compensated in any way.

108. On or about July 1, 2021, Mr. Combs and Bad Boy Records (or Holdings or both), directed Janice Combs Publishing Inc. to assign its administration rights of Ms. Richard's songs,[9]

---

[9]

| SONG TITLE | WRITER NAME | ARTIST |
|---|---|---|
| 86 | CARLA HAYNES-CARTER (20), **DAWN RICHARD (20)**, ANDREW SCOTT (60) | |
| 2 SIDES (TWO SIDES) | Ray Romulus (15), **Dawn Angelique Richard (13.34)**, Jeremy Reeves (15), Jonathan Yip (15), Malcolm McDaniel (13.33), Ray McCullough (15), Rosina Russell (13.33) | DANITY KANE |
| AIN'T GOING | Iyanna Dean (45), Bernard Malik (50), **DAWN RICHARD (2.5)**, WANITA WOODGETT (2.5) | DANITY KANE |
| ASS ON THE FLOOR | SEAN COMBS (5), KASSEEM DEAN (55), KALENNA HARPER (20), **DAWN RICHARD (10)**, LEROY WATSON (10) | DIDDY-DIRTY MONEY |
| Burn So Deep | James Michael Edgar (50), **DAWN RICHARD (50)** | Jimmy Edgar Feat. Dawn Richard |
| Dance | Noise Castle (25), Ester Dean (25), DAVID RYAN HARRIS (25), **Dawn Richard (25)** | DAWN RICHARD |
| Faith | Ricky Lewis (50), **DAWN RICHARD (50)** | |
| FIREFLIES | **DAWN RICHARD (25)**, HARMONY SAMUELS (50), ANDREW SCOTT (25) | ZENDAYA |
| FLASHBACK (INTERLUDE) | Romeo IX (50), **DAWN RICHARD (25)**, WANITA WOODGETT (25) | DANITY KANE |
| HATE YOU NOW | Marcela aracia (5), SEAN COMBS (10), JAMES FAUNTLEROY (35), KALENNA HARPER (2.5), Nathaniel Hills (45), **DAWN RICHARD (2.5)** | DIDDY-DIRTY MONEY |
| HOME FOR CHRISTMAS | **DAWN RICHARD (100)** | DANITY KANE |
| HURT (LOVING YOU NO MORE) | SEAN GARRETT (50), AUBREY GRAHAM (15), **DAWN RICHARD (5)**, MIKAL SNODDY (25), MARIO WINANS (5) | DIDDY |
| LIGHTS OUT | Craig Betz (20), Neil Betz (20), SEAN COMBS (5), **DAWN RICHARD (50)**, MARIO WINANS (5) | DANITY KANE |
| LOVE COME DOWN | Shawn Carter (7.5), SEAN COMBS (17), BERRY GORDY JR (1.5), KALENNA HARPER (10.63), ROB HOLLADAY (34), ALPHONSO MIZELL (1.5), FREDDIE PERREN (1.5), **DAWN RICHARD (10.62)**, DEKE RICHARDS (1.5), LEROY WATSON (12.75), KANYE WEST (1.5) | DIDDY |
| PERFECTLY BLIND | BRIAN ANDREWS (6.25), Robert Curry (6.25), MICHAEL MCCLUNEY (6.25), QWANELL MOSLEY (25), DIRK PATE (25), **DAWN RICHARD (25)**, Willie Taylor (6.25) | DAY26 |
| SECRET PLACE (INTERLUDE) | SHANNON BEX (10), AUNDREA FIMBRES (10), AUBREY O'DAY (10), **DAWN RICHARD (10)**, MARIO MENDELL WINANS (50), WANITA WOODGETT (10) | DANITY KANE |
| Stopwatch | Derek Scott Bergheimer (10), Jesse Dee Boykins III (33), **DAWN RICHARD (20)**, Karl Rubin (5), Travis Wayne Stewart (32) | |
| Stopwatch (Salva Remix) | Jesse Dee Boykins III (20), **DAWN RICHARD (10)**, PAUL SALVA (50), Travis Wayne Stewart (20) | |
| STRIP TEASE | Marcella Araica (5), SHANNON BEX (6), AUNDREA FIMBRES (6), NATE HILL (45), AUBREY O'DAY (6), **DAWN RICHARD (6)**, JAMES WASHINGTON (20), WANITA WOODGETT (6) | DANITY KANE |
| Strobe Lights | SEVEN AURELIUS (30), Dwayne Carter (10), Kenneth Coby (7.5), KALENNA HARPER (27.5), Tim McEwan (20), **DAWN RICHARD (5)** | DIDDY-DIRTY MONEY |
| TAILOR MADE SUIT | DANIEL BRYANT (0), PHILLIP BRYANT (0), CYNTHIA LOVING (0), **DAWN RICHARD (0)** | LIL MO |
| TELL ME | Ray Romulus (12.50), Briana Jackson (16.67), **Dawn Angelique Richard (16.67)**, Jeremy Reeves (12.50), Jonathan Yip (12.50), Ray McCullough (12.50), Rosina Russell (16.66) | DANITY KANE |
| YEAH YEAH YOU WOULD | MARCELLA ARACIA (5), RICHARD BUTLER (12), KALENNA HARPER (23), Floyd Hills (45), **DAWN RICHARD (5)**, LEROY WATSON (10) | DIDDY-DIRTY MONEY |

held from her tenure with Defendants in the years 2005-2012, to Sony Songs, a division of Sony Music Publishing LLC ("Sony"). The assignment, signed by Ms. Richard on October 22, 2024, purported to credit, through a semi-annual accounting, Ms. Richard's royalty account for Ms. Richard's compositions from between 80 to 90% of publisher's share. However, no statements were ever provided, no payments were ever made, and no reversions nor assignment were ever recorded with Performing Rights Organizations or other royalty collecting entities by Defendants or by Sony. Defendants have wholly failed to account to or pay Ms. Richard as agreed for her compositions and her performances in breach of the assignment and have thereby infringed her copyrights, resulting in Defendants being unjustly enriched.

109. During the summer of 2023, Mr. Combs' new record company, Love Records Inc., tendered a contract for negotiation to Ms. Richard for the song entitled "*Deliver Me*," embodied as Track 3 on *The Love Album: Off The Grid*, officially released on September 15, 2023. Upon information and belief, *Deliver Me* sold well prior to Mr. Combs' legal troubles in November 2023. Continuing to the present, Ms. Richard sought to establish her rightful percentage as a 21% composer on *Deliver Me*, Mr. Combs personally called Ms. Richard and left a voicemail complaining about her fair requests. Upon information and belief, Mr. Combs directed his attorneys to avoid confirming the composition percentages on the song; and in fact, list composers who played no part in composing the song. As a result, the contract was never signed by either Ms. Richard or Love Records Inc. Nevertheless, Ms. Richard obtained a copyright registration certificate on a timely basis; said registration lists authors/claimants as agreed when the song was created in 2009. That registration is filed separately in the Court and supports Ms. Richard's claim of copyright infringement by Defendants herein. Defendants Love Records Inc. and Mr.

Combs infringed Ms. Richard's copyrights in the composition of *Deliver Me* by releasing *Deliver Me* without Ms. Richard's permission and without compensation.

## DAMAGES

110.     As a result of the acts and conduct complained of herein, Ms. Richard has suffered and will continue to suffer the loss of income, wages, benefits, royalties, promotional fees, touring fees and other compensation. Ms. Richard has also suffered, among other things, future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, post-traumatic stress disorder, anxiety disorder, insomnia, panic attacks and other non-pecuniary losses entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorney's fees and costs, and other remedies as this Court may deem appropriate.

## FIRST CAUSE OF ACTION
### Violation of The Victims of Gender-Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq*. ("VGMVPL")
### *Against Defendants Sean Combs, Harve Pierre, Interscope Records & Bad Boy Records*

111.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

112.     The above-described conduct of Mr. Combs, including but not limited to Mr. Combs' physical and sexual assaults, harassment, and unlawful imprisonment of Plaintiff in New York City constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 of the New York City VGMVPL. The term "crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution or conviction; and the term "crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

28

113.     The above-described conduct of Mr. Combs, including, but not limited to, sexual assault, physical assault, threats, and false imprisonment, all conduct proscribed by PL 110/120.00(1), PL 120.15, PL 240.30(3), PL 135.05; PL 135.10 Pl 130.52, PL 240.30(1)(a), PL 120.14(2), PL S 135.5(3), constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103.

114.     Defendants Harve Pierre, Interscope Records, and Bad Boy Records have financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

115.     Defendants Harve Pierre, Interscope Records, and Bad Boy Records enabled, condoned, had knowledge of, and failed to act to prevent or mitigate Mr. Combs' commission of the abovementioned crimes of violence motivated by gender and are therefore also liable under the VGMVPL.

116.     As a direct and proximate result of the above mentioned crimes of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate, as set forth in § 10-1104.

117.     Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

## SECOND CAUSE OF ACTION
### Sexual Assault pursuant to The California Sexual Abuse and
### Cover Up Accountability Act, Cal. Civ. Proc. § 340.16
### *Against Defendants Sean Combs & Bad Boy Records*

118.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

119.    Mr. Combs subjected Plaintiff to sexual battery, as defined in Cal. Penal Code §§ 234.4(e)(1). In doing so, he intended to and did cause harmful and sexually offensive contact with their person and place them in imminent apprehension of such contact.

120.    Pursuant to California Code of Civil Procedure § 340.16, as amended by Assembly Bill 2777, this cause of action is timely because it is commenced within three years of the date Plaintiff discovered the injuries resulting from Defendants' acts, which Plaintiff did not discover, and could not have reasonably discovered, until November 2023 when Ms. Ventura filed a lawsuit against Defendant.

121.    Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

122.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

123.    Plaintiff also seeks reasonable attorneys' fees as provided under Cal. Civil Code § 52.5.

## THIRD CAUSE OF ACTION
### Forced Labor in Violation of 18 U.S.C. §§ 1589 and 1595
### *Against Defendants Sean Combs, Bad Boy Records & UMG Interscope Geffen A&M*

124.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

30

125.    Defendants knowingly obtained labor from Plaintiff through threats of serious harm, physical restraint, and other means of coercion, in violation of 18 U.S.C. § 1589.

126.    Defendants Bad Boy Records, UMG Interscope Geffen A&M Records knowingly benefited from the forced labor and the trafficking activities conducted by Mr. Combs.

127.    Under 18 U.S.C. § 1595, Plaintiff is entitled to bring a civil action against all Defendants for their violation of 18 U.S.C. § 1589.

128.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

129.    Plaintiff seeks compensatory damages for the harm suffered as a result of Defendants' forced labor practices.

130.    Plaintiff also seeks punitive damages to deter such conduct by Defendants in the future, along with reasonable attorney's fees and costs.

131.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## FOURTH CAUSE OF ACTION
### Violation of New York Services for Victims of Human Trafficking, N.Y. Servs. Law § 483-bb(c)
### *Against Defendants Sean Combs & Bad Boy Records*

132.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

133.    Plaintiff is a victim of labor trafficking within the meaning of N.Y. Penal Law 135.35 and is therefore entitled to bring a civil action under N.Y. Soc. Serv. § 483-bb.

134.    The Defendants' acts and omissions, taken separately and/or together, as outlined above, constitute a violation of N.Y. Soc. Serv. § 483-bb. Specifically, Defendant Sean Combs

perpetrated labor trafficking of Ms. Richard by inducing her to engage or continue to engage in labor activity by means of instilling a fear in her that, if she refused to comply, he would cause physical injury, serious physical injury, or engage in other conduct constituting a felony or unlawful imprisonment in the second degree in violation of New York Penal Law 135.05, and Defendant Bad Boy Records benefitted from Mr. Combs' venture by holding Ms. Richard, an artist signed with Defendant Bad Boy Records and otherwise employed by other Defendant Doe Corporations, captive to Mr. Combs' demands and desires. At all relevant times, Defendant Bad Boy Records participated in and facilitated the obtainment of Plaintiff's labor induced by force, fraud, or coercion.

135. As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

136. Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

### FIFTH CAUSE OF ACTION
### Sex Trafficking under 18 U.S.C. § 1591, *et seq.*
### *Against Defendant Sean Combs & Bad Boy Records*

137. Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

138. Mr. Combs, one of the most prominent musical artists and producers in the industry, recruited and enticed Plaintiff by initiating a professional relationship with her and inviting her to join his band *Diddy- Dirty Money* as a singer, songwriter, and performer. This opportunity instilled in Plaintiff the hope and expectation of advancing her career and achieving greater success in the music industry.

139.    Mr. Combs, through a pattern of coercive threats and displays of brutal violence, caused Plaintiff to engage in commercial sex acts, as defined by 18 U.S.C. § 1591(e)(3). These acts were carried out to further Mr. Combs' financial gain from Ms. Richard's participation in *Diddy-Dirty Money*, to exert control over her, and to satisfy his own sexual gratification.

140.    Mr. Combs used fraud and force to coerce and entice Ms. Richard into commercial sex acts. Mr. Combs did so by making threats of career derailment and promises of career advancement in exchange for Ms. Richard acquiescence to Mr. Combs' sexual batteries and assaults.

141.    Mr. Combs acted with knowledge or in reckless disregard of the fact that Plaintiff was forced to engage in these acts through coercion and that these acts were in exchange for her continued place in the band and her financial stability.

142.    Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

143.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

144.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

**SIXTH CAUSE OF ACTION**
**Violation of the California Trafficking Victims Protection Act,**
**Cal. Civil Code § 52.5**
***Against Defendants Sean Combs & Bad Boy Records***

145.    Plaintiff repeats and realleges each and every allegation contained in all of the preceding paragraphs as if fully set forth herein.

146.     Plaintiff is a victim of trafficking within the meaning of Cal. Penal Code § 236.1 and is therefore entitled to bring a civil action under Cal. Civil Code § 52.5.

147.     The Defendants' acts and omissions, taken separately and/or together, as outlined above, constitute a violation of Cal. Civ. Code § 52.5. Specifically, Defendant Sean Combs perpetrated human trafficking of Ms. Richard by depriving or violating her personal liberty with the intent to obtain forced labor, and Defendant Bad Boy Records benefitted from Mr. Combs' venture by holding Ms. Richard, an artist signed with Defendant Bad Boy Records and otherwise employed by other Defendant Doe Corporations, captive to Mr. Combs' demands and desires. At all relevant times, Defendants participated in and facilitated the obtainment of Plaintiff's labor induced by force, fraud, or coercion.

148.     Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

149.     As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

150.     Pursuant to Cal. Civ. Code § 52.5(d)(3), Defendants' continuous death threats and coercion induced Plaintiff to delay the filing of this action and asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

151.     Pursuant to Cal. Civ. Code § 52.5(d)(4), the suspension of the statute of limitations due to estoppel applies to all other related claims arising out of the trafficking situation, including but not limited to, Violation of The Victims of Gender-Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq*., Forced Labor in Violation of 18 U.S.C. §§ 1589 and 1595,  New York Services for Victims of Human Trafficking, N.Y. Servs. Law § 483-bb(c), Sex Trafficking under

18 U.S.C. § 1591, Assault Under New York Law, Battery/Sexual Battery Under New York Law, False Imprisonment under New York Law, False Imprisonment under California Law, Intentional Infliction of Emotional Distress, Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq*., Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York City Human Rights Law, N.Y. Exec. Law §§ 8-101, *et seq*., Retaliation in Violation of New York State Human Rights Law, ("NYSHRL") Section 296 and California Government Code Section 12940(h), Hostile Work Environment in violation of California Government Code §12940, Gender Discrimination in violation of California Government Code §12940, Violation of Right of Publicity Under New York Civil Rights Law § 50 and § 51, Unjust Enrichment, Copyright Infringement 17 U.S.C. § 106, Breach of Contract, Breach of Implied Covenant of Good Faith & Fair Dealing, Fraud, Intentional Misrepresentation, False Promise.

152.    Pursuant to Cal. Civ. Code § 52.5(e), the running of the statute of limitations may be suspended as Plaintiff could not have reasonably discovered the cause of action due to circumstances resulting from the trafficking, including psychological trauma.

## SEVENTH CAUSE OF ACTION
### Assault Under New York Law
### *Against Defendants Sean Combs, & Bad Boy Records*

153.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

154.    In engaging in the conduct described above, Mr. Combs committed an assault against Plaintiff because he intentionally placed Plaintiff in reasonable apprehension of imminent harmful or offensive contact, and Plaintiff reasonably feared immediate bodily harm as a result of Defendant's conduct. Defendant's actions amount to violations under N.Y. Penal Law §§ 110/120.00(1), 120.15, as well as analogous California law and the common law of New York and California.

155.    Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

156.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

157.    The conduct of Mr. Combs described above was willful, wanton, and malicious. At all relevant times, Mr. Combs acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Defendant Combs according to proof at trial.

158.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

**EIGHTH CAUSE OF ACTION**
**Battery/Sexual Battery Under New York Law**
*Against Defendants Sean Combs & Bad Boy Records*

159.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

160.    In engaging in the conduct described above, Mr. Combs committed a battery against Plaintiff because he intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff's person. Mr. Combs repeatedly and without consent touched Ms. Richard's body including her buttocks and chest area. Defendant's actions amount to violations under N.Y. Penal Law §§ 150.50, 130.52, 130.55, and 130.65, as well as analogous California law and the common law of New York and California.

36

161.    Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

162.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

163.    The above-described conduct by Mr. Combs was willful, wanton, and malicious. At all relevant times, Mr. Combs acted with conscious disregard of Ms. Richard's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Ms. Richard, and intended to cause fear, physical injury, and/or pain and suffering to Ms. Richard. By virtue of the foregoing, Ms. Richard is entitled to recover punitive and exemplary damages from Mr. Combs according to proof at trial.

164.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## NINTH CAUSE OF ACTION
### False Imprisonment under New York Law
#### *Against Defendants Sean Combs, Harve Pierre & Bad Boy Records*

165.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

166.    Defendants Mr. Combs and Mr. Pierre falsely imprisoned Plaintiff in New York as alleged in this Complaint, by suddenly and without provocation, willfully and maliciously falsely imprisoning Ms. Richard against her will in the Defendants' corporate vehicle for over two hours.

167. Following Plaintiff's false imprisonment in the Defendants' corporate vehicle, Defendant Mr. Combs issued a clear retaliatory threat of future injury and bodily harm to Plaintiff, underscoring the intent to both control and to silence Plaintiff as to Defendant's crimes.

168. Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

169. As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

170. Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## TENTH CAUSE OF ACTION
### False Imprisonment under California Law
*Against Defendants Sean Combs & Bad Boy Records*

171. Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

172. Defendant Mr. Combs falsely imprisoned Ms. Richard in California as alleged in this Complaint, by demanding, under false pretenses, that Ms. Richard appear for work, and subsequently, willfully and maliciously falsely imprisoning and threatening Ms. Richard in Mr. Combs' home studio against her will for over twenty minutes.

173. Following Plaintiff's false imprisonment in Mr. Combs' home studio, Defendant Mr. Combs issued a clear retaliatory threat of future injury and bodily harm to Plaintiff, underscoring the intent to both control and to silence Plaintiff as to Defendant's crimes.

174.     Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

175.     As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

176.     Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## ELEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### *Against Defendants Sean Combs, Harve Pierre & Bad Boy Records*

177.     Plaintiff repeats and re-alleges each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

178.     Defendants Sean Combs and Harve Pierre's conduct, which included abuse, death threats, sexual assault, false imprisonment, deprivation of basic necessities in the workplace, nonpayment or underpayments, and labor violations was extreme and outrageous, going beyond all possible bounds of decency and utterly intolerable in a civilized community.

179.     Defendants' conduct was intentional and reckless and Defendants knew or should have known that such conduct would cause Plaintiff severe emotional distress.

180.     Defendants Harve Pierre and Bad Boy Records have financially and otherwise benefited from these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

181.     Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

182.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

**TWELFTH CAUSE OF ACTION**
**Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq*. ("NYSHRL")**
*Against Defendants Sean Combs & Bad Boy Records*

183.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

184.    Defendants Sean Combs and Bad Boy Records discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment, verbal abuse, systematic exclusion, failure to address complaints of discrimination and/or harassment, retaliation, derogatory gender-based slurs and comments, insults and offensive gender-based language, intimidation and bullying, threats, unfair treatment, and denial of opportunities, promotions, or benefits based on gender.

185.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has sustained and will continue to sustain, monetary and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

186.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

187.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendant should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

## THIRTEENTH CAUSE OF ACTION
### Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York City Human Rights Law, N.Y. Exec. Law §§ 8-101, *et seq.* ("NYCHRL")
#### *Against Defendants Sean Combs & Bad Boy Records*

188.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

189.    Defendant Sean Combs and Bad Boy Records discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to unwanted touching of her intimate parts, forcing Plaintiff to endure derogatory name-calling, and exposing Plaintiff to sex trafficking and sex acts, constituting a hostile work environment. Defendants engaged in a pattern of criminal conduct in the workplace that created an offensive, intimidating, and hostile atmosphere for Plaintiff based on her gender.

190.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

191.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

192.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

//

//

//

## FOURTEENTH CAUSE OF ACTION
### Retaliation in Violation of New York State Human Rights Law, ("NYSHRL")
### Section 296 and California Government Code Section 12940(h).
### *Against Defendants Sean Combs & Bad Boy Records*

193.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

194.    Plaintiff engaged in protected activity by rejecting Defendant's sexual advances, which constitutes opposition to unlawful sexual harassment under New York State Human Rights Law (NYSHRL), Section 296. This rejection is protected activity under NYSHRL and California Government Code, as it opposes discriminatory conduct in the workplace.

195.    Defendants Sean Combs and Bad Boy Records' persistent denial of prominent or continuing singing/writing/performing roles as to Plaintiff constitutes adverse employment actions. Plaintiff's rejection of Combs' sexual advances subjected her to an increasingly hostile work environment based on her gender. These actions materially and detrimentally affected Plaintiff's terms and conditions of employment, and were in direct response to Plaintiff's protected activity of rejecting Defendant's sexual advances.

196.    Further, Defendants' failure to pay Ms. Richard earned wages, royalties, and concert and promotional appearance fees according to contracts and other promises constitute adverse employment actions based on gender and were done in retaliation by Defendants.

197.    There is a direct causal connection between Plaintiff's protected activity and Defendants' adverse employment action. The timing and circumstances indicate Defendant's retaliatory motives.

198.    As a direct and proximate result of Defendants' retaliation, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

42

199.     Defendants' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

200.     Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

### FIFTEENTH CAUSE OF ACTION
### Hostile Work Environment in violation of California Government Code §12940
*Against Defendants Sean Combs & Bad Boy Records*

201.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

202.     Defendants Sean Combs and Bad Boy Records subjected Plaintiff to sexual harassment on the basis of her gender in violation of California Government Code § 12940, including unwanted touching of her intimate parts, forcing Plaintiff to endure derogatory name-calling, and exposing Plaintiff to sex trafficking and sex acts, all of which constituted a hostile work environment.

203.     The conduct of Defendants Sean Combs and Bad Boy Records created an intimidating, hostile, and offensive working environment in violation of California Government Code §12923.

204.     As a direct and proximate result of Defendants' unlawful conduct in violation of Cal. Gov. Code § 12940, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

205.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Cal. Gov. Code § 12940 for which Plaintiff is entitled to an award of punitive damages.

43

206.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## SIXTEENTH CAUSE OF ACTION
### Gender Discrimination in violation of California Government Code §12940
*Against Defendants Sean Combs & Bad Boy Records*

207.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

208.    Defendants Sean Combs and Bad Boy Records discriminated against Plaintiff on the basis of her gender in violation of California Government Code § 12940 by subjecting Plaintiff to disparate treatment, verbal abuse, systematic exclusion, failure to address complaints of discrimination and/or harassment, retaliation, derogatory gender-based slurs and comments, insults and offensive gender-based language, intimidation and bullying, threats, unfair treatment, and denial of opportunities, promotions, or benefits based on her gender.

209.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Cal. Gov. Code § 12940, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

210.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Cal. Gov. Code § 12940 for which Plaintiff is entitled to an award of punitive damages.

211.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

//

44

## SEVENTEENTH CAUSE OF ACTION
### Violation of Right of Publicity Under New York Civil Rights Law
### § 50 and § 51 and Unjust Enrichment
*Against Defendants Sean Combs, Bad Boy Records, Universal Music Group NV, Interscope Geffen A&M Records, Diageo Americas Supply Inc. d/b/a Ciroc Distilling Company d/b/a Ciroc Canning Co., Combs Wines and Spirits LLC*

212.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

213.    Mr. Combs required Ms. Richard to perform at and attend numerous promotional events as part of *Diddy – Dirty Money*, including late or overnight parties  which were under contract between Mr. Combs and CIROC Vodka, or were between Mr. Combs and DiddyBeats pursuant to the aforementioned deal between Bad Boy Records and  Interscope Records.

214.    Defendants knowingly used Plaintiff's voice, likeness, image, and persona without Plaintiff's consent for advertising and promotion purposes and for the purpose of trade.

215.    Defendants have been unjustly enriched at Plaintiff's expense by using Plaintiff's voice, image, likeness, and persona without compensating Plaintiff.

216.    It would be inequitable for Defendant to retain the benefit conferred by the unauthorized use of Plaintiff's voice, image, likeness, and persona.

217.    As a result of Defendants' unauthorized use of Plaintiff's likeness, image, and persona, Plaintiff has suffered damages and is entitled to restitution in an amount to be determined at trial.

218.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

//

//

**EIGHTEENTH CAUSE OF ACTION**
**Copyright Infringement**
**17 U.S.C. § 106**
***Against Defendants Sean Combs, Bad Boy Records & Love Records, Inc.***

219.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

220.    Plaintiff wrote, created and performed on the music composition and sound recording of the song *Deliver Me* in 2009, as included on Defendants' 2023 released album *The Love Album: Off the Grid*.

221.    The composition and recording of *Deliver Me* was published by Defendants absent agreement on terms; thus, Defendants have no signed or enforceable agreement with Plaintiff. Plaintiff registered the musical composition and sound recording pertinent thereto with the Register of Copyrights and received the certificate of registration therefor.  Plaintiff owns copyrights in the musical composition, rights of performance therein, and the exclusive rights to reproduce and distribute to the public by sale or other transfer of ownership, or by lease, lending or license, reproductions of the copyrighted works under Copyright Act, 17 U.S.C. § 106.

222.    Plaintiff is informed and believes and thereon alleges that on September 14-15, 2023, and continuing to the present, Defendants, and each of them, knowingly and willfully and without securing Plaintiff's permission or license: embodied, adapted, used, reproduced, marketed, distributed and sold Plaintiff's copyrighted material on *Deliver Me* as affixed in the Defendants' album *The Love Album: Off the Grid*.

223.    Accordingly, Plaintiff alleges her claim for copyright infringement based on each Defendant's publication of *Deliver Me* as Plaintiff's copyrighted musical composition without license, permission or approval.

224.    Each Defendant unquestionably had access to Plaintiff's work through Defendants previous companies, Bad Boy Records, et al.  or other of Defendants' holders of recorded

46

compositions, and each Defendant knowingly and willfully ratified and confirmed said access thereafter.

225.    In undertaking the conduct complained of in this action, Defendants knowingly and intentionally violated Plaintiff's rights.

226.    At no time did Plaintiff authorize Defendants to use, license, own, reproduce, adapt or distribute Plaintiff's copyrighted material.  At the times of the acts of infringement complained of, Plaintiff was and is the owner of the copyright in the music composition identified and named above.

227.    After the respective dates of first publication and continuing to the present, the Defendants, and each of them, have infringed and continue to infringe Plaintiff's copyrights in the music composition by reproducing or causing, contributing to, and participating in the unauthorized reproduction of the copyrighted music composition and by causing, contributing to, and participating in the distribution of the unauthorized reproductions of the music composition as recorded to the public.

228.    Despite their actual or constructive knowledge through their individual and collective recording industry experience and knowledge of copyright laws, enforcement of intellectual property rights in other instances and their duties to view and examine licenses for uses of copyrighted works, Defendants have used and promoted and continue to use and promote, reproduce and to enable others to reproduce Plaintiff's copyrighted music composition in its complete or substantial entirety as and for the commercial profit of Defendants without any ongoing payment to or authorization by Plaintiff (i.e. no accountings have been received).

229.    As a direct and proximate result of the Defendants' knowing and willful infringing use of the copyrights, Plaintiff has sustained and will continue to sustain substantial injury, loss and damage to her ownership, publishing and performance rights in her music composition, which is copyrighted material.

230. As a result of all of Defendants' joint, several, willful and deliberate acts of copyright infringement, Plaintiff is further entitled to recover from Defendants all of the damages sustained by Plaintiff permitted by federal copyright law, including but not limited to compensatory damages and the profits derived by Defendants as a result of their infringing acts, in an amount to be determined according to proof at trial.

231. Plaintiff is further entitled to recover from Defendants the gains, profits and advantages Defendants, and each of them, have obtained as a result of their acts of copyright infringement.

232. Plaintiff is entitled to the maximum statutory damages which copyright registration confers upon a copyright owner, pursuant to 17 U.S.C. §504(c), in the amount of $150,000.00 with respect to each Defendant for each work infringed, or for such other amounts as may be proper under 17 U.S.C. §504(c).

### NINETEENTH CAUSE OF ACTION
#### Breach of Contract
*Against Defendants Sean Combs, Bad Boy Records, The Sean Comb Music Inc, The Nordlinger Group LLC, November 15, LLC, Janice Combs Publishing Inc & Sony Songs*

233. Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

234. Under the initial Participant Agreement signed by Plaintiff in 2005 with Defendant Remote Productions Inc., on information and belief, a company owned by Sean Combs, Plaintiff was promised transportation to and from venues, adequate meals, rest and sleep, medical care and impliedly, safety from a hostile workplace. Despite that Plaintiff fulfilled all of her duties and beyond, Defendants breached its duty to provide these basic remunerations. Defendants also failed to pay salary, royalties, profit participation, promotions, and touring to Plaintiff.

235. In late 2007, Plaintiff signed The Performer Agreement with Defendant Remote Productions, Inc. which promised minimum compensation to Plaintiff of $4,000 per episode of

*Making The Band,* travel and transportation costs, promotions pay at $3,000 per episode after 6 free, $250 per day for voiceovers or remixes, and performance rights.  Despite Plaintiff's working overtime and double-time, wages or other promised compensation was withheld at least 80% of the time.

236.   Defendant Bad Boy Records, LLC, naming itself as successor-in-interest to Remote Productions, Inc, and Plaintiff signed an agreement entitled The Danity Kane Letter Amendment [the "DK Letter"] in late 2007.  The DK Letter promised Plaintiff approval rights, advances, concert remuneration, royalties at 12.5% payable by Defendant The Nordlinger Group and/or November 15, LLC.  Such payments were not made in accordance with contract, if at all, despite demands to Defendants' attorneys.

237.   Defendants not only breached terms of the agreements listed above, but additionally breached the implied covenants of an employer-employee relationship by acting in bad faith and unfairly frustrating Plaintiff's right to receive the benefits of the agreements actually made.

238.   Plaintiff entered a contract with Defendants "The Sean Comb Music, Inc." on January 1, 2009, promising payment to Plaintiff of 12.5% on sound recording masters in the US and 10% of Net Tour Revenues or 5% per performance; Plaintiff was required to exclusively license her music compositions to Defendants and assign the publishing administration to Defendants.

239.   On information and belief, at an unknown point in time, Defendant The Sean Comb Music Inc. assigned its publishing administration to Janice Combs Publishing, Inc. and such administration rights are alleged to be held by Janice Combs Publishing Holdings Inc.

240.   On July 1, 2021, Defendants Janice Combs Publishing Inc. granted exclusive administration rights in Plaintiff's compositions to Sony Songs, a division of Sony Music Publishing LLC.   Plaintiff signed her assent to the assignment on October 22, 2021. The

49

assignment provided that Plaintiff would receive 90% of publisher's share of performance income, 80% of synchronization income and 90% of all other income.

241.    Since a music publisher owes a duty to a writer to account to the writer for royalties earned, each of the Defendants named in this count have wholly failed to provide accountings, statements, payments nor validly register, administer, exploit or oversee the Plaintiff's copyrights they were entrusted with via the contracts and thereby breached the contracts with Plaintiff.

242.    Plaintiff provided her talent as a singer, writer, performer, dancer and recording artist.  Defendants received significant benefits and compensation from Plaintiff's services. Yet none of the wages, royalties, publishing, touring, promotional fees and other profits promised by Defendants were paid as agreed; conversely,  Defendants routinely refused to pay despite Plaintiff's requests, nor was Plaintiff made whole at any time.

243.    Defendants' failure to perform the required duties set forth in the terms and conditions of the contracts was foreseeable in causing Plaintiff to suffer general, consequential and incidental damages, including economic damages.  Defendants' conduct is a breach of contract.

244.    As an actual and proximate result of Defendants' unlawful and unconscionable conduct in breaching its fiduciary duties, Plaintiff has lost wages, profits, benefits, royalties, and has incurred other out of pocket expenses.

245.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

//

//

//

//

## TWENTIENTH CAUSE OF ACTION
## Breach of Implied Covenant of Good Faith & Fair Dealing
### *Against All Defendants*

246.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

247.    Plaintiff entered several contracts with Defendants.

248.    Plaintiff did all, or substantially all of the significant things the contracts required her to do.

249.    The allegations set forth in this complaint detail the malevolent and intentional behavior by Defendants repeated throughout a 20 year span, all of which constitute breaches of the implied covenant of good faith and fair dealing and demonstrate the bad faith of Defendants at all relevant times.

250.    Defendants did not pay Plaintiff her salary as agreed.

251.    Defendants did not pay Plaintiff her royalties, nor extraneous promotions in any instance.

252.    Defendants did not pay Plaintiff her share of income for her contributions to musical compositions, her publishing, as agreed, despite the assignments to various companies.

253.    Not only have Defendants failed to pay Plaintiff, they have failed to promote Plaintiff's works, and infringed her copyrights.

254.    Defendants' unfair interference with Plaintiff's right to receive the benefits of each contract was foreseeable in causing Plaintiff to suffer general, consequential and incidental damages, including economic damages according to proof at trial.

255.    Defendants knew or could reasonably have foreseen that the harm and/or special circumstances were likely to occur in the ordinary course of events as a result of the breaches of Defendants' obligations to act in good faith, make Plaintiff's property productive and account for

51

and pay Plaintiff as agreed. Accordingly, Defendants' conduct was a breach of implied covenant of good faith and fair dealing.

256.    As an actual and proximate result of the aforementioned violations, Plaintiff has been harmed in an amount according to proof, and has lost wages, benefits, and other out of pocket expenses.

257.    As an actual and proximate result of Defendants' aforementioned acts, Plaintiff has suffered physical injury and became mentally upset, stressed and aggravated. Plaintiff has experienced post-traumatic stress disorder, mental anguish, aggravation, anxiety, humiliation, embarrassment, sleeplessness, loss of appetite, low self-esteem, depression, upset stomach, and other forms of extreme emotional distress.  Plaintiff claims damages for physical injuries and mental distress in an amount according to proof at trial.

258.    The above-described actions were perpetrated and/or ratified by a managing agent, employee or officer of Defendants, and each of them.  These acts were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights.  Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendants' future conduct.

259.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

**TWENTY FIRST CAUSE OF ACTION**
**Fraud / Intentional Misrepresentation / False Promise**
***Against All Defendants***

260.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

261.    Plaintiff asserts this cause of action against all Defendants.

262.    Defendants represented to Plaintiff that certain facts relative to payments to Plaintiff were true in each of the contracts above-listed.  Further, Defendants made multiple promises in writing to Plaintiff.

263.    Defendants' representations were false; Defendants did not intend to perform these promises when they were made or at any time.

264.    Defendants knew that their representations were false when they were made and they made such representations recklessly and without regard for the truth in such representations.

265.    Defendants intended that Plaintiff rely on their representations and promises.

266.    Plaintiff reasonably relied on Defendants' representations and promises.

267.    Defendants did not perform the promised acts.

268.    Plaintiff was harmed.

269.    Plaintiff's reliance on Defendants' representations and promises was a substantial factor in causing Plaintiff to suffer general, consequential and incidental damages, including economic damages according to proof at trial.  Defendants knew or could reasonably have foreseen that the harm and special circumstances were likely to occur in the ordinary course of events as a result of the Defendants' breaches of contracts.  Accordingly, Defendants' conduct was intentional misrepresentation.

270.    As an actual and proximate result of Defendants' intentional and unlawful misrepresentation and false promises, Plaintiff has lost wages, profits, benefits, royalties, and has incurred other out of pocket expenses.

271.    As an actual and proximate result of Defendants' fraudulent acts, Plaintiff has suffered physical injury and became mentally upset, stressed and aggravated. Plaintiff has experienced post-traumatic stress disorder, mental anguish, aggravation, anxiety, humiliation, embarrassment, sleeplessness, loss of appetite, low self-esteem, depression, upset stomach, and

other forms of extreme emotional distress.  Plaintiff claims damages for physical injuries and mental distress in an amount according to proof at trial.

272.    The above-described actions were perpetrated and/or ratified by a managing agent, employee or officer of Defendants, and each of them.  These acts were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights.  Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendants' future conduct.

273.    Defendants' continuous death threats and coercion prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## PRAYER FOR RELIEF ON CLAIMS

**WHEREFORE**, Ms. Richard prays that this Court enter judgment against Defendants herein and any other Defendants who may later be added to this action as follows:

1.    For a money judgment representing compensatory damages, including but not limited to:  consequential damages, lost wages, earning, royalties, publishing, touring and promotional income, and non-economic damages, and all other sums of money, together with interest on these amounts, according to proof;

2.    For a money judgment for mental pain and anguish and severe emotional distress, according to proof;

3.    For restitution;

4.    For disgorgement of all sums unjustly obtained from Plaintiff or inured to the benefit of Defendants;

5.    For civil penalties;

6.    For punitive and exemplary damages according to proof;

7. For attorneys' fees and costs;

8. For prejudgment and post-judgement interest; and

9. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

1. Ms. Richard demands a trial by jury on all issues triable of right by jury.

DATED:     September 10, 2024
          New York, New York

Respectfully submitted,

**THE BLOOM FIRM**

By: _Lisa Bloom_
     Lisa Bloom
     Arick Fudali
     Yasmine Meyer
     Devin Meepos
Attorneys for Ms. Richard

**IP LEGAL STUDIO LLC**

By: /s/ Lisa A. Cervantes
     Lisa A. Cervantes
Attorneys for Ms. Richard

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X
ADRIA ENGLISH,                                                      :
                                                                    :
                                  Plaintiff,        :        Civil Case No.:
                                                                    :
                    v.                              :
                                                                    :
                                                                    :        **COMPLAINT**
SEAN COMBS a/k/a "P. DIDDY, DIDDY, PUFF, PUFF     :
DADDY, PUFFY, BROTHER LOVE",                       :
BAD BOY ENTERTAINMENT HOLDINGS, INC.,              :
SEAN JOHN CLOTHING LLC, INC.,                      :
COMBS GLOBAL ENTERPRISES,                          :
TAMIKO THOMAS,                                     :
JACOB ARABOV a/k/a "JACOB THE JEWELER,"            :        **JURY  DEMAND**
VIBE MAGAZINE a/k/a "VIBE,"                         :
PENSKE MEDIA CORPORATION a/k/a and d/b/a           :
"PMC,"                                             :
JOHN and JANE DOES 1-10, and                                        :
ORGANIZATIONAL DOES 1-10                           :
                                  Defendants        :
--------------------------------------------------------------------X

> **TRIGGER WARNING:**
> **THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A**
> **SEXUAL NATURE, INCLUDING SEXUAL ASSAULT**

Plaintiff, ADRIA ENGLISH ("PLAINTIFF" or "PLAINTIFF ENGLISH" or "MS.

ENGLISH"), by and through her attorneys, hereby alleges and avers of the Defendants SEAN

COMBS a/k/a "P. DIDDY, DIDDY, PUFF, PUFF DADDY, PUFFY, BROTHER LOVE," BAD

BOY ENTERTAINMENT HOLDINGS, INC. ("BBE"), SEAN JOHN CLOTHING LLC.

("SJC"), COMBS GLOBAL ENTERPRISES ("CGE"), TAMIKO THOMAS, JACOB

ARABOV a/k/a "JACOB THE JEWELER" ("JACOB") VIBE MAGAZINE a/k/a "VIBE,"

PENSKE MEDIA CORPORATION a/k/a and d/b/a "PMC," JOHN and JANE DOES 1-10, and

ORGANIZATIONAL DOES 1-10, (collectively referred to as "Defendants"), alleges upon information and belief as to all other matters as follows:

## <u>PRELIMINARY STATEMENT</u>

1. On November 16, 2023, Casandra Ventura a/k/a "Cassie" filed a 35-page lawsuit in which she exposed Defendant Combs of subjecting her to nearly a decade of physical, sexual and emotional abuse punctuated by rape, sex trafficking and being forced to engage in drug-fueled nonconsensual sexual encounters with other men.

2. Ordinarily, when a lawsuit such as Ms. Ventura's is filed that involves events that took place long ago, witnesses are few and far between and evidence hard to muster. Not so for the claims brought against Defendant Combs. Within minutes of the filing, Ms. Ventura's claims were confirmed by various witnesses, including a rival musician whose car Defendant Combs blew up, various individuals who observed Defendant Combs beat Ms. Ventura and a video released by CNN, just a few weeks ago, showing Defendant Combs physically abusing, battering and assaulting Ms. Ventura.

3. Since Ms. Ventura's brave decision to file a lawsuit against Defendant Combs, Defendant Combs has accumulated numerous lawsuits across the country for the same conduct alleged by Ms. Ventura.

4. Days later, more lawsuits were filed against Defendant Combs. One being, Plaintiff Joi Dickerson-Neal,[1] alleged that Defendant Combs drugged and sexually assaulted her when she was a college student. The other lawsuit, currently being appropriately refiled in New Jersey, accused Ms. Combs and singer Aaron Hall of forcing the Plaintiff and another unidentified woman into nonconsensual sex.

---

[1] Supreme Court of the State of New York, New York County Index No. 952341/2023

5. At the same time, a fourth lawsuit was filed; this one against Defendant Combs'
   companies and Defendant Harve Pierre, the longtime President of Bad Boy Entertainment
   Holdings, Inc. The suit alleged that Mr. Pierre used his position of power at Bad Boy to
   groom and sexually assault his former assistant, and that Bad Boy looked the other way at
   the time.[2]

6. The fifth lawsuit filed against Defendant Combs include allegations brought by a Doe
   Plaintiff are just as egregious than those brought by his prior victims including that
   Plaintiff Doe was sex trafficked and gang raped by Defendant Combs and various other
   individuals.[3]

7. A sixth lawsuit was filed against Defendant Combs and various other Defendants by
   Plaintiff Rodney Jones, including allegations of sexual assault, sex work, sex and drug
   trafficking, and an ongoing criminal Enterprise and corrupt organization,[4] similar to the
   claims Plaintiff files in this instant action.

8. A seventh lawsuit was filed against Defendant Combs and Defendant's son Christian
   Combs by Plaintiff Grace O'Marcaigh.[5] Plaintiff in that suit alleges she was sexually
   assaulted and physically harmed by the actions of Defendant's son and that Defendant
   Combs aided and abetted in his son's tortious conduct.

9. An eighth lawsuit was filed against Defendant Combs by model Plaintiff Crystal
   McKinney alleging that she was "drugged and sexually assaulted" by Defendant Combs.[6]

---

[2] Supreme Court of the State of New York, New York County Index No. 952246/2023
[3] United States District Court Southern District of New York Case No. 1:23-cv-10628
[4] United States District Court Southern District of New York Case No. 1:24-cv-1457
[5] Superior Court of the State of California, County of Los Angeles Case No.: 24STCV08571
[6] United States District Court Southern District of New York Case No. 1:24-cv-03931

The allegations in Plaintiff McKinney's complaint echo similar claims filed by the Plaintiff in the instant action.

10. A ninth lawsuit was filed against Defendant Combs by Plaintiff April Lampros.[7] In that suit, Plaintiff Lampros alleges the Defendant of battery, assault, negligent infliction of emotional distress and violation of the victims of gender-motivated violence protection of the law, again eerily similar to the claims made by Plaintiff herein.

11. Prior to any of the cases above being filed, Defendant Combs was named as a Defendant in a civil sexual assault lawsuit in Florida involving R&B Singer Tremaine Neverson a/k/a Trey Songz.[8]



12. Defendant Combs was also implicated in a lawsuit filed in California against R&B Singer Chris Brown for a sexual assault that took place on a yacht anchored at Defendant Combs' Star Island estate in Miami, FL.[9]

---

[7] New York County Supreme Court Index No. 154859/2024
[8] 11th Judicial Circuit Court, Miami, Florida Case No.: 21-26889-CA-01
[9] Superior Court of the State of California, County of Los Angeles Case No.: 22VECV00140

13. Chris Brown was also referenced in the lawsuit between Plaintiff Rodney Jones and

Defendant Combs, implicating Mr. Brown was "in Mr. Combs Los Angeles home

consorting with underaged girls and sex workers."[10]



14. This is now the tenth lawsuit filed against Defendant Combs since November 16, 2023.

Just as the allegations brought by the other nine Plaintiffs, Plaintiff English's claims are

just as egregious.

15. Due to these numerous lawsuits filed against Defendant Combs alleging the same or

similar acts, there is now a growing awareness that Defendant Combs was engaging in far

more sinister acts than previously known including physical abuse and sex trafficking.

16. Specifically, from 2004-2009, Plaintiff was sex trafficked by Defendants Combs,

Thomas, and Arabov.

17. Additionally, because of Defendant Combs relationship with Defendant VIBE, due to

their conspiracy in the sex trafficking Enterprise, Defendants knew they could publish

Plaintiff's likeness, without her consent, and fear of recourse and chose Plaintiff's

likeness to use, without permission, in an effort to continue the Defendants sex

---

[10] United States District Court Southern District of New York Case No. 1:24-cv-1457, E.C.F 38 ¶ 29(j)

trafficking Enterprise for their financial benefit. Therefore, Plaintiff brings claims pursuant to New York Civil Rights Law §§ 50 and 51 and 15 U.S.C. § 1125(a).

18. Plaintiff can support her allegations within this complaint and has lived her adult life with the memories of being trapped in a cycle of sex trafficking she never asked to be a part of and was chosen because Defendant Combs knew he could groom her. For years, Plaintiff has been affected by Defendants actions and has suffered extreme emotional distress impacting nearly every aspect of Plaintiff's life and personal relationships. Given all the brave individuals who have come forward against Defendant Combs, Plaintiff is doing the same.

19. Plaintiff brings this action seeking injunctive, declaratory and monetary relief against Defendants in violation of the Victims of Gender-Motivated Violence Protection Law, Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq.* ("VGMVPL"), .

## JURISDICTION AND VENUE

20. This Court has personal jurisdiction over the Defendants under and consistent with the Constitutional requirements of Due Process in that the Defendants, acting directly or through his agents or apparent agents, committed one or more of the following:

    a. The transaction of any business within the state;

    b. The making of any contract within the state;

    c. The commission of a tortious act within this District; and

    d. The ownership, use, or possession of any real estate in this state.

21. As of the date of this filing, Defendants Combs, Jacob, BBE, SJC, VIBE, PMC and Organizational Does have consistently and purposefully availed themselves of the

privilege of conducting activities within New York, thus invoking the benefits and protections of New York law. In return for these benefits and protections, Defendants must submit to the burdens of litigation in New York.

22. This litigation arises from or relates to the tortious activities the Defendants Combs, Jacob and Thomas, BBE, SJC, VIBE, PMC and Organizational Does visited upon Plaintiff Jones in New York and Florida. This tortious conduct violated United States Federal Rico Laws and the United States Victims ("USVI") of the Trafficking and Violence Protection Act of 2000 ("TVPA").

23. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise from some conduct occurring by Defendants in New York, specifically, the trafficking of Plaintiff across State lines between New York and Florida.

24. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 for original jurisdiction over civil actions where the matter in controversy exceeds to the sum and value of $75,000 and is between citizens of different states. This Court has subject matter jurisdiction over this matter under 15 U.S. Code § 1121 because one claim at issue arises under the Lanham Act. This Court also has subject matter jurisdiction under 28 U.S. Code § 1332 and supplemental jurisdiction under 28 U.S. Code § 1367 because the state law claim forms part of the same case and controversy as the claim arising under the federal statute.

25. Pursuant to 28 U.S.C. § 1391(b), (c) and 1400(a), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, alleged herein, occurred in this district.

26. Plaintiff brings suit against Defendants pursuant to the NYC Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 8-901 *et. seq*, to redress the substantial and lifetime injuries she has suffered as a result of being drugged, sex trafficked and assaulted by Defendants Combs, Thomas and Jacob.

27. This action arises under N.Y. Civ. Rights Law §§ 50 and 51 and 15 U.S.C. § 1125(a).

28. This Court has personal jurisdiction over Defendants and each of them because Defendants have purposefully directed their unlawful conduct to this judicial district and have conducted substantial business in this judicial district.

## PROCEDURAL REQUIREMENTS

## THE N.Y.C. VICTIMS OF GENDER MOTIVATED VIOLENCE PROTECTION ACT

29. The N.Y.C. Victims of Gender Motivated Violence Protection Act ("NYC Gender Motivated Violence Act") created a lookback window on March 01, 2023, which runs for two years, for survivors of gender motivated violence, allowing them to sue their abusers regardless of when the abuse occurred. N.Y.C. Admin. Code § 10-1105(a).

30. The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

31. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

32. The above-described conduct of Defendant Combs, Thomas and Jacob including, but not limited to, Defendant Jacob's sexual assault of Plaintiff constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as well as Defendant Combs' direction, enabling, participation and conspiring in the commission of a crime of violence motivated by gender as defined by the NYC Gender Motivated Violence Act.

33. Given the extensive media coverage and numerous lawsuits filed in the District of New York, both federal and State against Defendant Combs, Defendants BBE, Combs Enterprises, Jacob, VIBE, PMC and Does and Doe Organizations were put on notice of the sexual abuse and trafficking allegations made against Defendant Combs.

## PARTIES

### DEFENDANT SEAN COMBS



34. Defendant Combs retains residences in both Florida and California and upon information and belief is a citizen of the State of California.

35. At all relevant times, Defendant Combs was a citizen and resident of the State of New York.

36. Defendant Sean Combs is a rapper and record executive popularly known by his stage names Puff Daddy, Puffy, Puff, P. Diddy, Diddy, Brother Love or Love. Defendant Combs rose to prominence in the music and entertainment industry over the decades and

9

is regularly referred to as a hip-hop mogul. Defendant Combs was first accused of acts described in this complaint by his long-time paramour and former BBE artist, Cassie Ventura as pictured above, on November 16, 2023.

37. Defendant Combs is a Grammy-awarded musician, rapper and producer.

38. Defendant P. Diddy founded co-Defendants BBE, SJC and CGE.

39. Defendant Diddy has signed, through BBE, some of the biggest stars in music including Rick Ross, Machine Gun Kelly, Notorious B.I.G., New Edition, Mase, Pitbull, Lil John, Fabolous, French Montana and groups like Danity Kane, 112, and Total, to name just a few.[11]

40. In 2008, Defendant P. Diddy was the first male rapper to get a star on the Hollywood Walk of Fame.

41. Defendant Diddy "founded Bad Boy Records in 1992, and the company has sold over 500 million records, produced 38 platinum albums, and won multiple Grammy Awards" according to the official website of Combs Global.[12]

42. In 2022, Forbes estimated that Defendant Diddy was one of the wealthiest hip-hop artists in America and that his net worth is over $1 billion.

43. Upon information and belief, Defendant Diddy has a long history of committing physical and sexual violence against women and men, both of age and underaged, as documented and publicly available in over nine lawsuits across the country as well as extensive media coverage on the lawsuits and the allegations made therein.

---

[11] https://www.ranker.com/list/bands-and-musicians-on-bad-boy-records/music-lover
https://combsglobal.com/bad-boy-entertainment/
[12] https://combsglobal.com/bad-boy-entertainment/

## DEFENDANT BAD BOY ENTERTAINMENT HOLDINGS, INC.



44. Bad Boy Entertainment Holdings, Inc., is a domestic business corporation licensed to do business in New York and headquartered at 1440 Broadway, Third Floor, New York, NY 10018.

45. Bad Boy Entertainment Holdings, Inc. is a domestic business corporation licensed to do business in New York since 1992.

46. Defendant Bad Boy Entertainment Holdings, Inc. ("BBE") is a music, media, and entertainment company founded and owned by Defendant Sean Combs. Bad Boy is incorporated and headquartered in New York, New York.

47. Defendant BBE has been named in several lawsuits where Defendant Combs has been accused of claims of sexual abuse and sex trafficking as every business Defendant Combs engages with play a role in his illegal Enterprise.

## SEAN JOHN CLOTHING LLC

48. In 1998, Combs founded Sean John, which has retail sales of over $450 million.

11

49. As CEO and president of the company, Defendant Combs was representing Sean John when he conspired and sex trafficked Plaintiff.

50. Sean John Clothing LLC is a domestic liability company licensed to business in New York.

## DEFENDANT COMBS ENTRERPRISE LLC



51. Defendant Combs Enterprise has its principal place of business located in New York, NY.

52. Upon information and belief, Combs Enterprise, LLC., d/b/a Combs Global.

53. Upon information and belief, Combs Enterprise LLC is a domestic liability company license to do business in New York.

54. Combs Enterprise, LLC. Is a business conglomerate founded by Defendant Combs which is prevalent in the music, entertainment, fashion, spirits, and television industries, while including a diverse portfolio of business and investments including fragrance, marketing, media properties and liquor.

## DEFENDANT TAMIKO THOMAS



12

55. Defendant Thomas, upon information and belief, is a citizen of the State of New York.

56. Defendant Thomas, upon information and belief, was an employee of Defendant BBE at all relevant times.

57. Defendant Thomas, in her employment capacity, was responsible for transporting and making payment to individuals like Plaintiff, in furtherance of a corrupt organization of sex trafficking on behalf of Defendant Combs and the beneficiaries of the corrupt organization including Defendants Jacob, VIBE and PMC.

**DEFENDANT JACOB ARABOV "JACOB THE JEWELER"**



58. Upon information and belief, Defendant Jacob, at all relevant times, was a resident of the State of New York.

59. Upon information and belief, Defendant Jacob, at all relevant times, was a citizen of the State of New York despite being born in Uzbekistan.

60. Defendant Jacob was a beneficiary of the corrupt organization ran by Defendants Combs, BBE, Thomas, VIBE and PMC, and is pictured with the Plaintiff above, when he knowingly had intercourse with Plaintiff, who was trafficked for that specific purpose.

13

61. Defendant Jacob, in 2008, was sentenced to two and a half years in federal prison regarding a multistate drug ring, was fined $50,000 and had to forfeit $2,000,000.00 to the U.S. Government.

62. Prior to being imprisoned, Defendant Jacob frequented parties thrown by Defendant Combs and BBE where he knowingly participated in the illegal commodification of women via sex trafficking.

63. Upon information and belief, Defendant Jacob still runs a business, Jacob and Co., licensed to do business in New York with its headquarters located at 48 East 57th Street, NY 10022.

## DEFENDANT VIBE MAGAZINE



64. Upon information and belief, Defendant VIBE runs a magazine, licensed to do business in New York with its headquarters located at 475 5th Ave. New York, NY 10022.

65. Defendant VIBE has had an ongoing relationship with Defendant Combs and all of Defendant's Enterprises include BBE, SJC and CGE, was corrupt and exploitive to Plaintiff and to benefit Defendant VIBE and other members of the corrupt organization.

66. Defendant VIBE's ongoing beneficial relationship with Defendant Combs dates back as far as 1993.

67. Defendant VIBE further injured Plaintiff in an effort to further the corrupt organization when it published Plaintiff's picture, in the issue pictured above, without Plaintiff's notice or consent, written or otherwise.

## DEFENDANT PENSKE MEDIA CORPORATION



68. Upon information and belief, Defendant PMC is the owner and the parent company of Defendant VIBE.

69. Upon information and belief ,PMC is a Delaware corporation with its headquarters in California.

70. Defendant PMC does business in New York throughout its ownership of Defendant VIBE and its distribution of several media outlets that are distributed, marketed and consumed in this jurisdiction.

### DEFENDANT JOHN and JANE DOES 1-10 and Organizational Does 1-10

71. Upon information and belief, Plaintiff alleges that Defendant Does 1 through 10, inclusive, are other parties not yet identified who have violated Plaintiff by sex trafficking her, conspired, and/or aided and abetted the Defendant in sex trafficking the Plaintiff through their participation in a corrupt organization that contributed to the

Plaintiff being sex trafficked or having engaged in one or more of the wrongful practices alleged herein. The true names, whether corporate, individual or otherwise, of Defendants 1 through 10, inclusive, are presently unknown to Plaintiff, which therefore sues said Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained, pursuant to CPLR §1024.

72. Upon information and belief, Plaintiff believes all of the Defendant Does 1-10 are citizens of the State of New York and/or Florida.

73. Upon information and belief, Plaintiff believes and thereon alleges that at all times relevant hereto each of the Defendant Organizational Does 1-10 were the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of Defendants Combs, BBE, SJC and/or CME and was at all times acting within the scope of such agency, affiliation, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged, with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately caused thereby.

74. Upon information and belief, Plaintiff believes all of the Defendant Organizational Does 1-10 are business licensed and/or doing business in the State of New York and/or Florida.

75. Upon information and belief, Plaintiff alleges that Defendant Organizational Does 1 through 10, inclusive, are other parties not yet identified who have violated Plaintiff by sex trafficking her, and/or conspired through their participation in a corrupt organization that contributed and aided and abetted the Defendant in sex trafficking the Plaintiff or

16

having engaged in one or more of the wrongful practices alleged herein. The true names, whether corporate, individual or otherwise, of Defendants 1 through 10, inclusive, are presently unknown to Plaintiff, which therefore sues said Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained, pursuant to CPLR §1024.

76. The limitations Article 16 of the CPLR do not apply because one or more of the exceptions set forth in CPLR §1601 and/or §1602 apply.

## PLAINTIFF ADRIA ENGLISH



77. Plaintiff is an individual who is a citizen of the United States and a resident of California.

78. Plaintiff, at all times relevant to the action, resided and was domiciled in the State of New York.

79. Prior to moving to New York, in or around early 2004, Plaintiff participated as an actor in the adult film industry under the name "Omunique."

80. Plaintiff participated in approximately eight adult films prior to moving to New York which were done while Plaintiff was a teenager. Plaintiff was coerced by veteran porn

star Jake Steed into doing these films with the promise they would never be viewed or circulated within the United States.[13]




81. Plaintiff moved to New York from California to evade the disappointment of her family when they discovered she was acting in adult movies, as Plaintiff was led to believe the adult movies would only be seen and purchased abroad therefore difficult to be viewed by those who knew her personally.

82. Plaintiff moved to New York, destitute and homeless with her then-boyfriend, starving up and coming model Anthony Gallo.

---

[13] https://www.tnaflix.com/amateur-porn/Omunique-vs.-Jake-Steed-Black-Street-Hookers-18/video5461090
https://xxxbunker.com/omunique_is_ready_to_fuck
https://spankbang.com/6lb3e/video/jake+steed+ft+omunique+part+1
https://www.holedk.com/sugarwalls-7/
https://www.holedk.com/booty-talk-4/

18



83. While Plaintiff's then-boyfriend auditioned for modeling gigs and attended go-sees in New York, Plaintiff began go-go dancing and performing at Larry Flint's Hustler Club on 51st Street in New York under the stage name of "Sasha."



84. On or about mid 2004, Mr. Gallo attended an audition for a Sean John modeling campaign in New York where Plaintiff accompanied him.

85. During that audition, another model and Mr. Gallo were asked to perform felatio on Defendant Combs in order to book the modeling campaign.

86. Mr. Gallo refused but was later reapproached by employee, Defendant Thomas, offering new terms. The terms being that Mr. Gallo could still book the Sean John campaign if he commanded the Plaintiff to work Defendant Combs' and BBE's upcoming "White Party"

19

in the Hamptons as a go-go dancer, as Plaintiff was a well-known talented and highly sought after dancer at Larry Flint's Hustler Club.

87. In an effort to assist Mr. Gallo's desire to become a model, Plaintiff agreed to what she believed to be legitimate employment with Defendant Combs and BBE as entertainment at the "White Parties" in the Hamptons, NY and Miami, FL from 2004-2009. Plaintiff did not agree to a lifetime of aftermath of being used as a sexual pawn for the pleasure and financial benefit of others.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment at Defendant Combs' Labor Day "White Party"

88. As agreed to between Mr. Gallo, Defendant Thomas and Defendant Combs, SJC and BBE, Plaintiff began her employment at the ultra-exclusive and lavish Labor Day parties thrown by Defendant Combs and BBE called the "White Party," and Mr. Gallo began his employment as a Sean John Model.



89. Plaintiff's first employment at a "White Party" was Summer, 2004.



90. Plaintiff believed this to be a legitimate employment opportunity.

91. Plaintiff was picked up by Defendant Thomas in a car driven by one of the Defendant Does owned either by Defendant Combs, BBE, SJC, CGE or Organizational Doe, and transported to Defendant Combs' estate in the Hamptons, NY which served as the venue for the Labor Day "White Party."

92. When Plaintiff arrived at Defendant Combs' Hampton Estates with Defendant Thomas, and other sex trafficked individuals, Defendant Thomas brought them into a room where they changed into clothes provided for them.

93. Plaintiff's outfit in the above picture was provided to her as a uniform as she was led to believe she was in an employment capacity, and Plaintiff was required to wear the clothing provided as part of her employment.

94. Plaintiff was also provided a separate room from the party, away from where the partygoers congregated, that was used by Plaintiff and other employees as a break room to take respite during the party as Plaintiff was there in an employment capacity.

95. Plaintiff was encouraged directly by Defendant Thomas to provide lap dances and be sexually flirtatious with the guests at the "White Party."

96. Plaintiff was also instructed and directed by Defendant Combs as to which guests Plaintiff should focus attention and interaction with to ensure his guests were having a great time.

97. Plaintiff was strictly instructed by Defendant Combs and Thomas on which bottles of alcohol and champagne female employees were to exclusively drink from and also required Plaintiff to take narcotics offered by a "White Party" guest.

98. Despite being forced to drink copious amounts of alcohol and consume illicit narcotics, the encounters Plaintiff was forced to endure were so excruciating that Plaintiff remembers them as they still haunt her to this day.

99. Plaintiff was forced to consume liquor and illicit narcotics as part of her employment at the "White Party."

100.     Upon information and belief, Defendant Combs laced the liquor with ecstasy which is why Plaintiff was provided strict rules on which bottles to consume from.

101.     Plaintiff performed to the expectations of Defendant Combs, was personally thanked for her obedience by Defendant Combs and was subsequently invited for future employment at the "White Parties."

102.     Plaintiff was paid, in cash, at the end of the night typically between 4-6 am once the party had concluded. Plaintiff was paid by Defendant Thomas who was given the money from Defendant Combs.

103.     The first "White Party" in 2004 had no sinister intent or requirements for physical sexual contact and seemed to be a legitimate employment opportunity; so, when Plaintiff was offered employment in the proceeding years at the Labor Day "White Party," she accepted the employment opportunity.

104.     Plaintiff was employed as entertainment at subsequent "White Parties" in the Hamptons, NY.

105.     Plaintiff was always transported to the Hamptons by way of car service provided by either Defendant Combs, BBE, SJC, CGE or Organizational Does, with a driver who was also an employee of either Defendant Combs, BBE, SJC, CGE or Organizational Does and with Defendant Thomas also being present as liaison and coordinator between employees and Defendant Combs.

106.     Plaintiff would use numbers provided to contact either, or both, Defendant Combs and Thomas to arrange transportation to the "White Parties." This included using the telephone and text messaging services to confirm the date, time and location of pick up.

107.     Defendant Thomas would then arrive at the location provided by Plaintiff, at the agreed date and time, in a chauffeured driven vehicle provided, or under the control of, Defendant Combs which would include Defendant Thomas, a member of Defendant

Combs' security team and other employees who were hired as entertainment for the party.

108.     Plaintiff was always provided wardrobe by Defendants Thomas and Combs and also was provided a breakroom while attending the "White Parties."

109.     Defendant Thomas and Combs groomed Plaintiff into sex trafficking over time.

110.     Around the third "White Party," Defendants Thomas and Combs demanded Plaintiff begin engaging in vaginal sexual intercourse with guests, as they had learned about her past in adult entertainment and used it forcefully to coerce Plaintiff into sex work for the benefit of Defendant Thomas and Combs and their beneficiaries.

111.     During this "White Party," Plaintiff was provided a "black dress" to wear by Defendants Thomas and Combs when previously Plaintiff was provided white clothing like other guests and the theme of the party.

112.     Upon information and belief, Plaintiff believes she was required to wear a black dress to the "White Party" to denote her capacity there as an employee, but more sinisterly as a sex trafficked sex worker.

113.     One beneficiary is Defendant Jacob, who Plaintiff was demanded by Defendant Combs to engage in sexual intercourse during a "White Party."

114.     Plaintiff, fearing not only her safety, but her and her then-boyfriend's job security, did as instruct and went with Defendant Jacob where she engaged in forced sexual intercourse with Defendant Jacob at the demand and behest of Defendant Combs. Plaintiff knew refusing Defendant Combs demands was not an option and to do so would be at her and Mr. Gallo's detriment.



115.    Plaintiff was coerced by Defendant Combs into consuming copious amounts of, allegedly laced, alcohol prior to being coerced and forced into having sexual intercourse with Defendant Jacob.

116.    Plaintiff is pictured with Defendant Jacob after the assault as Plaintiff was still in her role of employment at the "White Party."



117.    Plaintiff received an additional one thousand dollars, in cash, on top of what she had received as payment at the prior two "White Parties" from Defendant Thomas at the end of the night.

118.    At the end of the night, Defendant Combs, personally, congratulated Plaintiff for following his directives with Defendant Jacob and for a job well done.

119.    Plaintiff has personally witnessed Defendant Combs, Thomas and Jacob solicit and ingest narcotics and engage in illicit sex acts.

120.    Plaintiff was also employed at the "White Parties" that commenced at Defendant Combs' Miami, Star Island, residence.

121.    During these "White Party" employments, Plaintiff's travel was arranged by Defendant Thomas. Upon arrival at Ft. Lauderdale airport, a car service owned and operated by either Defendant Combs, BBE, SJC, CGE or Organizational Does would retrieve Plaintiff, Defendant Thomas and the other individuals from the airport and transport them to Defendant Combs' residence on Star Island.

122.     Defendant Thomas was to Defendant Combs as Ghislaine Maxwell was to Jeffrey Epstein.

123.     Without Defendant Thomas, a woman using her inherent good will as a woman to gain the trust of another woman, coordinating and acting as an avatar for Defendant Combs, Defendant Combs would be unable to execute his corrupt sex trafficking organization.

124.     Plaintiff is unable to recall details from the Miami "White Parties" due to the increased demand that Plaintiff engage in illicit narcotics and alcohol use while employed for Defendant Combs.

125.     Defendants Thomas and Combs passed off Plaintiff to other Defendants, outside of Defendant Jacob named as Defendant Does, to be sexually assaulted as part of their ongoing corrupt sex trafficking organization.

126.     Upon information and belief Plaintiff, believes Defendant Combs had hidden cameras in every room of his home in the Hamptons, NY and Star Island, Miami, FL.

127.     Upon information and belief, Defendant Does, who were individuals Defendants Thomas and Combs passed off Plaintiff to be sexually assaulted, were filmed by Defendant Combs security cameras sexually assaulting Plaintiff while Plaintiff is unconscious during the "White Parties" in both New York and Florida.

128.     Upon information and belief, these individuals and Plaintiff, were recorded without their knowledge and consent.

129.     Upon information and belief, this treasure trove of evidence in Defendant Combs' possession may either still be in Defendant's possession or in the possession of the FBI, as the FBI executed a warrant and raided Defendant Combs residences in April 2024.

**Defendant Combs Makes Promises of Career Advancement by way of Music Artist to Plaintiff**

130.     Defendant Combs is very forceful, demanding and does not take no for an answer and would often threaten to inflict bodily harm and/or terminate Plaintiff or her then-boyfriend's, Mr. Gallo, employment and "blackball" them from the industry if Plaintiff did not comply with his demands. As Defendant Combs acted and was viewed in such a way to where Mr. Gallo and Plaintiff believed he had the power where Defendant Combs threats were credible.

131.     Defendant Combs used his power, and influence to threaten and intimidate Plaintiff to continue participating in Defendant Combs' corrupt sex and drug trafficking organization.

132.     Defendant Combs, in an effort to continue to silence Plaintiff and keep her in his sex trafficking organization, offered to help Plaintiff enter into the music business as a part of an all-female music group.



My girl group when I worked for @diddy

133.    Plaintiff knew of Defendants Combs' prowess in the music industry and knew he

had the power to help her advance her music career.

134.    Plaintiff believed Defendant Combs would fulfill his promises to help her career

just as he had helped Plaintiff's then-boyfriends modeling career.

135.    Plaintiff, having been professionally exposed to the music industry side of

Defendant Combs' empire, grew more aware of the true nature of her employment at the

"White Parties" was grotesque, inexcusable, exploitative and criminal.

136.    Plaintiff's only way to escape Defendant Combs was to return to California,

which Plaintiff did in 2009.

137.     Upon information and belief, in retaliation for Plaintiff's escape, Defendant

Combs had Plaintiff's then-boyfriend, Mr. Gallo, "blackballed" from the modeling

industry and had all of Mr. Gallo's campaigns with Sean John removed.

138.     Upon information and belief, in retaliation for Plaintiff's escape, Defendant

Combs had Plaintiff "blackballed" from the entertainment industry.

**Defendant Combs' Corrupt Sex and Drug Trafficking Organization Has Caused Plaintiff**

**Lifelong Harm**

139.     Plaintiff became severely depressed and began to blame herself for being

trafficked and for sabotaging her own career.

140.     Being sex trafficked and abused has led Plaintiff into a tailspin of anxiety and

depression.

141.     In or about 2010, Plaintiff was hospitalized for mental illness as a direct cause of

her being trafficked by Defendants.

142.     Everywhere Plaintiff looked, she was reminded of being trafficked by Defendant

Combs, as he is an inescapable presence in music, television, and film.

143.     In the ensuing years, Plaintiff has also experienced alcohol and drug addiction, as

she attempted to cope with the emotional trauma of being assaulted and trafficked.

144.     Plaintiff has also experienced intimacy issues, as she struggles to maintain

emotional and sexual relationships with men.

145.     Plaintiff was recently married, however fears her marriage may fall apart  due to

her mental breakdowns precipitated by memories of the assault and trafficking.

146.     Defendant Combs has altered the trajectory of Plaintiff's career, denying her a successful and lucrative career in the music industry.

147.     To this day, Plaintiff experiences bouts of depression, anxiety, body image issues, feelings of worthlessness, and intimacy issues because of being trafficked by Defendant Combs.

148.     Plaintiff is a woman of faith and when she saw news coverage of the countless lawsuits, initiated by brave other individuals against Defendant Combs, she knew she had a moral obligation to speak up.

149.     Plaintiff feared further violence and/or retaliation from Defendant Combs in filing this lawsuit, but ultimately decided that it was imperative she speak her truth with the hopes that no other individual would have to endure the egregious and heinous treatment she has.

150.     Plaintiff seeks justice for herself and for any of other Combs' victims.

**Trafficking And Victims' Protection Act**

151.      According to Plaintiff, she was transported from New York to Florida throughout by Defendant Combs for the purpose of engaging in sexual activities.

152.     Plaintiff asserts during this time; Plaintiff was forced to engage in sex work and perform sex acts to the pleasure of and the behest of Defendant Combs.

153.     Between 2006-2009, Defendant Combs forced Plaintiff to engage in prostitution and sex work at his homes in Hampton, NY and Miami, Florida.

154.     Plaintiff asserts that Defendants VIBE and PMC were involved in Defendant Combs organized sex trafficking Enterprise.

155.     Plaintiff asserts that Defendants VIBE and PMC's involvement in the Enterprise included providing Defendant Combs' resources like intentionally and falsely marketing and promoting Defendant Combs' "White Parties" in its publication as a high-profile networking and social event in an effort to disguise and deceive the real intent of the event which was to further Defendant Combs, and his various businesses including BBE, SJC, CGE, and VIBE and PMC's profits.

156.     In furtherance of Defendants illegal Enterprise Defendants VIBE and PMC ensured Defendant Combs, and his businesses BBE, SJC, and CGE, appeared overwhelming in its magazine be it on covers or pages inside Defendants magazine featuring pages dedicated to Defendant Combs personally or his businesses.

157.     Plaintiff believes Defendants VIBE and PMC engaged in Defendant Combs' illegal Enterprise to increase the visibility and profitability of its publication, VIBE Magazine, through the magazine's constant affiliation and relationship with Defendant Combs.

158.     Plaintiff seeks justice against all Defendants for sex trafficking.

**Claims Related To Plaintiff's Picture And Likeness**

159.     On or around Labor Day, 2004, Plaintiff's picture was taken while in her employment capacity at Defendant Combs' "White Party" in Hampton, NY.

160.     Plaintiff did not know what her picture was being taken for, or would be used for, nor was Plaintiff's consent sought or given.

161.     Plaintiff has never entered into any agreement with any Defendant to license her likeness, nor was it a term for employment at the "White Party."

162.     Defendant VIBE, and PMC, intentionally mislabeled Plaintiff as a guest at the "White Party" in its magazine to further conceal the true intentions of the event and Plaintiff's employment role at the event in an effort to further the goals of the Defendants illegal and criminal Enterprise.

163.     Defendant VIBE and PMC exploited Plaintiff's likeness in their November 2006 magazine, where Defendant Combs was the cover and the story was about Defendant's "White Parties," which by this point was a cultural phenomenon.



164.     Plaintiffs' unauthorized, non-consensual and infringing use of her picture and likeness appears on Page 140 of the magazine.



165.     Plaintiff did not discover the infringing use until approximately April, 2024.

166.     This infringing use promoted, without limitation, products synonomus with Defendant Combs including the "White Party" and Defendants BBE, SJC and CGE.

167.     Plaintiff is readily and easily identifiable in the infringing use, and her picture and likeness is prominently displayed in Defendants VIBE and PMC's publication.

168.     The aforementioned act violates Plaintiff's rights to privacy via misappropriation.

169.     Plaintiff has never given any Defendant a release to use her likeness in any publication or platforms, media or formats digital, physical or otherwise.

170.     The November 2006 issue of Defendants VIBE and PMC is still readily available for sale and viewable online.

171.     At all relevant times, Plaintiff had the sole and exclusive right of publicity with regard to the use of her picture, portrait, and likeness under New York State Law and Common Law Right of Publicity.

172.     Defendants have, without Plaintiff's authorization or consent, since used Plaintiff's likeness for advertising and other trade purposes without consent and without a license to promote Defendant Combs, BBE, SJC, CGE, VIBE and PMC products for commercial gain. Plaintiff is further informed and believes and thereon alleges that Defendants VIBE and PMC used Plaintiff's likeness in its magazine nationwide, including in this District.

173.     None of the Defendants at any point had a license for the use of Plaintiff's picture and likeness to promote the "White Parties."

174.     At no point did Plaintiff authorize, consent to, or otherwise seek to allow the

Defendants, or any of them, to exploit her picture, image, or likeness as seen in the

infringing use in any manner.

175.     Plaintiff is informed and believes and thereon alleges, that Defendants, and each

of them, engaged in the unauthorized exploitation and misappropriation of Plaintiff's

photograph, image, picture, and likeness by prominently featuring Plaintiff in an

advertisement and marketing materials for Defendant Combs, BBE, SJC and CGE on

various online platforms and physical materials, including but not limited to the

infringing use.

176.     Plaintiff is informed and believes and thereon alleges, that Defendants, and each

of them, engaged in the unauthorized exploitation and misappropriation of Plaintiff's

photograph, image, picture, and likeness in an effort to further and continue their corrupt

sex and drug trafficking organization.

177.     Through their general business partnership, and financial support of Defendant

Combs, Defendants VIBE and PMC aided and abetted Defendant Combs' actions as

herein.

178.     Defendants' publication and distribution of the infringing use has resulted in

substantial injury to Plaintiff.


**FIRST CAUSE OF ACTION**


**CONDUCT AND PARTICIPATE IN A RICO ENTERPRISE THROUGH A PATTERN
OF RACKETEERING ACTIVITY A VIOLATION OF RACKETEER INFLUENCED
ANDCORRUPT ORGANIZATION ACT, CODIFIED AT 18 U.S.C. § 1962(A), (C)-(D)
(Against ALL Defendants)**

179.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

180.    Defendants VIBE and PMC are 100% liable for the actions of Defendant Combs, and by extension, BBE, SJC, CGE, and Thomas ("RICO orchestrators"). Defendants VIBE and PMC financially benefited from Defendants Combs, BBE, SJC, and CGE through their partnership with Defendant Combs and the brands he owned, listed as Defendants above. The collective provided the RICO orchestrators with unfettered access to resources and failed to adequately investigate, supervise, and or monitor how those resources were being used, who was using those resources and the purpose of use of those resources.

181.    The support provided by Defendants Thomas, Jacob, BBE, SJC, CGE, VIBE and PMC was a lifeline that spearheaded and maintained the RICO orchestrators' depraved actions. Upon information and belief, the establishment of a business relationship with a prominent publication, VIBE, PMC and Combs allowed for distribution platform for all Defendant Combs business endeavors to disguise his true intentions with overly broad and vague in nature description of activities. Defendants VIBE and PMC knew or should have known that Defendants Combs, BBE, SJC, and CGE had no intention to utilize the resources he received for business related purposes and they did not put any mechanism in place to ensure that their resources, specifically their publication, were not being used for any illegal activity. Defendants VIBE and PMC willful blindness resulted in Plaintiff suffering the harm detailed herein.

182.    Defendants are individuals and entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or

beneficial interest in property." The association is composed of Defendants Combs, BBE, SJC, CGE, VIBE, PMC, Thomas, Jacob, John and Jane Does 1-10, and Organizational Does 1-10.

183.    In the relevant part, 18 U.S. Code 1961 defines a racketeering activity as:

(1) (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, ***dealing in obscene matter, or dealing in a controlled substance or listed chemical** (as defined in section 102 of the Controlled Substances Act)*, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: *... section 933 (relating to trafficking in firearms)*, section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ***sections 1461–1465 (relating to obscene matter), section 1511 (relating to the obstruction of State or local law enforcement)**, **sections 1581–1592 (relating to peonage, slavery, and trafficking in persons)***, section 1952 (relating to racketeering), section 1956 (relating to the laundering of monetary instruments), (D) any offense involving fraud connected with a case under title 11...the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical.

184.    Section 1962(a) makes it: ***unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity*** or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any Enterprise which is engaged in, or the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a).

185.    Section 1962(c) makes it: ***unlawful for any person employed by or associated with any Enterprise engaged in,*** or the activities of which affect, interstate or foreign commerce, ***to conduct or participate***, directly or indirectly, in ***the conduct of such Enterprise's affairs through a pattern of racketeering activity.*** 18 U.S.C. §1962(c).

186.     Section 1962(d) makes it: unlawful for *"any person to conspire to violate"* Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

187.     Defendants mentioned herein are associated with each other as an Enterprise within the meaning of "Enterprise" as defined in 18 U.S.C. § 1961(4).

188.     Plaintiff, in its pleading, has detailed many acts by Defendants Combs, BBE, SJC, CGE, VIBE, PMC, Thomas, Jacob, Does 1-10 and Organizational Does 1-10, which are prohibited under 18 U.S.C. §1962.

189.     Defendants have unlawfully increased their profits by luring and deceiving individuals such as Plaintiff to their organization for the misstated purpose of using their talents as entertainment. Defendants' true intentions are later revealed through a calculated grooming scheme that involves false promises of business opportunities, exposure to high level celebrity individuals including: former President Donald Trump, Reverend Al Sharpton, and Paris Hilton, music mogul Jay-Z, and music executives like Russell Simmons, Irv Gotti, Steve Stout, Andre Harrell, and Lyor Cohen, with the promise of introductions, networking, fame and fortune which quickly shifts to unauthorized drugging, threats and sex trafficking.



11.06

**1998** "There were many illustrious guests at the White Party, but Puffy was the star attraction." —Donald Trump

**1998** Simmons with a fresh face Kimora Lee.

"I remember being with Betsey Johnson, Donna Karan, and Ronald Perelman—all of us were trying to figure out if we should buy a white outfit to make sure we got in." —Russell Simmons

**1998** The pre-Fergie Black Eyed Peas show love.

# CONTENTS

**122 // ON MY OWN**
After getting dropped by both G Unit and Aftermath, the odds seemed stacked against **THE GAME**. But this underdog's back. *By Allen Scott Gordon. Photographs by Jonathan Mannion.*

**126 // YOU DON'T KNOW ME, BUT...I'M YOUR BROTHER**
**TAYLOR HICKS** may just be the most successful American Idol yet. But who's really feeling his gray-haired soul man routine? *By Jon Caramanica. Photographs by Joaquin Palting.*

**130 // DELIVERANCE**
The son of a hustler and a preacher, **LIL SCRAPPY'S** been battling God and the Devil his entire life. Now he's got 50 Cent and Lil Jon on his side. *By Laura Checkoway. Photographs Julia Beverly.*

**132 // ...AND STILL CHAMPION**
SEAN "DIDDY" COMBS IS READY TO TAKE ON ALL COMERS
The ruler's back. With a new Bad Boy roster making noise on the Nielsen SoundScan charts and a best-selling fragrance, **SEAN COMBS** sits down for a candid Q&A. *By Danyel Smith. Photographs by Matthias Clamer.*

**135 // CHANGE CLOTHES—AND GO THE NOTORIOUS B.I.G.** was 'hood certified. So how did Puffy transform the kid in the "red and black lumberjack" into a fashion icon? *By Mark Allwood.*

**136 // BEEN AROUND THE WORLD**
Bad Boy's influential production unit, **THE HITMEN**, remember the session that made legends. *By Gregory Johnson.*

**138 // WHITE HEAT**
VIBE cleans up to give you access to PD's exclusive **WHITE PARTY**. *By Keith Murphy.*

**141 // BAD BOY'S GREATEST MISSES**
Because sometimes it just has to s

**142 // MO MONEY, NO PROBLE**
The hip hop Frank Sinatra's striking diverse business empire is arguabl as gangsta as it ever was. *By Robert LaFranco.*

(CONTINUED ON PAGE 18)

**16 VIBE**

39





40

190.     While employed by Defendant Combs at the "White Parties," Plaintiff witnessed Defendant Combs instruct, direct Defendant Thomas and other employees to acquire and transport the illicit narcotics. Plaintiff personally witnessed Defendant Thomas transport illicit narcotics to and from the "White Parties" in New York and Florida. Plaintiff personally witnessed Defendant Combs ingest and distribute the illicit narcotics once he received them. Plaintiff personally witnessed and was directed by Defendant Combs to engage in sex work while employed as an entertainer at the "White Parties." Plaintiff was required to engage in sex acts with attendees at the "White Parties" when instructed by Defendant Combs or Thomas. Plaintiff would be paid in cash for complying with the demands for se work and there was no negotiation between Plaintiff and either Defendant Combs, Thomas or the party receiving services regarding a price to be paid for Plaintiff complying with sex work demands.

191.     The RICO Enterprise activities affected interstate commerce, is comprised of an association of persons, including each Defendant and other unnamed co-conspirators herein. That association was structured by various agreements, deals, contracts, and non-contractual relationships between the Defendants, by which Defendants assumed different roles in knowingly and directly or indirectly participating in the acts necessary to carry out the directives of the Enterprise which was to acquire and distribute narcotics, prostitutes, and sex workers. Defendants also worked collectively to deceptively obtain the labor of models and entertainers, such as Plaintiff and Mr. Gallo, to utilize their talents and labor to produce tangible goods and services without full compensation. As detailed herein, Plaintiff worked for Defendant Combs for several years. Additionally,

Plaintiff's then-boyfriend, Mr. Gallo, was also employed by one of Defendant Combs' businesses Defendant SJC. Employee Defendant Thomas solicited Plaintiff, via Mr. Gallo, to work for Defendant Combs at his "White Parties" as entertainment. Plaintiff was never allowed to negotiate a rate for her employment with Defendant Combs. In fact, Plaintiff agreeing to employment with Defendant Combs was a condition precedent to Mr. Gallo gaining his employment with Defendant Combs as a model with Defendant SJC. Plaintiff fulfilled the condition precedent by providing services of sex work demanded by Defendant Combs at his "White Parties." Defendant Combs benefited from Plaintiff's forced sex work, did not compensate Plaintiff fairly and ultimately blackballed Plaintiff, and Mr. Gallo once she no longer cowered to Defendant Combs' demand for continued participation.

192.    Defendants Combs, BBE, SJC, CGE, VIBE, PMC, Thomas, Jacob, Doe 1-10, and Organizational Doe 1-10 all share a common purpose: to use deception, coercion, force, and the threat of violence to enrich themselves at the expense of individuals like the Plaintiff. As set forth herein, although all Defendants may not have directly threatened coerced, forced or violently threatened Plaintiff, they financially benefitted from Defendants Combs, BBE, SJC, CGE, Thomas, and Jacob's scheme of defrauding, and intimidating the Plaintiff with threats of destitution and isolation from the music and entertainment industry (which Defendant Combs made good on as there is no evidence of Mr. Gallo's Sean John campaign available and both Plaintiff and Mr. Gallo were effectively banned from the industry after Plaintiff refused continuing her employment at the "White Parties"), fake promises of a music career, guaranteed access to future exclusive celebrity events, fame and fortune. It is reasonable to believe Defendants

Combs, BBE, SJC, CGE, VIBE, PMC, Thomas, Jacob, Doe 1-10, and Organizational Doe 1-10 would not have engaged in these acts of threats but for the existence of the RICO scheme and their understanding that they would have unfettered access to engage in their illegal and corrupt Enterprise without question.

193.     As evidenced in Plaintiff's complaint herein, Defendants all orchestrated, participated, managed, and executed the RICO Enterprise.

194.     Defendants Combs, Thomas and Does purchased and distributed illegal narcotics to employees and guest of the "White Parties." Defendants transported the narcotics by flying on commercial airlines from New York to Florida and distributed the narcotics to guests of the "White Party" and/or to Defendant Combs directly.

195.     The RICO Enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

196.     This is the second case in this jurisdiction where Defendant Combs has been accused of engaging in racketeering, and both cases have similar fact patterns and descriptions of racketeering activities.

197.     Defendant Combs has a pattern of making false representations and omissions to entertainers who used their talents to provide services to the RICO Enterprise. These false representations and omissions were designed to induce people like the Plaintiff to utilize their talents and labor to provide entertainment and engage in forced sex work services without full compensation. Entertainers, like Plaintiff, were also forced to solicit and participate in sexual encounters with guests of the "White Parties" as part of their employment capacity. Entertainers, like Plaintiff, were also required to purchase and distribute narcotics. As further part of the Enterprise, Defendant Combs required

entertainers, like Plaintiff, wear clothing provided by Defendant Combs, so that she could easily be identified as a sex worker by the partygoers.

198.    Additionally, Defendant Combs used the prospects of  a music career, participating in future "White Parties" and meeting influential music industry executives, coupled with threats to blackball Plaintiff, and her then-boyfriend, if they did not comply with Defendant Combs demands. This pattern of false representations was disseminated to Plaintiff in Florida and New York. The dissemination typically used interstate telephone wires.

199.    The true nature of Defendants' Enterprise was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the Enterprise, causing further injury to Plaintiff and possibly many others.

200.    Upon information and belief, Defendants profited from the Enterprise, and Plaintiff suffered because the Enterprise diminished Plaintiff's finances for nonpayment of services rendered and diminished Plaintiff's health through consistent drugging and forced sexual encounters as a sex trafficking victim. Defendants used the proceeds from the Enterprise to advance the Enterprise by funding and operating their marketing machine, including through the use of the mail, magazine coverage, word of mouth, and interstate wires to sell the illusion that Defendant Combs was a serious and legitimate businessman who held exclusive networking events that would allow entertainers the opportunity to maximize their skills in the entertainment industry when nothing could be further from the truth.

201.    Defendants VIBE and PMC were a direct participant in the marketing aspect of the scheme as, in one issue of VIBE Magazine, November 2006, Defendant Combs received an astonishing 18 pages of advertisement including the cover of the magazine, the centerfold cover, and several direct 2-page advertisements for Defendant Combs' other Enterprises within CGE, including clothing, liquor and a cologne called "UNFORGIVABLE." The tagline for "UNFORGIVABLE" cologne was "Life without passion is UNFORGIVABLE." Who knew Defendant Combs' true passion was being the head of a corrupt organization that abused women, and trafficked sex and narcotics.





Two- page "UNFORGIVABLE" cologne advertisement featuring Kimora Lee Simmons.







Sean John campaign featuring Defendant Combs son, Justin Combs.

Childhood photos of Defendant Combs used to humanize him in furtherance of the conspiracy.





Multiple Covers of Defendant Combs for Defendants VIBE and PMC publication "VIBE Magazine."



47

Case 2:24-cr-00542-AB Document 273-3 Filed 07/08/25 Page 1 of 3
Case 2:24-cr-00542-AB Document 142-3 Filed 04/28/25 Page 161 of 412
Page ID: 5336

Two- page Centerfold Poster of Defendant Combs
"and still champion"



Defendant Combs with Jennifer Lopez on World Tour



Several pages dedicated to Defendant Combs Labor Day "White Parties" in the Hamptons, NY and Star Island, FL







202.     To reiterate, Defendants Combs, BBE, SJC and CGE appeared in 18 (eighteen)

pages including the cover of Defendants VIBE and PMC's publication "VIBE Magazine"

in a SINGLE issue.

203.     Defendants provided the general public at large this misrepresentative

information, including over interstate wireline communications systems via their

nationwide publishing VIBE magazine which is available in print and online.

204.     Upon information and belief, Defendants obtained revenue via wire transfers,

documents, and banking transactions that were exchanged via electronic means over

interstate wires, thereby growing the Enterprise and causing further injury to Plaintiff as

described throughout.

205.     Defendants' scheme was reasonably calculated to deceive Plaintiff of ordinary

prudence and comprehension through the execution of their complex and illegal scheme

to misrepresent the true purpose of employment at Defendant Combs' "White Parties"

and that employment at those parties would not and could not lead to a career in the music industry, fame nor fortune. Plaintiff would have never engaged in any regard with Defendant Combs for five years if not but for the complex and illegal racketeering scheme operated by Defendants.

206.    Upon information and belief, Defendants each had the specific intent to participate in the overall RICO Enterprise and scheme to defraud Plaintiff and each participated in the Enterprise as follows:

207.    Upon information and belief, Defendants Combs, BBE, SJC, CGE, VIBE and PMC control and participate in the activities of the Enterprise in a variety of ways as set forth herein, including but not limited to, developing marketing campaigns to legitimize the "White Parties" as a "way to integrate hip hop into the echelons of the mega-rich, to find an intersection of both worlds for the sake of unity."[14]

208.    Upon information and belief, throughout the relevant period, Defendant VIBE and PMC entered into a partnership agreement with Defendant Combs, BBE, SJC and CGE. As general business partners, each member is responsible for the partners' actions in the partnership. Defendants VIBE and PMC have an ethical obligation to ensure their business partners, Defendant Combs, BBE, SJC and CGE, were not using the partnership to engage in illegal activity.

209.    Defendants VIBE and PMC provided resources to their general business partners, Defendants Combs, BBE, SJC and CGE. Defendants Combs, BBE, SJC and CGE used the resources provided by their general business partners to solicit through the mail,

---

[14] https://www.yahoo.com/entertainment/diddy-white-party-labor-day-celebrity-fashion-photos-style-hip-hop-120027194.html

world wide web, and telephone entertainers whom they would promise music careers, modeling careers and meetings with powerful music industry executives. Defendants Combs and his staff, including Defendant Thomas and Does, would solicit entertainers who resided in New York and Florida. Defendants Combs and his staff, including Defendant Thomas, VIBE, PMC and Does, relied on the mail, world wide web  and telephone to disseminate the misleading information described herein. Defendants Combs, BBE, SJC, CGE, Thomas, VIBE or PMC did not disclose to the individuals they solicited the fact that they would be drugged, required to act as sex workers and forced to perform sex work without compensation.

210.    Defendants authorized the resources to their general business partner, Defendant Combs. In furtherance of the goals of their conspiracy, Defendants VIBE and PMC used the "White Parties" as a ruse to provide Defendants Combs, BBE, SJC and SGE cover to disguise their covert sex trafficking Enterprise. Throughout the relevant period, Defendants Combs BBE, SJC and CGE used the resources their general business partners provided to solicit entertainers. As detailed throughout, they relied on the mail, email, and world wide web to disseminate the misleading information described herein and profit from the free labor of these entertainers. In addition to the forced free labor, they used their power and influence to force these entertainers to engage in sex work and to engage in unwanted sexual encounters with friends and associates of the RICO Enterprise. Defendants also used their power and influence to force these entertainers to purchase, transport, and distribute illegal narcotics. As the general business partner of Defendants Combs, BBE, SJC and CGE, Defendants VIBE and PMC are equally liable for the commission of these acts.

211.    Upon information and belief, Defendant Thomas ensured the cash payments to

employees, like Plaintiff, were executed. Plaintiff was never given the opportunity to

directly negotiate the fees for forced sex work outside of her employment and would

typically be at the sole discretion of Defendant Thomas's grace for payment for sex work.

Plaintiff does not recall receiving appropriate United States federal tax documents for

payments or if they independently declared these payments on their taxes. It is unclear if

Defendants BBE, SJC, CGE, Jacob, VIBE or PNC requested an audit of Defendant

Combs business financial records to ensure the resources provided to Defendant Combs

was not being used to fund illegal activities like sex and drug trafficking.

212.    During the ten (10) years preceding the filing of this action and to the present, all

Defendants did cooperate jointly and severally in the commission of predicate acts

itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as

described in this Complaint.

213.    Beginning at an exact date unknown to Plaintiff, but within ten (10) years

preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully

participated in a pattern of racketeering activity that continues possibly to this day.

214.    The "Racketeering Acts" followed the same pattern and purpose: to defraud the

Plaintiff for the Defendants' benefit. Each Racketeering Act involved the same or similar

methods of commission and participants.

215.    Defendants' business would not have succeeded without the repeated predicate

acts and the ability to conduct their fraud using mail, telecommunications wires, interstate

travel, and possibly money laundering. Which is not far-fetched considering Defendant

Jacob was sentenced to thirty months for activities related to money laundering and required to forfeit over $2,000,000.00 in civil penalties and fees.[15]

216.    The Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the Enterprise to operate their businesses to solicit potential victims as detailed herein.

217.     The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the Enterprise to operate their businesses to fraudulently induce Plaintiff, and others like Plaintiff, to utilize their talents and labor to provide services without full compensation. In addition to the forced free labor, Defendants used their power and influence to force Plaintiff to engage in sex work and to engage in unwanted sexual encounters with others when directed. Defendants, specifically Defendant Combs, used his power and influence to force Plaintiff to engage in sex work but also distribute and consume illegal narcotics.

218.    Defendants' wrongful conduct has injured Plaintiff, remaining part of Defendants' ongoing business practices, and continues to threaten Plaintiff and the public.

219.    Defendants' association with the Enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

220.    To further their collective goals, Defendants worked in concert to engage in various forms of criminal activity, including forcing individuals into sex work by forcing them to solicit and engage in sexual encounters with others and to consume and distribute illegal narcotics at the direction and demand of Defendant Combs'.

---

[15] https://www.cbsnews.com/news/jacob-the-jeweler-jailed/

221.     Defendant's ongoing racketeering activity has injured and continues to injure

Plaintiff. Defendant's pattern of forcing Plaintiff and others like Plaintiff, to engage in

sex work and engage in sexual encounters with others and to purchase, transport, and

distribute illegal narcotics was the proximate cause of the injuries suffered by Plaintiff.

**Defendants Committed Multiple Acts of Sex Trafficking in Violation of 18 U.S.C. § 1591
(Sex trafficking by force, fraud, or coercion) in Furtherance of the Enterprise**

222.     As detailed throughout this complaint, Defendants knowingly affected interstate

commerce, by recruiting, enticing, harboring, transporting, providing, obtaining,

advertising, maintaining, patronizing, or soliciting by any means a person, Plaintiff, to

engage in illegal sex acts and sex work. In addition to violating federal law, these acts

violated the following state statutes: Florida, Penal Code 796.07(2)(f); and New York,

Penal Code 230.05.

223.     As detailed throughout this complaint, Defendants BBE, SJC, CGE, Jacob, VIBE

and PMC provided resources to Defendant Combs through their general business

partnership, Defendants BBE, SJC, CGE, Jacob, VIBE and PMC, and by extension

through Defendant Combs, knowingly benefited, financially or by receiving anything of

value, in an Enterprise which has engaged in an act described in violation of paragraph

(1) of 18 U.S.C. § 1591.

224.     Defendants BBE, SJC, CGE, Jacob, VIBE and PMC, and by extension through

Defendant Combs, knowingly, or, except where the act constituting the violation of

paragraph (1) 18 U.S.C. § 1591 advertised, in reckless disregard of the fact, that means of

force, threats of force, fraud, coercion described in subsection (e)(2) of 18 U.S.C. § 1591,

or any combination of such means will be used to cause Plaintiff to engage in several commercial sex acts.

225.    By way of example, in the Summer of 2007, Plaintiff was forced to engage in sex work at the "White Party" at Defendant Combs' home in Hampton, NY with Defendant Jacob. The picture included in this pleading of Defendant Jacob and Plaintiff was taken after Plaintiff was forced to engage in illegal sex acts with Defendant Jacob at the behest and demand of Defendant Combs. Defendant Combs forced Plaintiff to have sex with Defendant Jacob against her will. According to Plaintiff, Defendant Combs' required sex work and engaging in sex acts as part of the employment at the "White Parties." Plaintiff was only paid for her services at the party but not for the sex work she was forced to engage in.

226.    By way of example, between 2004-2009, Plaintiff was forced by Defendant Combs and Thomas to transport herself to Mr. Combs home located in Miami, FL. Plaintiff, upon information and belief, believes there may be videos showing her being sexually assaulted, while unconscious, during the "White Parties" at Defendant Combs' Florida residence.

227.    From at least 2004 through 2009, in the states of New York and Florida, and possibly elsewhere, Defendant Combs and others known and unknown, in affecting interstate commerce, knowingly combined, conspired, confederated and agreed to recruit, entice, harbor, transport, provide, obtain and maintain, by any means, a person, and to benefit, financially and by receiving anything of value, from participation in an Enterprise which has engaged in such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud and coercion and a combination of such

means, would be used to cause the person, Plaintiff, to engage in commercial sex acts, to wit, Defendants Combs, Jacob and others, known and unknown, caused Plaintiff to engage in commercial sex acts in the United States cities of Miami and New York by means of force, threats or force, fraud and coercion, and a combination of such means.

228. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the States of New York, and Florida:

    a. In or about 2004, Defendant Sean Combs, through his employee, Defendant Thomas, recruited Plaintiff to work for him as an entertainer at his "White Parties." Defendant Combs promised to book Plaintiff's then-boyfriend in the Sean John Clothing campaign he auditioned for as a model, make Plaintiff a music artist, and introduce Plaintiff to an ultra-exclusive group of high-profile individuals to further her career in the entertainment industry.

    b. In or about 2005, after Plaintiff's second "White Party," Defendant Combs began more aggressively grooming Plaintiff into engaging in sex work. Defendant Combs directed Plaintiff with whom to engage in sex work and would give approval and congratulations after Plaintiff complied with Defendant Combs' demands.

    c. As part of his grooming of Plaintiff, Defendant Combs threatened that if Plaintiff did not continue her employment at the "White Parties" that Defendant Combs would blackball Plaintiff from the entertainment industry and Plaintiff's then-boyfriend, Mr. Gallo, from the modeling industry, which Defendant Combs eventually did anyway.

d. At the direction of Defendants Combs and Thomas, Plaintiff was forced to engage in sex work at Defendant Combs' homes in Hampton, NY and Miami, Florida. Plaintiff had no authority to be on Defendant Combs' residential premises without Defendant Combs' consent. All of Defendant Combs' properties are protected by 24-hour security, and all visitors must be verified before entry.

e. Plaintiff communicated with Defendants Combs and Thomas by telephone. Defendant Combs communicated by a California number ending in "1496." However, a search of that number leads to New York-based artist Paloma Baillie[16] as the registered owner. Why or how a number registered to Ms. Baillie is being used by Defendant Combs is another conspiracy for another time. The number Plaintiff communicated with Defendant Thomas is seemingly still registered to Defendant Thomas.





---

[16] https://www.palomabaillie.com/about

229.    From 2004-2009, in the States of New York, and Florida, Defendants Combs, Thomas and others known and unknown, in and affecting interstate commerce, knowingly did recruit, entice, harbor, transport, provide, obtain, and maintain, by any means a person, Plaintiff, and did benefit, financially and by receiving anything of value, from participation in an Enterprise which has engaged in any such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud and coercion, and a combination of such means, would be used to cause the person to engage in a commercial sex act, to wit, Defendants Combs, Thomas and Jacob caused Plaintiff to engage in commercial sex acts utilizing force, threats of force, fraud and coercion, and a combination of such means. Additionally, Defendant Combs received personal gratification by directing and ensuring Plaintiff engage in commercial sex acts with the individuals Defendant Combs directed her to engage.

230.    From 2004-2009, up to and including currently, in the States of New York, and Florida, Defendants Combs, Thomas and others known and unknown, in and affecting interstate commerce did use, and cause to be used, facilities in interstate and foreign commerce, to wit internet and cellular telephone services, with the intent to promote manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, a business Enterprise involving prostitution offenses in violation of applicable state law, and thereafter performed and attempted to perform an act to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of such unlawful activity.

**Defendants Committed Multiple Acts of procuring, transporting, and distributing controlled substances in Violation of Title 18, United States Code, Sections 1961(1) and 1961(5) Furtherance of the Enterprise**

59

231.     Defendants knowingly affected interstate or commerce did knowingly and
intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to
conduct and participate, directly and indirectly, in the conduct of the affairs of that
Enterprise through a pattern of racketeering activity, as defined in Title 18, United States
Code, Sections 1961(1) and 1961(5). In addition to violating federal law, these acts
violated the following state statutes: Florida, Penal Code 893.135 and New York, Penal
Codes 220.77, 220.18, 220.50, and 220.06.

232.     **The Combs Rico Enterprise**:[17] As detailed throughout this pleading, Defendants
are an Enterprise as the term is defined pursuant to 18 USCS § 1961 (4). That is, a group
of individuals associated, in fact, that engaged in, and the activities of which affected
interstate commerce. The Enterprise constituted an ongoing organization whose members
functioned as a continuing unit to achieve the Enterprise's objectives.

233.     Upon information and belief, the Combs Rico Enterprise is comprised of
individuals residing in and around Los Angeles, California, Miami, Florida, New York,
and among other places. Members and associates of the Combs Rico Enterprise have
engaged in drug trafficking and sex trafficking.

234.     Upon information and belief, members and associates of the Combs Rico
Enterprise procured, transported, and distributed ecstasy, cocaine, and other illicit
narcotics, in and around the States of New York and Florida. During the relevant
timeframe, through their general business partnership, Defendants provided resources to

---

[17] "Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C.S. § 1961

Defendant Combs in furtherance of the Enterprise during its highly exclusive and sought after summer "White Parties."

235.    **The purpose of the Combs Enterprise**: As detailed herein, and according to Plaintiff, the purpose of the Combs Enterprise is to:

a. Use its position, power, and influence to control entertainers and force these entertainers to purchase, transport, and distribute illegal narcotics and engage in sex work;

b.  Promote and enhance the prestige, reputation, and position of the Enterprise with respect to rival music labels, artists and executives;

c. Preserve and protect the power, territory, and criminal ventures of the Enterprise through the use of intimidation, threats of violence, and coercion;

d. Keep victims in fear of the Enterprise and its members and associates;

e.  Enrich the members and associates of the Enterprise through criminal activity, including narcotics trafficking, sex trafficking and fraud;

f.  Conceal the activities of the Enterprise from law enforcement by threatening individuals' livelihoods if they ever spoke about their experiences to others, especially law enforcement.

236.    **Methods and Means of the Enterprise**: Upon information and belief, among the means and methods by which the Defendants and their associates conducted and participated in the conduct of the affairs of the Enterprise were the following:

a. Members of the Enterprise and their associates procured, transported and distributed illegal narcotics to Defendant Combs at his homes in New York and

Florida. Plaintiff personally witnessed members of the Enterprise doing this during domestic travel.

    b.   Members of the Enterprise and their associates used force, coercion, threats, or a combination therein to force Plaintiff to engage in sex work and have sex with "White Party" goers at the direction of Defendant Combs and/or Thomas.

237.    The pattern of racketeering activity through which Defendants, together with others, agreed to conduct and participate directly and indirectly, in the conduct of the affairs of the Enterprise consisted of multiple offenses involving dealing in controlled substances, in violation of Title 21, United States Code, Sections 841, 843 and 846. Parts of the conspiracy involved each Defendant agreeing that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

**Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

238.    Defendants voluntarily and intentionally devised and participated in a scheme with the intent to defraud Plaintiff.

239.    Defendants used the mail to execute the fraudulent scheme herein.

240.    Specifically, the Defendants agreed to each of the acts of mail fraud described throughout this Complaint. In addition, they agreed to rely on the mail to distribute their marketing materials, VIBE Magazine, secure wires and cash payments from purchasers of the illegal sex services and narcotics they required others to sell, distribute and perform.

241.    In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants, either individually or in

combination with themselves, used and caused to be used the U.S. mail by both placing

and causing to be placed, marketing materials, advertisements, agreements and other

matters in depositories and by removing, or causing to be removed, letters and other

mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. §

1341.

242.　　　Defendants could not have furthered their fraudulent scheme without the use of

the mail. For example, without the mail, Defendants VIBE and PMC would be unable to

distribute its marketing magazine as, during that time, "online viewing" was still in its

infancy. Defendants also required the mail to distribute misleading advertisements to

various states, including New York. For these reasons, the use of mail to conduct

fraudulent activity was necessary and inevitable.

**Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

243.　　　Defendants voluntarily and intentionally devised and participated in a scheme

with the intent to defraud Plaintiff.

244.　　　Defendants agreed to each of the acts of wire fraud described herein.

Additionally, Defendants agreed to rely on interstate wires to disseminate funds to others

in the Enterprise. Defendants illegally acquired and utilized wire transfers to further their

collective goal of furthering their RICO Enterprise. Defendants knew that these purchases

were illegally made.

245.　　　Defendants agreed that Defendants should facilitate these fraudulent purchases

over interstate wires in furtherance of the fraud. Plaintiff has received payment for

employment and sex work, comingled, in New York and Florida from Defendants Combs and Thomas.

246. In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants, either individually or in combination with themselves, used, or caused to be used, interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343.

247. Defendants could not have furthered their fraudulent scheme without the ability to use telecommunications to share information with clients and retailers nationwide. Defendants needed to communicate with clients and retailers around the country, utilizing interstate telecommunications wires to conduct the fraudulent activity. Which was necessary and inevitable to use.

248. Plaintiff has been damaged in her business or property because Defendants violated 18 U.S.C. § 1962(a), (c)-(d)), and, therefore, Plaintiff is entitled to recover the damages and other remedies enumerated therein.

249. Defendants' acts or omissions were actuated by actual malice and a willful and wanton disregard for the consequences suffered by Plaintiff, were directed towards her because of her gender, and with knowledge of a high degree of probability of harm to Plaintiff and reckless indifference to the consequences of their acts or omissions.

250. Compensatory damages alone will be insufficient to deter such conduct in the future. There needs to be a criminal referral to the United States Justice Department, as well as to the States Attorney General's Office.

**WHEREFORE,** Plaintiff requests that the Court issue an Order and grant Judgment to the Plaintiffs as follows:

- Grant Plaintiff statutory, common law, and punitive damages, and applicable pre- and post-judgment interest, in full recompense for damages;

- Enter judgment according to the declaratory relief sought;

- Grant Plaintiff such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

- Grant Plaintiff an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

## SECOND CAUSE OF ACTION

### SEXUAL ASSAULT AND SEXUAL HARASSMENT
### (Against Defendant Combs)

251.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

252.    As described herein, Defendant Combs frightened and placed Plaintiff in apprehension of harm when he forced and coerced Plaintiff to engage in sex work for him during his "White Parties" from 2004-2009 at Defendant Combs' homes in Miami, FL and Hampton, New York.

253.    Defendant Combs used threats, coercion to force Plaintiff into engaging in sex work and sex acts with his partygoers at his "White Parties."

254.     Defendant Combs directed Plaintiff to engage in sex acts with Defendant Jacob against Plaintiff's will at Defendant Combs' "White Party" in Hampton, NY.

255.     Upon information and belief, Defendant Combs may have directed others to engage in sex acts with Plaintiff while Plaintiff was unconscious at his "White Party" in Miami, FL.

256.     As a result of Defendant Combs' conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

257.     Defendant Combs' conduct described herein was willful, wanton, and malicious. At all relevant times, Defendant Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. Plaintiff believes Defendant Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and/or humiliation to Plaintiff due to Plaintiff's gender. By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

### THIRD CAUSE OF ACTION

### SEXUAL ASSAULT AND SEXUAL HARASSMENT
### (Against Defendant Jacob)

258.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

259.     As described herein, Defendant Jacob, Combs and Thomas frightened and placed Plaintiff in apprehension of harm of physical and sexual assault while employed as entertainment at Defendant Combs' "White Parties."

260.     Plaintiff was forced to engage in sex acts with Defendant Jacob against her will while the "White Party" was occurring.

261.     As a result of Defendant Jacob's assault, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

262.     The conduct of Defendant Jacob willful, wanton, and malicious. At all relevant times, Defendant Jacob acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION

### SEXUAL ASSAULT
### (Against Defendant Does)

263.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

264.     As described herein, Defendant Does frightened and placed Plaintiff in apprehension of harm when they physically and sexually assaulted her at the "White Party" in Miami.

265.    Defendant Does forcibly touched and attempted to touch Plaintiff's intimate areas
and/or touched Plaintiff with their own intimate body parts. Upon information and belief,
Defendant Does touched Plaintiff's intimate areas while Plaintiff was unconscious from
forced narcotics use by Defendant Combs. Defendant Combs and/or Thomas failed to
intervene.

266.    As a result of Defendant Does conduct, Plaintiff has suffered and continues to
suffer harm, including physical injury, severe emotional distress, humiliation, anxiety,
and other consequential damages for which she is entitled to an award of monetary
damages and other relief.

267.    The conduct of Defendant Does described herein was willful, wanton, and
malicious. At all relevant times, Defendant Does acted with conscious disregard for
Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for
the fact that their conduct was certain to cause injury and/or humiliation to Plaintiff, and
intended to cause fear, physical injury and/or pain and suffering to Plaintiff. By virtue of
the foregoing, Plaintiff is entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION

**THE NYC VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION ACT**
**(Against ALL Defendants)**

268.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as
if set forth fully herein.

269.    The NYC Gender Motivated Violence Act revives any claims against "a party
who commits, directs, enables, participates in, or conspires in the commission of a crime

of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

270. The herein described conduct of Defendant Combs, Thomas and Jacob, including forcing Plaintiff to engage in sex work, constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in N.Y. C. Admin Code § 10-1103. ("The term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

271. Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

272. Defendants' crimes of violence were motivated by Plaintiff's gender as defined in in the New York City Administrative Code § 8-903, as Defendant Jacob committed forcible sex acts upon Plaintiff that would constitute felonies under state law and as the conduct presents a serious risk of physical injury, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

273. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act

69

itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

274. The described conduct herein of Defendant Combs, Thomas and Jacob constitutes sexual offenses as defined in Article 130 of the New York Penal Law.

275. Plaintiff is a woman, who is older than 18, who alleges misdemeanor and/or felony penal law violations, including but not limited to sexual misconduct (N.Y. Penal L. § 130.20), criminal sexual act in the first degree (N.Y. Penal L. § 130.50), criminal sexual act in the third degree ( N.Y. Penal L. § 130.40), forcible touching (N.Y. Penal L. § 130.52), sexual abuse in the first degree (N.Y. Penal L. § 130.65), and sexual abuse in the second degree ((N.Y. Penal L. § 130.60).

276. Defendant Combs coerced and forced Plaintiff to engage in sexual contact and/or sexual intercourse with Defendant Jacob, despite her refusal and unwillingness to do so.

277. Defendant Combs demanded Plaintiff drink laced alcohol while in her employment capacity as entertainment at the "White Party." Thus, Defendant Combs knew or should have known that Plaintiff was incapable of consenting to sexual contact and/or sexual conduct.

278. Defendants Combs' and Jacobs' actions presented a serious risk of physical injury to Plaintiff's person, regardless of whether or not those acts resulted in criminal charges, prosecution or conviction.

279. Furthermore, Defendants BBE, SJC, CGE, VIBE and PMC enabled Defendant Combs' commission of the crimes of violence motivated by gender, and thus, are liable under the NYC Victims of Gender-Motivated Protection Act.

280.     Defendants Thomas, Jacob, BBE, SJC, CGE, VIBE and PMC enabled or participated in the sexual trafficking of Plaintiff because Defendants failed to, among other things, protect Plaintiff from a known danger; have sufficient policies and procedures in place to prevent sexual assault; properly implement policies and procedures to prevent sexual assault; take reasonable measures to ensure that policies to prevent sexual assault were working; train their employees on identifying sexual assault and inappropriate workplace behaviors; protect their employees from sexual assault; and adhere to the applicable standard of care.

281.     Defendants BBE, SJC, CGE, VIBE and PMC enabled or participated in the sexual trafficking of Plaintiff because Defendants failed to timely and properly educate, train, supervise, and/or monitor their agents or employees regarding policies and procedures that should be followed when sexual trafficking is suspected or observed.

282.     Prior to Defendant Combs forcing Plaintiff into sex work, Defendants BBE, SJC, CGE, VIBE and PMC knew, or should have known, that Defendant Combs was not fit to be in a position of authority. Defendants, by and through their agents, servants and/or employees, became aware, or should have become aware of Defendant Combs' propensity to commit sexual assault and of the risk to Plaintiff's safety. At the very least, Defendants knew, or should have known, that they did not have sufficient information about whether or not their leaders, managers, and people were safe to be in positions of power.

283.     Defendants BBE, SJC, CGE, VIBE and PMC knew, or should have known, that Combs posed a risk of sexual violence, assault, harassment and trafficking.

284.     Defendants BBE, SJC, CGE, VIBE and PMC failed to properly supervise Defendant Combs and protect Plaintiff from a known danger, and thereby enabled Combs' sexual trafficking of Plaintiff.

285.     Defendants BBE, SJC, CGE, VIBE and PMC negligently deemed that Defendant Combs was fit to be in a position of authority; and/or that any previous suitability problems Defendant Combs had were fixed and cured; and/or that Combs would not commit acts of sexual assault, battery, harassment or trafficking; and/or that Combs would not injure others.

286.     Moreover, Defendants BBE, SJC, and CGE enabled the sexual trafficking of Plaintiff by actively maintaining and employing Defendant Combs in a position of power and authority through which Combs had control over people, including Plaintiff.

287.     As a direct and proximate result of the aforementioned crime of violence and gender- motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys' fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants that:

- Declares Defendant Combs engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that Combs drugged and sex trafficked Plaintiff;

- Declares that Defendants BBE, SJC, CGE, Thomas, Jacob, VIBE, PMC, Does and Organizational Does engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that they enabled Defendant Combs' commission of the crimes of violence motivated by gender;

- Awards Plaintiff compensatory damages for mental, and emotional injury, distress, pain and suffering and injury to her reputation, consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts in an amount to be proven;

- Awards Plaintiff damages against Defendants joint and severally;

- Awards Plaintiff punitive and exemplary damages according to proof;

- Awards Plaintiff attorneys' fees, costs, and expenses incurred in the pursuance of this action;

- Awards prejudgment and post-judgment interest; and

- Awards Plaintiff such other and further relief as the Court may deem equitable, just and

## SIXTH CAUSE OF ACTION

### PREMISES LIABILITY FOR THE SEXUAL ASSAULT COMMITTED BY DEFENDANT JACOB
### (Against Defendant Combs)

288.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

289.    Plaintiff was sex trafficked to Defendant Jacob at the "White Party" in 2007 in Hampton, NY. Defendant Combs was present, along with other high profiled individuals, while Plaintiff was being assaulted by Defendant Jacob during the party. Plaintiff was legally on the premises as an employee of Defendants Combs, BBE, SJC and CGE.

Defendant Jacob was legally on the premises owned by Defendant Combs as a guest and invitee of Defendant Combs. Mr. Combs owned the premises and had dominion and control over the premises where Plaintiff was harmed. Defendant Combs had dominion and control over the actions of Defendant Jacob and failed to step in and stop Defendant Jacob from sexually assaulting Plaintiff.

290.    As the property owner, Defendant Combs had a duty to protect Plaintiff from the harm she suffered at the hands of Defendant Jacob. Defendant Combs breached his duty when he failed to stop Defendant Jacob from sexually assaulting Plaintiff. In furtherance of this breach, Defendant Combs demanded and encouraging Defendant Jacob, and possibly others, to assault Plaintiff. Plaintiff has suffered immensely because of Defendant Combs' intentional breach of his duty.

291.    As a result of Defendant Combs' breach of his duty, Plaintiff has suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages, for which she is entitled to an award of monetary damages and other relief.

292.    Defendant Combs' conduct described above was willful, wanton, and malicious. At all relevant times, Defendant Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. Plaintiff believes Defendant Combs intended his conduct against Plaintiff primarily because of her gender. By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## SEVENTH CAUSE OF ACTION

## TRAFFICKING AND VICTIMS' PROTECTION ACT
### (Against ALL Defendants)

293.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

294.     Defendants knowingly and intentionally participated in, perpetrated, assisted, supported, and facilitated a sex-trafficking Enterprise that was in and affecting interstate commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

295.     Among other things, Defendants Combs and Thomas knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Plaintiff, knowing that Defendants Combs and Thomas would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff to engage in commercial sex acts.

296.     Defendants BBE, SJC, CGE, VIBE, PMC and its employees had actual knowledge that they were perpetrating and facilitating Defendant Combs' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Plaintiff, as well as others, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

297.     Despite such knowledge, Defendants intentionally paid for, facilitated, perpetrated, and participated in Defendant Combs' violations of 18 U.S.C. § 1591(a)(1), which Defendants were in reckless disregard of the fact that Defendant Combs would coerce, defraud, and force Plaintiff to engage in sex work via commercial sex acts.

298.    Defendants' actions were in and affecting interstate commerce, including its distributing of marketing material and publishing activities with VIBE magazine which were in and affecting interstate commerce.

299.    By taking the concrete steps alleged in this complaint, Defendants knowingly participated in sex trafficking and furthered Defendant Combs' sex-trafficking Enterprise. The concrete steps constituted taking part in the sex-trafficking Enterprise and were necessary for its success. The concrete steps constituted active engagement by all Defendants in Defendant Combs's sex-trafficking Enterprise. Defendants knew that their active engagement would lead to and cause coercive commercial sex trafficking.

300.    In perpetrating TVPA violations, upon information and belief, Defendants Combs and Thomas willfully failed to file required taxes with the federal government.

301.    Defendants' affirmative conduct was committed knowing, and in reckless disregard of the facts, that Defendant Combs would use cash and the financial support provided by Defendants BBE, SJC, CGE, VIBE, PMC as a means of defrauding, forcing, and coercing sex acts from Plaintiff, as well as others. Defendants' conduct was outrageous and intentional.

302.    Defendants' knowing and intentional conduct has caused Plaintiff serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

303.    This case does not involve mere fraud. Instead, Defendants' criminal conduct in perpetrating TVPA violations was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants conduct also evinced a high degree of moral turpitude and demonstrated such

wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants'

criminal conduct was directed specifically at Plaintiff, because of her gender, who was a

victim of Defendant Combs' sex-trafficking Enterprise.

304.     Defendants' outrageous and intentional conduct in this case is part of a pattern

and practice of profiting by undertaking illegal "high-risk, high reward" actions.

305.     By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1),

1595, Defendants are liable to Plaintiff for the damages she sustained, and reasonable

attorneys' fees.

## EIGHTH CAUSE OF ACTION

### AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING ENTERPRISE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595
### (against Defendants Thomas, Jacob, BBE, SJC, CGE, VIBE, PMC, Does, Organizational Does)

306.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as

if set forth fully herein.

307.     Defendants BBE, SJC, CGE, VIBE and PMC entered into a general partnership

agreement with Defendant Combs. As general business partners, each individual member

is responsible for the actions of the partners of the partnership. Defendants BBE, SJC,

CGE, VIBE and PMC provide resources to Defendant Combs to throw the lavished

"White Parties." According to Plaintiff, the Combs Rico Enterprise was engaging in sex-

trafficking activities during almost every "White Party" specifically those attended by

Plaintiff from 2004-2009. As a result of their intentional or negligent failure of their duty

to supervise, Defendants BBE, SJC, CGE, VIBE and PMC aided, abetted, and induced

Sean Combs' sex-trafficking Enterprise that was in and affecting interstate commerce, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

308.     The crimes that Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does aided and abetted are (1) Defendant Combs' perpetrating of coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(1), and (2) Defendant Combs' co-conspirators knowingly benefitting from coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate commerce.

309.     Defendant Combs' co-conspirators benefitted financially and received things of value from their participation in the Combs' sex-trafficking Enterprise, including payments and other compensation, like actual sex acts co-conspirator Jacob received, from Defendant Combs. All co-conspirators who benefitted financially.

310.     Under 18 U.S.C. § 2, as a result of their general business partnership with Defendant Combs, and their failure to monitor Defendant Combs, Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does are punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, counseled, commanded, induced, and procured Defendant Combs' and his sex-trafficking Enterprise and sex trafficking of Plaintiff , as well as others.

311.     Under 18 U.S.C. § 2, as a result of their general business partnership with Defendant Combs, and their failure to monitor Defendant Combs, Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, inducing, and procuring Defendant Combs' and his sex-trafficking Enterprise and the sex trafficking of Plaintiff.

312. Defendants directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing the sex-trafficking Enterprise and the sex trafficking of Plaintiff. Defendants Combs, Thomas and Jacob directly violated Chapter 77 by committing and perpetrating these violations.

313. Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does aided, abetted, and induced Defendant Combs' sex-trafficking Enterprise and sex trafficking of Plaintiff knowing that Defendant Combs would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff to engage in commercial sex acts.

314. By aiding, abetting, and inducing Defendant Combs' and his co-conspirators' sex-trafficking Enterprise and sex trafficking of Plaintiff, Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does benefited financially and received things of value for participating in Defendant Combs' sex-trafficking Enterprise.

315. Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does and their employees had actual knowledge that they were aiding, abetting, and inducing Defendant Combs' and his co-conspirators' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Plaintiff, as well as others, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion. Defendants knew, and should have known, that Defendant Combs had engaged in acts in violation of the TVPA.

316. Despite such knowledge, and through their intentional or negligent failure to monitor Defendant Combs, Defendants BBE, SJC, CGE, VIBE , PMC, Does and

Organizational Does financed and aided, abetted, and induced Defendant Combs'
violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations
of those laws under 18 U.S.C. § 2. Defendants BBE, SJC, CGE, Jacob, VIBE and PMC
knew or should have known if they had conducted a simple investigation, they would
have discovered that Defendant Combs was acting in reckless disregard and was
coercing, defrauding, and forcing Plaintiff to engage in commercial sex acts.

317.     Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does
affirmative conduct of blind resources to Defendant Combs aided, abetted, and induced
Defendant Combs to continue his sex-trafficking Enterprise. Their violations were
committed knowingly, and in reckless disregard of the facts, that Defendant Combs
would use the resources provided as a means of defrauding, forcing, and coercing sex
acts from Plaintiff. Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational
Does conduct was outrageous and intentional.

318.     Upon information and belief, Defendants BBE, SJC, CGE, VIBE , PMC, Does
and Organizational Does intentional conduct of aiding, abetting, and inducing Defendant
Combs's violations has caused Plaintiff serious harm including, without limitation,
physical, psychological, emotional, financial, and reputational harm.

319.     This case does not involve mere fraud. Instead, Defendants' criminal conduct in
aiding, abetting, and inducing Defendant Combs' violations of the TVPA was outrageous
and intentional, because it was in deliberate furtherance of a widespread and dangerous
criminal sex trafficking organization. Defendants BBE, SJC, CGE, VIBE , PMC, Does
and Organizational Does criminal conduct also evinced a high degree of moral turpitude
and demonstrated such wanton dishonesty as to imply a criminal indifference to civil

obligations. Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does criminal conduct was directed specifically at Plaintiff who was the victim of Defendant Combs' sexual abuse and sex-trafficking organization.

320.     Defendants BBE, SJC, CGE, VIBE , PMC, Does and Organizational Does outrageous and intentional conduct in this case is part of a pattern and practice of Defendants profiting by undertaking illegal "high-risk, high reward" general business partnerships.

321.     By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants are liable to Plaintiff for the damages she sustained and reasonable attorneys' fees.

322.     By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants are liable to Plaintiff for punitive damages.

## NINTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Combs)

323.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

324.     Defendant Combs created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Combs knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

325.     Plaintiff's emotional distress was foreseeable to Defendant Combs.

326.     As a direct and proximate result of the negligent conduct of Defendant Combs, Plaintiff suffered and will continue to suffer severe emotional distress.

327.     Defendant Combs' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Jacob)

328.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

329.     Defendant Jacob created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Jacob knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

330.     Plaintiff's emotional distress was foreseeable to Defendant Jacob.

331.     As a direct and proximate result of the negligent conduct of Defendant Jacob, Plaintiff suffered and will continue to suffer severe emotional distress.

332.     Defendant Jacob's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## ELEVENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Thomas)

333.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

334.     Defendant Thomas created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Thomas knew or should have known that such conduct was

likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

335.    Plaintiff's emotional distress was foreseeable to Defendant Thomas

336.    As a direct and proximate result of the negligent conduct of Defendant Thomas, Plaintiff suffered and will continue to suffer severe emotional distress.

337.    Defendant Thomas's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWELTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant BBE)

338.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

339.    Defendant BBE created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant BBE knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

340.    Plaintiff's emotional distress was foreseeable to Defendant BBE.

341.    As a direct and proximate result of the negligent conduct of Defendant BBE, Plaintiff suffered and will continue to suffer severe emotional distress.

342.    Defendant BBE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## THIRTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant SJC)

343.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

344.     Defendant SJC created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant SJC knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

345.     Plaintiff's emotional distress was foreseeable to Defendant SJC.

346.     As a direct and proximate result of the negligent conduct of Defendant SJC, Plaintiff suffered and will continue to suffer severe emotional distress.

347.     Defendant SJC's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## FOURTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant CGE)

348.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

349.     Defendant CGE created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant CGE knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

350.     Plaintiff's emotional distress was foreseeable to Defendant CGE.

351.     As a direct and proximate result of the negligent conduct of Defendant CGE, Plaintiff suffered and will continue to suffer severe emotional distress.

352.     Defendant CGE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## FIFTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant VIBE)

353.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

354.    Defendant VIBE created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant VIBE knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

355.    Plaintiff's emotional distress was foreseeable to Defendant VIBE.

356.    As a direct and proximate result of the negligent conduct of Defendant VIBE, Plaintiff suffered and will continue to suffer severe emotional distress.

357.    Defendant VIBE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## SIXTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant PMC)

358.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

359.    Defendant PMC created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant PMC knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

360.    Plaintiff's emotional distress was foreseeable to Defendant PMC.

361.    As a direct and proximate result of the negligent conduct of Defendant PMC, Plaintiff suffered and will continue to suffer severe emotional distress.

362.     Defendant PMC's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## SEVENTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Does)

363.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

364.     Defendant Does created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Does knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

365.     Plaintiff's emotional distress was foreseeable to Defendant Does.

366.     As a direct and proximate result of the negligent conduct of Defendant Does, Plaintiff suffered and will continue to suffer severe emotional distress.

367.     Defendant Does' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## EIGHTEENTH CAUSE OF ACTION

### NIED – SEX TRAFFICKING
### (against Defendant Organizational Does)

368.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

369.     Defendant Organizational Does created an unreasonable risk of causing emotional distress to Plaintiff, and Defendant Organizational Does knew or should have known that

such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

370.     Plaintiff's emotional distress was foreseeable to Defendant Organizational Does.

371.     As a direct and proximate result of the negligent conduct of Defendant Organizational Does, Plaintiff suffered and will continue to suffer severe emotional distress.

372.     Defendant Organizational Does' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## NINETENTH CAUSE OF ACTION

## IIED – SEX TRAFFICKING
### (Defendant Combs)

373.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

374.     Defendant Combs engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

375.     The sexual assault, trafficking and misconduct by Defendant Combs were extreme and outrageous conduct that shocks the conscience.

376.      These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

377.     As a direct and proximate result of Defendant Combs's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

378.     Defendant Combs' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTIETH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant Jacob)

379.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

380.     Defendant Jacob engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

381.     The sexual assault, trafficking and misconduct by Defendant Jacob were extreme and outrageous conduct that shocks the conscience.

382.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

383.     As a direct and proximate result of Defendant Jacob's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

384.     Defendant Jacob's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-FIRST CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant Thomas)

385.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

386.     Defendant Thomas engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

387.     The sexual assault, trafficking and misconduct by Defendant Thomas were extreme and outrageous conduct that shocks the conscience.

388.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

389.     As a direct and proximate result of Defendant Thomas' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

390.     Defendant Thomas' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-SECOND CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant BBE)

391.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

392.     Defendant BBE engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

393.     The sexual assault, trafficking and misconduct by Defendant BBE were extreme and outrageous conduct that shocks the conscience.

394.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

395.     As a direct and proximate result of Defendant BBE'S extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

396.     Defendant BBE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-THIRD CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant SJC)

397.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

398.     Defendant SJC engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia*, subjecting her to sexual assault and misconduct.

399.     The sexual assault, trafficking and misconduct by Defendant SJC were extreme and outrageous conduct that shocks the conscience.

400.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

401.     As a direct and proximate result of Defendant SJC's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

402.     Defendant SJC's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-FOURTH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant CGE)

90

403.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

404.     Defendant CGE engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

405.     The sexual assault, trafficking and misconduct by Defendant CGE were extreme and outrageous conduct that shocks the conscience.

406.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

407.     As a direct and proximate result of Defendant CGE's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

408.     Defendant CGE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-FIFTH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant VIBE)

409.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

410.     Defendant VIBE engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

411.     The sexual assault, trafficking and misconduct by Defendant VIBE were extreme and outrageous conduct that shocks the conscience.

91

412.    These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

413.    As a direct and proximate result of Defendant VIBE's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

414.    Defendant VIBE's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-SIXTH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant PMC)

415.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

416.    Defendant PMC engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia*, subjecting her to sexual assault and misconduct.

417.    The sexual assault, trafficking and misconduct by Defendant PMC were extreme and outrageous conduct that shocks the conscience.

418.    These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

419.    As a direct and proximate result of Defendant PMC's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

420.    Defendant PMC's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-SEVENTH CAUSE OF ACTION

## IIED – SEX TRAFFICKING
### (Defendant Does)

421.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

422.     Defendant Does engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

423.      The sexual assault, trafficking and misconduct by Defendant Does were extreme and outrageous conduct that shocks the conscience.

424.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

425.     As a direct and proximate result of Defendant Does' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

426.     Defendant Does' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-EIGHTH CAUSE OF ACTION

### IIED – SEX TRAFFICKING
### (Defendant Organizational Does)

427.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

428.     Defendant Organizational Does engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

429.     The sexual assault, trafficking and misconduct by Defendant Organizational Does were extreme and outrageous conduct that shocks the conscience.

430.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

431.     As a direct and proximate result of Defendant Organizational Does' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

432.     Defendant Organizational Does' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWENTY-NINTH CAUSE OF ACTION

**KNOWING BENEFICIARY IN A SEX-TRAFFICKING ENTERPRISE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 1591(A)(2), 1595 (Against ALL Defendants)**

433.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

434.     Upon information and belief, Defendants knowingly and intentionally benefitted financially and by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive sex-trafficking Enterprise that was in and affecting interstate commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2). Defendants took several concrete steps to aid and participate in Defendant Combs' sex-trafficking Enterprise. Among the concrete steps that Defendants took to aid Defendant Combs was providing unfettered access to resources in his control which made the sex-trafficking Enterprise possible. Enabling Defendant Combs with significant, unmonitored, resources caused Defendants to receive the benefits detailed throughout this

complaint. Defendants' willingness to provide significant, unmonitored, resources to Defendant Combs was the quid pro quo for it receiving the benefits detailed herein.

435.     Upon information and belief, the resources provided were necessary for Defendant Combs to coerce Plaintiff to engage in commercial sex acts. The resources directly formed part of the commercial nature of the sex acts. The resources were also a necessary and required part of Defendant Combs' recruitment of Plaintiff. By providing unchecked resources, Defendants knew, or should have known, that the money would be used to fund the sex-trafficking Enterprise. Through their general business partnership with Defendant Combs, Defendants actively participated in the recruitment of sex-trafficking victims to the Enterprise.

436.     Upon information and belief, the unchecked resources that Defendants provided went far beyond providing routine partnership or compensation to a general business partner. It was far from routine for Defendants to provide substantial marketing and resources throughout the years to Defendant Combs on his business ventures including the "White Parties" and who did not have an apparent legitimate need for such extravagant marketing and resources. The sheer number of pages in which Defendant Combs appears in one issue of Defendants VIBE and PMC publication went far beyond normal for the music industry. Defendants knew, or should have known, through reasonable inquiry that they were feeding Defendant Combs' sexual deviancy.

437.     Upon information and belief, Defendants provided extravagant marketing and resources to Defendant Combs, which, under the circumstances of this case, was entirely inconsistent with the ordinary duties of a partner, or general business partnership member.

438.     Upon information and belief, the reason that Defendants ignored numerous "red flags" about Defendant Combs was to receive financial benefits from the sex-trafficking Enterprise. Defendants knew that they would gain far-from-routine benefits by ignoring the "red flags" associated with Defendant Combs and by participating in his sex-trafficking Enterprise.

439.     Upon information and belief, among the concrete steps that Defendants took to aid and participate in the Combs' sex-trafficking Enterprise were legitimizing Defendant Combs' "White Parties" as legitimate, high-profile networking events through intentionally false and misleading stories in its magazine. By cloaking the true nature of the "White Parties," Defendants were able to continue the Enterprise and  receive benefits from its participation in the sex-trafficking Enterprise. Through their general business partnership agreement with Defendant Combs, Defendants adopted, by association ,the intentional acts of their general business partner, Defendant Combs, affirmative conduct causing Defendants to receive those benefits.

440.     Upon information and belief, by taking the concrete steps outlined above (along with the others alleged in this complaint), Defendants knowingly participated in sex-trafficking and furthered the Combs' sex-trafficking Enterprise. The concrete steps above constituted taking part in the sex-trafficking Enterprise and were necessary for its success. The concrete steps above constituted active engagement by Defendants in Combs' sex- trafficking Enterprise.

441.      Upon information and belief, Defendants knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking Enterprise named herein with knowledge, or reckless disregard of the fact, that Defendant Combs

would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff to engage in commercial sex acts.

442.    Upon information and belief, Defendants knew of Defendant Combs deviant and violent behavior, through years of lawsuits, hush money settlements, and negative publicity surrounding Defendant Combs as early as 2021 and most notably by Ms. Cassie Ventura in 2023. Almost all of the suits, since Ms. Ventura's suit, allege Defendant Combs was engaging in sex-trafficking, among other things.

443.    Upon information and belief, Defendants' actions extend well beyond a situation of failing to train themselves and their staff about recognizing the warning signs of sex-trafficking. Defendants did recognize the signs of Combs' sex-trafficking which is why they prominently featured it in Defendants VIBE and PMC's November 2006 magazine publication of VIBE. Upon information and belief, indeed, Defendants' employees, knew about Combs sex-trafficking Enterprise but decided to continue facilitating the Combs' sex-trafficking Enterprise rather than ending its participation in the Enterprise.

444.    Upon information and belief, Defendants VIBE and PMC were also in the business of promoting money for sex as seen in the classified section of Defendants VIBE and PMC's November 2006 magazine.



445. Upon information and belief, due to the facts that came to their attention through complaint filed by Cassie Ventura, and others, accusing Defendant Combs of sex-trafficking, Defendants knew to a certainty that Combs was engaged in sex-trafficking.

446. Upon information and belief, Defendants knew the names of many of Combs' sex-trafficking victims, including Plaintiff.

447. Upon information and belief, Defendants helped to conceal the names of Combs' victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking Enterprise, including failing to get a release of Plaintiff before publishing her picture in Defendants VIBE and PMC's November 2006 magazine. Among the ways in which Defendants helped to conceal the Enterprise's

existence was by failing to properly monitor or audit Defendant Combs to ensure that the resources provided were being used in a legal manner as well as ensuring that the proper accounting and tax reporting was made to the federal government.

448.     Defendants had constructive knowledge of Combs' sex-trafficking Enterprise because of specific acts by Defendant Combs that put it on notice of a particular and ongoing sex-trafficking Enterprise. Among the specific acts were Combs' "White Party" events that representatives of Defendants, specifically Thomas, Jacob, VIBE and PMC, periodically attended; Defendant Combs had narcotics and sex workers present in circumstances that should have prompted Defendants and its employees to raise questions about Combs's sex-trafficking, and/or if he was using the resources provided to him by Defendants to continue such Enterprise.

449.      Upon information and belief, among the financial benefits that the Defendants received for participating in and facilitating Combs' sex-trafficking Enterprise were the affiliation and access to Defendant Combs' popularity and network of celebrities. Defendant Combs was a popular and highly influential figure in the entertainment and music industries to whom everyone wanted to connect. Defendant Combs was known for the "White Parties" turning it to a cultural phenomenon. Affiliation with and/or general business partnerships with Defendant Combs and his "White Parties" garnered legitimacy, immense success, and access to top and emerging artists, celebrities, famous athletes, political figures, musicians, and international dignitaries like former President Donald Trump. Defendants knew first-hand the power, influence, and effect attaching themselves to Defendant Combs would have on their bottom-line as evidenced by their repeated general business partnership with Defendant Combs ranging from 1993 to

recently. Defendants profited from their affiliation with Defendant Combs and their general business partnership may have supported his sex-trafficking Enterprise. Defendant Combs and Combs-controlled entities used the marketing and resources they received from their general business partners to facilitate their sex-trafficking Enterprise. Defendant Combs benefited from his general business partners' apparent willful blindness through their willingness to provide substantial resources in suspicious circumstances including their failure to ensure that their general business partners properly reported to the U.S. Federal Government.

450.     Upon information and belief, among the financial benefits that Defendants received for participating in Combs' sex-trafficking Enterprise was the referral of business opportunities from Defendant Combs and his co-conspirators and access to other celebrities, up-and-coming artists, entertainers, producers, songwriters, and creatives. Defendants profited from these business opportunities. Defendants VIBE and PMC received further financial benefits via an increase in revenue and sales from publications featuring Defendant Combs. Defendant Combs supplies numerous benefits to Defendants in exchange for assisting in his sex-trafficking Enterprise. These referrals and benefits were a quid pro quo for Defendants participation.

451.     Defendants, especially VIBE and PMC, knew, or should have known, that if they stopped assisting, supporting, and facilitating Combs' sex-trafficking Enterprise, they would no longer receive those benefits.

452.     Upon information and belief, Defendants knew and was in reckless disregard of the fact that it was Defendant Combs' pattern and practice to use the channels and instrumentalities of interstate commerce (vehicles, yachts and commercial airplanes) to

entice, recruit, solicit, harbor, provide, obtain, and transport individuals, like the Plaintiff, for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

453.    Upon information and belief, Defendants and their employees had actual knowledge that they were facilitating Defendant Combs' sexual abuse and trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and propel Plaintiff into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion, and a combination of all these means.

454.    Upon information and belief, despite such knowledge, Defendants intentionally facilitated, and participated in Combs' violations of 18 U.S.C. § 1591(a)(1), which Defendants knew, and were in reckless disregard of the fact that Defendant Combs would coerce, defraud, and force Plaintiff to engage in commercial sex acts.

455.    Upon information and belief, Defendants, through its employees and agents, actively participated in the sex trafficking conspiracy and led Plaintiff to engage in sex work under the belief that she would be rewarded if she cooperated and acquiesced to Defendant Combs' coercive demands.

456.    Initially, Plaintiff was rewarded by Defendant Combs' coercive demands as Defendant kept his word and hired Plaintiff's then then-boyfriend, Mr. Gallo, as a model in a nationwide Sean John clothing campaign.

457.    Upon information and belief, Defendants' affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Defendant Combs would use the resources provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Plaintiff. Defendants' conduct was outrageous and intentional.

458.     Upon information and belief, in addition to actual knowledge that they were participating in and facilitating the Combs' sex-trafficking Enterprise, Defendants also should have known that they were participating in and facilitating an Enterprise that had engaged in coercive sex-trafficking, as covered by 18 U.S.C. § 1595(a).

459.     Upon information and belief, in exchange for facilitating and covering up Combs' commercial sex-trafficking, Defendants received international recognition, notoriety, acclaim and praise in their magazines with Defendant Combs, which was a result of securing the partnership with Defendant Combs.

460.     Facilitating and covering up Combs' sexual trafficking and misconduct was a means of obtaining economic success and promotion within the Defendants' hierarchy.

461.     Upon information and belief, Defendants' knowing and intentional conduct has caused Plaintiff serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

462.     Upon information and belief, Defendants' knowing and intentional conduct has caused Plaintiff harm that is sufficiently serious.

463.     This case does not involve mere fraud. Instead, Defendants' criminal conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex-trafficking Enterprise. Defendants' willful blindness to Defendant Combs' criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' criminal conduct was directed specifically at Plaintiff, who was the victim of Defendant Combs' sexual abuse and sex-trafficking Enterprise directed at Plaintiff, largely due to her gender.

464.     Upon information and belief, Defendants' outrageous and intentional conduct, in this case, is part of a pattern and practice of Defendants by undertaking illegal "high-risk, high reward" general business partnerships.

465.     By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Plaintiff for the damages she sustained and reasonable attorneys' fees.

## THIRTIETH CAUSE OF ACTION

### OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)
### (against ALL Defendants)

466.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

467.     Defendants, and its officers and employees, knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

468.     Upon information and belief, Defendants' obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Defendants thereby violated Chapter 77, Title 18. Defendants' obstruction described herein directly, proximately, and foreseeably harmed Plaintiff by directly resulting in her coercively being caused to engage in commercial sex acts and in other ways.

469.     Upon information and belief, Defendant Combs has a well-documented history of criminal investigations. Defendants were on notice of Defendant Combs' proclivity to

criminal activity. They knew or should have known that Defendant Combs sex-trafficking Enterprise would or could result in a criminal investigation by State and Federal prosecutors for violating (among other laws) the TVPA. Defendants should have taken a que from the Federal Prosecutors arrest and prosecution of Jeffrey Epstein on or about July 8, 2019. The U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice victims to travel to be abused by Epstein. Defendant Combs, Jacob, Thomas and Does all engaged in the same activities as Mr. Epstein and Ms. Maxwell. In fact, Defendant Combs, Jacob, Thomas and Does may have done worse.

470.     Upon information and belief, by providing marketing and resources for Defendant Combs' sex trafficking Enterprise, and concealing their actions thereafter, Defendants obstructed, interfered with, and prevented the state and federal government enforcement of the TVPA against Defendant Combs, Jacob, Thomas and Does. Any filing of charges was delayed by Defendants' actions; and because of that delay, Plaintiff, and many others subsequently, thereafter, was coercively caused to engage in commercial sex acts.

471.     One example of how Defendants obstructed, attempted to obstruct, interfered with, and prevented state and federal government's enforcement of the TVPA, Defendants Combs and Thomas paid Plaintiff in cash so that the coercive commercial sex acts would escape the detection of state and federal law enforcement and prosecuting agencies. Defendants provided resources to further Defendant Combs' sex-trafficking Enterprise and with the purpose of helping Defendants evade criminal liability for violating the TVPA.

472. By providing unchecked resources to Defendant Combs, Defendants intended and knew that Defendant Combs' coercive commercial sex acts would escape the detection of law enforcement and prosecuting agencies for some period of time. Defendants provided resources to further the Combs sex-trafficking Enterprise and with the purpose of helping Defendant Combs evade criminal liability for violating the TVPA.

473. Upon information and belief, Defendants' obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, Defendants knew that Defendant Combs was high risk— specifically, high risk to violate the TVPA through continuing criminal sex-trafficking activities. As evidenced by Ms. Ventura's civil complaint, she informed members of Defendant Combs' parent label about the abuses he was visiting upon her.

474. Upon information and belief, Defendants were aware Defendant Combs had a laundry list of criminal charges, and barely escaped serving prison time. Defendants were aware that there were public allegations that Defendant Combs' illegal conduct was facilitated by several named co-conspirators. They were made aware of this through complaints made by Ms. Ventura, and other lawsuits including R&B singers Tremaine Neverson, a/k/a Trey Songz, and Chris Brown. Defendants intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by investigators and prosecuting agencies.

475. Upon information and belief, Defendants' relationship with Defendant Combs by providing his sex-trafficking Enterprise with unchecked resources went far beyond a normal (and lawful) partnership relationship. Defendants knew, and intended, that their relationship with Defendant Combs would go far beyond a normal entertainment industry

relationship. Defendants knew that its decision to go beyond a normal industry relationship with Defendant Combs obstructed the ability of law enforcement and prosecuting agencies to enforce the TVPA.

476. Upon information and belief, Defendants' obstruction of the government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Defendants intentionally and willfully caused Defendant Combs' commission of the forcible commercial sex acts with Plaintiff through its obstruction supporting the concealment of Defendant Combs' sex-trafficking Enterprise. Defendants knew that Defendant Combs and his other co-conspirators would use means of force, threats of force fraud, coercion, and a combination of such means to cause Plaintiff to engage in commercial sex acts.

477. Upon information and belief, Defendants knew, acted in reckless disregard of the fact, and should have known, that their obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Plaintiff with men, like Defendant Jacob.

478. Upon information and belief, Defendants' obstruction has caused Plaintiff serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

479. Defendants' obstruction has caused Plaintiff harm that is sufficiently serious.

480. Upon information and belief, this case does not involve mere fraud. Instead, Defendants' criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex-trafficking organization. Defendants' obstruction also evinced a high degree

of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal

indifference to civil obligations. Defendants' obstruction was directed specifically at

Plaintiff who was the victim of Defendant Combs' sex-trafficking Enterprise.

481.     By virtue of these violations of 18 U.S.C. § 1591(d), Defendants are liable to

Plaintiff for the damages she sustained and reasonable attorneys' fees by operation of 18

U.S.C. § 1595. Defendants perpetrated an obstruction of the TVPA, and therefore

perpetrated a violation of Chapter 77, Title 18.

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against

Defendants, containing the following relief:

- Declaratory judgment that the actions, conduct, and practices of Defendants

  complained of herein violate Federal laws and laws of the States of New York and

  Florida;

- Award Plaintiff damages against Defendants, in an amount to be determined at trial,

  plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic

  damages, including, but not limited to, loss of past and future income, wages,

  compensation, seniority, and other benefits of employment;

-  Award Plaintiff damages against Defendants in an amount to be determined at trial,

  plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or

  compensatory damages, including, but not limited to, compensation for her mental

  anguish, humiliation, embarrassment, stress and anxiety, emotional pain and

  suffering, and emotional distress;

- Award Plaintiff punitive damages, in an amount to be determined at trial;

- Award prejudgment interest on all amounts due;

- Award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

- Any such other and further relief as the Court may deem just and proper.

## THIRTY-FIRST CAUSE OF ACTION

**Violation of New York Civil Rights Law §§ 50 and 51
(against Defendants VIBE and PMC)**

482.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

483.    Upon information and belief, Plaintiff alleges that Defendants VIBE and PMC knowingly used Plaintiff's picture, image, and likeness for the purposes of advertising and marketing their illegal sex-trafficking Enterprise disguised as a lavish and exclusive Summer party and otherwise obtaining commercial gain including, without limitation through the infringing uses, in violation of New York Civil Rights Law §§ 50 and 51, as depicted herein when Defendants VIBE and PMC published Plaintiff's picture, image, and likeness, without permission or consent of Plaintiff, in its November 2006 magazine.

484.    Defendants VIBE and PMC unlawful uses of Plaintiff's picture, image, and likeness resulted in injuries to Plaintiff.

485.    Plaintiff's claim is timely as she discovered Defendants VIBE and PMC infringing use in or about April 2024.

486.    This statute further applies as the violation against Plaintiff occurred within New York State.

487.     There is no room for doubt that the identity of the person pictured in Defendants VIBE and PMC's November 2006 magazine is Plaintiff and Plaintiff is easily identifiable in the picture.

488.     The statute does not require Plaintiff to be a celebrity in order to have a commercially valuable identity.

489.     Plaintiff's picture was used for purposes of false advertisement and trade.

490.     Defendants VIBE and PMC may argue the incidental use exception that Defendant Combs' "White Parties" were a newsworthy matter or a matter of public interest, which would be an incredulous untruth, as Defendant Combs' "White Parties" were a ruse to disguise a corrupt sex-trafficking Enterprise.

491.     Defendants VIBE and PMC attempting to argue the incidental use exception also fails because the use of Plaintiff's likeness is a disguised advertisement to promote Defendants VIBE and PMC co-conspirator, Defendant Combs', "White Parties" and various entertainment businesses.

492.     Defendants VIBE and PMC attempting to argue the incidental use exception would further fail because Defendants VIBE and PMC did not give a factual account of the Plaintiff's presence at the "White Parties." Defendants VIBE and PMC print magazine falsely states Plaintiff was a "guest [striking] a revealing pose" despite Plaintiff not being a guest of the party. Plaintiff was an employee who was required to act revealing, seductive and sexually at the direction of Defendant Combs in an effort to further benefit Defendant Combs' and his co-conspirators sex-trafficking Enterprise.

493.     The above referenced violations of New York Civil Rights Law §§ 50 and 51 and

injuries to Plaintiff subject Defendants VIBE and PMC to statutory damages and

penalties, including punitive damages, in amounts to be determined at trial.

494.     Upon information and belief, Plaintiff alleges that Defendants VIBE and PMC's

conduct as alleged herein was willful, reckless, and/or with knowledge that such uses of

Plaintiff's picture, image, and likeness were forbidden or unlawful. Consequently,

Plaintiff is entitled to exemplary damages.

### THIRTY-SECOND CAUSE OF ACTION

**Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)**
**(against Defendants VIBE and PMC)**

495.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as

if set forth fully herein.

496.     Defendants VIBE and PMC commercially exploited and publicized Plaintiff's

image, likeness, and identity as part of the infringing uses and in doing so created a false

sponsorship and affiliation between Plaintiff and all Defendants. Through the infringing

uses, Defendants VIBE and PMC have falsely implied that Plaintiff endorses Defendants'

goods and services like continuing the farce that Defendant Combs' "White Parties" were

lavish, high-profile networking events and/or Plaintiff was a willing participant in

Defendant Combs' sex-trafficking Enterprise.

497.     The unauthorized use of the Plaintiff's image, likeness and identity in Defendants

VIBE and PMC November 2006 issue, is likely to confuse, deceive, or mislead

consumers into falsely believing that Plaintiff approves, sponsors, or endorses

Defendants' goods or services of the business at issue, like continuing the farce that

110

Defendant Combs' "White Parties" were lavish, high-profile networking events or as a willing participant in Defendant Combs sex-trafficking Enterprise.

498.    Defendants VIBE and PMC's conduct as set forth above is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Plaintiff with all Defendants, and as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by Plaintiff.

499.    Plaintiff's claim is timely as the Lanham Act does not contain a statute of limitations for claims under the Act, nor can the district court borrow from an analogous state statute.[18]

500.    As a result of the above conduct, Plaintiff has incurred special and general damages and seeks the same along with any statutory damages as allowed by law.

501.    As a result of the above conduct, Plaintiff has been irreparably harmed and is entitled to and seeks the remedy of injunctive relief in the form of an order prohibiting Defendants VIBE and PMC from exploiting her identity, image, or likeness without her prior express written consent.

502.    Defendants VIBE and PMC's conduct as alleged herein was willful, wanton, and malicious, and exposes them to additional and elevated damages in an amount to be proven at trial.

## THIRTY-THIRD CAUSE OF ACTION

### Violation of Common Law Unfair Competition
### (against Defendants VIBE and PMC)

---

[18] *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284 (2021)

503.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

504.     Defendants VIBE and PMC commercially exploited and publicized Plaintiff's image, likeness, and identity as part of the infringing uses and in doing so created a false sponsorship and affiliation between Plaintiff and Defendants. Through the infringing uses, Defendant has falsely implied that Plaintiff endorses Defendants' goods and services, like continuing the farce that Defendant Combs' "White Parties" were lavish, high-profile networking events and/ or as a willing participant in Defendant Combs' sex-trafficking Enterprise.

505.     The unauthorized use of the Plaintiff's image, likeness, and identity in Defendants VIBE and PMC November 2006 issue, is likely to confuse, deceive, or mislead consumers into falsely believing that Plaintiff approves, sponsors, or endorses Defendants' goods or services of the business at issue, like continuing the farce that Defendant Combs' "White Parties" were lavish, high-profile networking events or as a willing participant in Defendant Combs' sex-trafficking Enterprise.

506.     Defendants VIBE and PMC's conduct as set forth above is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Plaintiff with Defendants, and as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by Plaintiff.

507.     As a result of the above conduct, Plaintiff has incurred special and general damages and seeks the same along with any statutory damages as allowed by law.

508.     As a result of the above conduct, Plaintiff has been irreparably harmed and is entitled to and seeks the remedy of injunctive relief in the form of an order prohibiting

Defendants VIBE and PMC from exploiting her identity, image, or likeness without her prior express written consent.

509.     Defendants VIBE and PMC acted in bad faith when they misappropriated and exploited Plaintiff's identity, image, or likeness to promote, market, and advertise Defendant Combs' businesses, (BBE, SJC, CGE) and corrupt sex-trafficking Enterprises via the "White Parties" and is likely to cause confusion or deceive purchasers as to the intent of Defendant Combs' and goods and services provided by his conglomerate of businesses.

510.     Defendants VIBE and PMC acted in bad faith because they were co-conspirators with Defendant Combs in an organized corrupt sex-trafficking Enterprise.

511.      Defendants VIBE and PMC's conduct as alleged herein exposes them to additional and elevated damages in an amount to be proven at trial.

**WHEREFORE,** Plaintiff prays for judgment as follows:

- Compel Defendants VIBE and PMC, as well as their employees, agents, or anyone acting in concert with them, be enjoined from displaying, publishing, reproducing, or otherwise exploiting any materials using Plaintiff's picture, image, or likeness or that otherwise violates Plaintiff's rights to privacy;

- Compel Defendants VIBE and PMC, and their respective employees and agents, be enjoined from using or displaying Plaintiff's picture, image, or likeness in any manner;

- Award all profits of Defendants VIBE and PMC sales of the November 2006 issue of VIBE magazine, plus all losses of Plaintiff, plus punitive damages if found applicable, and all costs and attorneys' fees, the exact sums to be proven at trial, per N.Y. Civ. Rights Law § 50 and/or 51 and/or the Lanham Act;

- Award Plaintiff exemplary damages under N.Y. Civ. Rights Law § 50 and/or 51 and/or the Lanham Act;

- Award Plaintiff her costs and fees;

- Award Plaintiff pre-judgment interest as allowed by law; and

- Award Plaintiff further legal and equitable relief as deemed proper.

## FINAL PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for all of the relief enumerated and sought within this complaint.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein, so triable, pursuant to Fed. R. Civ. P. 38 and the 7th Amendment to the United States Constitution.

Respectfully Submitted,

Dated: July 3, 2024

By:/s/ Ariel E. Mitchell-Kidd, Esq.
Ariel E. Mitchell-Kidd, Esq.
**The Law Office of Ariel E. Mitchell, P.A.**
500 NW 2nd Ave. #12864
Miami, FL 33103
305-903-5835
ariel@arielesq.com
*Attorney for Plaintiff*
(pro hac vice motion pending)

By:/s/ Steven A. Metcalf, II, Esq.
Steven A. Metcalf, II, Esq.
**METCALF & METCALF**
99 Park Ave., Suite 110
New York, NY 10004
646-253-0514
*Attorney for Plaintiff*
(Co-counsel/local counsel)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------X

JANE DOE,                                             :
                                                      :        Civil Case No. 1:23-cv-10628-JGLC
                           Plaintiff,                 :
                                                      :        __AMENDED COMPLAINT__
              v.                                      :
                                                      :        __JURY TRIAL DEMAND__
SEAN COMBS, HARVE PIERRE; THE THIRD                   :
ASSAILANT; DADDY'S HOUSE RECORDINGS,                  :
INC. and BAD BOY ENTERTAINMENT                        :
HOLDINGS, INC.,                                       :
                                                      :
                           Defendants.                :
----------------------------------------------------------X

---

> ## TRIGGER WARNING:
> ## THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A
> ## SEXUAL NATURE, INCLUDING SEXUAL ASSAULT

---

Plaintiff Jane Doe ("Ms. Doe") hereby alleges as follows:

### PRELIMINARY STATEMENT

1.      On November 16, 2023, Casandra Ventura a/k/a "Cassie" filed a 35-page lawsuit
in which she exposed Sean Combs for subjecting her to nearly a decade of physical, sexual and
emotional abuse punctuated by rape, sex trafficking and being forced to engage in drug fueled
nonconsensual sexual encounters with other men.

2.      Ordinarily, when a lawsuit such as Ms. Ventura's is filed that involves events that
took place long ago, witnesses are few and far between and evidence hard to muster.  Not so for
the claims brought against Mr. Combs.  Within minutes of the filing, salient facts of Ms.
Ventura's claims were confirmed by various witnesses, including a rival musician whose car Mr.
Combs blew up as well as various individuals who observed Mr. Combs beat Ms. Ventura.

1

3.       Only a few days later, two other lawsuits were filed against Mr. Combs.  In one, plaintiff Joi Dickerson-Neal alleged that Mr. Combs drugged and sexually assaulted her when she was a college student.  The other lawsuit accused Ms. Combs and singer Aaron Hall of forcing the plaintiff and another unidentified woman into nonconsensual sex.

4.       At the same time, a fourth lawsuit was filed; this one against Mr. Combs' companies and Defendant Harve Pierre, the longtime President of Bad Boy Entertainment Holdings, Inc. ("Bad Boy").  The suit alleged that Mr. Pierre used his position of power at Bad Boy to groom and sexually assault his former assistant, and that Bad Boy looked the other way at the time.

5.       This lawsuit was the fifth suit filed against Mr. Combs over a three-week period in winter 2023.  Incredibly, the allegations brought by Ms. Doe are in many ways even more egregious than those brought by his prior victims.

6.        Specifically, in 2003, when she was only 17 years old and in the 11th grade, Ms. Doe was sex trafficked and gang raped by Mr. Combs, Mr. Pierre and the Third Assailant.[1]  In short:

- When she was just a teenager, Ms. Doe met Mr. Pierre and the Third Assailant in a lounge in the Detroit, Michigan area.  While at the lounge, Mr. Pierre insisted that he was "best friends" with Mr. Combs, and even called Mr. Combs with Ms. Doe.

- Mr. Combs convinced Ms. Doe, who was half his age at the time, to accompany Mr. Pierre and the Third Assailant on a private jet to come to his studio in New York City.

- Before they left for the private jet, Mr. Pierre smoked crack cocaine in a bathroom at the lounge, in which he also sexually assaulted Ms. Doe by forcing her to give him oral sex.

---

[1]       The "Third Assailant" is a pseudonym.  When the name of the Third Assailant is revealed during discovery, Plaintiff will seek to amend the Complaint to replace the pseudonym.

- Mr. Pierre, Third Assailant and another gentleman then escorted the highschooler to a private jet, which flew them to Teterboro, New Jersey. There were SUVs awaiting the group at Teterboro, and the four of them were driven to Daddy's House Recording Studio, a studio famously owned and operated by Mr. Combs and Bad Boy.

- While at the studio, Mr. Combs and his associates, including Mr. Pierre, plied Ms. Doe with drugs and alcohol. As the night wore on, the 17-year-old Ms. Doe became more and more inebriated, eventually to the point that she could not possibly have consented to having sex with anyone, much less someone twice her age.

- While at the studio, Ms. Doe was gang raped by Mr. Combs, the Third Assailant and Mr. Pierre, in that order.

- While Mr. Combs was raping Ms. Doe, he complained that he could not "get off" unless she pinched his nipples as hard as she could.

- Mr. Combs then watched on as Third Assailant, who Ms. Doe had not even realized had begun to have sex with her, raped Ms. Doe as she told him to stop.

- After Third Assailant was finished, Mr. Pierre took his turn at raping Ms. Doe and then violently forced her to give him oral sex, during which Ms. Doe was choking and struggling to breathe.

- When Mr. Pierre finished, he left Ms. Doe in the bathroom alone. Ms. Doe fell into the fetal position and lay on the floor. Her vagina was in pain.

- Finally, after a period of time, Ms. Doe regained her bearings. However, she could barely stand up following the gang rape, and had to be helped to walk out of the building and back into a car. She was taken back to an airport and flown back to Michigan. However, she has very limited recollection of her transport home, and only remembers being in her car sometime early in the morning.

7.     Unlike many victims who have come forward after decades, Ms. Doe can prove that she not only met Mr. Combs on the night in question, but was in his studio, in New York City, with him on that night.  Remember when viewing these, Ms. Doe was 17 years old.[2]



  

8.     Ms. Doe has lived with her memories of this fateful night for 20 years, during which time she has suffered extreme emotional distress that has impacted nearly every aspect of

---

[2]     Ms. Doe's face has been blurred in the following pictures for the purpose of anonymity.

her life and personal relationships.  Given the brave women who have come forward against Ms. Combs and Mr. Pierre in recent weeks, Ms. Doe is doing the same.

9.      To that end, Ms. Doe brings this action seeking injunctive, declaratory and monetary relief against Defendants in violation of the Victims of Gender-Motivated Violence Protection Law, Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq*. ("VGMVPL").

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and city law pursuant to 28 U.S.C. § 1367(a).

11.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and intentional and negligent tortious conduct alleged herein, occurred in this district.

## PARTIES

12.      Plaintiff Jane Doe is a citizen of State of Michigan and Canada.

13.      Defendant Sean Combs is a citizen of the State of California.  At all relevant times Mr. Combs was the owner of Defendants Bad Boy Entertainment Holdings and Daddy's House Recordings, Inc.

14.      Defendant Harve Pierre is, upon information and belief, a citizen of the State of New Jersey.  At all relevant times Mr. Pierre was a high-ranking executive (Senior Vice

President) of Defendant Bad Boy Entertainment Holdings, Inc., and was promoted to Executive

VP and General Manager of Bad Boy in 2003, the year the events described herein took place.

15. Defendant the Third Assailant is, upon information and belief, a citizen of the

State of New York. Upon information and belief, at all relevant times, the Third Assailant was

an employee and/or agent of Defendant Bad Boy Entertainment Holdings, Inc.

16. Defendant Daddy's House Recordings, Inc. ("Daddy's House") is a music, media,

and entertainment company founded and owned by Defendant Sean Combs and Bad Boy.

Daddy's House is incorporated and headquartered in New York, New York. During the relevant

time period, Daddy's House and/or Sean Combs owned and operated the Daddy's House

Recording Studio wherein Ms. Doe was raped by Mr. Combs, Mr. Pierre and Third Assailant. As

described herein, Mr. Combs used the facts of his ownership of and title at Daddy's House in

order to facilitate the unlawful conduct described herein. In addition, he, as the owner of

Daddy's House, watched Ms. Doe being raped by two of his employees, on the premises of

Daddy's House, and did nothing to stop them (in fact, he encouraged it).

17. Defendant Bad Boy Entertainment Holdings, Inc. ("Bad Boy") is a music, media,

and entertainment company founded and owned by Defendant Sean Combs. Bad Boy is

incorporated and headquartered in New York, New York. During the relevant time period, Bad

Boy and/or Sean Combs owned and operated the Daddy's House Recording Studio wherein Ms.

Doe was raped by Mr. Combs, Mr. Pierre and Third Assailant. As described herein, Mr. Combs

used the facts of his ownership of and title at Bad Boy in order to facilitate the unlawful conduct

described herein. In addition, he, as the owner of Bad Boy, watched Ms. Doe being raped by two

of his employees, on the premises of Daddy's House, and did nothing to stop them (in fact, he

encouraged it). Moreover, Mr. Pierre used his title and that of Mr. Combs in order to facilitate

6

the unlawful conduct described herein.  Further, he, the Senior Vice President of Bad Boy, watched Ms. Doe being raped by its owner and one of its employees, on the premises of Daddy's House, and did nothing to stop them (in fact, he encouraged it).

## FACTUAL ALLEGATIONS

18.     In 2003, Ms. Doe was a 17-year-old 11th grader residing in a suburb of Detroit Michigan.

19.     At the time, Mr. Combs was 34 years old – twice the age of Ms. Doe – and one of the most well-known and influential music artists of all time.

20.     A decade earlier, Mr. Combs founded Bad Boy and installed his longtime friend, Mr. Pierre, into the role of Senior Vice President, then the role of Executive Vice President, and eventually, promoted him to President of the Company.

21.     At the time, Mr. Combs had many connections to Michigan, including, among others, to the Black Mafia Family ("BMF"), a drug trafficking and money laundering organization that is rumored to have seeded Bad Boy.  Accordingly, upon information and belief, Mr. Combs' associates, including Mr. Pierre and the Third Assailant, spent significant time in and around Detroit, Michigan.

22.     On one evening between the spring and fall of 2003, Ms. Doe was out with friends.  It was not uncommon for her and her friends to frequent bars and lounges in the Detroit area.  Certain of Ms. Doe's friends were well connected with people in the music industry.

23.     On the evening in question, Ms. Doe was with friends in a lounge when she was approached by who she later learned was Mr. Pierre.  Mr. Pierre was with his own friends and/or business associates, including the Third Assailant.  Mr. Pierre, the Third Assailant and their friends were dressed in suits.

7

24.     Mr. Pierre complimented Ms. Doe's appearance, saying that she was hot, among other things.  He then began talking about his self-described "best friend" and "brother," Mr. Combs.

25.     He told Ms. Doe that he and his friends, including the Third Assailant, were executives at Bad Boy, Mr. Combs' well-known recording label.  He referenced his affiliation with Bad Boy and Mr. Combs as a means of keeping Ms. Doe interested in the conversation.

26.     Specifically, Mr. Pierre continually stated that Mr. Combs would love to meet Ms. Doe.

27.     Mr. Pierre even called Mr. Combs and put Ms. Doe on the line.  Mr. Combs told Ms. Doe that he would love to meet her, and that she should accompany Mr. Pierre to New York City in a private jet.

28.     The individual defendants used not only their affiliations with Bad Boy as a means to facilitate the unlawful conduct to follow, but also their affiliations with Daddy's House, where Ms. Doe was enticed to meet Mr. Combs.

29.     Shortly thereafter, Mr. Pierre directed Ms. Doe to go with him into the bathroom at the lounge.  Once inside the bathroom, Mr. Pierre began to smoke crack cocaine from what appeared to be an aluminum can.

30.     After he finished smoking crack, Mr. Pierre suddenly took out his penis, demanded that Ms. Doe "suck [his] dick" and forced Ms. Doe's head down to perform oral sex on him.

31.     After sexually assaulting Ms. Doe, Mr. Pierre directed her to accompany him, the Third Assailant and a third member of their group to an airport in Pontiac, Michigan, where

8

Signature, a Fixed Base Operator, had prepared a private jet to take the four of them to New York City.

32.     Upon information and belief, the private jet landed at Teterboro Airport. Upon departing the jet, two black SUVs were awaiting the group.

33.     Ms. Doe got into an SUV with Mr. Pierre, and the Third Assailant and the other member of the group went in the second SUV.

34.     The SUVs brought the group to Daddy's House Recording Studio, a recording studio and hangout owned and operated by Mr. Combs and Bad Boy.

35.     When Ms. Doe arrived, she was escorted into the building, where she distinctly remembers seeing a sign for the company, Technicolor.

36.     Upon entering the studio, Ms. Doe first encountered Mr. Combs. At the time she arrived, a female recording artist was using the studio as Mr. Combs and her parents watched on. She finished up shortly after Ms. Doe arrived and left. In other words, Mr. Combs had Ms. Doe trafficked to New York to observe him working prior to committing unlawful acts against her at his place of employment.

37.     While still in the studio section of Daddy's House, Mr. Combs asked Ms. Doe to sit on his lap to take a picture. A copy of the photograph is below.



38.     Mr. Combs, Mr. Pierre and the Third Assailant began to ply Ms. Doe – a 17-year-old child at the time – with copious amounts of drugs and alcohol.

39.     While the evening became a blur, Ms. Doe does recall Mr. Combs, Mr. Pierre and the Third Assailant hitting on her incessantly, stroking her body, asking to see her "ass" and telling her how "hot" and "sexy" she was.

40.     Various other pictures were taken in the studio that night, leaving no doubt that Ms. Doe was in Mr. Combs' New York City studio, with Mr. Combs, on the night she was raped.



41.     And, not only was Ms. Doe at the studio, but the individual defendants used the accoutrements of the studio (as depicted above) to entice Ms. Doe to stay and drink alcohol and do drugs.

42.     As the night wore on, the 17-year-old Ms. Doe became more and more inebriated, eventually to the point that she could not possibly have consented to having sex with anyone, much less someone twice her age.

43. Nevertheless, that evening Mr. Combs directed Ms. Doe to accompany him to the bathroom at the studio. Once there, Mr. Combs removed Ms. Doe's skirt and underwear and penetrated her from behind with his penis while she hung over the sink.

44. Ms. Doe did not consent to having sex with Mr. Combs, but he continued thrusting. At some point, Mr. Combs turned Ms. Doe around to face him. He told her that he could not orgasm and asked her to squeeze his nipples as hard as she could to help him "get off." He then turned her back around and continued to rape her.

45. Mr. Pierre, then SVP of Bad Boy, and the Third Assailant, who upon information and belief was also an executive of Bad Boy, watched Mr. Combs rape Ms. Doe, on the premises of Daddy's House, and did nothing to stop him. In fact, he encouraged it.

46. By this point, Ms. Doe was coming in and out of consciousness because of the drugs and alcohol she had been given by Defendants. Her next memory was looking up into the mirror above the sink to find that the Third Assailant had replaced Mr. Combs and was raping her from behind. Mr. Combs was watching the Third Assailant sexually assault Ms. Doe from a chair outside of the bathroom.

47. At this point, Ms. Doe mustered the energy to tell the Third Assailant to stop, and that she did not want to be having sex with him. The Third Assailant did not stop, and continued to rape Ms. Doe, who did not have the strength to force him off of her.

48. Mr. Combs used the facts of his ownership of and title at Daddy's House in order to facilitate the unlawful conduct described herein. In addition, he, as the owner of Daddy's House, watched Ms. Doe being raped by one of his employees, on the premises of Daddy's House, and did nothing to stop him. In fact, he encouraged it.

11

49.    And Mr. Pierre, then SVP of Bad Boy, watched one of his employees rape Ms. Doe, on the premises of Daddy's House, and did nothing to stop him.  In fact, he encouraged it.

50.    After the Third Assailant was finished, he was replaced by Mr. Pierre, who began by having nonconsensual vaginal sex with Ms. Doe before violently forcing her to give him oral sex.  During the latter part of the sexual assault, Mr. Pierre forced his penis into Ms. Doe's mouth without her consent.  Ms. Doe remembers that Mr. Pierre was sweaty and that she had difficulty breathing.

51.    Mr. Combs used the facts of his ownership of and title at Daddy's House in order to facilitate the unlawful conduct described herein.  In addition, he, as the owner of Daddy's House, watched Ms. Doe being raped by the Senior Vice President of his Company, on the premises of Daddy's House, and did nothing to stop him.  In fact, he encouraged it.

52.    When Mr. Pierre finished, he left Ms. Doe in the bathroom alone.  Ms. Doe fell into the fetal position and lay on the floor.  Her vagina was in pain.

53.    Finally, after a period of time, Ms. Doe regained her bearings.  However, she could barely stand up following the gang rape, and had to be helped to walk out of the building and back into a car.  She was taken back to an airport and flown back to Michigan.  However, she has very limited recollection of her transport home, and only remembers being in her car sometime early in the morning.  Her underwear was missing.

54.    As a result of being raped by Mr. Combs, Mr. Pierre and the Third Assailant, Ms. Doe suffered significant emotional distress and feels of shame that have plagued her life and personal relationships for 20 years.

55.    Ms. Doe knew that speaking out against Defendants would be extremely difficult and that she would likely be subjected to retaliation and defamatory slurs and attacks.

56.     However, in November 2023, Ms. Doe read about a lawsuit filed against Mr.

Combs by Casandra Ventura a/k/a "Cassie."  Ms. Ventura's suit described a decade of physical,

sexual and mental abuse.  Most triggering for Ms. Doe was reading about Ms. Ventura's

allegations of sex trafficking and being forced to have sex with other men against her will.  Ms.

Doe obviously understands that she too had been sex trafficked, and that Mr. Combs' behavior in

forcing women into nonconsensual sex was not an isolated incident or unique only to Ms.

Ventura.

57.     Then, just days later, Ms. Doe read about a case filed against Mr. Pierre.  The suit

alleged that Mr. Pierre used his position of power at Bad Boy to groom and sexually assault his

former assistant.

58.     Seeing two other women bravely speak out against Mr. Combs and Mr. Pierre,

respectively, gave Ms. Doe the confidence to tell her story as well.  As such, she filed this suit.

## FIRST CAUSE OF ACTION
**Violation of the Victims of Gender-Motivated Violence Protection Law,
N.Y.C. Admin. Code §§ 10-1101, *et seq.* ("VGMVPL")
*Against All Defendants***

59.     Plaintiff repeats and realleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

60.     New York City's Victims of Gender-Motivated Violence Protection Law was first

passed in 2000 as a remedial statute intended to correct "the void left by the Supreme Court"

when it struck down the federal Violence Against Women Act, VAWA, and "to resolve the

difficulty that victims face in seeking court remedies by providing an officially sanctioned and

legitimate cause of action for seeking redress for injuries resulting from gender-motivated

violence."  New York City, Local Law No. 73 Int. 752-A (2000), Sec.1.

13

61.     In June 2022, the City Legislature amended the VGMVPL to include a two year

"lookback" period, finding that "any civil claim or cause of action brought under this chapter that

is barred because the applicable period of limitation has expired is hereby revived and may be

commenced not earlier than six months after, and not later than two years and six months after,

September 1, 2022."

62.     The above-described conduct of Defendant Mr. Combs, including, but not limited

to, Mr. Combs's sexual assault of Plaintiff in New York City, constitutes a "crime of violence"

against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 ("The

term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or

felony against the person as defined in state or federal law or that would constitute a

misdemeanor or felony against property as defined in state or federal law if the conduct presents

a serious risk of physical injury to another, whether or not those acts have actually resulted in

criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by

gender' means a crime of violence committed because of gender or on the basis of gender, and

due, at least in part, to an animus based on the victim's gender.").

63.     The above-described conduct of Defendant Mr. Pierre, including, but not limited

to, Mr. Pierre's sexual assault of Plaintiff in New York City, constitutes a "crime of violence"

against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 ("The

term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or

felony against the person as defined in state or federal law or that would constitute a

misdemeanor or felony against property as defined in state or federal law if the conduct presents

a serious risk of physical injury to another, whether or not those acts have actually resulted in

criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by

14

gender' means a crime of violence committed because of gender or on the basis of gender, and
due, at least in part, to an animus based on the victim's gender.").

64.     The above-described conduct of Defendant the Third Assailant, including, but not
limited to, the Third Assailant's sexual assault of Plaintiff in New York City, constitutes a "crime
of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in
§ 10-1103 ("The term 'crime of violence' means an act or series of acts that would constitute a
misdemeanor or felony against the person as defined in state or federal law or that would
constitute a misdemeanor or felony against property as defined in state or federal law if the
conduct presents a serious risk of physical injury to another, whether or not those acts have
actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of
violence motivated by gender' means a crime of violence committed because of gender or on the
basis of gender, and due, at least in part, to an animus based on the victim's gender.").

65.     Defendant Bad Boy Entertainment Holdings, Inc. and Daddy's House Recordings,
Inc. enabled the commission of the crime of violence motivated by gender, and is therefore also
liable under the VGMVPL § 10-1104.

66.     As a direct and proximate result of the aforementioned crime of violence and
gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary
damages, physical injury, pain and suffering, and serious psychological and emotional distress,
entitling her to an award of compensatory and punitive damages, injunctive and declaratory
relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages,
as set forth in § 10-1104.

67.     The above-described conduct of Defendants constitutes a sexual offense as
defined in Article 130 of the New York Penal Law.

68.     Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays judgment be entered in her favor against Defendants, and each of them, as follows:

A.     For a money judgment representing compensatory damages including consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts, according to proof;

B.     For a money judgment for mental pain and anguish and severe emotional distress, according to proof;

C.     For punitive and exemplary damages according to proof;

D.     For attorneys' fees and costs;

E.     For prejudgment and post-judgment interest; and

F.     For such other and further relief as the Court may deem just and proper.

Dated: March 29, 2024
      New York, New York                     Respectfully submitted,

                                          **WIGDOR LLP**

                                          By: _____
                                            Douglas H. Wigdor
                                            Michael J. Willemin
                                            Meredith A. Firetog

                                          85 Fifth Avenue
                                          New York, New York 10003
                                          Telephone: (212) 257-6800
                                          Facsimile: (212) 257-6845

                                          dwigdor@wigdorlaw.com
                                          mwillemin@wigdorlaw.com
                                          mfiretog@wigdorlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X  **Index No: 24-3931**

CRYSTAL MCKINNEY,

                Plaintiff,                      **AMENDED COMPLAINT**

        - against -

                                        **PLAINTIFF DEMANDS**
SEAN COMBS a/k/a "P. DIDDY," BAD BOY     **A TRIAL BY JURY**
ENTERTAINMENT LLC d/b/a BAD BOY
RECORDS, BAD BOY ENTERTAINMENT
HOLDINGS, INC., SEAN JOHN CLOTHING LLC,
and DADDY'S HOUSE RECORDINGS, INC.,

                Defendants.
------------------------------------------------------------------------X

       Plaintiff CRYSTAL MCKINNEY ("Plaintiff"), by and through her attorneys, PHILLIPS

& ASSOCIATES, PLLC, hereby alleges and avers of the Defendants SEAN COMBS a/k/a "P.

DIDDY," BAD BOY ENTERTAINMENT LLC d/b/a BAD BOY RECORDS, BAD BOY

ENTERTAINMENT HOLDINGS, INC, (collectively Bad Boy Entertainment LLC and Bad Boy

Entertainment Holdings, Inc. are referred to as "Defendants Bad Boy Records"), SEAN JOHN

CLOTHING LLC ("Sean John"), and DADDY'S HOUSE RECORDINGS INC ("Daddy's

House") (Bad Boy Records, Sean John, and Daddy's House, are collectively referred to as

"Corporate Defendants") alleges upon information and belief as to all other matters as follows.

## NATURE OF THE ACTION

1.     Plaintiff brings suit against Defendants pursuant to the NYC Gender Motivated Violence

      Act, N.Y.C. Admin. Code §§ 8-901 *et. seq*, to redress the substantial and lifetime injuries

      she has suffered as a result of being drugged and sexually assaulted by Sean Combs or "P.

      Diddy."

## JURISDICTION

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 insofar as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

3.  Plaintiff is a citizen of the State of Georgia.

4.  Defendant Combs is a citizen of the State of California.

5.  Bad Boy Entertainment Holdings, Inc. is a domestic business corporation licensed to do business in New York and is headquartered at 1440 Broadway, 3rd Floor, New York, New York 10018.

6.  Bad Boy Entertainment LLC is a domestic limited liability company licensed to do business in New York and is headquartered at 1440 Broadway, 3rd Floor, New York, New York 10018.

7.  Sean John is a domestic liability company licensed to business in New York and is headquartered at 1440 Broadway, New York, NY 10018.

8.  Daddy's House is a domestic business corporation licensed to business in New York and its primary place of business is located at 321 W 44th St # 201, New York, NY 10036.

9.  Venue is proper in the Southern District of New York because a substantial part of the events giving rise to the claim, including but not limited to, Defendant Combs' assault of Plaintiff, occurred in this District.

## PROCEDURAL REQUIREMENTS

## THE N.Y.C. VICTIMS OF GENDER MOTIVATED VIOLENCE PROTECTION ACT

10. The N.Y.C. Victims of Gender Motivated Violence Protection Act ("NYC Gender Motivated Violence Act") created a lookback window on March 01, 2023, which runs for two years, for survivors of gender motivated violence, allowing them to sue their abusers

2

regardless of when the abuse occurred. N.Y.C. Admin. Code § 10-1105(a).

11. The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

12. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

13. The above-described conduct of Defendant Combs, including, but not limited to, Defendant Combs' sexual assault of Plaintiff in New York City, constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by the NYC Gender Motivated Violence Act.

## PARTIES

### DEFENDANT COMBS

14. P. Diddy a.k.a. Puff Daddy or Diddy is a Grammy-awarded musician, rapper and producer.

15. In 1992, P. Diddy founded Defendants Bad Boy Records.

16. In 2008, P. Diddy was the first male rapper to get a star on the Hollywood Walk of Fame.

17. In 2022, Forbes estimated that P. Diddy is one of the wealthiest hip-hop artists in America and that his net worth is over $1 billion.

18. Upon information and belief, P. Diddy has a long history of committing physical and sexual violence against women and men as documented in publicly available lawsuits and extensive media coverage.

3

19.     On November 16, 2023, Cassie Venture, an artist signed onto Bad Boy Records, filed a suit in the United States District Court of the Southern District of New York alleging that Combs provided her with copious amounts of drugs, before sexually assaulting her.

20.     On November 23, 2023, Joi Dickerson-Neal, filed suit in the Supreme Court of New York, New York County, alleging that Combs drugged her, sexually assaulted her, and filmed a "revenge porn" tape of his assault.

21.     On November 23, 2023, Liza Gardener, filed suit in the Supreme Court of New York, New York County, alleging that Combs and Aaron Hall sexually assaulted her when she was a minor.

22.     On December 06, 2023, a Jane Doe, filed suit in the United States District Court of the Southern District of New York alleging that when she was a minor, she was gang raped by Combs, Harve Pierre, and a third unnamed assailant at Daddy's House Recording Studios.

23.     On February 26, 2024, Rodney Jones, filed suit in the United States District Court of the Southern District of New York alleging that Combs sexually assaulted him and provided laced alcoholic beverages to minors.

24.     On May 23, 2024, April Lampros, filed suit in the Supreme Court of the State of New York, County of New York, alleging that Combs sexually assaulted her on multiple occasions.

25.     On July 03, 2024, Adria English, filed suit in the United States District Court of the Southern District of New York, alleging that Defendant Combs forced her to take narcotics and engage in sexual intercourse with guests at Combs' White Parties.

**DEFENDANTS BAD BOY RECORDS**

26.     In 1992, Combs founded Bad Boy Records, a record label which has sold over 500 million
        records, and where he produced records by Mary Blige, The Notorious B.I.G., and Usher.

27.     On February 08, 2003, Combs and other Bad Boy Entertainment employees were working
        on *One Love*, an album by New Edition, at Daddy's House Recording Studio, located at
        321 W 44th St # 201, New York, NY 10036.

## DADDY'S HOUSE

28.     Daddy's House is a recording studio located at 321 West 44th Street, New York, NY,
        10036.

29.     At all relevant times, Daddy's House was owned by Sean Combs and/or Bad Boy Records.

30.     At Daddy's House, albums and singles for Bad Boy Records artists were mixed, recorded,
        and engineered.

## SEAN JOHN

31.     In 1998, Combs founded Sean John, which has retail sales of over $450 million.

32.     As CEO and president of the company, Defendant Combs was representing Sean John
        when he attended the Men's Fashion Week dinner where he met Plaintiff.

33.     As CEO of Sean John, and a prominent figure in the world of fashion, Combs promised
        Plaintiff to help Plaintiff advance her modeling career.

## FACTUAL ALLEGATIONS

### Plaintiff Begins Her Modeling Career

34.     At the age of seventeen, Plaintiff won MTV's inaugural Model Mission on December 05,
        1998, a televised modeling competition akin to Miss America, and was awarded a modeling
        contract with IMG.

35.     Shortly thereafter, Plaintiff's career took off.

36.     Plaintiff modeled for a Tommy Hilfinger jeans campaign.

37.     Plaintiff was also featured in Macy's catalogs, Elle, Cosmopolitan and Mademoiselle magazines.

38.     Plaintiff also made appearances in television and film program such as MTV's Total Request Live ("TRL"), Fashionably Loud, True Life, and a movie with Joan Rivers.

39.     Furthermore, Plaintiff had international modeling gigs in Germany and Australia.

**A Fashion Designer Invites Plaintiff To Men's Fashion Week to Meet Combs**

40.     On or about February 2003, when Plaintiff was twenty-two years old, a fashion designer ("the Designer") invited Plaintiff to attend a Sean John Fall 2003 Fashion Show event held at Cipriani Downtown, located at 376 W. Broadway, New York, NY 10012.

41.     At the time, Plaintiff was engaged in modeling gigs in Miami, Florida and flew to New York for the event that would take place on February 08, 2003.

42.     The Designer told Plaintiff that he would be introducing her to Combs which could advance her modeling career.

43.     The Designer began to direct Plaintiff's appearance, as he sought to ensure Combs found her attractive.

44.     For instance, the Designer instructed Plaintiff to go to Elizabeth Arden to get a root touch up to ensure it was platinum blonde.

45.     The Designer also scheduled a stylist to put in hair extensions for Plaintiff.

46.     The Designer then handpicked a black leather coat with a fur hood, a translucent chiffon beige v-cut shirt, fur-lined handbag, and jewel encrusted jeans for Plaintiff to wear to the event.

47.     Due to the traumatic events to occur later, Plaintiff saved the unwashed clothing from that

night in her closet where they remain in a plastic wrap.

## Combs Makes Promises of Career Advancement

48.    Soon thereafter, Plaintiff took a car to Cipriani Downtown, where the Designer was dining with Combs and other guests.

49.    Plaintiff felt little control over the events as she was directed what to do and put on display, for the others in attendance.

50.     For instance, Plaintiff sat down at an empty seat next to the Designer, but he insisted that she sit down directly across from Combs instead.

51.    Once seated, Combs made a very public display of coming on to Plaintiff in a sexually suggestive manner, which continued throughout the dinner.

52.    For others to hear, Combs bestowed compliments on Plaintiff by stating for example that she was beautiful and that her eyes were gorgeous.

53.    Later, and at a more intimate volume, Combs told Plaintiff that she "was going to make it big one day" as a model.

54.    Combs went on to tell Plaintiff that he had power in the industry and was going to help her advance her career.

55.    Combs provided Plaintiff with his phone number as a gesture of good faith in his promises to help her.

56.    Throughout their interactions, Combs was flirtatious, bordering on leering, as he leaned across the table towards her.

57.    Combs also plied Plaintiff with alcohol throughout the dinner as he repeatedly refilled her glass with wine.

58.    After the meal ended, Combs told Plaintiff that he wanted to get to know her better.

7

59. Combs asked Plaintiff to call him a bit later.

60. Plaintiff felt confused but hopeful that Combs would fulfill his promises to help her career.

**Plaintiff Meets Combs At His Studio Where He Drugs and Sexually Assaults Her**

61. Later that night, Combs requested Plaintiff come see his studio Daddy's House located at 321 W. 44th Street, New York, NY 10036.

62. Upon information and belief, Combs regularly recorded albums at Daddy's House that were produced and released by Bad Boy Records. Upon information and belief, Combs invited other women to Daddy's House to drug and/or sexually assault them.

63. Plaintiff felt reassured that she would be with others at the studio rather alone in a personal residence.

64. When Plaintiff arrived in the Demo Room, she found that Combs and several other men seated together.

65. The men were Bad Boy Records employees and/or other industry professionals who were working on *One Love,* a New Edition album.

66. She found that the men were passing around a bottle of Hennesy and joints.

67. After Plaintiff sat down, one of Combs' associates asked her: "Do you smoke weed?", to which she responded affirmatively.

68. Combs' associate replied: "You've never had weed like this before."

69. Plaintiff later came to understand that Combs had laced the joint with a narcotic or other intoxicating substance.

70. Combs passed her the joint and Plaintiff took a hit, which felt very powerful.

71. Although Plaintiff insisted that she had enough after that, Combs pressured her to imbibe more alcohol and marijuana by telling her that she was acting too uptight.

72.     Plaintiff felt as if she was floating.

73.     Although Plaintiff had smoked marijuana in the past, she had never experienced such a disorienting feeling after smoking and has not since that night.

74.     Plaintiff would not have ingested the joint if she had known that Combs had laced it.

75.     In providing Plaintiff with a laced joint and/or intoxicating substance, Combs involuntarily drugged her. Seeing Plaintiff was very intoxicated, Combs demanded Plaintiff follow him and he physically led Plaintiff to the bathroom that adjoined the Demo Room.

76.     The bathroom had a frosted, semi-transparent glass pane which allowed occupants of the Demo Room to see activity within the room.

77.     In the bathroom, Combs forced himself on Plaintiff and began kissing her without her consent.

78.     Combs, then, shoved her head down to his crotch before commanding her to "suck it."

79.     Plaintiff refused, but Combs pushed her head down onto his phallus and forced her to perform oral sex on him.

80.     As she was being assaulted, Plaintiff felt panicked and physically sick.

81.     Afterwards, Combs led Plaintiff back into the studio.

82.     Upon standing and walking, Plaintiff felt more and more woozy and then lost consciousness.

83.     Plaintiff awakened in shock to find herself in a taxicab heading back to the Designer's apartment.

84.     As her consciousness returned, Plaintiff realized that she had been sexually assaulted by Combs.

85.     Plaintiff felt humiliated and traumatized and without recourse.

9

86. Upon information and belief, Combs purposely assaulted Plaintiff so others could see it in a voyeuristic display for his associates and others present.

87. A prominent music industry professional who worked for Bad Boy Records was present that night and witnessed the events as described herein

**Combs' Assault Has Caused Plaintiff Lifelong Harm**

88. Following the assault, Plaintiff's modeling opportunities quickly began to dwindle and then evaporated entirely.

89. Upon information and belief, Combs had Plaintiff "blackballed" in the industry and utilized his significant influence to impede Plaintiff's career growth.

90. Plaintiff became severely depressed as she began to blame herself for the assault and for sabotaging her own career.

91. The assault led Plaintiff into a tailspin of anxiety and depression.

92. In or about 2004, Plaintiff attempted suicide and was hospitalized.

93. Everywhere Plaintiff looked she was reminded of Combs' assault, as Combs was an inescapable presence in music, television, and film.

94. In the ensuing years, Plaintiff has also experienced alcohol and drug addiction, as she attempted to cope with the emotional trauma of being assaulted.

95. Plaintiff has also experienced intimacy issues, as she struggles to maintain emotional and sexual relationships with men.

96. Plaintiff was married from approximately 2006 to 2010, however, her marriage fell apart as she had a mental breakdown precipitated by memories of the assault.

97. Combs' assault has altered the trajectory of Plaintiff's career, denying her a successful and lucrative career in the modeling and film industries.

10

98.    To this day, Plaintiff experiences bouts of depression, anxiety, body image issues, feelings of worthlessness, and intimacy issues because of Combs' assault.

99.    Plaintiff is a woman of faith and when she saw news coverage of the lawsuits from Ms. Cassie Ventura, Ms. Dickerson-Neal, and others, she knew she had a moral obligation to speak up.

100.   Plaintiff prayed to G-d before bringing this lawsuit, as she feared further violence and/or retaliation from Defendant Combs, but ultimately decided that she needed to speak her truth.

101.    Plaintiff seeks justice for herself and for any of other Combs' victims.

**Corporate Defendants' Knowledge Of Combs' Behavior**

102.   Corporate Defendants knew, should have known and/or had actual and constructive notice of Defendant Combs' propensity for sexually harassing, assaulting, and/or drugging women.

103.   Upon information and belief, Combs' propensity for violence was an open industry secret.

104.   Upon information and belief, industry professionals regularly discussed that Combs engaged in forceful sex with women and made promises of career advancement.

105.   In a May 28, 2024, article, Rolling Stone reported on several violent acts allegedly committed by Combs prior to his assault of Plaintiff.

106.   Rolling Stone reported that Defendant Combs publicly beat his then-girlfriend while he was a student at Howard University in approximately 1989 or 1990.

107.   Combs' propensity for violence was not a secret, as he allegedly told Jet Magazine: "I had a temper. That's why my friend started calling me Puffy."

108.   Indeed, Combs released his first single in 1996 utilizing the stage name "Puff Daddy" –

seven years prior to his assault of Plaintiff.

109. That same year, Combs allegedly threatened Kirk Burrowes, former president of Bad Boy Records, with a baseball, as detailed in the Rolling Stone article and a 2003 lawsuit.

110. Rolling Stone also reported that Burrowes witnessed Combs attack a woman at the Bad Boys office in 1994.

111. In 2000, according to Rolling Stone, Combs allegedly approached a Bad Boy Records employee named "Anna" and began to massage her shoulders without her consent and allegedly approached her boss to solicit Anna for sex.

112. Lawsuits by Liza Gardner and Joi Dickerson-Neal also detail sexual assaults committed by Combs in 1990 and 1991.

113. Given the above-referenced acts, Corporate Defendants were on notice of Combs' violent behavior and negligently placed him and/or allowed him to remain in positions of power where he could engage in sexual and/or violent misconduct.

114. Defendants Bad Boy Records, Sean John, and Daddy's House allowed Defendant Combs to remain in leadership positions such as CEO, which allowed him access to victims such as Plaintiff, which he sexually assaulted.

115. Corporate Defendants and/or their agents, servants and/or employees did not use reasonable care in making decisions in regard to hiring and retaining Defendant Combs.

116. Corporate Defendants and/or their agents, servants and/or employees would have discovered Defendant Combs' ongoing harassing conduct but for their negligence in carrying out their supervisory duties.

117. Corporate Defendants and/or their agents, servants and/or employees breached the above-stated duty in a negligent, reckless, willful, and wanton manner, and caused Plaintiff to be

sexually harassed, abused, and assaulted.

## CAUSE OF ACTION

### AS A FIRST CAUSE OF ACTION
### THE NYC VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION ACT
### (Against Defendants)

118. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

119. The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

120. The above-described conduct of Defendant Combs, including sexually assaulting or abusing Plaintiff at a music studio located in Manhattan. constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in N.Y. C. Admin Code § 10-1103.

121. Defendant Combs' crimes of violence were motivated by Plaintiff's gender as defined in in the New York City Administrative Code § 8-903, as Defendant committed forcible sex acts upon Plaintiff that would constitute felonies under state law and as the conduct presents a serious risk of physical injury, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

122. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

123. The above-described conduct of Defendant Combs constitutes sexual offenses as defined

13

in Article 130 of the New York Penal Law.

124. Plaintiff is a woman, who is older than 18, who alleges misdemeanor and/or felony penal law violations, including but not limited to sexual misconduct (N.Y. Penal L. § 130.20), criminal sexual act in the first degree (N.Y. Penal L. § 130.50), criminal sexual act in the third degree ( N.Y. Penal L. § 130.40), forcible touching (N.Y. Penal L. § 130.52),  sexual abuse in the first degree (N.Y. Penal L. § 130.65), and sexual abuse in the second degree (N.Y. Penal L. § 130.60).

125. Defendant Combs coerced Plaintiff to engage in sexual contact and/or sexual intercourse, despite the fact that he was rendered incapable of consenting due to intoxication.

126. Defendant Combs gave Plaintiff several drinks throughout the night and a laced blunt, thus, he knew or should have known that Plaintiff was incapable of consenting to sexual contact and/or sexual conduct.

127. Defendant Combs' actions presented a serious risk of physical injury to Plaintiff's person, regardless of whether or not those acts resulted in criminal charges, prosecution or conviction.

128. Prior to Combs sexually assaulting Plaintiff, Corporate Defendants knew or should have known that Combs was not fit to be in a position of authority. Corporate Defendants, by and through their agents, servants and/or employees, became aware, or should have become aware of Combs' propensity to commit sexual assault and of the risk to Plaintiff's safety.

129. Corporate Defendants knew or should have known that Combs posed a risk of sexual assault.

130. Corporate Defendants failed to protect Plaintiff from a known danger, and thereby enabled Combs' sexual assaults of Plaintiff.

14

131.    Corporate Defendants negligently deemed that Combs was fit to be in a position of authority; and/or that any previous suitability problems Combs had were fixed and cured; and/or that Combs would not commit acts of sexual assault; and/or that Combs would not injure others.

132.    Moreover, Corporate Defendants enabled the sexual abuse of Plaintiff by actively maintaining and employing Combs in a position of power and authority through which Combs had control over people, including Plaintiff.

133.    As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

## JURY DEMAND

134.    Plaintiff demands a trial by jury of all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.    Declaring that Defendant Combs engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that Combs drugged and sexually assaulted Plaintiff;

B.    Declaring that Corporate Defendants engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that they enabled Defendant Combs' commission of the crimes of violence motivated by gender;

15

Case 2:24-cv-07729-GRB-JMA   Document 93-2   Filed 03/01/24   Page 62 of 33
Case 1:24-cv-07293-GRB-JMA   Document 93-2   Filed 03/01/24   Page 307 of 412
PageID #: 16334

C.      Awarding Plaintiff compensatory damages for mental, and emotional injury, distress, pain

and suffering and injury to her reputation in an amount to be proven;

D.      Awarding Plaintiff damages for Defendants' breach of contract;

E.      Awarding Plaintiff punitive damages;

F.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the

action; and

G.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

proper to remedy Defendants' unlawful practices.

Dated:  New York, New York
        August 1, 2024


                                        **PHILLIPS & ASSOCIATES,**
                                        **Attorneys at Law, PLLC**


                        By:     _____
                                Michelle A. Caiola, Esq.
                                Jonathan Goldhirsch, Esq.
                                *Attorneys for Plaintiff*
                                45 Broadway, Suite 430
                                New York, New York 10006
                                T: (212) 248-7431
                                F: (212) 901 - 2107
                                mcaiola@tpglaws.com
                                jgoldhirsch@tpglaws.com

# UNITED STATES FEDERAL COURT
## SOUTHERN DISTRICT OF NEW YORK

RODNEY JONES,

           Plaintiff,

v.

SEAN COMBS,
JUSTIN DIOR COMBS
CUBA GOODING JR.,
LUCIAN CHARLES GRAINGE,
KRISTINA KHORRAM,
LOVE RECORDS,
MOTOWN RECORDS,
UNIVERSAL MUSIC GROUP,
COMBS GLOBAL ENTERPRISES,
JOHN and JANE DOES 1-10 and
ABC CORPORATIONS. 1-10

           Defendants.

Case Number: 24-1457

**<u>Second Amended Complaint</u>**
**<u>Civil Action</u>**

**Jury Demand**

---

**<span style="color:red">TRIGGER WARNING</span>:**
**<span style="color:red">THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A
SEXUAL NATURE, INCLUDING SEXUAL ASSAULT. ADDITIONALLY,
THERE ARE GRAPHIC IMAGES OF THE AFTERMATH OF A SHOOTING,
REDACTED IMAGES OF SEXUAL INTERCOURSE, REDACTED IMAGES OF
MINORS, SEX WORKERS, AND PROSTITUTES, DETAILS OF SEX
TRAFFICKING, AND THE ILLEGAL DISTRIBUTION OF GUNS, AND DRUGS</span>**

---

Plaintiff Rodney "Lil Rod" Jones ("Mr. Jones") hereby alleges, as and for his Complaint against Defendant Sean Combs ("Mr. Combs"), Defendant Justin Dior Combs ("J. Combs"), Defendant Lucian Charles Grainge ("Mr. Grainge"), Defendant Cuba Gooding Jr. ("Mr. Gooding Jr."), Defendant Kristina Khorram ("Ms. Khorram"), Defendant Love Records ("LR"), Defendant Motown Records ("MR"), Defendant Universal Music Group ("UMG"), Defendant Combs Global Enterprises ("CGE"), John and Jane Does 1-10, ABC Corporations 1-10, as follows:

## JURISDICTION AND VENUE

1. This Court has personal jurisdiction over the Defendants under and consistent with the Constitutional requirements of Due Process in that the Defendants, acting directly or through his agents or apparent agents, committed one or more of the following:

   a. The transaction of any business within the state;

   b. The making of any contract within the state;

   c. The commission of a tortious act within this District; and

   d. The ownership, use, or possession of any real estate in this state.

2. From September 2022 to the date of this filing, Defendants have consistently and purposefully availed themselves of the privilege of conducting activities within New York, thus invoking the benefits and protections of New York law. In return for these benefits and protections, Defendants must submit to the burdens of litigation in New York.

3. This litigation arises from or relates to the tortious activities the defendants visited upon Plaintiff Jones in New York, California, Florida, Saint Barthelemy, and the United States Virgin Islands. This tortious conduct violated United States Federal Rico Laws and the United States Victims ("USVI") of the Trafficking and Violence Protection Act of 2000 ("TVPA").

4. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise from some conduct occurring by Defendants in New York. Specifically, the trafficking of Plaintiff across State lines between California, Florida, New York, and the USVI, and the trafficking of Plaintiff internationally to Saint-Barthélemy.

## PARTIES

5. Plaintiff Rodney Jones is an American artist and music producer. Mr. Jones is domiciled in the state of New York.

2



**Defendant Sean Combs**

6.  Defendant Sean Combs is a rapper and record executive popularly known by his stage names
    Puff Daddy, Puffy, P. Diddy, Diddy, Brother Love or Love.  Mr. Combs became famous in the
    early 1990s with his record label Bad Boy Records.  He rose to prominence in the music and
    entertainment industry over the decades and is regularly referred to as a hip-hop mogul.  Mr.
    Combs is domiciled in California, and Florida.



**Defendant Justin Dior Combs**

7.  Defendant Justin Dior Combs is the son of Mr. Combs and Misa Hylton.  J. Combs was born
    on December 30, 1993.  J. Combs is a producer and actor.  He has appeared on TV series like
    Catfish: The TV Show, Wild' N Out, and Hip-Hop Squares.  Defendant Justin Dior Combs is
    domiciled in Claifornia.

3



**Lucian Charles Grainge**

8. Defendant Lucian Charles Grainge is the CEO of Defendant Universal Music Group. Upon information and belief, Defendant Lucian Charles Grainge is domiciled in California. Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to enter into a general business partnership agreement and to provide financial resources to their general business partners, Defendants Sean Combs and Love Records, Inc.



**Cuba Gooding, Jr.**

9. Defendant Cuba Gooding, Jr. was a relevant actor who has fallen from grace due to several sexual assault lawsuits and a recent guilty plea for sexual assault. Upon information and belief, Defendant Gooding, Jr. is domiciled in New York.

4



**Kristina Khorram, Chief of Staff to Sean "Diddy" Combs**

10. Defendant Kristina Khorram is the Chief of Staff to Sean "Diddy" Combs, Combs Global Enterprises.  Upon information and belief, she is domiciled in California.  Defendant Khorram manages the day-to-day operation of the Combs RICO and TVPA Enterprises.



11. Defendant Motown Records is a record label with a principal place of business located at 1750 Vine St, Los Angeles, CA. According to a Declaration by former Motown Chairwoman and CEO Ethiopia Habtemariam, Motown Records, with the consent of Defendant UMG, and presumably, Ms. Habtemariams direct supervisor, Defendant Lucian Grainge, entered a general partnership, as that term is defined by the laws of the State of New York, with Defendants Love Records, Inc. and Sean Combs.

5



12. Defendant Universal Music Group is a record label with a principal place of business located at 2220 Colorado Avenue in Santa Monica, California, and 1755 Broadway # 6, New York, NY 10019.  Lucian Grainge is the Chairman & CEO of Universal Music Group.  Defendant Lucian Charles Grainge, as CEO of UMG, authorized Universal Music Group to enter a general business partnership with Love Records, Inc. and Sean Combs.  Additionally, according to former Motown Records Chairwoman, Ms. Habtemariam, they provided funding and/or reimbursements for expenses associated with the recording cost of the Love Album.  The Love Album was released on September 23, 2023.



13. Defendant Love Records is a record label with a principal place of business located California and Delaware.  Defendant Combs founded Defendant Love Records.  According to their website, Defendant Motown Records helped Sean Combs establish Love Records and had a distribution deal for the Love Album.

6



**Combs Global**

14. Defendant Combs Enterprises is a diverse portfolio of businesses and investments, including music, fashion, fragrance, beverage, marketing, film, television, and media properties. They have a principal place of business located in New York, New York.

## RODNEY LIL ROD JONES

15. Rodney "Lil Rod" Jones Jr. is from the Windy City [Chi-town]. He was born and raised in Chicago, Illinois. Mr. Jones is the second oldest son and fourth child out of nine siblings. Mr. Jones comes from a long line of Gospel Music influencers.

16. Mr. Jones started playing instruments at the age of five. He began playing drums in church, and at thirteen, he picked up playing the guitar. From thirteen to the present day, Mr. Jones has taught himself to play over thirteen instruments.



**Mr. Jones, the Child Prodigy**

17. Mr. Jones is considered a musical prodigy. His talents have led him to produce and create a commercial marketplace for music that has been recorded by some of the most prestigious and highly acclaimed artists in music history.

18. Throughout his career, Mr. Jones has worked the south side of the Chicago Music scene, playing with the following legendary acts: Georgia Mass Choir, Donald Lawrence, The Clark Sisters, and The Smokie Norful.

19. On or about August 2022, Mr. Jones received a call from Mr. Combs's representative requesting that he produced several songs on a rhythm and blues album titled "The Love Album: Off the Grid," ("Love Album").

20. Mr. Jones agreed, and his life has been detrimentally impacted ever since.

21. During the relevant period, Defendants John and Jane Does 1-10 are currently unknown individuals and/or employees who aided and/or abetted in the commission of conduct complained of herein and/or who either acted within the scope of their employment, Defendants ratified, embraced, and added to this conduct. As parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

22. During the relevant period, Defendants ABC Corps. 1-10 are currently unknown entities who employed Plaintiff or aided and/or abetted in the commission of conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these entities or individuals by name.

## SUMMARY OF EVENTS

23. From September 2022 to September 2023, Mr. Jones produced nine songs on Mr. Combs' Love album.

24. From September 2022 to September 2023, Mr. Jones lived with Mr. Combs for months, spending holidays, birthdays and missing major family events.

25. Mr. Jones resided at Mr. Combs's residences in Los Angeles, California, and Miami, Florida. He also spent several weeks on a yacht rented by Mr. Combs in the US Virgin Islands and Saint-Barthélemy. As detailed below, Mr. Jones made several trips with Mr. Combs to New York City throughout his time living with him.

26. Throughout his time with Mr. Combs, Mr. Jones witnessed, experienced, and endured many things that went far beyond his role as a Producer on the Love album.

27. The claims raised in this complaint have been corroborated through witness statements, video/audio recordings, personal experiences, and images Mr. Jones possesses.

28. Mr. Combs required Mr. Jones to record him constantly. On several occasions, Mr. Combs took Mr. Jones's cell phone and began recording himself. As a result, Mr. Jones has secured **HUNDREDS** of hours of footage and audio recordings of Mr. Combs, his staff, and his guests engaging in serious illegal activity.

29. Mr. Jones has personally witnessed and secured irrefutable evidence of:

    a. The acquisition, use, and distribution of ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms,

    b. The displaying and distribution of unregistered illegal firearms,

    c. Mr. Combs providing laced alcoholic beverages to minors (LA home July 2023) and sex workers at his homes in California, the U. S. Virgin Islands[1], Florida, and Saint-Barthélemy,

    d. Mr. Combs Chief of Staff, Kristina Khorram ("KK") instructs her staff to retrieve drugs so she can provide them to Mr. Combs for his consumption,

    e. Christian Combs drugging and sexually assaulting a woman[2],

    f. Mr. Combs detailing how he planned to leverage his relationship with Bishop T.D. Jakes, to soften the impact on his public image of Cassie Ventura's lawsuit,

    g. Yung Miami's cousin and or assistant sexually assaulting Mr. Jones,

    h. Actor Cuba Gooding Jr. sexually harassing and assaulting Mr. Jones,

    i. Rapper[3] (REDACTED) on Mr. Combs yacht consorting with underaged girls, sex workers, and

    j. R&B Singer[4] (REDACTED) in Mr. Combs Los Angeles home consorting with underaged girls and sex workers.

## CHALICE RECORDING STUDIOS SHOOTING

---

[1] This writer spoke with several employees of the yacht rented by Mr. Combs in the U.S. Virgin Islands and Saint-Barthélemy who personally witnessed Defendant Khorram instruct her staff, Brendan Paul, Frankie Santella, and Moy Baun spike bottles of champagne with ecstasy. Upon information and belief, this occurred the day of the December 31, 2022, New Year's Eve party.

[2] A complaint is forthcoming.

[3] He is a Philadelphia Rapper who dated Nicki Minaj.

[4] He is a Grammy Award winning R&B singer who had trouble with law enforcement after assaulting a Bajan Billionaire.

30. On or about September 12, 2022, Mr. Combs held a writers and producers camp at Chalice Recording Studio at 845 Highland Ave, Los Angeles, CA 90038.

31. Mr. Combs, his son Justin Combs, and Justin's friend G were present at this camp.

32. Based on information and belief, Mr. G is a 30-year-old tall African American male.

33. Based on information and belief, in addition to these individuals, other musicians were present at the camp. This writer has spoken to several musicians who attended the camp.

34. One evening during this camp, Mr. Combs, J. Combs, and G were in a heated conversation.

35. That conversation was moved out of the studio and into a restroom adjacent to where Mr. Jones was sitting.

36. Mr. Jones was approximately 2 feet away from the bathroom when gunshots rang out. Mr. Jones recalls hearing multiple gunshots.

37. Mr. Jones immediately went into a state of shock and feared that he would be shot next. Mr. Jones genuinely believed that he would be shot through the door due to how close he was.

38. After the shooting ended, a crowd gathered around the restroom.

39. Upon information and belief, when the door finally opened, Mr. Combs and J. Combs exited.

40. G was lying on the restroom floor in a fetal position, holding his stomach and bleeding out of his torso and leg/hip area.

41. Everyone stood around looking upon G. Frustrated by the lack of aid to G, Mr. Jones dropped everything, ran to G, and immediately began placing pressure on G's gunshot wound to his torso.

42. As he was applying pressure to his torso, Mr. Jones realized that G was gushing blood from another area near his leg/hip.

43. He decided to lift G and placed him to sit on the toilet. Mr. Jones asked the crowd to call the ambulance.

44. Mr. Jones lifted G and brought him to the ambulance at the front of the studio. At this time, Mr. Combs and Justin disappeared to another part of the studio.

45. Mr. Combs gave strict instructions to inform the police that he had nothing to do with the shooting. He also forced Mr. Jones to lie to the police by telling them that G was shot standing outside the studio by a drive-by assailant.

10



46. Mr. Jones has several corroborating witnesses who spoke with this writer anonymously because they feared retaliation from Mr. Combs. They have agreed to speak publicly when subpoenaed.

47. Mr. Jones has the clothing he wore that day and believes it may still have G's blood stains and DNA.

48. The following are screenshots of the aftermath of the restroom where G was shot by either Mr. Combs or J. Combs:



**Aftermath of the Shooting of G**

49. Upon information and belief, it is clear that G was NOT shot outside of the studio, as Mr. Combs instructed his team to report to law enforcement.

50. Upon information and belief, Mr. Combs and Defendant's LR, MR, UMG, and CRS provided private security for the writers' camp at Chalice.

51. The Security was porous and lackluster at best.

12

52. The fact that either Mr. Combs and J. Combs were allowed to enter CRS with guns, and those guns were not confiscated by security is a clear breach of duty by Mr. Combs, Defendant's LR, MR, and UMG to protect Mr. Jones and the other attendees of this writers' camp.

53. As a result of this shooting, Mr. Jones is severely traumatized. Mr. Jones now suffers from PTSD, severe anxiety, depression, and insomnia.

54. The following is an image of Mr. Combs a couple of hours before G is shot in the restroom of Chalice:



**This photo of Mr. Combs was taken at Chalice Recording Studios outside of Studio G hours before G was shot.**

**CHALICE RECORDING STUDIOS, AND DEFENDANTS SEAN COMBS AND JUSTIN COMBS REPRESENTATIVE SHAWN HOLLEY PROVIDE CONFLICTING AND INTELLECTUALLY DISHONEST ACCOUNTS CONCERNING THE SHOOTING**

55. On or about, February 28, 2024, Chalice sent an Instagram message which alleges that G was shot a "half a block <u>away</u> from Chalice."

13



**Instagram Message From Chalice Recording Studios**

56. Upon information and belief, Shawn Holley[5] claimed that she had "evidence" the shooting took place several blocks away and that G returned to the studio after being shot.

57. Upon information and belief, TMZ[6] reports that their "law enforcement sources" claim that "the story that was told to cops that night -- namely, that the victim was robbed at gunpoint and shot by unknown assailants outside. The gunshot victim [G] stepped outside of the studio around 3:30 AM and was accosted by two individuals ... at which point they tried to rob him. … the man suffered a gunshot wound."

58. Below is an image of the front of Chalice Recording Studios:

---

[5] Shawn Holley previously represented Tory Lanez and Danny Masterson.
[6] https://www.tmz.com/2024/02/28/diddy-lawyer-women-come-forward-deny-underage-claim-lawsuit/

14



**Photo of Chalice Recording Studios**

59. In the photo above, the white van is blocking a security gate.

60. Upon information and belief, to enter the building, you must buzz the gate and announce which session you are there to attend.

61. Upon information and belief, once the correct session is confirmed, you then must go past another layer of security before you can enter the reception area.

62. Upon information and belief, once inside the reception area, you must identify yourself, and the receptionist will check to ensure that you are on the list of visitors for that session. Once you are confirmed, you are then allowed in.

63. Upon information and belief, to get to the restroom where G was bleeding out, you have to follow a maze. Once you've passed the receptionist, you walk down a long hallway, walk past three recording studios, turn left, and go past a lounge area before you arrive at the restroom where G was bleeding out.

64. Upon information and belief, TMZ also reported that Mr. Combs and J. Combs were not in the studio when the police arrived. That is also factually inaccurate.

15

65. Mr. Combs and J. Combs were located in Studio G across the parking lot from the building where G was shot (near Studio A). Mr. Combs and J. Combs hid out in Recording Studio G while the police "investigated," and were the first to depart after the officers left[7].



**Mr. Combs Published the Love Records Chalice Recording Studios
Assignment List. Mr. Combs Stayed in Studio G
Throughout The Duration of the Writers Camp**

66. Upon information and belief, after being shot in the torso and hip/leg, G was physically incapable of walking; therefore, the notion that he was shot several blocks away (Shawn Holley), half a block away (CRS), or as he stepped outside of the studio is implausible.

67. If G could do as much walking as Shawn Holley and CRS claim, then Mr. Jones would not have been required to physically pick him up off the restroom floor and walk him through the maze that is CRS for him to receive care from the ambulance.

---

[7] This FACT will be made crystal clear in discovery.

16

68. As of the date of this filing, neither the Los Angeles Police Department nor the Los Angeles Fire Department has released any official reports surrounding this shooting. There has been no body camera footage or 911 call recording. What is even more disturbing is that there has been no citing of G.

    a. The LAPD has only released a vaguely written "News Release" dated September 12, 2022.

69. The unfortunate shooting of G, the unexplained disappearance of G, the lack of disclosures by the LAPD and LAFD, and the incoherent nature of Shawn Holley and Chalice Recording Studios' account of the shooting raises more questions than answers point to foul play, and an apparent **massive coverup**.


## THE DEAFENING SILENCE FROM THE ATTENDEES OF THE CRS SHOOTING STEMS FROM UNDERSTANDABLE FEAR THAT THE ATTENDEES WOULD BE SUED BY MR. COMBS FOR VIOLATING A NON-DISCLOSURE AGREEMENT

70. Upon information and belief, a few days before the September 12, 2022, shooting inside of Chalice Recording Studio, Mr. Combs required all attendees of the CRS shooting to sign a Non-disclosure Agreement.

71. Mr. Jones did not sign the agreement.

72. A copy of the non-disclosure agreement[8] that a witness who has asked to remain anonymous provided this writer is attached.  (**Attachment A**).


## MR. JONES WAS SEXUALLY HARASSED, AND ASSAULTED BY MR. COMBS

73. Throughout his time living with Mr. Combs, Mr. Jones was the victim of constant unsolicited and unauthorized groping and touching of his anus by Mr. Combs.

74. These events occurred in LA, NY, FL, Saint-Barthélemy, and the United States Virgin Islands.

75. In addition to the unsolicited and unauthorized touching, Mr. Jones was forced by Mr. Combs to work in Mr. Combs' bathroom as Mr. Combs walked around naked and showered in a clear glass enclosure.

---

[8] Unfortunately for the attendees of the writers' camp, they are unaware that NDAs are non-binding when it comes to reporting **criminal activity** such as a shooting, sex trafficking, and the distribution and use of illegal drugs and guns.

17

76. As a heterosexual Christian man, Mr. Jones was uncomfortable with Mr. Combs' advances and expressed his discomfort to Mr. Combs' Chief of Staff, Defendant Kristina Khorram.

77. KK responded to Mr. Jones complaint with, "you know, Sean will be Sean."

78. KK also attempted to downplay Mr. Combs groping of Mr. Jones's anus and genitals as friendly horseplay, stating that those acts were Mr. Combs's way of "showing that he likes you [Mr. Jones]."

79. Despite these assurances, on several occasions, when Mr. Combs began to undress and walk around his house naked, KK would say, "Okay, I am leaving now," and she would disappear. KK's hypocrisy is breathtaking at best or enabling at worst.

80. Mr. Jones believes that KK aided and abetted Mr. Combs' sexual assault and was working with Mr. Combs to groom him into accepting a homosexual relationship.

81. Through these sexually deviant acts, one would say Mr. Combs has a pattern and practice of engaging in such nefarious activity. This ongoing conduct shows that Mr. Combs cannot be rehabilitated.


**MR. COMBS ATTEMPTED TO GROOM MR. JONES INTO ENGAGING IN GAY SEX**

82. Mr. Combs knew Mr. Jones looked up to and idolized music Producer Steven Aaron Jordan ("Stevie J").

83. Based on information and belief, Stevie J is an American DJ, record producer, and television personality.

84. Based on information and belief, Stevie J was part of the Bad Boy Records production team, the Hitmen.

85. Upon information and belief, in 1997, Stevie J won a Grammy Award for his work on Puff Daddy's debut album.

86. Upon information and belief, throughout the late 1990s, Stevie J produced for several artists, including Mariah Carey, Tevin Campbell, The Notorious B.I.G., 112, Jodeci, Faith Evans, Jay-Z, and Eve.

87. Based on information and belief, Stevie J was one of the producers of the Love Album.

88. According to Mr. Jones, Mr. Combs used access to Stevie J and his knowledge of Mr. Jones' admiration of Stevie J to groom and entice Mr. Jones to engage in homosexual acts.

89. Mr. Combs went so far as to share a video of who he claims was Stevie J[9] anally penetrating a Caucasian male without a condom.  Mr. Jones believes that Mr. Combs showed him this and attributed it to his idol Stevie J. to ease Mr. Jones' anxiety concerning homosexuality.  According to Mr. Jones, Mr. Combs said, "this is a normal practice in the music industry, look even Stevie J[10] is doing it."

90. According to Mr. Jones, Mr. Combs informed Mr. Jones that he had engaged in sexual intercourse with rapper[11] (REDACTED), R&B singer[12] (REDACTED), and Stevie J.

91. According to Mr. Jones, Mr. Combs promised to make sure that Mr. Jones wins producer of the year at the Grammys if he engaged in homosexual acts.

## THANKSGIVING 2022, MR. JONES IS SEXUALLY ASSAULTED BY YUNG MIAMI'S COUSIN

92. On Thanksgiving Day, 2022, Mr. Jones was in Mr. Combs' house in Miami, Florida.  Yung Miami and her female cousin (Jane Doe 1) were also present.

93. According to Mr. Jones, Mr. Combs was intoxicated and offered cocaine to Mr. Jones.  Mr. Jones rejected him and proceeded to walk to the restroom.

94. While using the restroom, Yung Miami's cousin burst into the bathroom and began groping Mr. Jones.  Mr. Jones believes that Mr. Combs sent her in there to sexually assault Mr. Jones.

95. According to Mr. Jones, as she entered the bathroom, she dropped to her knees and began performing oral sex on Mr. Jones' exposed penis.  Mr. Jones pushed her away and exited the bathroom.

96. According to Mr. Jones, Yung Miami's cousin did not accept Mr. Jones rejection, as she proceeded to follow Mr. Jones out of the bathroom.

97. She started undressing and attempted to straddle him and have sex with him in the presence of Mr. Combs and his staff.

98. Despite the lack of assistance from Mr. Combs and his staff, Mr. Jones pushed her off.  The following are images from a video[13] of Yung Miami, her cousin, Mr. Jones, and Mr. Combs:

---

[9] This writer is in possession of the video and will provide a copy to the court.
[10] Upon information and belief, Stevie J denies that he is the person in the video.  A male porn star claimed that he was the black male in the video.  Mr. Jones stands by his position that Mr. Combs provided him with the video and identified the individual in the video as Stevie J.
[11] He is a Philadelphia Rapper who dated Nicki Minaj.
[12] He performed at the Superbowl and had a successful Vegas residency.
[13] This writer is in possession of the video and will provide a copy to the court.



**Mr. Jones and Mr. Combs on Thanksgiving Day right before Mr. Combs invites Mr. Jones into the restroom and attempted to force him to take cocaine**.



**Yung Miami, and Jane Doe 1 who sexually assaulted Mr. Jones on Thanksgiving Day 2022**

## TRAFFICKING AND VICTIMS' PROTECTION ACT

99. According to Mr. Jones, he was transported from California to New York, Florida, Saint-Barthélemy, and the United States Virgin Islands throughout his time with Mr. Combs.

100.  According to Mr. Jones, during this time, Mr. Jones was forced to solicit sex workers and perform sex acts to the pleasure of Mr. Combs.

101.  On or about February 4, 2023, Mr. Combs forced Mr. Jones to bring prostitutes and sex workers back to his home in Miami, Florida.



**The Sex Workers That Mr. Combs Forced Mr. Jones To Bring Back To His Home**

102.   On or about February 2, 2023, Mr. Jones believes Mr. Combs drugged him.  Mr. Jones recalls waking up naked, dizzy, and confused.  He was in bed with two sex workers and Mr. Combs.  He also recalls aimlessly wandering around the house with no clothes on.



**Sex Workers In Mr. Jones Bed The Morning After Being Drugged**

103.  According to Mr. Jones, on another occasion in Miami, Florida, on Thanksgiving night of 2022, Mr. Combs asked Mr. Jones and DeForrest Taylor to enter the studio bathroom.

104.  According to Mr. Jones, he asked them for a hundred-dollar bill because he wanted them to do cocaine with him.

105.  Mr. Jones was scared, but luckily, he didn't have a hundred-dollar bill, so Mr. Combs waited a little later to do coke with Yung Miami.

106.  According to Mr. Jones, later that evening, Mr. Combs required Mr. Jones to solicit sex workers from Booby Trap on the River, located at 3615 NW S River Dr, Miami, FL 33142. Mr. Jones did so, and Mr. Combs forced him to engage in unsolicited sex acts with these workers.



**Booby Trap on the River**

107.   According to Mr. Jones, as part of Mr. Jones' sex worker recruitment tools, Mr. Combs
provided Mr. Jones with an exclusive Bad Boy baseball cap.  They required him to wear it to
Booby Trap on the River as a signal to any sex worker he approached that Mr. Combs was in
town and had sent Mr. Jones to recruit them.

108.   According to Mr. Jones, Mr. Jones had no desire to visit Booby Trap on the River.  Mr.
Jones had no desire to solicit sex workers from Booby Trap on the River.  Mr. Combs used
his power and influence to intimidate and force Mr. Jones into soliciting sex workers from
Booby Trap on the River.  As detailed below, Mr. Combs used many tactics to maintain
dominion and control over Mr. Jones.

109.   According to Mr. Jones, these workers were accustomed to servicing Mr. Combs and would
know he was in town by the sight of the Bad Boys baseball cap.

110.   The following are Instagram Profiles of two of the sex workers that Mr. Combs required
Mr. Jones to solicit and have sex with at his home in Miami, Florida:

23



111.  Mr. Jones had no desire to solicit and or have sex with the individuals in the previous paragraph.  According to Mr. Jones, Mr. Combs used his power and influence to intimidate and force Mr. Jones into soliciting and sleeping with these women.

112.  The following is the phone number of another sex worker that Mr. Combs required Mr. Jones to solicit and perform sex acts with at his home in Miami, Florida:



113.  Mr. Jones had no desire to solicit and or have sex with the individual in the previous paragraphs.  According to Mr. Jones, Mr. Combs used his power and influence to intimidate and force Mr. Jones into soliciting and sleeping with the individuals above.

114.  According to Mr. Jones, Mr. Combs used many tactics to maintain dominion and control over Mr. Jones.  He promised him a Grammy for Producer of the Year for the Love Album.

24

He offered him $250,000.00 to purchase all the instruments he wanted.  He promised him ownership of his $20,000,000 property, 1 Star Island, in Miami, Florida.  He promised access to record label executives.

115.    According to Mr. Jones, Mr. Combs would often switch up his approach.  He would go from promising Mr. Jones the world to threatening Mr. Jones with physical harm.  Mr. Combs threatened to eat Mr. Jones' face and informed Mr. Jones that he was willing to kill his mother, Janice Combs, if he must get what he wanted so he wouldn't think twice about harming Mr. Jones.  In light of Mr. Combs' detailed history of committing violent crimes, Plaintiffs fear of Mr. Combs is reasonable.

### MR. JONES HAS PERSONALLY WITNESSED MR. COMBS AND J. COMBS SOLICIT, DRUG AND ENGAGE IN ILLICIT SEX ACTS

116.    On or about July 2, 2023, Mr. Combs held a "listening party" at his home in California.

117.    According to Mr. Jones, present at this party were an R&B artist (REDACTED), J. Combs, sex workers, and some underaged girls.

118.    According to Mr. Jones, the event began at 7 pm.  Mr. Combs requested female sex workers and required Mr. Jones to solicit them.  An hour later, several sex workers appeared.

119.    According to Mr. Jones, in addition to sex workers, there were at least five women in the crowd who were under the age of sixteen.

120.    According to Mr. Jones, Mr. Combs forced all the women to drink laced DeLeon liquor.  Upon information and belief, Mr. Combs laced the liquor with ecstasy.

121.    According to Mr. Jones, Mr. Combs did not check the identification of any of these underage girls.

122.    According to Mr. Jones, the presence of these underage women made him very uncomfortable[14].  He attempted to leave, and Mr. Combs forced him to stay.

123.    According to Mr. Jones, Mr. Combs went so far as to take Mr. Jones' car keys to prevent him from leaving.

124.    After being forced to drink laced DeLeon shots, Mr. Jones began feeling lightheaded and recalls passing out and waking up at 4 am the following morning naked with a sex worker sleeping next to him.

---

[14] Plaintiff Jones is in possession of the video and will provide a copy to the court.

25

**MR. COMBS ATTEMPTS TO PASS OFF MR. JONES TO CUBA GOODING JR.**

125.   Mr. Jones believes Mr. Combs was grooming him to pass him off to his friends.

126.   This fear became a reality when Mr. Combs introduced Mr. Jones to Cuba Gooding Jr. while they were on Mr. Combs' yacht.

127.   According to Mr. Jones, during the introduction, Mr. Combs suggested that Cuba "get to know" Mr. Jones better.  He then left them alone in a makeshift studio on the yacht[15].



**Mr. Combs and Cuba Gooding Jr. Moments Before Mr. Jones is Assaulted**

128.   As evidenced by a video, of which screenshots are embedded below, Cuba Gooding Jr. began touching, groping, and fondling Mr. Jones' legs, his upper inner thighs near his groin, the small of his back near his buttocks, and his shoulders.

129.   According to Mr. Jones, he was extremely uncomfortable and proceeded to lean away from Mr. Gooding Jr.

---

[15] This writer has spoken to an eyewitness who was a former employee of the yacht who confirmed this.

130.   He rejected his advances and Mr. Gooding Jr. did not stop until Mr. Jones forcibly pushed him away.  The following is a screenshot[16] of the encounter with Cuba Gooding Jr.:



**Cuba Gooding Jr[17]. Forcibly Touching Mr. Jones on Mr. Combs yacht**

## <u>THE LOVE ALBUM</u>

131.   Throughout his time with Mr. Combs, Mr. Jones was under an implied work-for-hire agreement.

132.   According to Mr. Jones, he was not compensated for his time living with Mr. Combs or for the songs he produced.

133.   According to Mr. Jones, he was recruited by **Frankie Santella** to work on the Love Album. Mr. Jones informed Mr. Santella that he required the following to work on the Love Album:

   a.   $20,000.00 per song,

   b.   Four royalty points,

   c.   Credit as producer and credited for each instrument Mr. Jones played, and

   d.   Mr. Jones must retain his publishing rights.

134.   According to Mr. Jones, they agreed to the terms detailed above after meeting with Frankie Santella.  Mr. Jones met with Defendant Combs, who further reiterated and guaranteed that the abovementioned terms were accepted.  As a result, Mr. Jones began working on the album.

---

[16] This writer is in possession of the video and will provide a copy to the court.
[17] Mr. Gooding Jr. has a storied history of sexually assaulting and forcibly touching individuals against their well. https://www.usatoday.com/story/entertainment/celebrities/2023/11/22/cuba-gooding-jr-lawsuits-sexual-assault-battery/71682417007/

135.   As evidence, he was listed as a producer for the following songs on the Love Album final release:   *Deliver Me, Stay PT 1, Reachin', What's Love, Stay Awhile, Moments, Need Somebody, Homecoming,* and *Tough Love.*

136.   Mr. Combs and Defendants LR, MR, and UMG benefited from Mr. Jones' work product.

137.   They failed to compensate Mr. Jones for his work.

138.   As a result, Mr. Combs and Defendants LR, MR, and UMG were all unjustly enriched at Mr. Jones' expense.

139.   According to Mr. Jones, he attempted to work with Mr. Combs to secure his publishing and royalty rights for the work he completed on the Love album.   Mr. Combs only offered Mr. Jones $29,000.00 for 13 months, thousands of hours of work, and nine songs that made it to the Love album.   Mr. Jones was willing to take $50,000.00, his publishing and royalties.   Mr. Combs' self-serving greed would not allow him to pay[18] Mr. Jones an additional $21,000.

140.   Mr. Combs deceptive business practices became so bad that Mr. Jones was left with no choice other than to make a public plea on social media for Mr. Combs to pay him for his work.

141.   After publicly requesting that Mr. Combs do the right thing and pay him fairly, Mr. Jones received an onslaught of threatening messages from Stevie J and Love Records A&R DeForrest Taylor [19].

---

[18] This writer has retained other creatives, artists, and writers who have experienced this same treatment from Mr. Combs and will file suit in the coming month.

[19] As the A&R of Love Records, DeForrest Taylor did not require Mr. Jones or any of the other creatives, musicians, or artists to sign an NDA.

28



**DeForrest Taylor Threatening Mr. Jones**

## MR. COMBS USED HIS POWER, AND INFLUENCE TO THREATEN AND INTIMIDATE MR. JONES

142.   According to Mr. Jones, Mr. Combs is very forceful and demanding.

143.   According to Mr. Jones, Mr. Combs does not take no for an answer and would often threaten to inflict bodily harm on Mr. Jones if Mr. Jones did not comply with his demands.

144.   As detailed above, Mr. Combs threatened to eat Mr. Jones' face.

145.   According to Mr. Jones, on another occasion, while standing in Mr. Combs' bedroom, Mr. Jones was forced to watch as Mr. Combs displayed his guns and bragged about getting away with shooting people.

146.   According to Mr. Jones, Mr. Combs shared that he was responsible for the shooting in the nightclub in New York City with rapper Shyne.



147.   According to Mr. Jones, he shared that artist and Mr. Combs' girlfriend at the time, Jennifer Lopez, aka, J-Lo, carried the firearm into the club for him and passed him the gun after he got into an altercation with another individual.

148.   According to a civil complaint filed by Cassie Ventura, during their decade long relationship, Mr. Combs "demanded that Ms. Ventura to carry his firearm in her purse just to make her uncomfortable and demonstrate how dangerous he is."

149.   According to Mr. Jones, as was the case with Jennifer Lopez and Ms. Ventura, Mr. Combs required Brendan Paul and Mr. Jones to carry his firearm on their person whenever they went out.  One of these occasions Mr. Jones was required to carry Mr. Combs' firearm was when Mr. Combs recorded himself coaching Mr. Jones on how to solicit sex workers.



150.    According to Mr. Jones, the shooting in Chalice Recording Studios confirmed Mr. Combs' statements.

151.    Based on information and belief, these statements reinforced Mr. Jones's fear of Mr. Combs and strengthened Mr. Combs's dominion and control over Mr. Jones.

152.    Mr. Jones was terrified of Mr. Combs.  He felt like he could not tell him no.

153.    According to Mr. Jones, Mr. Combs consistently made it clear that he has immense power in the music industry and with law enforcement.

154.    According to Mr. Jones, Mr. Combs made it clear that his head of security, Faheem Muhammad ("Mr. Muhammad"), had the power to make people and problems disappear.



**Faheem Muhammad**

155.   According to Mr. Jones, Mr. Combs instructs his staff to always contact Mr. Muhammad if the police in Miami or California ever pull them over.

156.   Upon information and belief, Mr. Muhammad spoke with the LAPD after G was shot at CRS.  The LAPD was in CRS and witnessed the blood in the restroom, and they went with the bogus claim that the shooting of G occurred outside of the studio.  This was all thanks to Mr. Muhammad's connections within law enforcement.

157.   Mr. Jones had no reason to disbelieve Mr. Combs as he had seen firsthand through the shooting of G and the subsequent silence of the LAPD and the media that Mr. Combs indeed had the power to harm him.

158.   The LAPD spent **HOURS** in CRS after the shooting of G, yet there were no arrests.  Mr. Jones witnessed the LAPD in the restroom pictured above, yet no arrests were made.

159.   The morning after the shooting, Mr. Jones and several others arrived at CRS, and G's blood was still on the floor of the restroom; Mr. Combs hired a cleaning crew to clean it up.

///
///
///
///
///
///
///
///
///
///

32

**DEFENDANT LUCIAN CHARLES GRAINGE IN HIS CAPACITY AS CEO OF UMG, MOTOWN RECORDS, AND UNIVERSAL MUSIC GROUP THROUGH THEIR GENERAL BUSINESS PARTNERSHIP, AND THEIR FINANCIAL SUPPORT OF SEAN COMBS AND LOVE RECORDS, INC., AIDED AND ABETTED MR. COMBS ACTIONS AS DETAILED BELOW**

160. On March 21, 2024, former Motown Records Chairwoman and CEO Ethiopia Habtemariam provided Mr. Jones with a Declaration ("Habtemariam Declaration"). (**See attachment B**).

161. According to the Habtemariam Declaration, as Motown Records' Chairwoman and CEO, she reported directly to Defendant Lucian Charles Grainge.

162. According to the Habtemariam Declaration, Motown Records entered into an agreement with Love Records, Inc., in or around May 2022.

163. According to the Habtemariam Declaration, UMG was aware of and **authorized** Motown Records to enter into a license agreement with Love Records.

164. According to the Habtemariam Declaration, under the license agreement, Motown Records agreed to **pay (or reimburse)** Love Records for certain of the invoiced recording costs incurred by Love Records in making The Love Album.

165. According to the Habtemariam Declaration, since leaving Motown Records in November 2022, she has not been involved with Love Records.

166. s detailed throughout this pleading, Plaintiff Jones began working on the Love Album in September 2022 until it was released in September 2023.

167. According to Mr. Jones, the recording of the Love Album began in Chalice Recording Studios, where Mr. Combs hosted a nightly party where sex workers and alcohol laced with drugs were provided.

168. Mr. Jones informed Mr. Combs that the Chalice Recording Studios sessions cost him over $500,000.

169. In addition to the Chalice Recording Studios recording sessions, The Love Album was recorded in Mr. Combs' homes in Los Angeles, California, and Miami, Florida.

170. Mr. Jones has a copy of every song recorded for the Love Album, including songs recorded on the Yacht Mr. Combs and Love Records, Inc., chartered from December 2022 to January 2023.

171. According to Mr. Jones, every song has at least five versions, and many other songs never made it on the Love Album. Each of these files is timestamped and provides a clear timeline of the creation of The Love Album.

172. According to Mr. Jones, during the creation of the Love Album, Mr. Combs was very serious about setting the mood and creating a love-making atmosphere. To accomplish this, Mr. Combs did the following:

    a. He installed a lighting system so he could adjust the lighting in the room to red, blue, pink, or any color he wanted, depending on the mood he was going for.

    b. Mr. Combs required everyone working on the Love Album to take shots of Ciroc and Deleon alcohol. He would instruct either DeForrest Taylor or KK to eliminate them if they refused. On several occasions, Mr. Combs would send voice notes to the Love Album phone group chat and pose questions to the group, soliciting their opinions on Mr. Jones, questioning his loyalty and whether they think he is a good fit for the team. Mr. Combs knew that Mr. Jones was on the group chat, in his house, and received those voice notes. After witnessing several people sent home for refusing to engage in the acts Mr. Combs required to show loyalty, Mr. Jones feared what could happen to him if he told Mr. Combs no. This is another example of Mr. Combs' grooming of Mr. Jones.

    c. Throughout the creation of the Love Album, Mr. Combs required Mr. Jones and others to solicit sex workers and engage in sex acts. According to Mr. Jones, Mr. Combs felt that you cannot make a love album without making love.



173. As the general business partners of Sean Combs and Love Records, Inc., and the financial backer for the creation of the Love Album, Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, had a duty to ensure that the financial support they provided to Sean Combs and Love Records was not being used for sex workers, drugs, and laced alcohol.

34

174.   It is no secret that Mr. Combs had specific bottles of alcohol designated for females, and other bottles designated for his staff, his artists, and himself.   This fact was detailed by former artists and bodyguards of Mr. Combs.

175.   n the YouTube channel The Art of Dialogue, former bodyguard Gene Deal exposed Mr. Combs's pill-mixing method to spike cranberry juice and orange juice.  According to Mr. Deal, Mr. Combs would place ecstasy[20] and other date rape drugs in the juices[21].

176.   On YouTube, the Art of Dialogue, former artist Mark Curry exposed Mr. Combs spiking bottles of Moet champagne in the VIP section of night clubs.  Mr. Combs would have a set of Moet champagne bottles for his artists, and a set for women[22].

**DEFENDANT KRISTINA KHORRAM IS THE GHISLAINE MAXWELL TO SEAN COMBS JEFFREY EPSTEIN**



177.   According to Mr. Jones, during the thirteen months he lived and traveled with Mr. Combs, he witnessed Mr. Combs display and distribute guns from his bedroom closets in Miami, Florida, and Los Angeles, California, to questionable individuals dressed in all black.

178.   According to Mr. Jones, during the thirteen months he lived and traveled with Mr. Combs, he witnessed Defendant Khorram openly order her assistants to keep Mr. Combs "high" off gummies and pills[23].

179.   Defendant Khorram required all employees, from the butler to the chef to the housekeepers, to walk around with a black Prada pouch or fanny pack filled with cocaine, GHB, ecstasy,

---

[20] This writer has spoken with several former employees of Mr. Combs who witnessed Defendant Khorram instruct her staff to lace Champagne, DeLeon, and Ciroc liquor bottles with ecstasy and other drugs.
[21] https://youtu.be/MFIP8b2IDeg?si=VVM397WmKXlnbHU-
[22] https://youtu.be/pjvhfwUmMQw?si=6-5_W6evemGP_AI0
[23] We have a recording of this and will provide it to the court.

marijuana gummies (100 - 250 mg's each), and Tuci (a pink drug that is a combination of ecstasy and cocaine).

 

**TUCI**

180.   According to Mr. Jones, Defendant Khorram wanted Mr. Combs' drug of choice immediately ready when he asked for it.

181.   According to Mr. Jones, Defendant Khorram ordered sex workers for Mr. Combs.  On one occasion, she sent Mr. Jones a text message requesting that he call a particular sex worker. We have the message.

182.   According to Mr. Jones, Defendant Khorram ordered and distributed ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms to Mr. Combs and his celebrity guests, who were present on his rented yacht and in his homes in LA and Miami.

183.   According to Mr. Jones, on multiple occasions, Defendant Khorram forced him to carry Mr. Combs' drug pouch against his will.  The pouches were always black, and several of Mr. Combs' staff carried black Prada pouches.

184.   According to Mr. Jones, Defendant Khorram also sent Mr. Jones to solicit sex workers for Mr. Combs.  When the sex workers arrived at Mr. Combs' residence, Defendant Khorram would negotiate their price and would take them aside and pay them.



**Sean Combs Butler, Frankie with the Black Prada Pouch Mentioned Above While On The Yacht From December 2022 to January 2023**

185.   As the Chief of Staff, Defendant Khorram was instrumental in organizing and executing the RICO and TVPA Enterprises.  Defendant Khorram had the following individuals execute the following tasks for the RICO, and TVPA enterprises:

   a. **Stevie J**: Recruits sex workers and attends and participates in freak offs[24].
   b. **Justin Combs**:  Solicits Prostitutes, Underaged Girls, and Sex Workers.  Would engage in Freak Offs.
   c. **Brendan Paul**: Works as Mr. Combs Mule.  He acquires, and distributes, Mr. Combs Drugs, and Guns.



**Brendan Paul and Mr. Combs**

   d. **Frankie Santella[25]**:  Works alongside Brendan.  While Brendan acquires, and distributes, Mr. Combs Drugs, and Guns.  Frankie carries the money and pays for the Guns and Drugs.

---

[24] We have a video of Mr. Combs, Stevie J, and Plaintiff Jones at a strip club.  Mr. Combs is recording the video, while coaching and training Plaintiff Jones how to recruit the sex workers.
[25] Vice President of Music Management & Strategic Partnerships Vice President of Music Management & Strategic Partnerships, Combs Global.



**Frankie Santella and Sean Combs**

e. **Moy Baun**:  Hires sex workers, attends and participates in freak offs.



**Moy Baun, Thanksgiving 2022 When Mr. Combs Offered Mr. Jones Cocaine**.

186.   According to Mr. Jones, Mr. Combs funded and used his affiliation with local gangs and gang leaders[26] who would frequent his homes in LA, and Miami to secure the drugs and guns he obtained and distributed out of his homes in LA and Miami.

---

[26] Plaintiff has intentionally left the names, and images of these individuals out of the pleading out of fear of retaliation. He will provide the information to the Court under seal or in Camera.

38

187.   According to Mr. Jones, Defendants executed their RICO and TVPA Enterprises with threats of violence: threatening to eat Plaintiff's face, displaying and distributing guns in Plaintiff's presence, bragging about having law enforcement under control, bragging about murdering people, and bragging about bribing witnesses, and jurors in the criminal case concerning the 1999 NYC nightclub shooting with Shyne.  As a result, Mr. Combs could maintain dominion and control over Mr. Jones.

188.   According to Mr. Jones, Defendants executed his RICO and TVPA Enterprises with threats of isolation from the music and entertainment industry: parading powerful music industry executives at his parties filled with sex workers and illegal drugs, such as ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms.

189.   According to Mr. Jones, Defendant Combs executed his RICO and TVPA Enterprise with threats of nonpayment for work completed, fake promises of cash payments ($250,000), producer of the year Grammy awards, and guaranteed access to future projects, and a 20-million-dollar home on Star Island in Miami.

## MR. COMBS IS ALLOWED TO WREAK HAVOC

190.   While living and traveling with Mr. Combs, Mr. Jones discovered that Mr. Combs had hidden cameras in every room of his home.

191.   Mr. Jones believes that Mr. Combs has recordings of several celebrities, artists, music label executives, and athletes engaging in illegal activity at Mr. Combs' functions.

192.   Upon information and belief, these individuals were recorded without their knowledge and consent. As is the case with the homosexual sex tape that Mr. Combs provided to Mr. Jones, claiming to be Stevie J., Mr. Combs possesses compromising footage of every person who has attended his freak-off parties and his house parties.

193.   Upon information and belief, due to this treasure trove of evidence he has in his possession, Mr. Combs believes that he is above the law and untouchable.

194.   Based on information and belief, Mr. Combs employs Jose Cruz as his IT director.  This writer has spoken to several former employees of Mr. Combs, who confirmed that Jose Cruz is the gatekeeper to all of Mr. Combs recordings.

195.  Upon information and belief, Jose Cruz intentionally hides behind the camera and from
      social media and the internet due to all of the incriminating acts he was required to record for
      Mr. Combs.



**DEFENDANT MR. COMBS HIRED PRIVATE INVESTIGATOR
RUSSELL L. GREENE TO SEEK OUT, HARASS, AND
BRIBE INDIVIDUALS TO PROVIDE DIRT ON MR. JONES**

196.  On or about March 2, 2024, Mr. Jones was informed by a close friend from his church that
      Mr. Combs' engineer, Matt Testa, provided an individual's phone number to Los Angeles-
      based private investigator Russell L. Greene[27].

---

[27] https://nextdoor.com/pages/blue-diamond-investigationscom/



197.   Upon information and belief, Mr. Greene attempted to bribe this anonymous individual with an uncertain amount of money in exchange for her producing text messages or any evidence that this individual could produce to paint Mr. Jones in a bad light.

198.   During a call with Mr. Jones, this individual expressed fear for their safety and the safety of their family.

199.   This is a clear example of some of the tactics implemented by Mr. Combs and the members of Combs Rico and TVPA Enterprise.

200.     Besides contacting the individual previously mentioned, Mr. Greene contacted Mr. Jones's eight-year-old daughter.  He solicited information from this child about her father until she cried in fear and handed the phone to her mother.  At that time, her mother hung up the phone.  Mr. Greene proceeded to text her; she informed him that she did not want to be bothered, and he continued to send her unwanted harassing, text messages.

## FIRST CAUSE OF ACTION
### CONDUCT AND PARTICIPATE IN A RICO ENTERPRISE
### THROUGH A PATTERN OF RACKETEERING ACTIVITY
### VIOLATION OF RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATION ACT, CODIFIED AT 18 U.S.C. § 1962(A), (C)-(D)
### (Against Defendants Lucian Charles Grainge in his capacity as CEO of UMG,
### Motown Records, Universal Music Group, Sean Combs, Justin Combs, Kristina Khorram,
### Combs Global, and Love Records)

201.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

202.   Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group ("the collective"), is 100% liable for the actions of Sean Combs, and by extension, Love Records, Combs Global, Justin Combs, and Kristina Khorram ("RICO orchestrators") as they were acting in their capacities as the collectives' General Business Partners when they committed the acts detailed below.  The collective financially benefited from Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram through their partnership and distribution deal with Sean Combs and Love Records. The collective provided Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram with unfettered access to financial resources in the form of wire transfers, direct payments, and invoice reimbursements and failed to adequately investigate, supervise, and or monitor where the money was being used, who was using the money, and what the money was being used for.

203.   The financial support provided by the collective was the lifeline that spearheaded and maintained Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram's depraved actions.  Upon information and belief, the establishment and distribution partnership deal between the collective and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram was intentionally written overly broad.  For Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs,

and Kristina Khorram to receive financial support from the collective, they had to state that the payment was for "Love Album Related Expenses." Well, the writer's camp at CRS, the nightly Club Love parties at CRS, and the yacht were all spaces that Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram utilized to produce songs that were released on the Love Album. The "Love Album Related Expenses" reimbursement requirement was a ruse. The collective knew or should have known that Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram had no intention to utilize the collective's financial support for album-related expenses, and they did not put any mechanism in place to ensure that the money was not being used for any illegal activity. The collective's willful blindness resulted in Plaintiff Jones suffering the harm detailed herein.

204. Defendants are individuals and entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Lucian Charles Grainge, Sean Combs, Justin Combs, Kristina Khorram, Combs Global, Motown Records, Love Records, Universal Music Group, JOHN, and JANE DOES 1-10, and ABC CORPORATIONS 1-10.

205. In the relevant part, 18 U.S. Code 1961 defines a racketeering activity as:

(1) (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, **dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act)**, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: … **section 933 (relating to trafficking in firearms)**, section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), sections 1461–1465 (relating to obscene matter), **section 1511 (relating to the obstruction of State or local law enforcement)**, **sections 1581–1592 (relating to peonage, slavery, and trafficking in persons)**, section 1952 (relating to racketeering), section 1956 (relating to the laundering of monetary instruments), (D) any offense involving fraud connected with a case under title 11…the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical.

206. Section 1962(a) makes it:

**unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity** or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of,

any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce.  18 U.S.C. § 1962(a).

207.  Section 1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. §1962(c).

208.  Section 1962(d) makes it:

unlawful for "any person to conspire to violate" Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

209.  Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

210.  Throughout this pleading, Mr. Jones has detailed many acts by Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram, which are prohibited under 18 U.S.C. §1962.

211.  Defendants have unlawfully increased their profits by luring and deceiving producers, musicians, writers, creators, and artists such as Plaintiff to their organization for the misstated purpose of using their talents as creatives to produce music.  Defendants' true intentions are later revealed through a calculated grooming scheme that involves false promises of business opportunities, exposure to music executives with the promise of future introductions, and the promise of awards and accolades, which quickly shifts to unauthorized drugging, threats of bodily harm, sex trafficking, and sleep deprivation.  According to Mr. Jones, Defendant Combs often required Mr. Jones to work for several consecutive days without sleep.  According to Mr. Jones, it was imperative always to look like he was working whenever Mr. Combs walked by.

212.  Within a few months of working for and living with Mr. Combs, Mr. Jones witnessed KK instruct her direct reports and Combs enterprise employees Brendan, Frankie, and Moy to acquire and transport the following drugs: ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms.  Mr. Jones personally witnessed Combs Enterprise employee Brendan transport firearms to and from nightclubs, strip clubs, and other venues for Mr. Combs on his person in Miami, Florida.  Mr. Jones personally witnessed Mr. Combs distribute firearms out of his bedroom closet to individuals that Mr. Jones knew to be members of local gangs[28].   During

---

[28] Plaintiff is intentionally being vague, in fear of his personal safety. He can provide more detail to the Court in camera.

the making of the Love Album, several evenings, Mr. Jones personally witnessed Mr. Combs instruct the Combs enterprise employees Brendan, Frankie, and Moy to solicit sex workers to the recording studio at his homes and to the Chalice Recording Studios.  According to Mr. Jones, Mr. Combs felt there was too much testosterone in the studio and wanted sex workers there to create the vibe for the Love Album.  Then these workers arrived, and Mr. Jones and the other musicians and producers were required to engage in sex acts with them.  KK and Frankie would often negotiate the price for the sex workers' services.  They would either pay the workers in cash, electronically (cash app, Venmo, PayPal, or wire transfers), or through any other form requested by the sex worker.  As detailed in the chart below, when Mr. Jones was groomed into soliciting sex workers for Mr. Combs, he often negotiated the cost via text message.

213.   The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association, in fact, of persons, including each Defendant and other unnamed co-conspirators.   That association was structured by various general partnership agreements, establishment deals, distribution deals, contracts, and non-contractual relationships between the Defendants, by which Defendants assumed different roles in either knowingly or negligently funding, directly or indirectly participating in the acts necessary to carry out a scheme to acquire and distribute drugs, firearms, prostitutes, and sex workers.  They also worked collectively to deceptively obtain the labor of producers, musicians, writers, creators, and artists such as Plaintiff to utilize their talents and labor to produce music and other tangible goods and services without full compensation.  As detailed herein, Plaintiff Jones worked for Mr. Combs for thirteen months. Combs Enterprise employee Frankie solicited him to produce the Love Album.  Frankie and Mr. Combs agreed to provide Mr. Jones $20,000.00 per song, four royalty points per song, credit as producer, credit for each instrument Mr. Jones played, and publishing rights for Mr. Jones' work in exchange for Mr. Jones' services on The Love Album.  Over thirteen months, Mr. Jones fulfilled his end of the agreement and provided services for the Love Album.  Mr. Combs benefited from Mr. Jones' services and refused to compensate him by their agreement. Mr. Jones is not the only creative who had his services stolen by Mr. Combs; many creatives worked for months on the Love Album and were never compensated for their work.

214.   According to the Habtemariam Declaration, the collective reimbursed or paid for the production of the Love Album.  Mr. Jones was not compensated, so if the Habtemariam Declaration is correct, what was the collective financial support used for?  And what mechanism did the collective have in place to ensure the money provided to Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram were used for the purposes outlined in the collective's partnership deal with Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram.

215.   The collective and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram all share a common purpose: to use deception, coercion, force, and the threat of violence to enrich themselves at the expense of individuals like the Plaintiff. As set forth herein, although members of the collective may not have directly threatened coerced, force or violently threaten Plaintiff, they financially benefitted from Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram scheme of defrauding, and intimidating the Plaintiff with threats of violence (threatening to eat Plaintiff's face, displaying and distributing guns in Plaintiff's presence, bragging about having law enforcement under control, bragging about murdering people, and bragging about bribing witnesses, and jurors in the criminal case concerning the 1999 NYC nightclub shooting with Shyne), threats of isolation from the music and entertainment industry (parading influential music industry executives at Mr. Combs parties filled with sex workers, minors, and illegal drugs, such as ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms), threats of nonpayment for work completed, fake promises of cash payments ($250,000), producer of the year Grammy awards, guaranteed access to future projects, and a $20 million dollar home on Star Island in Miami.  It is reasonable to believe Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram would not have engaged in these acts of threats but for the existence of the Rico scheme and their understanding that the collective would provide unfettered access to financial recourses without ever questioning Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram use of the money.

216.  Upon information and belief, the collective and Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram have had several partnerships throughout the years.  As is the case here, Defendant UMG provided Mr. Combs

46

with unfettered access to financial dollars in exchange for Mr. Combs and Defendants Sean
Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram providing
Defendant UMG with the fruits of the labor of producers, musicians, writers, creators, and
artists such as Plaintiff to utilize their talents and labor to produce music, and other tangible
goods and services without full compensation.

| Date of Partnership | Participants in the Partnership | Details of the Partnership |
|---|---|---|
| 2003 to 2005[29] (3 years) | Sean Combs, Bad Boy Records, and Universal Music (subsidiary of Defendant UMG) | Joint Venture |
| 2009 to 2015 (6 years) | Sean Combs, Bad Boy Records, and Universal/Interscope Geffen A&M (subsidiary of Defendant UMG)[30] | Worldwide Distribution Deal |
| 2022 to 2023 (approx. 1 year) | Sean Combs and Motown Records (subsidiary of Defendant UMG)[31] | Establish Love Records and distribute the Love Album |

217.   As outlined in the chart above, from 2003 to 2005, Defendant Combs, the then CEO and
owner of Bad Boy Records, entered a joint venture deal with Universal Music, a subsidiary
of Defendant Universal Music Group.  Upon information and belief, at the time Defendant
Combs and UMG entered their three-year joint venture, it was public knowledge that Mr.
Combs had a serious reputation for violence and engaging in criminal activity.  Defendant
UMG had firsthand knowledge of Combs' propensity for violence because on April 16, 1999,
Defendant Combs assaulted Steve Stoute, their Executive Vice President of Interscope Geffen
A&R.  Combs was arrested and charged with two felonies — second-degree assault and
criminal mischief — in the beating of Steve Stoute, who says Combs and two bodyguards
beat him with their fists, a telephone, a champagne bottle, and a chair.  Mr. Combs had a
criminal trial surrounding the 1999 Nightclub shooting in NYC, when Mr. Combs required
his then-girlfriend, Jennifer Lopez, to transport his illegal firearm into the NYC nightclub.  In

---

[29] https://www.nytimes.com/2003/02/08/business/p-diddy-signs-3-year-deal-with-universal-records.html
[30] "Puff is a rare person in the music industry today, that can move the culture in many areas – fashion, TV, music – as well as making records," commented IGA Chairman Jimmy Lovine. "Whenever a free agent like him comes along, which is rare, you grab him."
[31] https://www.ebony.com/diddy-launches-new-rb-label-in-partnership-with-motown-records/ and https://www.motownrecords.com/culture/diddy-and-motown-partner-up/

2001, Former television host Roger Mills sued Mr. Combs for assault. This case did not end
until 2004, two years into the joint venture deal. Despite all these public warning signs of a
pattern and practice of behavior that evidence a propensity to engage in violent crimes and
other criminal activity, Defendant UMG chose to enter into a general partnership agreement
with Mr. Combs. Defendant UMG knew or should have known that it had a duty to monitor
how the financial resources they provided to Mr. Combs were being spentUpon information
and belief, from 2009 to 2015, the collective and Defendants Sean Combs, Combs Enterprises,
Love Records, Justin Combs, and Kristina Khorram[32] continued their Rico enterprise when
Mr. Combs, UMG and Mr. Grainge entered a general business partnership to internationally
distribute music produced by Mr. Combs and Bad Boy Records. As part of that deal UMG
provided financial support to Mr. Combs and paid for all expenses related to the development
and distribution of the music Mr. Combs and Bad Boy Records produced.

218. On or about 2022 to 2023, the collective and Defendants Sean Combs, Combs Enterprises,
Love Records, Justin Combs, and Kristina Khorram established the latest iteration of their
RICO enterprise when they entered a general business partnership to establish Love Records
and to distribute Love Records first album, the Love Album off the Grid. According to the
Declaration of Ms. Habtemariam, as the Chairwoman and CEO of Motown Records, she
reported directly to Defendant Lucian Grainge. Ms. Habtemariam also states that she was
given approval by Defendant UMG to enter the partnership with Sean Comes to help establish
Love Records. It is safe to assume that Defendant Lucian Grainge, Ms. Habtemariam's direct
supervisor, was aware of and signed off on the UMG and Sean Combs partnership, which led
to the establishment of Love Records. According to Ms. Habtemariam, Defendants UMG and
MR financed Sean Combs for "approved" invoices associated with the creation of the Love
Album. Ms. Habtemariam did not identify any mechanism MR or UMG implemented to
ensure the financial support remitted to Mr. Combs and Love Records went to approved
invoices associated with the Love Album. If the treatment of Plaintiff Jones is any indication
of how Defendants UMG and MR ensured that their financing of Love Records and the Love
Album was applied in accordance with the partnership agreement, then they would have

[32] Upon information and belief, Defendant Kristina Khorram began her employment with Defendant Combs, and
Combs Enterprises in 2013.

realized that artists like Plaintiff Jones had worked for several months on the Love Album without full compensation.

219.    Upon information and belief, if the collective financed Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorramin in the manner described by Ms. Habtemariam's declaration, then it is safe to assume that they financed the "recording costs" at Chalice Recording Studios, Defendant Combs houses in Miami and Los Angeles, as well as the Yacht as evidenced by posts Mr. Combs made on his Instagram page from September 2022 to September 2023 (on or about the time the Love Album was released), as well as the videos, and photos in Mr. Jones possession, Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram did more than just record music.  On a daily basis, Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorram had sex workers and endless drugs flowing through the recording sessions at CRS, Mr. Combs' homes, and on the Yacht which Mr. Combs rented.  Unless the collective had an overseer present at the recording sessions to account for how the money they provided Defendants Sean Combs, Combs Enterprises, Love Records, Justin Combs, and Kristina Khorramwas being spent, it is safe to say they were complicit in allowing their money to pay for illegal drugs, and sex workers.

220.    As evidenced by the hundreds of hours of video and audio recordings in Plaintiff's possession, Defendants Sean Combs, Justin Combs, Kristina Khorram, his assistants, and staff all orchestrated, participated, managed, and executed the RICO Enterprise by purchasing and distributing ecstasy, cocaine, GHB, ketamine, marijuana, and mushrooms.  They transported the drugs by flying on commercial airlines from California to New York, Florida, the Virgin Islands, and Saint Barthélemy in the French Caribbean.  They placed these controlled substances in their carry-on luggage through TSA.  They then carried these substances in black pouches and distributed the drugs to Mr. Combs, his friends, house guests, girlfriends, and sex workers.

221.    The RICO enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

222.    Upon information and belief, the enterprise was characterized by the collective providing unlimited, unchecked financing to Defendants Sean Combs and Love Records for the establishment of Love Records and the creation of the Love Album.  Defendants Sean Combs,

Love Records, and Kristina Khorram had a pattern of making false representations and omissions to the artists, creatives, musicians, and producers who used their talents to provide services to the RICO enterprise. These false representations and omissions were designed to induce artists, creatives, musicians, and producers to utilize their talents and labor to produce music and other tangible goods and services without full compensation. These artists, producers, creatives, and musicians were also forced to solicit and participate in sexual encounters with prostitutes and sex workers. They were also required to transport illegal, unregistered handguns and to purchase and distribute narcotics.

223. As part of this scheme, Defendants required their artists, creatives, musicians, and producers to visit strip clubs wearing exclusive authentic Bad Boy merchandise and to use the name and reputation of Mr. Combs to solicit sex workers and prostitutes.



**Mr. Jones and Brendan wearing the Bad Boy Hat**

224. Additionally, Mr. Combs used the prospects of winning Grammy awards, purchasing 20-million-dollar homes, participating in future projects, making $250,000 cash payments, and meeting influential music industry executives. This pattern of false representations was disseminated to artists, creatives, musicians, and producers who reside in California, Florida, New York, and around the country by Defendants based in California, Florida, and New York

under the direction and on behalf of Defendants in New York.  The dissemination typically used interstate telephone wires, social media messages, and electronic mail.

225.   Upon information and belief, the true nature of Defendants' scheme was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiff Jones and other unwitting artists, creatives, musicians, and producers.

226.   Upon information and belief, Defendants profited from the enterprise, and Plaintiff Jones suffered because the enterprise diminished Plaintiff Jones's finances due to 13 months of nonpayment and diminished Plaintiff Jones's health through consistent drugging and forced sexual encounters with prostitutes and sex workers.  Defendants used the proceeds from this scheme to advance the scheme by funding and operating their marketing machine, including through the use of the mail, social media, word of mouth, and interstate wires to sell the illusion that Mr. Combs was serious about the talents and skills of the artists, creatives, musicians, and producers, and wanted to use those skills to make music when nothing could be further from the truth.  Defendants provided their artists, creatives, musicians, and producers with this misrepresentative information, including via email all over interstate wireline communications systems and obtaining free labor, the distribution of drugs and firearms, as well as prostitutes, sex workers, and minors.  Defendants obtained revenue via wire transfers, documents, and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to Plaintiff Jones as described throughout.

227.   Upon information and belief, The Defendants' scheme was reasonably calculated to deceive Plaintiff Jones, artists, creatives, musicians, and producers of ordinary prudence and comprehension through the execution of their complex and illegal scheme to misrepresent the effectiveness of soliciting prostitutes, sex workers, and minors and distributing drugs and guns that did not, would not, and could not lead to securing Grammy Awards, purchasing $20 million homes, participating on future projects, $250,000 cash payments, and meeting influential music industry executives.  Plaintiff Jones would not have lived with Mr. Combs for 13 months, missing birthdays, holidays, and family events, but for the illegal racketeering scheme operated by Defendants.

228.   Upon information and belief, Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiff Jones, and each participated in the enterprise as follows:

229.   Upon information and belief, Defendants Lucian Charles Grainge, Combs Global, Motown Records, Love Records, and Universal Music Group control and participate in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to developing and marketing scores of writing camps, and listening parties services that are marketed to innocent, unassuming artists, creatives, musicians, and producers who are.

230.   Throughout the relevant period, Defendant Lucian Charles Grainge in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to enter into a general partnership agreement with Sean Combs and Love Records.   As general business partners, each member is responsible for the partners' actions in the partnership.   Defendants Lucian Charles Grainge, Motown Records, and Universal Music Group have an ethical obligation to ensure their business partners, Sean Combs and Love Records, were not using the partnership assets to engage in illegal activity.

231.   Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to their general business partners, Defendants Sean Combs and Love Records.   Defendants Sean Combs and Love Records used the financial resources provided by their general business partners to solicit through the mail, email, social media, and the telephone artists, creatives, musicians, and producers whom they would promise Grammy Awards, expensive property, participation on future projects, cash payments, and meetings with powerful music industry executives. Defendants Sean Combs and Love Records instructed Defendants Justin Combs, Kristina Khorram, and her staff to solicit these artist's creatives, musicians, and producers who resided in New York, Illinois, California, Georgia, and Florida.   Defendants Justin Combs, Kristina Khorram, and her staff relied on the mail, email, social media messenger, and telephone to disseminate the misleading information described herein.   Defendants Sean Combs, Love Records, Justin Combs, and Kristina Khorram did not disclose to the individuals they solicited the fact that they would be drugged, required to sleep with sex workers, and forced to work for days at a time without compensation.   As it relates to Plaintiff Jones, Defendants Sean Combs, Love Records, and Kristina Khorram controlled his ability to travel.   They did not

provide him with full compensation for the work he provided. As a result, Mr. Jones did not have the finances to return home without Defendants Sean Combs, Love Records, and Kristina Khorram paying for it. On several occasions in Miami, Florida, he asked Defendants Sean Combs and Kristina Khorram for permission to visit his family for their birthdays and holidays. Defendants Sean Combs and Kristina Khorram refused. They went so far as threatening Mr. Jones by telling him that if he left, he would not be paid for the work he had done, would not be allowed to return, and would not receive the promised Grammy Awards, expensive property, participation in future projects, cash payments, and meetings with influential music industry executives.

232.   In connection with Defendants acting from New York, these Defendants used the mail and interstate wires to solicit Plaintiff Jones and artists, creatives, musicians, and producers and to use Plaintiff Jones and the artists, creatives, musicians, and producers to utilize their talents and labor to produce music, and other tangible goods and services without full compensation, as well as the solicitation of sexual encounters with prostitutes, sex workers, and the purchasing and distribution of illegal firearms and drugs. Each of these acts was undertaken with the knowledge and approval of all other Defendants to further the goals of their conspiracy.

233.   Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to their general business partners, Defendants Sean Combs and Love Records. As the financial supplier of Defendants Sean Combs and Love Records, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, had a duty to direct and control the manner in which Defendants Sean Combs and Love Records, used the money they supplied. In furtherance of the goals of their conspiracy, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, used the Love Album as a ruse to provide Defendants Sean Combs and Love Records with the financial resources he used to execute his RICO enterprise. Throughout the relevant period, Defendants Sean Combs and Love Records used the financial resources their general business partners provided to solicit potential artists, creatives, musicians, and producers. As detailed throughout, they relied on the mail, email, social media, text messages, and WhatsApp messages to disseminate the misleading information described herein and profit from the free

53

labor of these artists, creatives, musicians, and producers. In addition to the forced free labor, they used their power and influence to force these creatives to solicit sex workers and to engage in unwanted sexual encounters with these sex workers. They also used their power and influence to force these creatives to purchase, transport, and distribute illegal firearms and drugs. As the general business partner of Defendants Sean Combs and Love Records, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, are equally liable for the commission of these acts.

234. Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to Defendants Sean Combs and Love Records through wire transfers to Defendants Sean Combs and Love Records accountant Robin Greenhill. Upon information and belief, Ms. Greenhill ensured the wiring, funds transfer, or cash payments to sex workers were completed. Defendant Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul, would negotiate the fees the sex workers received and would ensure that the workers are paid in one of the manners detailed above. According to Plaintiff Jones, Defendant Sean Combs bragged about having several women on a monthly stipend. According to Plaintiff Jones, the women who received these payments are Caresha Romeka Brownlee, aka "Yung Miami," Jade Ramey, aka "Jade," and Daphne Joy Cervantes Narvaez, aka, "Daphne Joy" who were paid a monthly fee to work as Mr. Combs' sex workers. Based on information and belief, they received payment via wire transfer from Robin Greenhill. It is unclear if they were provided the appropriate United States federal tax documents for these payments or if they independently declared these payments on their taxes. It is unclear if Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, requested an audit of Defendants Sean Combs and Love Records' financial records to ensure the financial support they provided to Defendants Sean Combs and Love Records as part of their general business partnership was not being used to pay Caresha Romeka Brownlee, Jade Ramey, and Daphne Joy Cervantes Narvaez.

235. During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Complaint.

236. Beginning at an exact date unknown to Plaintiff, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

237. The acts set below ("Racketeering Acts") followed the same pattern and purpose: to defraud the Plaintiff for the Defendants' benefit. Each Racketeering Act involved the same or similar methods of commission and participants.

238. The Defendants' business would not have succeeded without the repeated predicate acts and the ability to conduct their fraud using mail, telecommunications wires, interstate travel, international travel, and money laundering.

239. The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to solicit potential artists, creatives, musicians, and producers. As detailed throughout, they relied on the mail, email, social media, text messages, and WhatsApp messages to disseminate the misleading information described herein and profit from the free labor of these artists, creatives, musicians, and producers. In addition to the forced free labor, they used their power and influence to force these creatives to solicit sex workers and to engage in unwanted sexual encounters with these sex workers. They also used their power and influence to force these creatives to purchase, transport, and distribute illegal firearms and drugs.

240. The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiff Jones and the artists, creatives, musicians, and producers to utilize their talents and labor to produce music, and other tangible goods and services without full compensation. In addition to the forced free labor, they used their power and influence to force these creatives to solicit sex workers and to engage in unwanted sexual encounters with these sex workers. They also used their power and influence to force these creatives to purchase, transport, and distribute illegal firearms and drugs.

241. The Defendants' wrongful conduct has injured Plaintiff Jones, remains part of their ongoing business practices, and continues to threaten Plaintiff Jones and the public.

242.   Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

243.   To further their goals, Defendants worked in concert to engage in various forms of criminal activity, including the solicitation of sexual encounters with sex workers and the purchasing and distribution of illegal firearms and drugs.

244.   The defendant's ongoing racketeering activity has injured and continues to injure Plaintiff Jones.  The Defendants' pattern of forcing Plaintiff Jones and the artists, creatives, musicians, and producers to solicit sexual encounters with sex workers and to purchase, transport, and distribute illegal drugs and firearms was the proximate cause of the injuries suffered by Plaintiff.

**Defendants Committed Multiple Acts of Sex Trafficking in Violation of 18 U.S.C. § 1591 (Sex trafficking of children or by force, fraud, or coercion) in Furtherance of the Enterprise**

245.   As detailed throughout this pleading, Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul knowingly affected interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, by recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting by any means a person (Plaintiff Jones) to engage in illegal sex acts.  In addition to violating federal law, these acts violated the following state statutes: Florida, Penal Code 796.07(2)(f); California, Penal Code 647(b); New York, Penal Code 230.05; and USVI, Penal Code tit.  14, § 1622.

246.   In addition to violation of laws in the United States territory, Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul's actions, may have violated the laws of Saint-Barthélemy.

247.   As detailed throughout this pleading, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to Defendants Sean Combs and Love Records.  Through their general business partnership, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, Universal Music Group, Love Records, Sean Combs, and by extension through Sean Combs, Justin Combs, Combs Enterprises, and Kristina Khorram knowingly

56

benefited, financially or by receiving anything of value, in a venture which has engaged in an act described in violation of paragraph (1) of 18 U.S.C. § 1591.

248.   Defendants Love Records, Kristina Khorram, Sean Combs, and by extension through Sean Combs, Justin Combs, and Combs Enterprises knowingly, or, except where the act constituting the violation of paragraph (1) 18 U.S.C. § 1591 advertised, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2) of 18 U.S.C. § 1591, or any combination of such means will be used to cause Plaintiff Jones to engage in several commercial sex acts.

249.   By way of example, on or about January 28, 2023[33], Plaintiff Jones[34] was residing in Defendant Combs' home at 2 Star Island Drive in Miami, Florida.  Defendants Sean Combs and Kristina Khorram forced Mr. Jones to send Ubers to transport a sex worker to Mr. Combs' home located at 2 Star Island Drive in Miami, Florida.  We have the complete text thread and have intentionally opted not to include it here to protect the identity of this sex worker. Defendant Combs forced Mr. Jones to have sex with this individual against his will. According to Mr. Jones, Defendant Combs felt there was too much testosterone in the studio and wanted sex workers there to create the vibe for the Love Album.  Upon information and belief, this Uber and this sex worker were compensated from the financial support Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide to Sean Combs and Love Records for the recording costs associated with the creation of the Love Album.

---

[33] According to Counsel for Defendants Lucian Charles Grainge, Motown Records, and Universal Music Group, they ended their general business partnership agreement with Mr. Combs and Love Records at some point during the month of February 2023.
[34] In the interest of preserving Plaintiff Jones Fifth Amendment rights, we will provide the remaining text messages, and voice memos to the Court in Camera.  It is important for the Court to remember that Plaintiff was coerced through threats of violence to engage in these acts.  Additionally, Defendants Khorram and Sean Combs controlled the purse, and would only allow Plaintiff to leave their custody and control based on their terms.



250. By way of example, on or about February 8, 2023, Plaintiff Jones was forced by Defendants
Sean Combs and Kristina Khorram to send Ubers to transport a sex worker to and from Mr.
Combs' home located at 2 Star Island Drive in Miami, Florida. We have the complete text
thread and have intentionally opted not to include it here to protect the identity of this sex
worker. Defendant Combs forced Mr. Jones to have sex with this individual against his will.
According to Mr. Jones, Defendant Combs felt there was too much testosterone in the studio
and wanted sex workers there to create the vibe for the Love Album. Upon information and
belief, this Uber and this sex worker were compensated from the financial support Defendants
Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and
Universal Music Group to provide to Sean Combs and Love Records for the recording costs
associated with the creation of the Love Album.



251. From at least in or about September 2022, up to and including in or about November 2023, in the States of New York, California, Florida, the USVI and elsewhere, Defendants Sean Combs and Kristina Khorram and others known and unknown, in and affecting interstate commerce, did knowingly combine, conspire, confederate and agree to recruit, entice, harbor, transport, provide, obtain, and maintain by any means a person, and to benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud and coercion, and combination of such means, would be used to cause the person (Plaintiff Jones) to engage in a commercial sex act, to wit, Defendants Sean Combs and Kristina Khorram and others known and unknown caused Plaintiff Jones to engage in commercial sex acts in the United States cities of Miami, Los Angeles, and New York, as well as within the special maritime and territorial jurisdiction of the United States by means of force, threats of force, fraud and coercion, and a combination of such means.

59

252.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the States of New York, California, Florida, the USVI, and elsewhere:

a.   In or about September 2022, Defendant Sean Combs, through his authorized agent, Frankie Santella, recruited Plaintiff Jones to work for him as a producer, musician, and creative for Love Records.  Defendant Combs promised to pay Mr. Jones the following to work on the Love Album: $20,000.00 per song, four royalty points, Credit as producer, and Credit for each instrument Mr. Jones played.  Mr. Jones must retain his publishing rights.

b.   In or about September 2022, Defendant Sean Combs began slowly grooming Plaintiff Jones by directly[35] teaching Mr. Jones how to go about recruiting sex workers.  He provided Mr. Jones with a Bad Boy Baseball cap, instructed his agents Stevie J., and Moy Baun to teach Plaintiff Jones the type of sex workers to solicit, and way to solicit them.

c.   As part of his grooming of Plaintiff Jones, in or about December 2022, while on a Yacht, Defendant Combs bragged about and detailed how he got away with a New York City nightclub shooting in 1999.  In or about January 2023, while in his home in Miami, Defendant Combs required Mr. Jones to work out of his bedroom and watch as Defendant Combs distributed guns to individuals dressed in all black.  In or about April 2023 in Los Angeles, Defendant Combs required Mr. Jones to work out of his bedroom and watch as Defendant Combs distributed guns to individuals that Mr. Jones knew to be members of a local gang.  In or about April 2023, Defendant Combs threatened to eat Mr. Jones' face and informed him that he would not hesitate to kill his own mother to get what he wanted.

d.   As evidenced by the chart below, at the direction of Defendants Combs and Kristina Khorram, Plaintiff Jones was forced to solicit the identified sex workers.  These workers were brought to Mr. Combs' homes at 2 Star Island Drive in Miami, Florida, and 1 Star Island Drive in Miami, Florida.  Plaintiff Jones had no authority to invite guests to Defendant Combs' home without either Defendant Combs' or Defendant

---

[35] We have a recording, taken my Mr. Combs at a club in Miami Florida.  This was the night that Mr. Combs personally taught Mr. Jones how to solicit sex workers.  We will provide a copy of the video to the court in camera.

Kristina Khorram's consent. Defendant Combs property is protected by 24-hour security, and all visitors must be verified before entry:

| Sex Workers and last two digits of their cellphone | Dates of forced solicitation | Location |
|---|---|---|
| Sex Worker 1 (98) | 1/30/23, 1/31/23, 2/1/23, 2/2/23 | 2 Star Island Drive in Miami, Florida. |
| Sex Worker 2 (87) | 2/8/23, 2/9/23, 4/4/23 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 3 (82) | 11/29/22, 1/26/23, 2/2/23, 2/4/23 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 4 (82) | 11/30/22, 12/1/22, 12/2/22 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 5 (77) | 2/1/23, 2/2/23, 2/4/23, 2/5/23 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 6 (43) | 1/28/23, 1/28/23 | 2 Star Island Drive in Miami, Florida |
| Sex Worker 7 (31) | 12/3/22, 12/6/22, 1/26/23, 1/27/23, 1/29/23, 1/30/23, 4/1/23, 5/3/23, 5/6/23, 5/7/23, 5/8/23, | 2 Star Island Drive in Miami, Florida, and 1 Star Island Drive in Miami, Florida |
| Sex Worker 8 (72) | 5/8/23 | 2 Star Island Drive in Miami, Florida |

253. From at least in or about September 2022, up to and including in or about November 2023, in the States of New York, California, Florida, the USVI, and elsewhere, Defendants Sean Combs and Kristina Khorram and others known and unknown, in and affecting interstate commerce, knowingly did recruit, entice, harbor, transport, provide, obtain, and maintain, by any means a person (Plaintiff Jones), and did benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud and coercion, and a combination of such means, would be used to cause the person to engage in a commercial sex act, to wit, Defendants Sean Combs and Kristina Khorram caused Plaintiff Jones to engage in

commercial sex acts utilizing force, threats of force, fraud and coercion, and a combination of such means.  Additionally, Defendant Combs received personal gratification by watching Plaintiff Jones engage in commercial sex acts with the aforementioned sex workers.

254.   From at least in or about September 2022, up to and including in or about November 2023, in the States of New York, California, Florida, the USVI, and elsewhere, Defendants Sean Combs and Kristina Khorram and others known and unknown, in and affecting interstate commerce, did use and cause to be used facilities in interstate and foreign commerce, to wit internet and cellular telephone services, with the intent to promote manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, a business enterprise involving prostitution offenses in violation of applicable state law, and thereafter performed and attempted to perform an act to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of such unlawful activity.

### Defendants Committed Multiple Acts of procuring, transporting, and distributing controlled substances in Violation of Title 18, United States Code, Sections 1961(1) and 1961(5) Furtherance of the Enterprise

255.   As detailed throughout this pleading, Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul, knowingly affected interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).  In addition to violating federal law, these acts violated the following state statutes: Florida, Penal Code 893.135; California, Health and Safety Code § 11352; New York, Penal Codes 220.77, 220.18, 220.50, and 220.06; and USVI, Penal Code tit. 19, § 614a.

256.   **The Combs Rico Enterprise[36]**: As detailed throughout this pleading, Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her

---

[36] "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C.S. § 1961 (LexisNexis, Lexis Advance through Public Law 118-40, approved March 1, 2024).

direct reports Frankie Santella, Moy Baun, and Brendan Paul, are an enterprise as the term is defined pursuant to 18 USCS § 1961 (4). That is, a group of individuals associated, in fact, that engaged in, and the activities of which affected interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit to achieve the enterprise's objectives.

257. Upon information and belief, the Combs Rico Enterprise is comprised of individuals residing in and around Los Angeles, California, Miami, Florida, New York, New York, among other places. Members and associates of the Combs Rico Enterprise have engaged in drug trafficking and firearms trafficking.

258. Upon information and belief, members and associates of the Combs Rico Enterprise procured, transported, and distributed ecstasy, cocaine, GHB, ketamine, marijuana, mushrooms, and tuci in and around the States of New York, California, Florida, the USVI, and elsewhere. During the relevant timeframe, through their general business partnership, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, authorized Motown Records and Universal Music Group to provide financial resources to Defendants Sean Combs and Love Records. According to the Habtemariam Declaration, this financial support was supposed to pay (or reimburse) Love Records for certain of the invoiced recording costs incurred by Love Records in making The Love Album. According to Plaintiff Jones, while the Combs Rico Enterprise was procuring, transporting, and distributing ecstasy, cocaine, GHB, ketamine, marijuana, mushrooms, and tuci, it was during the making of The Love Album.

259. **The purpose of the Combs Enterprise**: As detailed throughout this pleading, and according to Plaintiff Jones, the purpose of the Combs Enterprise is to:

    a. Use its position, power, and influence to control artists, creatives, musicians, and producers to force these creatives to purchase, transport, and distribute illegal firearms and drugs,

    b. Promoting and enhancing the prestige, reputation, and position of the enterprise with respect to rival music labels, artists and executives,

    c. Preserving and protecting the power, territory, and criminal ventures of the enterprise through the use of intimidation, threats of violence, and coercion,

    d. Keeping victims in fear of the enterprise and its members and associates,

63

e.  Enriching the members and associates of the enterprise through criminal activity, including narcotics trafficking and fraud,

f.  Concealing the activities of the enterprise from law enforcement by instructing the associates of the enterprise to consult with Faheem Muhammed, the enterprise head of security, if they ever encounter any problems with law enforcement.

260.  **Methods and Means of the Enterprise**:  Upon information and belief, among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

g.  Members of the enterprise and their associates procured, transported and distributed ecstasy, cocaine, GHB, ketamine, marijuana, mushrooms, and tuci by packing these substances in their carry-on luggage and going through TSA.  Plaintiff Jones personally witnessed members of the enterprise do this during national and international travel, as detailed below:

| Enterprise Member | Approximate Dates of Travel | Location: (Starting and destination) |
|---|---|---|
| DeForrest Taylor | 11/22/2022 | Los Angeles, California to Miami, Florida |
| Brendan Paul | 12/22/2022 | Miami, Florida to Saint Barthélemy[37] |
| Brendan Paul[38], and Kristina Khorram | 04/28/2023 | Los Angeles – to New York City – Virginia – to Los Angeles |
| Brendan Paul[39] | 11/4/2023 | Los Angeles, California to London England[40] |

---

[37] Mr. Jones is uncertain if it was a direct flight or if he stopped off in Los Angeles or New York prior to his arrival to Saint Barthélemy.

[38] Brendan and Kristina Khorram brought drugs.  Plaintiff and the Combs Rico Enterprise were rehearsing for "something in the water festival" in Virginia. Plaintiff Jones personally witness Mr. Combs do a few lines of coke in his dressing room.  Defendant Sean Combs wanted tuci but Brendan forgot it, so Defendant Kristina Khorram called Yung Miami. Who then brought it on the private jet from Miami.

[39] Packed cocaine in his carryon luggage in the garage of Defendant Combs house the evening of 11/3/2023.

[40] Defendant Combs and Giggs reunited in London, England on November 7, 2023, for a sold-out show at O2 Shepherd's Bush Empire.   https://www.voice-online.co.uk/entertainment/music/2023/10/30/hip-hop-titans-giggs-and-diddy-to-perform-special-one-night-only-event/

261. According to Mr. Jones, the Combs Enterprise defendants informed the members and associates of the enterprise that it would be safe to transport narcotics through in their carryon luggage because according, to a TSA advisory, TSA security officers do not search for marijuana or other illegal drugs[41].

262. The following is a screenshot of a video taken on Mr. Combs' yacht on or about December 25, 2022, at 2:40 am; Brendan Paul is videotaped with one of the black pouches Defendant Combs, and Kristina Khorram required the associates and members of the Combs Rico Enterprise to carry. This pouch was filled with ecstasy, cocaine, GHB, ketamine, marijuana, mushrooms, and tuc:



---

[41] https://www.tsa.gov/travel/security-screening/whatcanibring/items/medical-marijuana#:~:text=Accordingly%2C%20TSA%20security%20officers%20do,to%20a%20law%20enforcement%20officer.

263.   The pattern of racketeering activity through which Defendants Sean Combs, Love Records, Combs Enterprises, Justin Combs, Kristina Khorram, through her direct reports Frankie Santella, Moy Baun, and Brendan Paul, together with others, agreed to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise consisted of multiple offenses involving dealing in controlled substances, in violation of Title 21, United States Code, Sections 841, 843 and 846. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

**Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

264.   Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs out of money, relying on the mail.  They committed these acts with the intent to defraud Plaintiff Jones and the artists, creatives, musicians, and producers.

265.   Defendants used the mail to execute the fraudulent scheme herein.

266.   Specifically, the Defendants agreed to each of the acts of mail fraud described throughout this Complaint.  In addition, they agreed to rely on the mail to secure wire frauds and cash payments from purchasers of the illegal firearms and drugs they required others to sell and distribute.

267.   In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants, either individually or in combination with themselves, used and caused to be used the U.S. mail by both placing and causing to be placed cash, letters, marketing materials, advertisements, agreements and other matters in depositories and by removing or causing to be removed letters and other mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. § 1341.

268.   Defendants could not have furthered their fraud without the use of the mail.  For example, Defendants sought to acquire wire transfers and cash payments and to utilize their talents and labor to produce music and other tangible goods and services without full compensation. Defendants also required the mail to distribute misleading advertisements to various states, including New York.  For these reasons, the use of mail to conduct fraudulent activity was necessary and inevitable.

**Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

269.   Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff out of money, in reliance on the mail.  Defendants committed these acts with the intent to defraud Plaintiff Jones and the artists, creatives, musicians, and producers.

270.   Specifically, Defendants agreed to each of the acts of wire fraud described throughout this Complaint.  In addition, Defendants agreed to rely on interstate wires to disseminate funds and to submit payment to sex workers and prostitutes, as well as to transfer payment for the distribution and procurement of drugs and guns.  Defendants illegally acquired wire transfers, money transfers, credit cards, and bank cards via search engines and other online platforms to further their collective goal of furthering their RICO enterprise.  Defendants knew that these online purchases were illegally made.

271.   Additionally, Defendants agreed that Defendants should facilitate these fraudulent purchases over interstate wires in furtherance of the fraud.  Sex workers and prostitutes nationwide have received payment from Defendants.

272.   In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants, either individually or in combination with themselves, used or caused to be used interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343.

273.   Defendants could not have furthered their fraud without the ability to use telecommunications to share information with clients and retailers nationwide.  Because Defendants needed to communicate with clients and retailers around the country, using interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable.

274.   Plaintiffs have been damaged in their business or property because Defendants violated 18 U.S.C. § 1962(a), (c)-(d)), and, therefore, he is entitled to recover the damages and other remedies enumerated therein.

275.   Defendants' acts or omissions were actuated by actual malice and a willful and wanton disregard for the consequences suffered by Plaintiff and with knowledge of a high degree of probability of harm to Plaintiff and reckless indifference to the consequences of their acts or omissions.

276.   Compensatory damages alone will be insufficient to deter such conduct in the future.  There needs to be a criminal referral to the United States Justice Department, as well as to the States Attorney General's Office.

**WHEREFORE,** Plaintiff requests that the Court issue an Order and grant Judgment to the Plaintiffs as follows:

    a.  Granting Plaintiff statutory, common law, and punitive damages, and applicable pre- and post-judgment interest, in full recompense for damages;[42]

    b.  Entering judgment according to the declaratory relief sought;

    c.  Granting Plaintiff such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

    d.  Granting Plaintiff an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

### SECOND CAUSE OF ACTION
### SEXUAL ASSAULT AND SEXUAL HARASSMENT
### (against Mr. Combs)

277.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

278.   As described above, Mr. Combs frightened and placed Plaintiff in apprehension of harm when he physically and sexually assaulted him from October 2022 to October 2023 in Mr. Combs' home in Miami, New York, the United States Virgin Islands, and Los Angeles.

279.   Mr. Combs forcibly touched and attempted and/or threatened to touch Plaintiff's intimate areas and/or touched Plaintiff with his own intimate body parts.

280.   Mr. Combs violently gripped and palmed Mr. Jones' anus and crotch without consent.  Mr. Combs forced Mr. Jones to work in Mr. Combs' bathroom and watch Mr. Combs as he showered.  Mr. Combs forced Mr. Jones to work in the studio while Mr. Combs stripped naked to get his body massaged.  Mr. Combs forced Mr. Jones to work while Mr. Combs walked around naked.

281.   As a result of Mr. Combs' conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which he is entitled to an award of monetary damages and other relief.

---

[42] Damages shall include, but not limited to, all damages permitted under the New Jersey Racketeer Influenced and Corrupt Organizations Act.

282.   Mr. Combs' conduct described above was willful, wanton, and malicious.  At all relevant times, Mr. Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## THIRD CAUSE OF ACTION
### SEXUAL ASSAULT
### (against Jane Doe 1 (Yung Miami's Cousin))

283.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

284.   As described above, Jane Doe 1 frightened and placed Plaintiff in apprehension of harm when she physically and sexually assaulted him on Thanksgiving Day, 2022, in Mr. Combs's home in Miami, Florida.

285.   Jane Doe 1 forcibly touched and attempted and/or threatened to touch Plaintiff's intimate areas and/or touched Plaintiff with her own intimate body parts.  Jane Doe 1 used her mouth and performed oral sex on Plaintiff while he was urinating in the restroom.  The Plaintiff fought her off while Mr. Combs and his associates sat outside loudly laughing.  Jane Doe 1 then followed Mr. Jones outside of the restroom and began undressing in front of Mr. Combs and his associates, straddled Mr. Jones, and attempted to have forced sexual intercourse with him.

286.   As a result of Jane Doe 1's conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which he is entitled to an award of monetary damages and other relief.

287.   The conduct of Jane Doe 1 described above was willful, wanton, and malicious.  At all relevant times, Jane Doe 1 acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that her conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

69

## FOURTH CAUSE OF ACTION
### PREMISES LIABILITY FOR THE SEXUAL ASSAULT COMMITTED BY
### JANE DOE 1 (YUNG MIAMI'S COUSIN)
#### (against Mr. Combs)

288.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

289.   Mr. Jones was sexually assaulted by Jane Doe 1 in Miami, Florida, on Thanksgiving 2022. Mr. Combs was present while Mr. Jones was being assaulted by Jane Doe 1.  Mr. Jones was legally on the premises as a guest and invitee of Mr. Combs.  Jane Doe 1 was legally on the premises as a guest and invitee of Mr. Combs.  Mr. Combs owned the premises and had dominion and control over the premises where Mr. Jones was harmed.  Mr. Combs had dominion and control over the actions of Jane Doe 1 and failed to step in and stop Jane Doe 1 from sexually assaulting Mr. Jones.

290.   As the property owner, Mr. Combs had a duty to protect Mr. Jones from the harm he suffered at the hands of Jane Doe 1.  Mr. Combs breached his duty when he failed to stop Jane Doe 1 from sexually assaulting Mr. Jones.  In furtherance of this breach, Mr. Combs was laughing and encouraging Jane Doe 1 to continue her assault on Mr. Jones.  Mr. Jones has suffered immensely because of Mr. Combs' intentional breach of his duty to him.

291.   As a result of Mr. Combs's breach of his duty, Mr. Jones has suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages, for which he is entitled to an award of monetary damages and other relief.

292.   Mr. Combs's conduct described above was willful, wanton, and malicious.  At all relevant times, Mr. Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION
### PREMISES LIABILITY FOR THE SEXUAL ASSAULT COMMITTED
### BY CUBA GOODING, JR.
#### (against, Mr. Combs)

293.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

294.   Here, Mr. Jones was sexually assaulted by Cuba Gooding Jr. on a yacht rented by Mr.
Combs in the US Virgin Islands in January 2023.   Mr. Combs was present while Cuba
Gooding Jr. was assaulting Mr. Jones.   Mr. Jones was legally on the premises as a guest and
invitee of Mr. Combs.   Cuba Gooding Jr was legally on the premises as a guest and invitee of
Mr. Combs.   Mr. Combs owned (through renting) the premises and had dominion and control
over the premises where Mr. Jones was harmed.   Mr. Combs had dominion and control over
the actions of Cuba Gooding Jr and failed to step in and stop Cuba Gooding Jr from sexually
assaulting Mr. Jones.

295.   As the owner of the property, Mr. Combs had a duty to protect Mr. Jones from the harm he
suffered at the hands of Cuba Gooding Jr.   Mr. Combs breached his duty when he failed to
stop Cuba Gooding Jr from sexually assaulting Mr. Jones.   In furtherance of this breach, Mr.
Combs encouraged Cuba Gooding Jr to continue his assault on Mr. Jones when he said that
Cuba Gooding Jr should privately get to know Mr. Jones better.   Mr. Jones has suffered
immensely because of Mr. Combs's intentional breach of his duty to him.

296.   As a result of Mr. Combs' breach of his duty, Mr. Jones has suffered and continues to suffer
harm, including severe emotional distress, anxiety, and other consequential damages, for
which he is entitled to an award of monetary damages and other relief.

297.   Mr. Combs' conduct described above was willful, wanton, and malicious.   At all relevant
times, Mr. Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with
the knowledge of or with reckless disregard for the fact that his conduct was certain to cause
injury to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to
Plaintiff.   By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## SIXTH CAUSE OF ACTION
## TRAFFICKING AND VICTIMS' PROTECTION ACT
### (against, Defendants Sean Combs, Justin Combs, Kristina Khorram, And Combs Global)

298.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set
forth fully herein.

299.   Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knowingly
and intentionally participated in, perpetrated, assisted, supported, and facilitated a sex-

trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

300.  Among other things, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Mr. Jones, as well as other Class Members, knowing that Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Mr. Jones, as well as others, some of whom were under the age of seventeen, to engage in commercial sex acts.

301.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global and its employees had actual knowledge that they were perpetrating and facilitating Mr. Combs' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Mr. Jones as well as others who were under the age of seventeen, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

302.  Despite such knowledge, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global intentionally paid for, facilitated, perpetrated, and participated in Mr. Combs' violations of 18 U.S.C. § 1591(a)(1), which Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knew, and were in reckless disregard of the fact that Mr. Combs would coerce, defraud, and force Mr. Jones to engage in commercial sex acts.

303.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's actions were in and affecting interstate and foreign commerce, including its music distributing and publishing activities which were in and affecting interstate and foreign commerce.

304.  By taking the concrete steps alleged in this complaint, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knowingly participated in sex trafficking and furthered the Combs' sex-trafficking venture.  The concrete steps constituted taking part in the sex-trafficking venture and were necessary for its success.  The concrete steps constituted active engagement by Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global in Mr. Combs's sex-trafficking venture.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global knew that its active engagement would lead to and cause coercive commercial sex trafficking.

305.  As part of perpetrating TVPA violations, between on or about September 12, 2022, and through about November 2023, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global concealed its delivery of hundreds of thousands of dollars in cash to Mr. Combs and his associates.

306.  In addition to perpetrating TVPA violations, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global willfully failed to file required taxes with the federal government.

307.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's affirmative conduct was committed knowing, and in reckless disregard of the facts, that Mr. Combs would use cash and the financial support provided by Defendants Love Records, Motown Records, and the Universal Music Group as a means of defrauding, forcing, and coercing sex acts from Plaintiff Jones as well as others.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's conduct was outrageous and intentional.  On or about January 2023, Justin Combs engaged in a freak-off session on a yacht with his father and sex workers.

308.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's knowing and intentional conduct has caused Mr. Jones serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

309.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's knowing and intentional conduct has caused Mr. Jones harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, to avoid incurring that harm.

310.  This case does not involve mere fraud.  Instead, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's criminal conduct in perpetrating TVPA violations was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs

73

Global's criminal conduct was directed specifically at Mr. Jones, who was the victim of Mr. Combs' sexual abuse and sex trafficking harassment.

311.    Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global's outrageous and intentional conduct in this case is part of a pattern and practice of profiting by undertaking illegal "high risk, high reward" actions.

312.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants Sean Combs, Justin Combs, Kristina Khorram, and Combs Global are liable to Mr. Jones for the damages they sustained, and reasonable attorneys' fees.

313.    By virtue of these intentional and outrageous violations of 18 U.S.C. § 1591(a)(1), 1595, Defendants Sean Combs, Justin Combs, and Kristina Khorram are liable to Mr. Jones.


**SEVENTH CAUSE OF ACTION**
**AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN**
**VIOLATION OF THE TRAFFICKING VICTIMS'**
**PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595**
**(against Defendants Lucian Charles Grainge in his capacity as CEO of UMG,**
**Motown Records, and Universal Music Group)**

314.    Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

315.    Defendants Lucian Charles Grainge in his capacity as CEO of UMG, authorized Motown Records, and Universal Music Group to enter into a general partnership agreement with Sean Combs and Love Records.   As general business partners each individual member is responsible for the actions of the partners of the partnership. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, authorized Motown Records, and Universal Music Group to provide financing to Sean Combs, and Love Records, Inc. According to the Habtemariam Declaration this financial support was supposed to pay (or reimburse) Love Records for certain of the invoiced recording costs incurred by Love Records in making The Love Album.  According to Plaintiff Jones, while the Combs Rico Enterprise was engaging in sex trafficking activities it was during the making of The Love Album.  Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group did not implement any mechanism to monitor how the Mr. Combs and Love Records, Inc. was spending the money.  As a result of their intentional or negligent failure of their duty to supervise, Defendants Lucian Charles Grainge in his

74

capacity as CEO of UMG, Motown Records, and Universal Music Group aided, abetted, and induced Sean Combs' sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

316.  The crimes that Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group aided and abetted are (1) Mr. Combs's perpetrating of coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(1), and (2) Mr. Combs' co-conspirators knowingly benefitting from coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate and foreign commerce.

317.  Mr. Combs' co-conspirators benefitted financially and received things of value from their participation in the Combs sex-trafficking venture, including payments and other compensation from Mr. Combs. The co-conspirators who benefitted financially include Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun.

318.  Under 18 U.S.C. § 2, as a result of their general business partnership with Defendant Sean Combs, and Love Records, Inc., and their failure to monitor their financing of Defendants Sean Combs and Love Records, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group are punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, counseled, commanded, induced, and procured Combs' and his co-conspirators sex-trafficking venture and sex trafficking of Plaintiff Jones, as well as others.

319.  Under 18 U.S.C. § 2, as a result of their general business partnership with Defendant Sean Combs, and Love Records, Inc., and their failure to monitor their financing of Defendants Sean Combs and Love Records, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, inducing, and procuring Combs' and his co-conspirator's sex-trafficking venture and the sex trafficking of Mr. Jones. As a consequence, Mr. Jones is a victim of Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun's criminally aided, abetted, and inducing Combs' and his co-conspirators' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2).

320.   Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing the sex-trafficking venture and the sex trafficking of Plaintiff Jones.  Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun themselves directly violated Chapter 77 by committing and perpetrating these violations.

321.   Among other things, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun aided, abetted, and induced Combs' and his co-conspirators' sex-trafficking venture and sex trafficking of Plaintiff Jones knowing that Combs and his-conspirators would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Mr. Jones to engage in commercial sex acts.

322.   By aiding, abetting, and inducing Mr. Combs' and his co-conspirators' sex-trafficking venture and sex trafficking of Plaintiff.  Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun benefited, both financially and by receiving things of value, from participating in Combs' sex-trafficking venture.

323.   Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun and its employees had actual knowledge that they were aiding, abetting, and inducing Combs' and his co-conspirators' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Mr. Jones as well as others, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.  Defendants knew, and should have known, that Mr. Combs had engaged in acts in violation of the TVPA.

324.   Despite such knowledge, and through their intentional or negligent failure to monitor how their financial support of Mr. Combs and Love Records was being spent, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group financed and aided, abetted, and induced Combs' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew or should have known if they had conducted a simple investigation, and acted in reckless disregard of the fact that, Combs would coerce, defraud, and force Mr. Jones to engage in commercial sex acts.

325.   Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's affirmative conduct of blindly financing Defendant Combs and Love Records, Inc. aided, abetted, and induced Combs'.  Their violations were committed knowingly, and in reckless disregard of the facts, that Mr. Combs would use the financial support provided by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group as a means of defrauding, forcing, and coercing sex acts from Mr. Jones.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Groups conduct was outrageous and intentional.

326.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's knowing and intentional conduct of aiding, abetting, and inducing Combs's violations has caused Mr. Jones serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

327.   Through their unchecked financial support Defendants Sean Combs, and Love Records, Inc., Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's aided, abetted, and induced Combs's violations and caused Mr. Jones harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

328.   This case does not involve mere fraud.  Instead, Defendants' criminal conduct in aiding, abetting, and inducing Combs's violations of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's criminal conduct was directed specifically at Mr. Jones, who was the victim of Mr. Combs's sexual abuse and sex trafficking organization.

329.   Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's outrageous and intentional conduct in this case is part of a

pattern and practice of Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group profiting by undertaking illegal "high risk, high reward" general business partnerships.

330.  By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group are liable to Mr. Jones for the damages he sustained and reasonable attorneys' fees.

331.  By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group are liable to Mr. Jones for punitive damages.

## EIGHT CAUSE OF ACTION
### NIED (FOR SEXUAL ASSAULT)
### (against Defendant Jane Doe 1 (Yung Miami's Cousin))

332.  Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

333.  Jane Doe 1's conduct created an unreasonable risk of causing emotional distress to Plaintiff, and Jane Doe 1 knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

334.  The Plaintiff's emotional distress was foreseeable to Jane Doe 1.

335.  As a direct and proximate result of the negligent conduct of Jane Doe 1, Plaintiff suffered and will continue to suffer severe emotional distress.

336.  Jane Doe 1's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## NINTH CAUSE OF ACTION
### NIED (FOR SEXUAL ASSAULT)
### (against Mr. Combs)

337.  Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

338.  Mr. Combs' conduct created an unreasonable risk of causing emotional distress to Plaintiff, and Plaintiff knew or should have known that such conduct was likely to result in emotional distress that might and/or would likely cause illness or bodily harm.

339.  The Plaintiff's emotional distress was foreseeable to Mr. Combs.

340.   As a direct and proximate result of the negligent conduct of Mr. Combs, Plaintiff suffered and will continue to suffer severe emotional distress.

341.   Mr. Combs' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

### TENTH CAUSE OF ACTION
### IIED (FOR SEXUAL ASSAULT)
### Defendant Jane Doe 1 (Yung Miami's Cousin)

342.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

343.   Jane Doe 1 engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

344.   The sexual assault and misconduct by Jane Doe 1 were extreme and outrageous conduct that shocks the conscience.

345.   These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

346.   As a direct and proximate result of Jane Doe 1's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

347.   The Defendant's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

### ELEVENTH CAUSE OF ACTION
### IIED (FOR SEXUAL ASSAULT)
### (against Mr. Combs)

348.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

349.   Mr. Combs engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

350.   The sexual assault and misconduct by Mr. Combs were extreme and outrageous conduct that shocks the conscience.

351.   These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

352.   As a direct and proximate result of Mr. Combs' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

353.   The Defendant's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## TWELFTH CAUSE OF ACTION
### IIED (FOR SEXUAL ASSAULT)
### (against Mr. Gooding, Jr.)

354.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

355.   Mr. Gooding, Jr. engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting him to sexual assault and misconduct.

356.   The sexual assault and misconduct by Mr. Gooding, Jr. were extreme and outrageous conduct that shocks the conscience.

357.   These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

358.   As a direct and proximate result of Mr. Gooding, Jrs' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

359.   The Defendant's conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## THIRTEENTH CAUSE OF ACTION
### NIED (FOR SEXUAL ASSAULT)
### (against Mr. Gooding, Jr.)

360.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

361.   Mr. Gooding, Jrs' conduct created an unreasonable risk of causing emotional distress to Plaintiff, and Plaintiff knew or should have known that such conduct was likely to result in emotional distress that might and/or would likely cause illness or bodily harm.

362.   The Plaintiff's emotional distress was foreseeable to Mr. Gooding, Jr.

363.   As a direct and proximate result of the negligent conduct of Mr. Gooding, Jr., Plaintiff suffered and will continue to suffer severe emotional distress.

364.   Mr. Gooding, Jr.s' conduct was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## FOURTEENTH CAUSE OF ACTION
### SEXUAL ASSAULT
### (against Mr. Gooding, Jr.)

365.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

366.   As described above, Mr. Gooding, Jr. frightened and placed Plaintiff in apprehension of harm when he physically and sexually assaulted him on a yacht chartered by Mr. Combs in the USVI.

367.   Mr. Gooding, Jr. forcibly touched and attempted and/or threatened to touch Plaintiff's intimate areas and/or touched Plaintiff with his own intimate body parts.  Mr. Gooding, Jr. used his hand and forcibly touched Plaintiff while he was in sitting on the yacht.  The Plaintiff pushed him off while Mr. Combs failed to intervene.

368.   As a result of Mr. Gooding, Jr.'s conduct, Plaintiff has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which he is entitled to an award of monetary damages and other relief.

369.   The conduct of Mr. Gooding, Jr. described above was willful, wanton, and malicious.  At all relevant times, Mr. Gooding, Jr. acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## FIFTEENTH CAUSE OF ACTION
### KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS' PROTECTION ACT, 18 U.S.C. §§ 1591(A)(2), 1595
### (against Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group)

370.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

371.   Upon information and belief, through their general business partnership with Defendants Sean Combs and Love Records, Inc., and their financing of the establishment of Love Records and the Love Album, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group knowingly and intentionally benefitted,

financially and by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2)Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, took many concrete steps to aid and participate in Mr. Combs' sex-trafficking venture. Among the concrete steps that Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, took to aid Mr. Combs was providing unfettered access to financing, which made the sex-trafficking venture possible. Providing Mr. Combs with large sums of U.S. currency caused Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, to receive the benefits detailed throughout this pleading. Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Groups, willingness to provide large sums of unchecked financing to Mr. Combs was the quid pro quo for it receiving the benefits detailed within this pleading from Mr. Combs.

372.   Upon information and belief, the financing that Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, provided was necessary for Mr. Combs to coerce Plaintiff Jones to engage in commercial sex acts. The financing directly formed part of the commercial nature of the sex acts. The financing was also a necessary and required part of Mr. Combs' recruitment of Plaintiff Jones, as well as other sex workers. By providing unchecked financing, Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew or should have known that the money would be used to fund the sex trafficking venture. Through their general business partnership with Defendants Sean Combs and Love Records, Inc., Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, actively participated in the recruitment of victims of the venture.

373.   Upon information and belief, the unchecked financing that Defendant Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, provided went far beyond providing routine partnership or compensation to a general business partner. It was far from routine for Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, to provide substantial financing throughout the years to Mr. Combs, who did not have an apparent legitimate need for such

extravagant sums.  The sheer number of "listening parties," yacht parties, and nighttime writers camp after parties, which Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, either intentionally or unintentionally funded, went far beyond normal for the music industry.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew or should have known through reasonable inquiry that they were feeding Mr. Combs sexual deviancy.  Moreover, the circumstances in which Mr. Combs requested such large amounts were far from routine and should have raised numerous "red flags"—taking it well outside routine circumstances.

374.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, provided large sums of financing to Mr. Combs, which, under the circumstances of this case, was entirely inconsistent with the ordinary duties of a record label, music group, publishing partner, or general business partnership member.

375.  Upon information and belief, the reason that Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, ignored the numerous red flags about Mr. Combs was to receive financial benefits from Mr. Combs and his sex-trafficking venture.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew that it would gain far-from-routine financial benefits by ignoring the red flags associated with Mr. Combs and by participating in his sex- trafficking venture.

    a.  Upon information and belief, among the concrete steps that Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group took to aid and participate in the Combs sex-trafficking venture were opening up numerous lines of finance for Mr. Combs's production of the Love Album. By opening these unchecked lines of finance, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, received many benefits from participating in Mr. Combs's venture.  Through their general business partnership agreement with Defendant Sean Combs and Love Records, Inc., they adopted by association the intentional acts of their general business partner, Sean Combs, and Love Records, Inc.'s affirmative conduct that caused Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group to receive those benefits.

    b.  Upon information and belief, among the concrete steps that Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, took to aid the Combs sex- trafficking venture between about 2003 -

2005, 2009-2015, and 2022 and continuing through about November 2023, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group concealed its delivery of vast sums financing (likely millions of dollars) to Mr. Combs and his associates. To benefit from the Combs sex-trafficking venture, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, willfully failed to do their due diligence and ensure that their general business partners, Defendants Sean Combs and Love Records, Inc. accurately accounted for all of the financing that they received as it relates to the establishment of Love Records, Inc., and distribution of Love Album by timely filing required tax disclosures surrounding the funding of these sex trafficking parties with the federal government, because doing so would imperil its ability to profit from the sex-trafficking venture. Due to their status as a general business partner of Defendant Combs and Love Records, Inc., Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, were equally liable for the concealment of the financial transactions caused it to receive financial benefits through the continuation of the Combs sex-trafficking venture.

c.  Upon information and belief, among the concrete steps that Defendants Lucian Charles Grainge took in his capacity as CEO of UMG, Motown Records, and Universal Music Group took to aid the Combs sex- trafficking venture was its failure to ensure that their general business partners Sean Combs and Love Records, Inc. followed AML requirements. This failure was not just passive facilitation but a deliberate omission by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group. This omission was a specific act of concealment, which allowed Combs to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented. Combs paid for his sex workers through cash payments or wire transfers.

d.  Upon information and belief, by taking the concrete steps outlined above (along with the others alleged in this complaint), Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowingly participated in sex trafficking and furthered the Combs sex-trafficking venture. The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success. The concrete steps above constituted active engagement by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group in Combs's sex- trafficking venture.

e.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Mr. Combs, with Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's knowledge, or their reckless disregard of the fact, that Combs would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiff Jones, as well as others, some of whom were under the age of seventeen, to engage in commercial sex acts.

f.  Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew, through years of

lawsuits, hush money settlements, and notice that was provided by Ms. Cassie Venture at the beginning of 2023, that Mr. Combs was engaging in sex trafficking, and that Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group was participating in a particular sex-trafficking venture—i.e., the coercive Combs sex-trafficking venture outlined above through their general business partnership deal with Defendants Sean Combs and Love Records, Inc. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's knowledge went far beyond having an abstract awareness of sex trafficking in general. Indeed, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's representatives, were present at Chalice Recording Studios and in Mr. Combs' Miami and Los Angeles homes while he was actively engaging in acts enumerated in this pleading, and the large sum of financing that Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group gave him access to. Thus, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, did not simply fail to adequately detect signs of Combs' sex trafficking; it did detect multiple signs of Combs' coercive sex-trafficking venture and continued to participate in the venture. Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew or should have known that the venture was ongoing, which was why Combs required vast sums of financing.

g. Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's actions, extend well beyond a situation of failing to train themselves and their staff about recognizing the warning signs of sex trafficking. Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's employees, did recognize the signs of Combs' sex trafficking. Upon information and belief, indeed, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's employees, knew about Combs' sex-trafficking venture. But Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, decided to continue facilitating the Combs sex-trafficking venture rather than ending its participation in the venture.

h. Upon information and belief, among the signs that Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, was facilitating Combs sex trafficking venture were those facts that came to the attention of Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group from the reporting of Cassie Ventura mentioned above.

i. Upon information and belief, among the signs that Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, was facilitating Combs' sex trafficking venture were those facts that came to the attention of Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group were those facts that came to its attention through complaints filed by Cassie Ventura of Combs' sex trafficking. Because of those complaints, Defendants Lucian Charles Grainge, in his capacity as

CEO of UMG, Motown Records, and Universal Music Group — knew to a certainty that Combs was engaged in sex trafficking.

j.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group and knew the names of many of Combs' sex trafficking/freak-off participants (Yung Miami, Daphne Joy, Stevie J, and Jade).

k.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, helped to conceal the names of Combs' victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture. Among the ways in which Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, helped to conceal the venture's existence was by failing to properly monitor or audit Sean Combs and Love Records, Inc. to ensure that the finances they provided were being used in the manner outlined in the Habtemariam Declaration, as well as ensuring that the proper accounting and tax reporting was made to the federal government. Additionally, they knew or should have known that Defendant Combs employed and empowered Faheem Muhammad to handle law enforcement and Defendant Khorram to compensate the sex workers.

l.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's concealment included failing to provide enhanced monitoring that is normally required in general business partnership agreements where one partner was providing the financing for the partnership. Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, failed to implement enhanced monitoring of Mr. Combs to ensure that the finances they provided were being used for the purpose identified in Ms. Habtemariams's Declaration. Upon information and belief, they failed to do this specifically to help conceal Combs' ongoing sex trafficking. Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew that if it implemented that enhanced monitoring, it would have to stop providing Combs with the financing he needed to run his sex-trafficking venture.

m.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's concealment included failing to ensure that their general business partners, Sean Combs and Love Records, Inc. properly reported their financial support of Mr. Combs to the federal government for tax purposes. This includes reporting all payments or wire transfers sent to Caresha Romeka Brownlee, Jade Ramey, and Daphne Joy Cervantes Narvaez.

n.   Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, had constructive knowledge of Combs' sex-trafficking venture because of specific acts by Mr. Combs that put it on notice of a particular and ongoing sex trafficking venture. Among the specific acts were Combs' use of vast sums of financing and the club love parties that representatives of UMG periodically attended; Defendant Combs had drugs and sex workers present in circumstances that should have prompted Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group and its employees to raise questions about Combs's sex-trafficking, and

or his use of the financing provided to him by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group.

o.  Also, among the specific acts giving rise to constructive knowledge were the facts that associates of Mr. Combs made numerous reimbursement requests to Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group through Mr. Combs' accountant Robin Greenhill.  The circumstances of these reimbursement requests gave Defendants notice that Mr. Combs' sex-trafficking enterprise was being funded.

p.  Upon information and belief, among the financial benefits that the Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group received for participating in and facilitating Combs' sex-trafficking venture were the affiliation and access to Mr. Combs' popularity.  Before Cassie Ventura's lawsuit was filed, Mr. Combs was a popular and highly influential figure in the music industry to whom everyone wanted to connect.  Mr. Combs was known for throwing the "best" parties.  Affiliation with and/or general business partnerships with Mr. Combs garnered legitimacy, immense success, and access to top and emerging artists, celebrities, famous athletes, political figures, musicians, and international dignitaries like British Royal and Prince Harry.   Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew first-hand the power, influence, and effect attaching themselves to Mr. Combs would have on their bottom-line and, as evidenced by their repeated general business partnership agreements with Mr. Combs from 2003-2005, 2009-2015, and 2022-2023.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, profited from their affiliation with Mr. Combs and their general business partnership, which came with unmonitored financing that may have supported his sex-trafficking enterprise.  Mr. Combs and Combs-controlled entities used the financing they received from their general business partners to facilitate their sex trafficking venture.  Mr. Combs benefited from his general business partners' apparent willful blindness through their willingness to provide large amounts of financing in suspicious circumstances and their failure to ensure that their general business partners properly reported their financing to the U.S. Federal Government.

q.  Upon information and belief, among the financial benefits that D Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group received for participating in Combs' sex-trafficking venture was the referral of business opportunities from Mr. Combs and his co-conspirators.  Access to up-and-coming artists, producers, songwriters, and creatives.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, profited from these referred business opportunities.  Mr. Combs referred business opportunities to Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group in exchange for financing his sex trafficking venture.  These referrals were a quid pro quo for Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's unchecked financing of the establishment of Love Records, Inc., and the funding and reimbursement for the invoiced expenses associated with the creation of the Love Album.

r.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowingly received financial benefits in return for its assistance, support, and facilitation of Combs' sex-trafficking venture.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew or should have known that if it stopped assisting, supporting, and facilitating Combs' sex-trafficking venture, it would no longer receive those benefits.

s.  Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knew and was in reckless disregard of the fact that it was Combs's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce (private jets, yachts, and commercial airplanes) to entice, recruit, solicit, harbor, provide, obtain, and transport young women, and young men for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

t.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group and its employees had actual knowledge that they were facilitating Combs' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and propel Mr. Jones into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion, and a combination of all these means.

u.  Upon information and belief, despite such knowledge, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group intentionally paid for, facilitated, and participated in Combs' violations of 18 U.S.C. § 1591(a)(1), which Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew, and were in reckless disregard of the fact that Combs would coerce, defraud, and force Mr. Jones to engage in commercial sex acts.

v.  Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, through its employees and agents, actively participated in the sex trafficking conspiracy and led Mr. Jones and sex workers to believe that they would be rewarded if they cooperated and acquiesced to Mr. Combs' coercive demands.

w.  Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Mr. Combs would use the financial support provided by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group as a means of defrauding, forcing, and coercing sex acts from Mr. Jones.  Defendants Lucian Charles Grainge's capacity as CEO of UMG, Motown Records, and Universal Music Group's conduct was outrageous and intentional.

x.  Upon information and belief, in addition to actual knowledge that it was participating in and facilitating the Combs sex-trafficking venture, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

y.  Upon information and belief, in exchange for facilitating and covering up Combs' commercial sex trafficking, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, received international recognition, notoriety, and praise for the establishment of Love Records, Inc., and the development and distribution of the Love Album.  This was a result of securing the Sean Combs Love Records, Inc. relationship.

z.  Facilitating and covering up Combs' sexual trafficking and misconduct was a means of obtaining economic success and promotion within the Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group hierarchy.

aa. Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowing and intentionally conduct, has caused Mr. Jones serious harm, including, without limitation, physical, psychological, emotional, financial, and reputational harm.

bb. Upon information and belief, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, knowing and intentionally conduct has caused Mr. Jones harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing a commercial sexual activity, to avoid incurring that harm.

cc. This case does not involve mere fraud.  Instead, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, 's criminal conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Groups' willful blindness to Combs' criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group's criminal conduct was directed specifically at Mr. Jones, who was the victim of Combs' sexual abuse and sex trafficking organization.

dd. Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's outrageous and intentional conduct, in this case, is part of a pattern and practice of Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group profiting by undertaking illegal "high risk, high reward" general business partnerships.

376.  By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants Lucian Charles Grainge, in his capacity as CEO of UMG, Motown Records, and Universal Music Group, is liable to Mr. Jones for the damages he sustained and reasonable attorneys' fees.

///
///
///

**SIXTEENTH CAUSE OF ACTION**
**OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM**
**PROTECTION ACT, 18 U.S.C. § 1591(d)**
**(against, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group)**

377.   Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

378.   Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group and its officers and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

379.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group thereby violated Chapter 77, Title 18. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Mr. Jones by directly resulting in him coercively being caused to engage in commercial sex acts and in other ways.

380.   Upon information and belief, Defendant Sean Combs has a well-documented history of criminal investigations.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group were on notice of Mr. Combs proclivity to criminal activity.  They knew or should have known that Mr. Combs sex-trafficking operation would or could result in a criminal investigation by State and Federal prosecutors for violating (among other laws) the TVPA.  Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group should have taken a que from the Federal Prosecutors arrest and prosecution of Jeffrey Epstein on or about July 8, 2019.  On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein.  Mr. Combs, Defendants J. Combs, Khorram

and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun all engaged in the same activities as Mr. Epstein and Ms. Maxwell. In fact, Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun may have done worse.

381. Upon information and belief, by providing financing for Mr. Combs' sex trafficking organization, and concealing its actions thereafter, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group obstructed, interfered with, and prevented the state and federal government enforcement of the TVPA against Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun. To the extent that the federal government was able to ultimately charge Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun with TVPA violations, the filing of those charges was delayed by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's actions. Because of that delay, Mr. Jones was coercively caused to engage in commercial sex acts.

382. As one example of how Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group obstructed, attempted to obstruct, interfered with, and prevented state and federal government's enforcement of the TVPA, Defendants Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group provided financial resources to Mr. Combs and so that the coercive commercial sex acts would escape the detection of state and federal law enforcement and prosecuting agencies. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group provided financial resources to further the Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun sex-trafficking venture and with the purpose of helping Mr. Combs, Defendants J. Combs, Khorram and her direct reports: Brendan Paul, Frankie Santella, and Moy Baun evade criminal liability for violating the TVPA.

383. As an example of how Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group obstructed, attempted to obstruct, interfered with, and prevented state and federal government's enforcement of the TVPA, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal

Music Group failed to ensure that their general business partners, Sean Combs and Love Records, Inc. timely and accurately reported to the federal government the required tax forms that detailed the partnership payments provided by Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group to Mr. Combs. Timely filing of these reports is required by the United States Tax code and related laws and regulations. These reports are tools that the federal government uses to detect and prosecute, among other illegal activities, sex trafficking in violation of the TVPA. By failing to ensure that their general business partner timely and accurately filed, the required tax reporting documents regarding Mr. Combs' partnership financial transactions, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group obstructed, attempted to obstruct, interfered with, and prevented the government's enforcement of the TVPA by concealing from the government's attention Mr. Combs' financing in aid of sex trafficking.

384.   By providing unchecked financial support to Mr. Combs, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group intended and knew that Mr. Combs' coercive commercial sex acts would escape the detection of law enforcement and prosecuting agencies for some period of time. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group provided financial support to further the Combs sex-trafficking venture and with the purpose of helping Mr. Combs evade criminal liability for violating the TVPA.

385.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew that Mr. Combs was high risk— specifically, high risk to violate the TVPA through continuing criminal sex trafficking activities. As evidenced by Cassie Ventura's civil complaint, she informed members of Mr. Combs parent label about the abuses he was visiting upon her, and instead of coming to her rescue, they forced her to return his calls and to return to his sex trafficking enterprise.

386.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group was aware Mr. Combs had a laundry

list of criminal charges, and barely escaped serving prison time. Upon information and belief Mr. Combs engaged in witness intimidation, and bribery to escape criminal liability for shooting Natania Reuben in the face. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group was aware that there were public allegations that Mr. Combs illegal conduct was facilitated by several named co-conspirators. They were made aware of this through complaints made my Cassie Ventura, and the lawsuit by former Diddy sex worker Jonathan Oddi. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group concealed from federal the government its numerous financial payments to Mr. Combs and Love Records, Inc. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group continued its affirmative conduct of providing financing to Mr. Combs so that he could make payments to his co-conspirators with knowledge that such transactions did not produce a clear paper trail. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by investigators and prosecuting agencies.

387. Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's relationship with Mr. Combs in providing to his sex- trafficking venture with unchecked financing went far beyond a normal (and lawful) partnership relationship. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew, and intended, that its relationship with Mr. Combs would go far beyond a normal music industry relationship. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew that its decision to go beyond a normal music relationship with Mr. Combs obstructed the ability of law enforcement and prosecuting agencies to enforce the TVPA.

388. Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction of the government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group intentionally and willfully caused Mr. Combs' commission of the

93

forcible commercial sex acts with Mr. Jones through its obstruction supporting the concealment of Mr. Combs' sex-trafficking venture. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew that Mr. Combs and his other co-conspirators would use means of force, threats of force fraud, coercion, and a combination of such means to cause Mr. Jones to engage in commercial sex acts.

389.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Mr. Combs with men, like Plaintiff Jones, young men, and young women.

390.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction has caused Mr. Jones serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

391.   Upon information and belief, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction has caused Mr. Jones harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity to avoid incurring that harm.

392.   Upon information and belief, this case does not involve mere fraud. Instead, Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group's obstruction was directed specifically at Mr. Jones who was the victim of Mr. Combs' sex trafficking organization.

393. By virtue of these violations of 18 U.S.C. § 1591(d), Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group is liable to Mr. Jones for the damages he sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Defendants Lucian Charles Grainge in his capacity as CEO of UMG, Motown Records, and Universal Music Group perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

## SEVENTEENTH CAUSE OF ACTION
### Breach of Oral Contract
### (against, Love Records, and Sean Combs)

394. Mr. Jones incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

395. Plaintiff Jones and Defendants Mr. Combs and LR had an oral contract for Mr. Jones to receive $20,000 for every song he produced on the Love Album. Mr. Combs agreed to allow Mr. Jones to keep his publishing, as well as 4 royalty points per song, and to credit him as a producer for every song that he touched, as well as credit him for each instrument he played.

396. Mr. Jones fully executed his obligations under the contract when he produced: *Deliver Me, Stay PT 1, Reachin', What's Love, Stay Awhile, Moments, Need Somebody, Homecoming*, and *Tough Love.*

397. Mr. Jones worked on the following songs: *Brought My Love, and Creepin Remix.*

398. Mr. Jones lived and traveled with Mr. Combs from September 2022 to October 2023. Through the duration of that time Mr. Combs did not compensate Mr. Jones for his time or the work he did on the above-mentioned songs. Mr. Combs also failed to provide Mr. Jones with producer credit, or 4 royalty points for all songs.

399. As a result of Mr. Combs' actions, Mr. Jones has suffered the following losses: $180,000, 4 royalty points, and producer credit for the following songs: *Deliver Me, Stay PT 1, Reachin', What's Love, Stay Awhile, Moments, Need Somebody, Homecoming*, and *Tough Love.*

400. As a result of Mr. Combs' actions, Mr. Jones has suffered the following losses: $40,000, 4 royalty points, and producer credit for the following songs: *Brought My Love, and Creepin Remix.*

401.  As a result of Mr. Combs' breach of contract, Mr. Jones has suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages for which he is entitled to an award of monetary damages and other relief.

402.  The conduct of Mr. Combs described above was willful, wanton, and malicious.  At all relevant times, Mr. Combs acted with conscious disregard for Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury to Plaintiff Jones.  By virtue of the foregoing, Plaintiff is entitled to recover punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

    a.  A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the State of New York;

    b.  An award of damages against Defendant, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

    c.  An award of damages against Defendant, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

    d.  An award of punitive damages, in an amount to be determined at Trial;

    e.  Prejudgment interest on all amounts due;

    f.  An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

    g.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: April 12, 2024
Brooklyn, New York

                    T. A. BLACKBURN LAW, PLLC.
                    By: *Tyrone A. Blackburn, Esq.*
                    Tyrone A. Blackburn, Esq.
                    Attorney for Plaintiff
                    1242 E. 80th Street, 3rd Floor
                    Brooklyn, New York 11236

96

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors.  From this point forward, you are directed to prevent "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed.  Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses.  This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information.  You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

Regarding the paper information, you are directed to preserve any emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents about the controversy, parties, or witnesses.  We expect to obtain several documents and other data from you through discovery, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in

this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this Complaint's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Dated: April 12, 2024
Brooklyn, New York

> T. A. BLACKBURN LAW, PLLC.
> By: *Tyrone A. Blackburn, Esq.*
> Tyrone A. Blackburn, Esq.
> Attorney for Plaintiff
> 1242 E. 80th Street, 3rd Floor
> Brooklyn, New York 11236

## DEMAND FOR INSURANCE COVERAGE

Defendants are demanded to provide a complete copy of their applicable insurance policies and declaration sheets demonstrating coverage within thirty (30) days of service of this Complaint.

Dated: April 12, 2024
Brooklyn, New York

> T. A. BLACKBURN LAW, PLLC.
> By: *Tyrone A. Blackburn, Esq.*
> Tyrone A. Blackburn, Esq.
> Attorney for Plaintiff
> 1242 E. 80th Street, 3rd Floor
> Brooklyn, New York 11236

98

# ATTACHMENT # A

# Standard Combs NDA



**Name**

**Date**

**Email**

This Confidentiality Agreement ("Agreement") is made and effective as of Friday, September 9, 2022 by and on behalf of ▓▓▓▓ "you"). The term "you" shall include you, your estate, each corporation and/or other business entity in which you have an ownership or beneficial interest and any and all persons and/or entities owned and/or controlled by you and/or such businesses (e.g., affiliates, employees, officers, directors, managers, accountants and agents), and all of your respective heirs, executors, representatives, administrators, employees, licensees, successors and assigns. For good and valuable consideration (collectively, "Consideration"), the receipt and sufficiency of which are hereby acknowledged by you, you hereby irrevocably agree as follows:

1. Sean "Diddy" Combs a/k/a Puff Daddy ("Artist") privacy is highly valued and all efforts will be made to maintain confidentiality with respect to all information and other material of any kind (including without limitation, the terms, conditions and existence of this Agreement) concerning and/or related to directly and/or indirectly Artist and/or any person, corporation and/or other entity related to or affiliated and/or associated with Artist personally and/or professionally (including without limitation, family members, relatives and past or present fiancés/fiancées, husbands/wives, boyfriends/girlfriends, friends and business associates) (collectively, "Artist Parties" and each an "Artist Party"), except for information or material publicly and intentionally disclosed by Artist. You hereby irrevocably agree that: (a) you shall not at any time use or disclose, directly or indirectly, to anyone any of the following information: any information acquired by you in any manner and/or by any medium or means whatsoever at any time in the past, present and/or future which concerns or in any way relates to Artist, any Artist Parties and/or Artist's business activities, entertainment activities, financial affairs and/or personal life, and all such information shall be deemed confidential, private, secret and sensitive and kept by you as confidential unless Artist otherwise advises you in writing in Artist's sole discretion; (b) any and all information described in paragraph 1(a), including, without limitation, pictures, recordings, records, documents, property, merchandise or other information related to Artist and/or the personal, professional and/or other activities of Artist or any Artist Party, whether prepared by or on behalf of you or otherwise coming into your possession, is and shall remain Artist's sole and exclusive property and shall not be disclosed, removed, sold, disseminated, copied or otherwise used and/or exploited by or on behalf of you without Artist's prior written consent; (c) without limiting the foregoing, without Artist's prior written consent (which may be withheld for any or no reason), you shall not and shall not authorize any third party to photograph, film or otherwise record: (i) any sound, likeness and/or activities of Artist and/or any Artist Parties of any kind or nature, whether personal, professional or otherwise (including without limitation, any appearance, performance and/or rehearsal by Artist); and/or (ii) any other activities during or related to any service or activity performed by Artist and/or any Artist Parties; (d) without limiting the foregoing: (i) you shall not and shall not authorize or facilitate any third party to, without Artist's prior written consent (which may be withheld for any or no reason), give any interviews (whether oral or written), write or prepare or assist in the preparation of any books or articles (whether fictional or nonfictional), make any remarks of any kind or create any other materials in any media (including without limitation, confirming and/or denying any confidential information related to Artist and/or any Artist Parties) to or for use by yourself and/or any third party (including, without limitation, print and/or broadcast media), which interviews, books, articles, remarks and/or materials concern, discuss or reference Artist and/or any Artist Parties in any manner whatsoever (all information and materials in paragraph 1(a)-(d), whether or not publicly disclosed by others, the "Prohibited Material"); (ii) you hereby irrevocably grant, convey, transfer and assign to Artist all worldwide right, title and interest (including all copyrights and any renewal, extension or similar rights) in and to any Prohibited

Material, whether or not the same are used and/or exploited and regardless of the medium involved, and Artist may register such copyright in his own name (or the name of any designee); and (iii) without limitation of any other rights or remedies of Artist and/or any Artist Parties, Artist and/or the Artist Parties shall be entitled to recover any and all monies or other benefits whatsoever received by or on behalf of you, from any and all sources, in connection with any use and/or dissemination by or on behalf of you of any confidential information and/or Prohibited Material hereunder, and any such monies or other benefits so received by or on behalf of you shall be held in trust by or on behalf of you for immediate payment to Artist and/or Artist Parties; (e) you shall not (and shall not authorize or facilitate any third party to) use and/or reference Artist and/or Artist Parties' name or identity (including your relationship with Artist and/or any Artist Party) with respect to any transaction, sale of goods or other solicitation; and (f) without limiting the foregoing, you shall not at any time defame or disparage Artist and/or the Artist Parties and/or use, disclose, disseminate or confirm, directly or indirectly, to anyone any information or material which may harm, disparage, demean or reflect negatively or poorly upon or cause injury to the reputation, character or career of Artist and/or any of the Artist Parties. The foregoing expressly includes, without limitation, communications appearing on the Internet via blogging and/or social networking sites such as Facebook, Twitter and Instagram. Without limiting the foregoing, you shall not, without Artist's prior written authorization (in Artist's sole discretion): (A) distribute, publish or permit the distribution or publication of photographs, videotapes, films, audio tapes or any other recorded sound or image or any other materials of Artist and/or Artist Parties (whether or not the same constitutes Prohibited Material); or (B) copy, excerpt or otherwise use and/or dispose of any Artist and/or Artist Parties materials, including any property or materials in your possession or control that belong to Artist and/or the Artist Parties (and/or, if such property does not belong to Artist and/or Artist Parties, which contain Prohibited Material to the extent you have not delivered and removed such Prohibited Material therefrom as required hereunder) (including, without limitation, data, documents, records, smartphones, computers, files, etc.), and that upon expiration or termination of the relationship with or in connection with Artist (or such earlier date as Artist may require), you or your legal representatives, heirs, successors or assigns shall promptly deliver possession to Artist, in good condition, any such property of Artist and/or Artist Parties and/or other records, copies, excerpts and other aforementioned materials that are in your possession or control.

2. You acknowledge that, due to the nature of the entertainment industry, any disclosure or dissemination by you of any information or material described in paragraph 1 will deprive Artist and/or the Artist Parties of the right to use such information or material. You expressly agree that, if you breach or threaten to breach paragraph 1, Artist and/or the Artist Parties would suffer immediate irreparable harm and injury which could not be adequately compensated by an award of monetary damage. In addition to all other rights or remedies available to Artist and/or the Artist Parties, Artist and/or the Artist Parties shall be entitled to injunctive relief and all other remedies provided in such event by law or equity. Such remedies shall include, without limitation, the right to prevent dissemination of any information or materials described in paragraph 1. You agree to execute any documents and take such other actions as may be reasonably requested by Artist and/or the Artist Parties to further evidence or effectuate the rights set forth in this Agreement. You hereby appoint Artist as your attorney-in-fact (which appointment is irrevocable and coupled with an interest) with full power of substitution and delegation to execute all such documents which you fail to execute within five (5) days after Artist and/or any Artist Party's request therefor.

3. The term of this Agreement and duty to keep all information confidential and not use Prohibited Material shall commence on the first date above and continue for the life of Artist plus twenty (20) years or seventy (70) years, whichever is longer.

4. You warrant and represent that: (a) you have the full right, power and authority to enter into this Agreement and be bound by the obligations herein; (b) neither the execution, delivery nor performance of this Agreement by you shall conflict with or result in a default or loss of rights under any agreement or understanding to which you or any of your affiliates is a party or by which you or any of your properties may be bound; (c) this Agreement constitutes your valid and binding obligation enforceable in accordance with its terms; and (d) you have signed this Agreement voluntarily, without duress, coercion or undue influence. This Agreement shall be deemed to have been entered into in the State of New York, and its validity, interpretation and legal effect shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely therein. The New York courts

2

only will have jurisdiction over all controversies regarding this Agreement; and any action or other proceeding which involves such a controversy will be brought solely in the courts located within the State of New York. You hereby consent to the personal jurisdiction of such court and waive any objection based on personal jurisdiction, venue or forum non conveniens. This Agreement embodies our entire agreement with respect to the subject matter hereof. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, representatives, members, owners, shareholders, licensees, designees, successors and assigns. This Agreement may not be transferred or assigned in any manner by you and any attempted transfer or assignment shall be deemed null and void. Faxed, photocopied and scanned signatures of this Agreement shall be deemed effective as originals.

5. You agree to defend, indemnify and hold Artist and the Artist Parties and their respective parents, subsidiaries, affiliates, licensees, assignees and their officers, directors, members, managers, agents, distributions and employees harmless from and against and all liabilities, damages, judgments, losses, costs and expenses (including, without limitation, reasonable counsel fees) of any kind or nature whatsoever which may be sustained or suffered by or secured against any of them, by reason of, based upon or relating to any breach of any of the provisions, representations or warranties contained herein or by virtue for any inaccuracy in or breach of the representations and warranties made by you hereunder to any third party on behalf of the Artist and/or Artist Parties; or any claim, action or proceeding asserted or instituted relating to or growing out of any such breach.

6. All covenants, terms, restrictions and provisions of this Agreement are severable. If any such covenant, term, restriction and/or other provision is held by a court or other legal forum of competent jurisdiction ("Competent Judicial Authority") to be invalid, void or unenforceable, such covenant, term, restriction or other provision shall be amended to the limited extent necessary to be valid and enforceable and the remainder of this Agreement shall remain in full force and effect. The parties acknowledge that any Competent Judicial Authority shall be empowered to modify such invalid, illegal or unenforceable covenant, term, restriction and/or other provision (if any) in accordance with this paragraph.

7. THIS IS AN IMPORTANT LEGAL DOCUMENT. You acknowledge that: (a) you have reviewed this Agreement with your legal counsel or knowingly declined the opportunity to do so; (b) your failure to review this Agreement with your legal counsel shall not impair the legally binding nature of this Agreement; and (c) you have fully read and you understand and voluntarily accept all of the terms and conditions of this Agreement. You certify that you are eighteen (18) years of age or older ACCEPTED AND AGREED, including acknowledgement of receipt of all Consideration:

Name:
Street Address:
City:
State / Province:
Postal / Zip Code:
Date: Friday, September 9, 2022

**Signature**



3

# ATTACHMENT # B

# UNITED STATES FEDERAL COURT
## SOUTHERN DISTRICT OF NEW YORK

RODNEY JONES,

Plaintiff,
v.

SEAN COMBS,
JUSTIN DIOR COMBS,
ETHIOPIA HABTEMARIAM,
LUCIAN CHARLES GRAINGE,
KRISTINA KHORRAM,
CHALICE RECORDING STUDIOS,
LOVE RECORDS,
MOTOWN RECORDS,
UNIVERSAL MUSIC GROUP,
COMBS GLOBAL ENTERPRISES,
JOHN and JANE DOES 1-10 and
ABC CORPORATIONS. 1-
10

           Defendants.

Case Number: 24-1457

DECLARATION OF
ETHIOPIA HABTEMARIAM

I, Ethiopia Habtemariam, declare according to 28 U.S.C. §1746 as follows:

1. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and, if called upon to testify as a witness, I could and would competently testify thereto.

   ***Employment History with UMG***:

2. I began my employment with Universal Music Publishing Group ("UMPG") in January 2003.

3. In or around February 2014, I was promoted to President of Urban Music/Co-Head of Creative at UMPG.

4. In or around February 2014, I was also given the titles of President of Motown Records and Executive Vice President of Capitol Music Group. In those roles, I reported directly to Steve Barnett.

1

5. In or around March 2021, I became the Chairwoman & CEO of Motown Records. At that time, Motown Records became a standalone label within UMG Recordings, Inc. ("UMG"). In that role, I reported directly to Lucian Grange.

6. I left Motown Records and the entire UMG organization in November 2022.

***Love Records***:

7. In or around May 2022, Motown Records entered into an agreement with Love Records, Inc. whereby Motown Records obtained the right to distribute one album being produced by Love Records, Inc. entitled *The Love Album*. UMG was aware of and authorized Motown Records to enter into a license agreement with Love Records.

8. To the best of my recollection, under the license agreement, Motown Records agreed to pay (or reimburse) Love Records for certain of the invoiced recording costs incurred by Love Records in making *The Love Album*.

9. I am not personally aware of any financial sponsorship by Motown Records or UMG of any Love Records listening parties or writers camps. To my knowledge, neither Motown Records nor UMG would have organized or run any listening parties or writers camps for *The Love Album* while I was at Motown.

10. I am not personally aware of any cash payments from Motown Records or UMG to Love Records or Mr. Combs. Instead, as I said, to the best of my recollection, under the license agreement, Motown Records would have paid or reimbursed Love Records only for certain invoiced recording costs.

11. Since leaving Motown Records in November 2022, I have had no involvement with Love Records.

I declare under penalty of perjury that the preceding is true and correct.

Executed on March 21, 2024

Ethiopia Habtemariam

2